# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

ANGELA JOHNSON,

        Defendant.

No. CR 01-3046-MWB

**MEMORANDUM OPINION AND ORDER REGARDING THE DEFENDANT'S MOTIONS IN ARREST OF JUDGMENT AND FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL**

———————————

## TABLE OF CONTENTS

*I. OVERVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*II. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    *A. Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        *1. Prior prosecutions of Honken* . . . . . . . . . . . . . . . 20
        *2. The disappearance of the witnesses* . . . . . . . . . . . . 21
        *3. Discovery of the murder victims' bodies* . . . . . . . . . . 22
        *4. The indictments in this case* . . . . . . . . . . . . . . . . 23
        *5. Honken's trial* . . . . . . . . . . . . . . . . . . . . . . . . 25
    *B. Significant Rulings Before And During Johnson's Trial* . . . . . . . . . 27
    *C. Johnson's Trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        *1. The charges at trial* . . . . . . . . . . . . . . . . . . . . . 32
        *2. Jury selection* . . . . . . . . . . . . . . . . . . . . . . . . 33
        *3. The "merits phase"* . . . . . . . . . . . . . . . . . . . . . . 37
        *4. The "eligibility phase"* . . . . . . . . . . . . . . . . . . . 39
        *5. The "penalty phase"* . . . . . . . . . . . . . . . . . . . . . 41
    *D. Post-Trial Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . 45

*III. THE MOTION IN ARREST OF JUDGMENT* . . . . . . . . . . . . . . . . . . . . . 48

**A. Grounds For The Motion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
**B. Timeliness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    **1.** *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . 49
    **2.** *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
**C. Failure To Charge A "Substantive Connection"** . . . . . . . . . . . . . . 52
    **1.** *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . 52
    **2.** *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
**D. Failure To Charge A Cognizable "Aiding And Abetting" Offense** . . . 56
    **1.** *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . 56
    **2.** *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**IV. THE MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL** . . . . 59
  **A. Waiver** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
  **B. Applicable Standards** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    **1.** *Judgment of acquittal* . . . . . . . . . . . . . . . . . . . . . . . 63
    **2.** *New trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
  **C. Allegedly Erroneous Pretrial Rulings** . . . . . . . . . . . . . . . . . . . . . 66
    **1.** *Ground No. 5: Denial of motions for change of venue* . . . . 66
      **a.** *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
      **b.** *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 68
      **c.** *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
    **2.** *Ground No. 11: Failure to strike and submission to the jury*
      *of legally insufficient allegations in Counts 6 through 10* . . . 72
      **a.** *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
      **b.** *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 73
      **c.** *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
    **3.** *Ground No. 21: Failure to strike the death penalty after the*
      *indictment was amended during jury selection* . . . . . . . . . 75
      **a.** *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
      **b.** *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 76
      **c.** *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
  **D. Alleged Errors During Jury Selection** . . . . . . . . . . . . . . . . . . . . 79
    **1.** *Ground No. 7: Rule 24 violates equal protection* . . . . . . . 80
      **a.** *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
      **b.** *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 80
      **c.** *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

**2.**     *Ground No. 6:   Failure to grant Johnson additional peremptory challenges* .......................... 83
    *a.*     *Background* ........................... 83
    *b.*     *Arguments of the parties* ................... 85
    *c.*     *Analysis* ............................. 85
**3.**     *Ground No. 8: Challenges for cause erroneously granted* .. 88
    *a.*     *Background* ........................... 88
        *i.*     *Prospective Juror 533* ............. 88
        *ii.*     *Prospective Juror 458* ............. 89
        *iii.*     *Prospective Juror 769* ............. 90
    *b.*     *Arguments of the parties* ................... 91
    *c.*     *Analysis* ............................. 92
        *i.*     *The standard for an "impartial" juror* ....... 92
        *ii.*     *The standard for erroneous rulings on motions to strike jurors* ..................... 93
        *iii.*     *Application of the standards* ............. 95
**4.**     *Ground No. 9: Challenges for cause erroneously denied* ... 98
    *a.*     *Jurors on whom the claim can be based* ......... 98
    *b.*     *Background* ........................... 102
        *i.*     *Prospective Juror 600* ............. 102
        *ii.*     *Prospective Juror 797* ............. 103
    *c.*     *Arguments of the parties* ................... 104
    *d.*     *Analysis* ............................. 105
**E. *Alleged Errors During The "Merits Phase"*** ................. 107
    **1.**     *Ground No. 1: Insufficiency of the "merits phase" evidence* ............................. 108
    *a.*     *Arguments of the parties* ................... 108
    *b.*     *Analysis* ............................. 113
        *i.*     *Insufficiency of the evidence on the "conspiracy murder" counts* ............ 113
        *ii.*     *Insufficiency of the evidence on the "CCE murder" counts* ................... 118
    **2.**     *Ground No. 4: The "merits" verdicts were against the weight of the evidence* ......................... 120
    **3.**     *Ground No. 13: The admission of, and argument from, evidence of Honken's guilty plea, conviction, and offense details* ............................... 121

|   |   |   |   |
|---|---|---|---|
| *a.* | *Background* . . . . . . . . . . . . . . . . . . . . . . . | 121 |
| *b.* | *Arguments of the parties* . . . . . . . . . . . . . . . . | 123 |
| *c.* | *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . | 125 |
|   | *i.* | *Applicable law* . . . . . . . . . . . . . . . . | 125 |
|   | *ii.* | *The admission of Honken's 1997 guilty plea and details of the offenses* . . . . . . . . . . . . | 128 |
|   | *iii.* | *The prosecutor's argument concerning Honken's 1997 conviction* . . . . . . . . . . . . . | 131 |
| *4.* | *Ground No. 14:  The admission of "bad acts" evidence* . . . | 133 |
| *a.* | *Background* . . . . . . . . . . . . . . . . . . . . . . . | 133 |
| *b.* | *Arguments of the parties* . . . . . . . . . . . . . . . . | 134 |
| *c.* | *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . | 135 |
|   | *i.* | *Untimeliness* . . . . . . . . . . . . . . . . . . | 135 |
|   | *ii.* | *Evidence of drug activity after the killings* . . . | 136 |
|   | *iii.* | *Other challenged evidence* . . . . . . . . . . . | 140 |
| *5.* | *Ground No. 15:  The admission of hearsay* . . . . . . . . . | 142 |
| *a.* | *Background* . . . . . . . . . . . . . . . . . . . . . . . | 142 |
| *b.* | *Arguments of the parties* . . . . . . . . . . . . . . . . | 143 |
| *c.* | *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . | 144 |
|   | *i.* | *Admissibility of statements of Nicholson and DeGeus* . . . . . . . . . . . . . . . . . . . . . . | 144 |
|   | *ii.* | *Admissibility of Honken's 1997 guilty plea* . . . | 150 |
| *6.* | *Ground No. 16:  The admission of Rick Held's testimony concerning Honken's purchase of a firearm* . . . . . . . . . . | 151 |
| *a.* | *Background* . . . . . . . . . . . . . . . . . . . . . . . | 151 |
| *b.* | *Arguments of the parties* . . . . . . . . . . . . . . . . | 152 |
| *c.* | *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . | 154 |
|   | *i.* | *"Testimonial" hearsay* . . . . . . . . . . . . . | 154 |
|   | *ii.* | *Admissibility* . . . . . . . . . . . . . . . . . . | 158 |
| *7.* | *Ground No. 17:  The admission of evidence from McNeese* . | 159 |
| *8.* | *Ground No. 22:  The admission of evidence that Johnson was the "principal" in the offenses* . . . . . . . . . . . . . . . . | 160 |
| *a.* | *Background* . . . . . . . . . . . . . . . . . . . . . . . | 161 |
| *b.* | *Arguments of the parties* . . . . . . . . . . . . . . . . | 162 |
| *c.* | *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . | 164 |
| *9.* | *Ground No. 18:  The closing argument allegedly in violation of Johnson's right against self-incrimination* . . . . . . . . . | 167 |

4

　　　　　*a.*    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . 167

　　　　　*b.*    *Arguments of the parties* . . . . . . . . . . . . . . . . . 169

　　　　　*c.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

　　　　　　　　*i.*    *Violation of the right against self-incrimination* . . . . . . . . . . . . . . . . . . . . . . 172

　　　　　　　　*ii.*    *The prosecutor's argument that Johnson may have been "the shooter"* . . . . . . . . . . . . . . . 177

　　　*10.*    *The "merits phase" jury instructions* . . . . . . . . . . . . . 178

　　　　　*a.*    *Applicable standards* . . . . . . . . . . . . . . . . . . . . . . 179

　　　　　*b.*    *Ground No. 12: The preliminary jury instructions* . . 180

　　　　　　　　*i.*    *Background* . . . . . . . . . . . . . . . . . . . . . . 180

　　　　　　　　*ii.*    *Arguments of the parties* . . . . . . . . . . . . . 182

　　　　　　　　*iii.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 184

　　　　　*c.*    *Ground No. 19: Substantive errors in the "Merits Phase" Jury Instructions* . . . . . . . . . . . . . . . . . . . 186

　　　　　　　　*i.*    *Active continuance of drug offenses* . . . . . . . 187

　　　　　　　　*ii.*    *Unanimous verdict on predicate CCE offenses* 189

　　　　　　　　*iii.*    *Lack of a buyer-seller instruction* . . . . . . . . 191

　　　　　　　　*iv.*    *Failure to instruct that the killings resulted from Johnson's conduct* . . . . . . . . . . . . . . 194

*F.*  *Alleged Errors In The "Eligibility Phase"* . . . . . . . . . . . . . . . . . . 198

　　*1.*    *Ground No. 2: Insufficiency of the evidence of "eligibility" factors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

　　　　　*a.*    *Arguments of the parties* . . . . . . . . . . . . . . . . . 199

　　　　　*b.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

　　　　　　　　*i.*    *Insufficient evidence of the "gateway aggravating factor"* . . . . . . . . . . . . . . . . 201

　　　　　　　　*ii.*    *Insufficient evidence of "planning and premeditation"* . . . . . . . . . . . . . . . . . . 203

　　*2.*    *Ground No. 4: The "eligibility phase" verdicts were against the weight of the evidence* . . . . . . . . . . . . . . . . . . . . . . 207

*G.*  *Alleged Errors In The "Penalty Phase"* . . . . . . . . . . . . . . . . . . . 208

　　*1.*    *Ground No. 3: Insufficiency of the "penalty phase" evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

　　　　　*a.*    *Arguments of the parties* . . . . . . . . . . . . . . . . . 209

　　　　　*b.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

2.    *Ground No. 4:  The "penalty phase" verdicts were against the weight of the evidence* . . . . . . . . . . . . . . . . . . . . .   212

3.    *Ground No. 20:  The death penalty should be barred by advice to Johnson from a government agent* . . . . . . . . . .   214

   a.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .   214
   b.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   216

4.    *Ground No. 23:  The admission of Mr. Vest's testimony* . . .   216

5.    *Ground No. 24:  The admission of a former clerk's testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   218

   a.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . .   218
   b.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .   219
   c.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   220

6.    *Ground No. 25:  The admission of a poem written by a murdered child's friend* . . . . . . . . . . . . . . . . . . . . . .   222

   a.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . .   222
   b.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .   223
   c.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   224

7.    *Ground No. 26:  The cross-examination of Chief Book* . . .   227

   a.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . .   227
   b.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .   228
   c.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   228

8.    *Ground No. 27:  The treatment of defense experts by the court* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   231

   a.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . .   231
   b.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .   235
   c.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   237

9.    *Grounds Nos. 34 and 22:  The prosecutor's closing argument* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   244

   a.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . .   245
   b.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .   246
   c.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   248

10.   *Ground No. 28:  Denial of motion to allocute* . . . . . . . . . .   251

11.   *Ground No. 29:  Striking the "substantial influence" mitigator* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   251

   a.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . .   252
   b.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .   252
   c.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   252

**12.**     *Ground No. 10:  Instructions and argument that mitigating factors could be given "no weight"* . . . . . . . . . . . . . . . . . 253
       *a.*      *Background* . . . . . . . . . . . . . . . . . . . . . 254
       *b.*      *Arguments of the parties* . . . . . . . . . . . . . . . . 257
       *c.*      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 259

**13.**     *Ground No. 30:  Placing the mitigators in a relatively negative light* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
       *a.*      *Background* . . . . . . . . . . . . . . . . . . . . . 263
       *b.*      *Arguments of the parties* . . . . . . . . . . . . . . . . 266
       *c.*      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 267

**14.**     *Ground No. 31:  Failure to instruct in the "penalty phase" that the jury had not found certain aggravating factors in the "eligibility phase"* . . . . . . . . . . . . . . . . . . . . . . . . . 270

**15.**     *Ground No. 33:  Plain error in the "penalty phase" verdict form regarding findings for life or death* . . . . . . . . . . . . 273
       *a.*      *Background* . . . . . . . . . . . . . . . . . . . . . 273
       *b.*      *Arguments of the parties* . . . . . . . . . . . . . . . . 275
       *c.*      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 277

**16.**     *Ground No. 36:  Prejudicial misconduct by a juror* . . . . . . 279

**17.**     *Ground No. 32:  The verdicts on numerous mitigators demonstrate juror confusion and a miscarriage of justice* . . 280
       *a.*      *Arguments of the parties* . . . . . . . . . . . . . . . . 281
       *b.*      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 285

**G.**   *Fundamental Eighth Amendment Violation* . . . . . . . . . . . . . . . . . . 289
    **1.**     *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 289
    **2.**     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

**V.   CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

7

After her separately indicted co-defendant, Dustin Honken, had been convicted as the "principal" on five capital counts of "conspiracy murder" and five capital counts of "CCE murder," in violation of 21 U.S.C. § 848(e)(1)(A), for the killings of three adults and two children, defendant Angela Johnson came to trial in April 2005 on ten capital charges of "aiding and abetting" the same killings. Johnson's trial was just as long and complicated as Honken's, and also led to convictions on all ten capital counts. However, while Honken's jury had recommended the death penalty only for the counts charging the killings of the children, Johnson's jury recommended the death penalty not only for the killings of the children, but for the killings of two of the three adults, as well. The alleged unfairness of the recommendation of a more severe sentence for the "aider and abetter" than for the "principal" for two of the killings was a dominant theme of Johnson's post-trial challenges to her convictions, and indeed, the potential for such a disparity in sentences has been a dominant theme in her arguments concerning the availability of the death penalty in her case ever since Honken was convicted as the "principal" for the same offenses. However, it is but one of thirty-eight alleged errors that Johnson contends should result in an arrest of judgment, a judgment of acquittal, or a new trial on one or more of the "merits," "eligibility," and "penalty" phases of her trial. The plethora of alleged errors explains, in part, the length and depth of the court's ruling on Johnson's post-trial motions. However, another reason is the fundamental principle that, in punishment of crimes, death is "different." *See, e.g., Gardner v. Florida*, 430 U.S. 349, 357 (1977) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *see also Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring).

## I. OVERVIEW

Defendant Angela Jane Johnson, like her separately indicted co-defendant and some time boyfriend, Dustin Honken, was charged with five counts of "conspiracy murder" and five counts of "CCE murder," in violation of 21 U.S.C. § 848(e)(1)(A), for the 1993 murders of five people who were witnesses to Honken's drug-trafficking activities, or other criminal conduct, or both.[1] Two of the murder victims were children, ages 6 and 10, who like their mother had had the misfortune to be at home when Johnson and Honken came looking for one of Honken's drug dealers whom Honken and Johnson suspected of cooperating with law enforcement officers. The two children, their mother, and the drug dealer were shot to death in one episode and buried in a single grave. A second drug dealer, who was Johnson's ex-boyfriend, and whom Honken and Johnson also suspected had or might cooperate with law enforcement officers, was shot and beaten to death in a separate episode more than three months later and buried at a different burial site. Although the police suspected Honken and Johnson in the disappearances of these five victims, the two were not indicted on capital charges until 2001, after the discovery of the victims' graves.

Honken and Johnson were indicted and tried separately, with Honken's trial first. Honken was convicted on all counts, and the jury recommended the death sentence for the capital counts charging the murders of the two children. In part because Honken had previously been convicted as a "principal" in the murders, the government elected to go to trial against Johnson only on the theory that Johnson "aided and abetted" the killings. In the "merits phase" of her trial, the jury found Johnson guilty of all ten capital counts.

---

[1] Although Johnson was also originally charged with seven non-capital crimes relating to the murders of the five witnesses and other criminal conduct, the government dismissed those non-capital counts prior to Johnson's trial.

In the "penalty phase," the jury made a binding recommendation that Johnson, like Honken, be sentenced to death, but on eight of the ten capital counts, not just four, as Honken had been. More specifically, Johnson's jury recommended death sentences for the murders of the two children, their mother, and Johnson's ex-boyfriend, but recommended a life sentence for the murder of the first drug dealer.

Johnson has filed two post-trial motions, her August 19, 2005, Motion In Arrest Of Judgment (docket no. 636), and her August 19, 2005, Motion For Judgment Of Acquittal Or For New Trial (docket no. 634). In her Motion In Arrest Of Judgment, Johnson asserts that the following two flaws require the court to set aside the verdicts against her:

| GROUNDS FOR ARREST OF JUDGMENT | |
|---|---|
| **Defendant's No.** | **Asserted Error** |
| 1. | The indictment in this matter fails to charge an offense in that an essential element of the offense is lacking from each of the counts in the indictment. Specifically, the indictment does not allege a "substantive connection" between the killings and the drug conspiracy or CCE offense charged. |
| 2. | The indictment as amended during jury selection to allege only that Angela Johnson aided and abetted the intentional killings failed to charge an offense cognizable under 21 U.S.C. § 848(e), and because of this defect, the court lacks jurisdiction. |

In her separate Motion For Judgment Of Acquittal Or For New Trial, Johnson asserts that any one of thirty-six errors or incidents that occurred before or during her trial would require the court to enter judgment of acquittal on the capital charges, strike the death penalty as an available punishment, and/or grant her an entirely new trial or, at the very least, grant her a new trial on the applicable penalties. While the court must consider

each of Johnson's thirty-six alleged errors, the court finds that Johnson has set them out in what appears to be a "stream of consciousness" order, without any apparent rhyme or reason. The court, however, finds it appropriate to consider the alleged errors chronologically, by phases of the case and trial, and then by topic or category in each phase, rather than simply in the order in which Johnson has listed them. Therefore, the court has reorganized the grounds for judgment of acquittal or new trial that Johnson raises as shown in the following chart, and will consider them in that order, although the court here states the grounds asserted essentially as Johnson stated them:

| GROUNDS FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL | | |
|---|---|---|
| PRETRIAL RULINGS | | |
| Defendant's No. | Court's No. | Asserted Error |
| 5. | 1. | The trial court erred by not granting a change of venue, thereby denying defendant her right to a fair and impartial trial. |
| 11. | 2. | The trial court erred in failing to strike legally insufficient allegations from Counts 6 through 10 as requested in defendant's December 23, 2004 motion and further erred in submitting these allegations to the jury. |
| 21. | 3. | The trial court erred in failing to strike the death penalty after the government amended the indictment during jury selection for the reasons argued in defendant's May 1, 2005 filing. |
| JURY SELECTION | | |
| Defendant's No. | Court's No. | Asserted Error |
| 7. | 1. | The peremptory challenge rule in capital cases violates equal protection and due process as argued in defendant's pretrial filings. |

| JURY SELECTION (continued) | | |
|---|---|---|
| **Defendant's No.** | **Court's No.** | **Asserted Error** |
| **6.** | **2.** | The trial court erred and denied defendant her right to a fair and impartial jury by not granting her additional peremptory challenges. |
| **8** | **3.** | The trial court erroneously struck for cause jurors 533, 458 and 769 thereby denying defendant her right to a fair trial before a fair and impartial jury comprised of a cross-section of the community in violation of the Sixth, Eighth and Fourteenth Amendments. |
| **9.** | **4.** | The trial court erroneously denied challenges for cause to jurors 52, 64, 109, 228, 293, 301, 379, 403, 495, 528, 576, 600, 617, 653, 788, 797 and 800 thereby depriving defendant her right to a fair trial before a fair and impartial jury comprised of a cross-section of the community in violation of the Sixth, Eighth and Fourteenth Amendments. |
| MERITS PHASE | | |
| **Defendant's No.** | **Court's No.** | **Asserted Error** |
| **1.** | **1.** | The evidence, when viewed in the light most favorable to the "guilt phase" verdicts, was not sufficient to establish the elements of the offenses charged beyond a reasonable doubt as required by due process. |
| **4.** | **2.** | The weight of the evidence is against the jury's verdicts and findings in each of the phases and a miscarriage of justice has occurred such that a new trial, in whole or in part, is warranted. |

| MERITS PHASE (continued) | | |
|---|---|---|
| Defendant's No. | Court's No. | Asserted Error |
| **13.** | **3.** | The evidence of Honken's guilty plea, conviction, and offense details and the government's res judicata argument that Honken's guilty plea and conviction established essential elements of the offenses charged against Angela Johnson violated Angela Johnson's due process rights, including her right to confront and cross-examine witnesses against her. |
| **14.** | **4.** | The trial court erred in allowing evidence of alleged criminal activity and other bad acts of defendant and other persons occurring after the date of the killings to be received in evidence without a limiting instruction. |
| **15.** | **5.** | The trial court erred in receiving various hearsay statements made by Greg Nicholson, Dustin Honken and Terry DeGeus in violation of the Confrontation Clause. |
| **16.** | **6.** | The trial court erred in admitting the testimony of Rick Held concerning Honken's firearm purchase and Held's conversation with an unknown female caller in violation of the Rules of Evidence and the Confrontation Clause. |
| **17.** | **7.** | The trial court and Court of Appeals erred in allowing the testimony of McNeese and the fruits of that testimony for all the reasons previously urged, including the fact that such testimony was received in violation of Johnson's Fifth and Sixth Amendment rights. |
| **22.** | **8.** | The trial court erred in failing to exclude all evidence and suggestion that defendant was the principal for the reasons argued in defendant's May 1, 2005 motion. [IDENTIFIED BY JOHNSON AS A "PENALTY PHASE" ISSUE] |

| MERITS PHASE (continued) | | |
|---|---|---|
| **Defendant's No.** | **Court's No.** | **Asserted Error** |
| **18.** | **9.** | Mr. Miller violated this court's in limine ruling concerning defendant's alleged role in the offense and violated her Fifth Amendment privilege against self incrimination during closing argument when he suggested that Angela Johnson may have been the shooter/trigger-person and when he argued that she had made no "claim of innocence" to various people who spoke to her and testified at trial. |
| **12.** | **10.b.** | The trial court denied defendant a fair trial in violation of due process by reading to the jury and providing each of the jurors with an extensive and detailed set of Preliminary Instructions. |
| **19.a.** | **10.c.i.** | The court did not adequately define that the underlying drug offenses had to have been proven to have existed before the killings and had to be actively continuing at the time of the killings; |
| **19.b.** | **10.c.ii.** | The instructions on the CCE murder failed to adequately protect defendant's right to an unanimous verdict with respect to the predicate drug offenses comprising the alleged series. |
| **19.c.** | **10.c.iii.** | The instructions on the CCE murder failed to advise the jurors properly with respect to the insufficiency of proof of a buyer-seller relationship vis-à-vis Dustin Honken. |
| **19.d.** | **10.c.iv.** | The instructions did not require that the killings result from the conduct or actions of Angela Johnson. |

| ELIGIBILITY PHASE | | |
|---|---|---|
| Defendant's No. | Court's No. | Asserted Error |
| 2. | 1. | The evidence, when viewed in the light most favorable to the "eligibility phase" verdict was not sufficient to establish those factors found by the jury beyond a reasonable doubt as required by due process. |
| 4. | 2. | The weight of the evidence is against the jury's verdicts and findings in each of the phases and a miscarriage of justice has occurred such that a new trial, in whole or in part, is warranted. |
| PENALTY PHASE | | |
| Defendant's No. | Court's No. | Asserted Error |
| 3. | 1. | The evidence when viewed in the light most favorable to the "penalty phase" verdict was not sufficient to establish the aggravators found by the jury beyond a reasonable doubt as required by due process. |
| 4. | 2. | The weight of the evidence is against the jury's verdicts and findings in each of the phases and a miscarriage of justice has occurred such that a new trial, in whole or in part, is warranted. |
| 20. | 3. | The death penalty should be barred in this case where the government's agent McNeese advised defendant that she could not receive the death penalty as part of his effort undertaken in concert with his government handlers to obtain a confession and the bodies of the five victims. To allow the death penalty to be pursued would be outrageous government conduct in violation of due process and fundamental fairness. |

| PENALTY PHASE (continued) | | |
|---|---|---|
| Defendant's No. | Court's No. | Asserted Error |
| 23. | 4. | The trial court erred in allowing the testimony of Mr. Vest as to alleged jailhouse statements of Dustin Honken because such testimony violated the Confrontation Clause, was not constitutionally reliable, and its probative value was substantially outweighed by unfair prejudice. |
| 24. | 5. | The court erred in allowing its former law clerk to testify to statements she purportedly overheard defendant make in her presence when the court itself was a witness to defendant's own letter of apology that had been misplaced or lost and where the court's remedy denied the defendant the opportunity to take the sting out of the evidence and created a false impression for the jury. |
| 25. | 6. | The court erred in allowing Robert Milbrath to read the poem of Brittany to the jury where Brittany was not a relative of any victim and such evidence was offered for its extreme emotional impact with the jury, denying defendant her due process right to a fair sentencing. |
| 26. | 7. | The court erred in allowing testimony on cross-examination of Douglas Book that clearly bore no relation to his direct examination and where the testimony concerned allegedly recorded statements of the defendant of a purportedly threatening nature that were not the subject of any prior disclosure by the government, and whose probative value was greatly outweighed by unfair prejudice, all of which denied defendant due process of law. |
| 27. | 8. | The trial court's conduct in interrupting and chastising defense experts Dr. Logan and Dr. Hutchinson sua sponte in the presence of the jury denied defendant her due process right to a fair and impartial penalty proceeding. |

| PENALTY PHASE (continued) | | |
|---|---|---|
| Defendant's No. | Court's No. | Asserted Error |
| **34.** | **9.** | During the penalty phase closing, counsel for the government engaged in prejudicial improper argument when he suggested that the statutory mitigator for no prior criminal record did not apply and was not proven because Angela Johnson just "had not been caught" and when he further argued that the defense statutory mitigator concerning victim contributory responsibility was somehow created by the defense to "blame the victims." These arguments denigrated these mitigating factors and misled the jury and denied defendant a fair penalty phase. |
| **28.** | **10.** | The trial court erred in denying defendant's motion filed on June 3, 2005 to allocate [sic: allocute] before the trial jury. |
| **29.** | **11.** | The trial court erred in striking the defense mitigating factor concerning Angela Johnson being under the substantial influence of Dustin Honken and thereby denied defendant due process. |
| **10.** | **12.** | The trial erred in instructing the venire, and allowing the prosecution to argue, that it is permissible for jurors to consider mitigating circumstances, but that they can give such mitigators that they find "no weight" if they choose to do so. This instruction violates the Eighth and Fourteenth Amendments and the Supreme Court's mandate on the issue as set out in *Eddings v. Oklahoma*, 455 U. S. 104, 114-115 (1982), *Penry v. Lynaugh*, 492 U. S. 302, 327-328 (1989) (*Penry I*), and *Penry v. Johnson*, 532 U. S. 782, 797 (2001) (*Penry II*). |

| PENALTY PHASE (continued) | | |
|---|---|---|
| **Defendant's No.** | **Court's No.** | **Asserted Error** |
| **30.** | **13.** | The court's instructional language concerning the mitigators in comparison to the instructions concerning the aggravating factors at both the eligibility and penalty phases, placed the mitigators in a comparatively negative and weaker light than the aggravators. The verdict forms invited the jury to evaluate whether the mitigators "applied" but did not have similar language for the aggravators. The instructions told the jurors that the mitigators, including statutory mitigators, were things that the defense was merely "contending" constituted mitigating factors, while the prosecution "statutory" and "gateway" aggravators were given the imprimatur of law by having such labels affixed to them by the court. The instructions constituted an impermissible negative judicial comment on the mitigating factors and an impermissible positive comment on the aggravators, and denied defendant due process of law. |
| **31.** | **14.** | The trial court erred in denying defendant's request to instruct the jury in the final penalty phase instructions that it had not found defendant to have engaged in substantial planning and premeditation with respect to the first four killings and that such finding was not subject to being revisited by the jury in their final penalty phase deliberations. In light of the evidence admitted at the third phase that was not admissible at the earlier phases, the failure to instruct deprived defendant of due process. |

| PENALTY PHASE (continued) | | |
| --- | --- | --- |
| **Defendant's No.** | **Court's No.** | **Asserted Error** |
| **33.** | **15.** | The verdict forms were plainly erroneous and in conflict with the narrative instructions. The instructions correctly told the jury that if they could not unanimously agree upon the death penalty, the court would impose a life sentence. However, the verdict form required the jury to return an unanimous verdict itself imposing a life sentence without possibility of parole. The forms of verdict only allowed a "life" verdict if the jury unanimously agreed upon a life sentence. This verdict form was in error in that it should have contained only an option for an unanimous death verdict and a second verdict form stating the jury could not unanimously agree upon a death sentence. This verdict form error denied defendant due process and her statutory right. |
| **36.** | **16.** | One juror engaged in prejudicial misconduct when he sought and received information during the week preceding penalty phase arguments concerning prison conditions for an inmate serving a sentence of life without parole and one on death row. |
| **32.** | **17.** | The verdicts on numerous mitigators are contrary to the weight of the evidence and evidence that the jury was either confused by the instructions, declined to follow the instructions or simply disregarded the evidence and rendered verdicts that evidence a miscarriage of justice, all in violation of due process. |
| EIGHTH AMENDMENT VIOLATION | | |
| **Defendant's No.** | **Court's No.** | **Asserted Error** |
| **35.** | **1.** | Imposition of the death penalty under the circumstances shown in this record would violate the Eighth Amendment. |

The government resisted both of Johnson's post-trial motions on each and every ground asserted.

The court will turn to a detailed explication of its ruling on Johnson's post-trial motions below, after a more detailed statement of the context of the "merits," "eligibility," and "penalty" verdicts on all ten counts against Johnson.

## II. INTRODUCTION

### A. Background

As with other rulings in this case, the background to defendant Johnson's motions in arrest of judgment and for judgment of acquittal or new trial begins with a survey of co-defendant Dustin Honken's prior prosecutions in this judicial district, Johnson's relationship with Honken, and a description of the charges against Johnson in this case. In addition, the court must now add a summary of the proceedings leading to Johnson's conviction and jury recommendation for death sentences on eight of the ten capital charges against her. However, specific incidents or factual circumstances may require further amplification, in the legal analysis to follow, as they become relevant to issues that Johnson raises in her post-trial motions.

#### 1.  Prior prosecutions of Honken

The genesis for the capital charges against Johnson is found in the 1993 prosecution of her then boyfriend, Dustin Honken, for drug-trafficking offenses in this district ("the 1993 case"). As the Eighth Circuit Court of Appeals concisely explained,

> In April 1993, a grand jury in the Northern District of Iowa indicted [Honken] for conspiracy to distribute methamphetamine. After the disappearance of one or more prospective prosecution witnesses, the government dismissed the indictment.

*United States v. Honken*, 184 F.3d 961, 963 (8th Cir.), *cert. denied*, 528 U.S. 1056 (1999). Thus, the first prosecution of Honken in this district did not lead to a conviction, but it did give rise to the subsequent capital prosecutions of both Honken and Johnson, as explained more fully below.

### 2. *The disappearance of the witnesses*

The witnesses whose convenient disappearance ended the 1993 prosecution against Honken were Gregory Nicholson, Lori Duncan, Duncan's two daughters, Kandi and Amber Duncan, and Terry DeGeus. Nicholson and DeGeus had both been methamphetamine dealers for Honken. At one time, Terry DeGeus had also been Angela Johnson's boyfriend—albeit in a stormy and physically abusive relationship.

The evidence at Johnson's trial showed that, after Honken was indicted in 1993, he and Johnson, who was by then Honken's girlfriend and pregnant with his daughter, became concerned that Nicholson might testify against Honken. Therefore, Honken and Johnson began a search for Nicholson, who had suddenly changed residences. Honken and Johnson eventually discovered that Nicholson had moved in with Lori Duncan and her two daughters, Kandi Duncan and Amber Duncan, ages ten and six, respectively. On or about July 25, 1993, Johnson gained entry to the Duncan's house by a ruse, followed by Honken, who was armed with a gun that Johnson had acquired for him. The evidence showed that, at least initially, Honken and Johnson used threats to the Duncans to extort a videotaped statement from Nicholson exonerating Honken of any drug-trafficking activity. However, Nicholson and the Duncans were eventually removed from the house at gunpoint, driven into the country in a car that Johnson had borrowed from her babysitter, the adults were bound, gagged, and tortured, and all four victims were shot to death. Honken and Johnson then buried these four victims in a single shallow grave.

The evidence at Johnson's trial also showed that her relationship with DeGeus had been stormy:  Johnson presented evidence at trial that DeGeus had often beaten her, including evidence of police responses to domestic abuse calls.  However, DeGeus was not killed until several months after he and Johnson had separated and Johnson had become involved in a sexual relationship with Honken.  On or about November 5, 1993, approximately seven days after a Grand Jury questioned Johnson about DeGeus's involvement in Honken's drug-trafficking activities, Johnson lured DeGeus to a meeting with Honken in a secluded location, where Honken shot DeGeus several times, then beat him with a baseball bat before he died.  DeGeus was buried in another shallow grave a few miles from the burial site of Nicholson and the Duncans.

### 3. *Discovery of the murder victims' bodies*

Law enforcement officers had always suspected that Honken and Johnson were involved in the disappearances of Nicholson, the Duncans, and DeGeus.  However, it was several years before they were able to gather enough evidence to charge either of them with crimes arising from the disappearance of these witnesses.  In the meantime, Honken was again indicted on drug-trafficking charges on April 11, 1996 ("the 1996 case"), this time with co-defendant Timothy Cutkomp.  In 1997, Honken pleaded guilty to two of the four drug-trafficking charges against him in the 1996 case, and he began serving his sentence on those charges.  *See, e.g., Honken*, 184 F.3d at 963; *see also United States v. Honken*, 2 Fed. Appx. 611, 2001 WL 66287 (8th Cir. 2001) (unsuccessful appeal of sentence).

Eventually, in 2000, Johnson was indicted in Case No. CR 00-3034-MWB for the killings of Nicholson, the Duncans, and DeGeus on non-capital charges of aiding and abetting the murder of witnesses in violation of 18 U.S.C. §§ 1512(a)(1)(A) and (C),

1512(a)(2)(A) or 1513(a)(1)(A) and (C),[2] 1111, and 2; one count of aiding and abetting the solicitation of the murder of witnesses, in violation of 18 U.S.C. §§ 373(a)(1) and 2; and one count of conspiracy to interfere with witnesses, in violation of 18 U.S.C. § 371. While she was incarcerated pending trial on these charges, a jailhouse informant named Robert McNeese convinced Johnson that he could get someone already serving a life sentence to confess to the killings, if she could give him information that would provide a credible basis for the false confession. In addition to other information about the killings, Johnson gave McNeese a map that showed where the five murder victims were buried. McNeese turned the map over to law enforcement officers. The map led law enforcement officers to the two shallow graves containing the bodies of the five murder victims. After the bodies were recovered, Johnson made an unsuccessful suicide attempt.

### 4. The indictments in this case

Following the discovery of the bodies, a Grand Jury handed down separate indictments against Honken and Johnson on August 30, 2001, charging each of them with ten capital offenses for the murders of Nicholson, the Duncans, and DeGeus. This second indictment against Johnson, in this case, Case No. CR 01-3046-MWB, charged Johnson with five counts of killing or aiding and abetting the killing of witnesses while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; and five counts of killing or aiding and abetting the killing of the same witnesses in furtherance of a continuing criminal enterprise ("CCE

---

[2]The court notes that there is no subdivision (C) to 18 U.S.C. § 1513(a)(1), nor does it appear that there ever has been. *See* 18 U.S.C.A. § 1513(a) & Historical and Statutory Notes. Notwithstanding this fact, Count 1 of the Superseding Indictment in this case, which alleges that Johnson aided and abetted the killing of Gregory Nicholson, alleges that the killing was, *inter alia*, "in violation of Title 18, United States Code, Sections . . . 1513(a)(1)(A) & (C). . . ." Superseding Indictment, Count 1.

murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. The 2001 indictment against Honken charged him with the identical capital charges as well as seven non-capital offenses that mirrored the seven non-capital charges against Johnson in the 2000 indictment in Case No. CR 00-3034-MWB.

On April 25, 2002, the government filed in both cases against Johnson its notice of intent to seek the death penalty on all of the charges relating to the murder of witnesses, that is, Counts 1 through 5 of the first indictment in Case No. CR 00-3034-MWB, and all ten of the charges in the second indictment in Case No. CR 01-3046-MWB. Those notices identified the factors that the government contended warranted the imposition of the death penalty under the applicable death-penalty statutes.

Various superseding indictments were filed in both cases against Johnson. Although the charges in the two indictments survived various challenges by Johnson, on November 15, 2004, the court granted the government's November 3, 2004, renewed motion in Case No. CR 00-3034-MWB to dismiss, without prejudice, Counts 1-5 and portions of Count 7 of the superseding indictment. The government's goal in seeking to dismiss the charges or parts of charges in question was to eliminate the need for two juries or two trials and to prevent possible error, in light of a ruling of the Eighth Circuit Court of Appeals on interlocutory appeals that certain evidence from the jailhouse informant, Robert McNeese, and other evidence developed from his evidence, *would not be* admissible as to the counts of Case No. CR 00-3034-MWB that involved the alleged murders of five witnesses, but *would be* admissible as to charges that involved the alleged murders of the same witnesses in Case No. CR 01-3046-MWB. As a result of the partial dismissal of the first indictment, the charges in Case No. CR 00-3034-MWB consisted of one count of aiding and abetting the solicitation of the murders of witnesses Timothy Cutkomp and Daniel Cobeen, in violation of 18 U.S.C. §§ 373(a)(1) and 2, and one count of conspiracy to interfere with

witnesses Cutkomp and Cobeen, in violation of 18 U.S.C. § 371, but the latter charge no longer related to the murders of Nicholson, the Duncans, and DeGeus.

Subsequently, on December 8, 2004, the government filed a Second Superseding Indictment in Case No. CR 01-3046-MWB, which essentially consolidated the remaining counts in the two separate cases into a single indictment. Then, on December 14, 2004, the government moved to dismiss the superseding indictment in Case No. CR 00-3034-MWB, because all charges against Johnson were then consolidated into a single charging document in Case No. CR 01-3046-MWB. Johnson concurred in the dismissal of that indictment on December 15, 2004. Therefore, on December 15, 2004, the court dismissed the superseding indictment in Case No. CR 00-3034-MWB, and denied as moot all motions pending it that case, leaving Case No. CR 01-3046-MWB as the only case against Johnson.

On January 11, 2005, the government moved to dismiss Counts 11 and 12 of the Second Superseding Indictment in Case No. CR 01-3046-MWB, stating that the government no longer had any intention of pursuing those charges. By order dated January 15, 2005, the court granted the government's motion to dismiss Counts 11 and 12 and also denied as moot several motions pertaining to those counts. Thus, the only charges pending against Johnson from that time through trial were the charges of "conspiracy murder" in Counts 1 through 5 and the charges of "CCE murder" in Counts 6 through 10 of the Second Superseding Indictment in Case No. CR 01-3046-MWB.

### 5. *Honken's trial*

The case against Honken came to trial first in the fall of 2004. In Honken's case, the government moved for an "anonymous" jury, and the court granted that motion. *See United States v. Honken*, 378 F. Supp. 2d 880 (N.D. Iowa 2004) (originally filed under seal) (order for anonymous jury and determining degree of "anonymity"); *United States v. Honken*, 378 F. Supp. 2d 925 (N.D. Iowa 2004) (originally filed under seal) (order

denying motion to reconsider order for anonymous jury and determining degree of "anonymity"). Therefore, jurors' names, addresses, and places of employment, and the names of spouses and their places of employment, were not disclosed to the parties, their counsel, or the public, either before or after selection of the jury panel. However, each juror's community of residence and the "nature" of his or her employment, and the "nature" of his or her spouse's employment, were disclosed to the parties, their counsel, and the public.

Jury selection began in Honken's case on August 17, 2004, and continued over twelve days until a jury was empaneled on September 8, 2004. The "merits phase" of the trial began that day and continued, usually four days a week, until the issue of Honken's guilt or innocence was submitted to the jury on October 11, 2004. The jury returned a verdict on October 14, 2004, finding defendant Honken guilty of all seven non-capital and all ten capital charges against him.

The "penalty phase" of Honken's trial on the capital charges commenced on October 18, 2004, and concluded on October 21, 2004, at which time, the jury began its "penalty phase" deliberations. An issue of improper contacts with a juror arose during the "penalty phase" deliberations. Ultimately, on October 25, 2004, the court excused one juror and substituted an alternate juror. The jury was then instructed to begin its "penalty phase" deliberations anew. On October 27, 2004, the reconstituted jury rendered its "penalty phase" verdict, finding that a sentence of life imprisonment should be imposed upon Honken for the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus, but that a sentence of death should be imposed for the murders of Amber and Kandi Duncan. The jury contact issue and the verdicts, in both the "merits phase" and the "penalty phase," garnered considerable additional media coverage, some of which mentioned Angela Johnson's alleged involvement in the killings, as well as Honken's.

On December 16, 2004, the court heard evidence in support of post-trial motions in Honken's case. The parties in Honken's case briefed his post-trial motions through the spring of 2005, during which time, Johnson's case came to trial. On July 29, 2005, approximately nine months after the conclusion of Honken's trial, and approximately two months after the conclusion of Johnson's trial, the court entered a two-hundred-six-page ruling denying Honken's post-trial motions on all grounds. *See United States v. Honken*, 381 F. Supp. 2d 936 (N.D. Iowa 2005) (ruling on defendant's post-trial motions for judgment of acquittal or new trial, including ruling on allegations of juror misconduct and jury tampering). On October 12, 2005, the court sentenced Honken to death on the charges involving the killings of Amber and Kandi Duncan and to life imprisonment on the charges involving the killings of Lori Duncan, Greg Nicholson, and Terry DeGeus. The court ordered that the execution of Honken's death sentence be carried out in Terre Haute, Indiana. Honken is now pursuing appeals from death row in Terre Haute, Indiana.

## B. *Significant Rulings Before And During Johnson's Trial*

Before and during Johnson's trial (and thus, before, during, and after Honken's trial), the court entered a number of significant rulings in Johnson's case. Many of those rulings are the subject of post-trial challenges, so that they will be summarized in pertinent portions of the present ruling. Nevertheless, the court deems it appropriate to survey the significant rulings before and during Johnson's trial here, although the survey will be by topic or category, rather than by chronology.

Johnson's challenges to the sufficiency of the pleadings in her case were addressed in the following three rulings: *United States v. Johnson*, 225 F. Supp. 2d 982 (N.D. Iowa 2002) (ruling on appeal of magistrate judge's orders regarding bill of particulars affirming magistrate judge's order that the government specify, as to the drug conspiracy counts, the

names of all known but unindicted co-conspirators, and, as to the CCE counts, all known supervisees, supervisors, managers, or organizers, and upon reconsideration, requiring that the government disclose the location(s), substance, time, place, and date of each overt act upon which the government intended to rely to prove the CCE underlying the offenses charged in Counts 6 through 10 of the second indictment); *United States v. Johnson*, 225 F. Supp. 2d 1009 (N.D. Iowa 2002) (ruling on the defendant's motion to dismiss the indictment on capital charges for failure to plead essential elements, denying the motion as to the "conspiracy murder" counts, but dismissing the "CCE murder" counts without prejudice to filing of a superseding indictment adequately pleading the essential element of the existence of the underlying CCE); *United States v. Johnson*, 377 F. Supp. 2d 686 (N.D. Iowa 2005) (order denying the defendant's motion to dismiss for failure to charge offenses owing to purported omission of "substantive connection" between killings and drug conspiracy or CCE, finding the argument waived by untimely assertion, and that the superseding indictment did adequately charge the necessary "substantive connection").

Johnson also made various constitutional and other challenges to the charges against her. *United States v. Johnson*, 239 F. Supp. 2d 897 (N.D. Iowa 2002) (ruling denying the defendant's motion to dismiss non-capital offenses on statute of limitations grounds); *United States v. Johnson*, 270 F. Supp. 2d 1060 (N.D. Iowa 2003) (ruling denying the defendant's motion to reconsider denial of motion to dismiss non-capital offenses on statute of limitations grounds); *United States v. Johnson*, 239 F. Supp. 2d 924 (N.D. Iowa 2003) (ruling denying the defendant's motion to declare death-penalty provisions of 21 U.S.C. § 848 unconstitutional, which asserted that those provisions treat "aggravating factors" as mere "sentencing factors," rather than as elements of capital offenses; that the "relaxed evidentiary standard" in the "penalty phase" of sentence determination under § 848 violates a defendant's due process, confrontation, and cross-examination rights; and that

the government's "novel" attempts to overcome the unconstitutional aspects of the statute were not permissible); *United States v. Johnson*, 378 F. Supp. 2d 1049 (N.D. Iowa 2005) (order denying the defendant's renewed motion to strike death penalty where government was no longer asserting her guilt as a "principal").

Johnson also challenged allegedly improperly acquired evidence. More specifically, she challenged use of the evidence from the jailhouse informant, Robert McNeese, as to the original, non-capital indictment, then as to the subsequent, capital indictment. While this court ruled in her favor, in substantial part, on these challenges, *see United States v. Johnson*, 196 F. Supp. 2d 795 (N.D. Iowa 2002) (ruling on the defendant's motion to suppress evidence from jailhouse informant as to indictment on non-capital offenses); *United States v. Johnson*, 225 F. Supp. 2d 1022 (N.D. Iowa 2002) (ruling on the defendant's motion to suppress evidence from jailhouse informant as to subsequent indictment on capital offenses), the Eighth Circuit Court of Appeals was less sympathetic, and overturned much of this court's rulings, thereby making the evidence from McNeese admissible with only limited restrictions. *See United States v. Johnson*, 352 F.3d 339 (8th Cir. 2003) (panel rehearing and amplification of prior decision reversing in substantial part the district court's ruling and holding, instead, that evidence obtained by McNeese before September 11, 2000, was admissible under the first indictment; that evidence obtained by McNeese on or after that date was inadmissible on the first indictment; but that all of the evidence obtained by McNeese was admissible on the second indictment), *cert. denied*, ___ U.S. ___, 125 S. Ct. 76 (2004); *United States v. Johnson*, 338 F.3d 918 (8th Cir. 2003) (first panel decision reversing the district court in substantial part). Also, Johnson sought and obtained from this court an order for return of ostensibly privileged documents inadvertently disclosed to law enforcement officers and then provided to the prosecutors. *See United States v. Johnson*, 378 F. Supp. 2d 1041 (N.D. Iowa 2005) (originally filed

under seal) (order for return to the defendant of a chronology of the defendant's life prepared by the defendant's mitigation specialist obtained by law enforcement officers when the defendant sent it to a third party improperly marked as legal mail).

Johnson, and the government as well, also challenged the admissibility of various kinds of evidence, generating several substantial pretrial rulings. *See United States v. Johnson*, 354 F. Supp. 2d 939 (N.D. Iowa 2005) (ruling on first round of pretrial motions); *United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005) (ruling on second round of pretrial motions); *United States v. Johnson*, 379 F. Supp. 2d 1005 (N.D. Iowa 2005) (ruling denying the defendant's motion to exclude evidence of identification of remains where the defendant had stipulated to identity of remains); *United States v. Johnson*, 377 F. Supp. 2d 689 (N.D. Iowa 2005) (order granting in part and denying in part the defendant's motion to exclude evidence and argument that she acted as a "principal" in the alleged killings); *United States v. Johnson* 378 F. Supp. 2d 1051 (N.D. Iowa 2005) (order on the defendant's motion to exclude hearsay testimony during the "penalty phase" on Confrontation Clause, due process clause, and statutory grounds, recognizing that "trifurcation" provides adequate protection for these constitutional rights). Several of the specific rulings in these decisions are challenged again in Johnson's post-trial motions.

Johnson's intention to assert her mental condition as a mitigating factor in the "penalty phase," if any, engendered two substantial rulings. *See United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005) (ruling on second round of pretrial motions, including ruling on the government's motion for court-ordered mental examination of the defendant) (also identified above as a ruling on the admissibility of evidence); *United States v. Johnson*, 383 F. Supp. 2d 1145 (N.D. Iowa 2005) (ruling on management of

experts, where the defendant asserted her Fifth Amendment right against self-incrimination in response to offense-specific questions).

Finally, jury and trial management issues generated substantial rulings. First, the court considered, *sua sponte*, the proper degree of case-specific questioning, if any, that is permissible in the course of life- or death-qualifying prospective jurors. *See United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005). The court also ruled that Johnson's trial would be "trifurcated" into three phases: (1) a "merits phase," to determine guilt or innocence of the charged offenses; (2) an "eligibility phase," to determine whether one "gateway aggravating factor" identified in § 848(n)(1) and one or more of the "statutory aggravating factors" in § 848(n)(2) through (12) were present; and (3) a "penalty phase," to determine whether "non-statutory aggravating factors" and "mitigating factors" were present and "'whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death.'" *See United States v. Johnson*, 362 F. Supp. 2d 1043, 1099-1111 (N.D. Iowa 2005) (quoting 21 U.S.C. § 848(k)). Subsequently, in response to Johnson's challenge to hearsay testimony during the "penalty phase" on Confrontation Clause, Due Process Clause, and statutory grounds, the court ruled that "trifurcation" provided adequate protection for these constitutional rights. *See United States v. Johnson* 378 F. Supp. 2d 1051 (N.D. Iowa 2005) (also mentioned above as a ruling on admissibility of evidence).

These rulings set the stage for Johnson's trial on the ten capital offenses charged against her.

### C. Johnson's Trial

#### 1.     The charges at trial

Johnson's case came to trial approximately five-and-one-half months after the conclusion of Honken's trial, but while post-trial motions were still pending in Honken's case. Prior to Johnson's trial, the government withdrew its allegations that Johnson was a "principal" in the murders and, instead, proceeded to trial only on the theory that Johnson "aided and abetted" each of the "conspiracy murders" and "CCE murders." *See* Government's April 29, 2005, Motion To Strike Language From Indictment (docket no. 449); Order, April 29, 2005 (docket no. 450) (granting motion to strike).

Therefore, at the time of trial, **Counts 1 through 5** of the Indictment, the "conspiracy murder" counts, charged that, on or about July 25, 1993, in the case of Nicholson and the Duncans, and on or about November 5, 1993, in the case of DeGeus, while Angela Johnson was knowingly engaging in a conspiracy to commit drug-trafficking offenses, Angela Johnson aided and abetted the intentional killings of the named individuals, and such killings resulted, all in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Somewhat more specifically, **Count 1** alleged the "conspiracy murder" of Gregory Nicholson; **Count 2** alleged the "conspiracy murder" of Lori Duncan; **Count 3** alleged the "conspiracy murder" of Kandi Duncan; **Count 4** alleged the "conspiracy murder" of Amber Duncan; and **Count 5** alleged the "conspiracy murder" of Terry DeGeus.

Similarly, **Counts 6 through 10** of the Indictment, the "CCE murder" counts, charged that, on or about July 25, 1993, in the case of Nicholson and the Duncans, and on or about November 5, 1993, in the case of DeGeus, while Johnson was working in furtherance of a "continuing criminal enterprise" (CCE), Johnson aided and abetted the intentional killings of the named individuals, and such killings resulted, also all in violation

of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Somewhat more specifically, **Count 6** alleged the "CCE murder" of Gregory Nicholson; **Count 7** alleged the "CCE murder" of Lori Duncan; **Count 8** alleged the "CCE murder" of Kandi Duncan; **Count 9** alleged the "CCE murder" of Amber Duncan; and **Count 10** alleged the "CCE murder" of Terry DeGeus.

### 2. *Jury selection*

As in Honken's case, well in advance of trial, the court authorized the use of an extensive juror questionnaire to obtain basic biographical information about each prospective juror, as well as more detailed information about the juror's views on trial-related issues, such as the death penalty. Also as in Honken's case, the court authorized Johnson's defense team to hire a jury consultant, who participated in the drafting of the juror questionnaire. Unlike Honken's jury, Johnson's jury was not "anonymous," so potential jurors in Johnson's case were asked in the juror questionnaire for some additional biographical information that had not been available in Honken's case. Nevertheless, the prospective and final jurors in Johnson's case were identified in court only by number during jury selection and other court proceedings to protect juror privacy from excessive media attention, to protect juror privacy from intrusion by other interested members of the public, and also to limit the potential for jurors to be exposed to extra-judicial information. The questionnaire was distributed to eight hundred prospective jurors.[3] If a questionnaire was returned as undeliverable, Clerk's Office personnel attempted to determine whether the prospective juror had moved or died and, if possible, would resend the questionnaire

---

[3]The questionnaire in Honken's case had been distributed to one thousand prospective jurors.

to the prospective juror. Based on directions from the court, the Clerk's Office excused jurors who could not be located.

Prior to trial, counsel for the parties reviewed the hundreds of responses to the juror questionnaires that had been returned. The parties then agreed to excuse over one-hundred-eighty prospective jurors for hardship. The remaining prospective jurors were randomly sorted into daily panels of fifteen and each juror was notified of the day on which his or her panel was to appear for preliminary jury selection. After panel assignment notices were sent out, the court excused several additional jurors for hardship based on renewed requests for excuses from service. Also, the court had directed the parties to identify those prospective jurors whom the parties agreed had professed in their questionnaires such extreme views for or against the death penalty that they obviously could not qualify for service in this death-penalty case. However, the parties did not do so before the jurors were sorted into daily panels, as the court had contemplated, but did so only after jury selection started. Consequently, many more jurors were excused by agreement, in the course of jury selection instead of before jury selection, on the basis of their obvious inability to qualify for service in this capital case. These jurors were often excused only one or two days before they were to appear with their daily panels. Therefore, despite the best efforts of Clerk's Office personnel to move willing jurors from later panels to earlier panels to fill panel vacancies created by the parties' belated agreements to excuse obviously unqualified jurors, the court and the parties often did not have "full" daily panels of fifteen potential jurors to question during jury selection.

Jury selection commenced on April 12, 2005. By agreement of the parties, the jury selection process was somewhat different than it had been in Honken's case. Specifically, each party was allocated twenty peremptory challenges for prospective trial jurors, as provided by Rule 24(b)(1) of the Federal Rules of Criminal Procedure, and three

peremptory challenges for prospective alternate jurors, as provided by Rule 24(c)(4)(C). The court denied Johnson's pretrial request for "additional" peremptory challenges or for more peremptory challenges than the government was allocated. The agreed plan was that the parties were each allocated fifteen of their twenty peremptory challenges for prospective trial jurors to be used "on the fly" at any time during jury selection, and five peremptory challenges to be "reserved" for use on the day that sufficient prospective trial jurors had been qualified. After prospective jurors on each daily panel had been questioned by both the court and the parties, as a group and individually, and any requests to strike prospective jurors for cause had been granted, the parties were allowed to use however many of their peremptory challenges they deemed necessary. The parties agreed to alternate peremptory challenges, at least until one party was satisfied, at which point the other party could continue to exercise peremptory challenges, if that party so desired. The parties also agreed to alternate which party would exercise the first peremptory challenge each day of jury selection. In this manner, selection of trial jurors was to continue until twenty-two prospective jurors were qualified, whether or not the parties had each used their fifteen "on-the-fly" peremptory challenges. The parties would then use their five "reserved" peremptory challenges each, alternating strikes, to trim the panel of twenty-two qualified trial jurors to the final twelve trial jurors.

Once sufficient trial jurors were qualified, the parties agreed that jury selection would continue with the daily panels, in the same manner, for the selection of alternate jurors. Each party was allocated three "on-the-fly" peremptory challenges for this phase of jury selection. The parties agreed to seat six alternate jurors and agreed, further, that jury selection would be completed as soon as sufficient alternate jurors had been qualified, without the exercise of any "reserved" peremptory challenges to alternate jurors.

As it turned out, Johnson had used all fifteen of her "on-the-fly" peremptory challenges at the end of the ninth day of jury selection, April 22, 2005, but not enough prospective trial jurors had been qualified at that point.[4]  The court denied Johnson's request for additional "emergency" peremptory challenges.  Therefore, jury selection continued until twenty-two trial jurors were qualified with only strikes for cause available to Johnson.  The necessary tally of trial jurors was reached on day twelve of jury selection, April 28, 2005, at which time, the government forfeited the six "on-the-fly" peremptory challenges that it had not used.[5]  Jury selection continued on day twelve for purposes of selecting alternate jurors, with the parties each rearmed with their three "on-the-fly" peremptory challenges to prospective alternate jurors.  On day thirteen, April 29, 2005, after having the chance to consider overnight how to use their "reserved" peremptory challenges, the parties each exercised those challenges to qualified prospective trial jurors, thereby selecting the final twelve trial jurors.  Selection of alternate jurors also continued that day, with the defendant exhausting her peremptory challenges to alternate jurors.  The

---

[4]More specifically, on day one (April 12, 2005), the defendant used her first and second "on-the-fly" peremptory challenges, and the government used none; on day three (April 14, 2005), the defendant used her third and fourth, and the government used its first; on day four (April 15, 2005), the defendant used her fifth and sixth, and the government used none; on day five (April 18, 2005), the defendant used her seventh, eighth, and ninth, and the government used none; on day six (April 19, 2005), the defendant used her tenth, and the government used its second and third; on day seven (April 20, 2005), the defendant used her eleventh and twelfth, and the government used its fourth; on day eight (April 21, 2005), the defendant used her thirteenth, and the government used its fifth; and on day nine (April 22, 2005), the defendant used her fourteenth and fifteenth, and the government used its sixth.

[5]On day ten (April 26, 2005), the government exercised its seventh and eighth "on-the-fly" peremptory challenges; and on day eleven (April 27, 2005), the government used its ninth.

full complement of six alternate jurors was obtained on day sixteen, May 3, 2005, without the government exhausting its peremptory challenges to prospective alternate jurors.[6]

The jurors who had been finally qualified as either trial or alternate jurors were recalled and empaneled on May 4, 2005. However, the alternate jurors were not informed of their alternate status until the end of evidence in the "merits phase."

### 3.    The "merits phase"

At the beginning of the "merits phase," on May 4, 2005, after the jury was empaneled, the court read a detailed set of Preliminary Jury Instructions. The court had prepared the Preliminary Jury Instructions after considering the submissions by the parties and after providing the parties with various draft versions of its own for the parties' review and comments. The parties were also allowed to make any final objections to the Preliminary Jury Instructions on the record before those Instructions were read to the jurors. Among other objections, the court overruled Johnson's objection that the Preliminary Jury Instructions were "a playbook for the government."

In the course of the "merits phase," during ten trial days, the government called forty-five witnesses, submitted into evidence two-hundred-twelve exhibits, and used two demonstrative exhibits. Johnson rested without calling any witnesses or submitting any exhibits or other evidence. On May 23, 2005, the court read Final Jury Instructions on

---

[6]On day twelve (April 28, 2005), after the full complement of prospective trial jurors was obtained, jury selection continued for purposes of selecting alternate jurors. On that day, the defendant used her first peremptory challenge to alternate jurors, and the government also used its first such challenge; on day thirteen (April 29, 2005), the defendant used her second and third, exhausting her peremptory challenges for prospective alternate jurors, and the government used none; and on days fourteen and fifteen (May 2 and 3, 2005, respectively), the government did not use either of its remaining peremptory challenges.

the "merits," also prepared in consultation with the parties, and the parties made their closing arguments. After the parties' arguments, the court read Final Jury Instructions on deliberations, and after identifying the alternate jurors, sent the trial jurors to deliberate at 2:57 p.m. The court then admonished and excused four of the alternate jurors until recalled, if necessary, and excused two of the alternate jurors from all further service in this case.

The jury returned a verdict on the afternoon of May 24, 2005, finding Johnson guilty of "aiding and abetting" the murders charged in all ten capital counts. More specifically, the jurors found Johnson guilty of "aiding and abetting" the "conspiracy murders" in **Counts 1 through 5**, and that each count involved a conspiracy to distribute and manufacture 100 grams or more of actual (pure) methamphetamine and to distribute and manufacture 1000 grams or more of a methamphetamine mixture. The jury also found Johnson guilty of "aiding and abetting" the "CCE murders" in **Counts 6 through 10**; that the government had proved twelve of the thirteen violations alleged to constitute the series of three or more violations that were part of the CCE;[7] and that all seven of the violations that allegedly occurred either before or both before and after the killings had, in fact, occurred either before or both before and after the killings. The jury also found that all eight persons identified by the government were the "five or more persons" acting "in concert" with Dustin Honken in the CCE, and also found that each such person was a

---

[7]The exception was number 10, an alleged violation of "[u]sing a communications facility to facilitate the commission of a felony drug offense by Dustin Honken during about September 1995." *See* Verdict Form, Counts 6 through 10, Step 2 (docket no. 527).

member of the CCE before (and in the case of Timothy Cutkomp and Angela Johnson, both before and after) the killings.[8]

Because the jury had found Johnson guilty of capital offenses, the trial continued with the "eligibility phase."

### 4.    *The "eligibility phase"*

The "eligibility phase" of Johnson's trial began and ended on May 31, 2005. No evidence was presented during this phase of the trial, only arguments by the parties and "Eligibility Phase" Instructions To The Jury by the court. The four remaining alternate jurors were again in attendance for the instructions and arguments on Johnson's "eligibility" for the death penalty, but did not participate in the jury's deliberations.

The government asserted only one of the four "gateway aggravating factors" identified in 21 U.S.C. § 848(n)(1) in the "eligibility phase," that factor being that Johnson "intentionally engaged in conduct intending that the victim[s] be killed or that lethal force be employed against the victim[s], which resulted in the death of the victim[s]." 21 U.S.C. § 848(n)(1)(C). The government asserted only the following three "statutory aggravating factors": for **Counts 1** through **10**, that Johnson "committed the offense after substantial planning and premeditation," 21 U.S.C. § 848(n)(8); for **Counts 1** and **6** (Gregory Nicholson), **2** and **7** (Lori Duncan), and **5** and **10** (Terry DeGeus), that Johnson "committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim," 21 U.S.C. § 848(n)(12); and for

_____

[8]The Verdict Form clarified that, in the case of Terry DeGeus, the jurors were to indicate whether DeGeus had been a member of the CCE before or after the killings of Nicholson and the Duncans, or both. This query did not apply to Gregory Nicholson, and the Verdict Form so indicated, because he had obviously been a member of the CCE before his murder or not at all.

Counts **3** and **8** (Kandi Duncan) and **4** and **9** (Amber Duncan), that "[t]he victim was particularly vulnerable due to . . . youth." 21 U.S.C. § 848(n)(9).

The "eligibility phase" was submitted to the jury at 10:30 a.m. on May 31, 2005, and the alternate jurors were retained at the courthouse, in a separate location from the trial jurors, in case proceedings entered the "penalty phase." The jury returned its "eligibility phase" verdict at 1:33 p.m., finding Johnson "eligible" for the death penalty on all ten capital counts. *See* "Eligibility Phase" Verdict Form (docket no. 545) (Step Three). Somewhat more specifically, the jury found that, for all ten counts, "[t]he defendant intentionally engaged in conduct intending that the victim in question be killed or that lethal force be employed against the victim, which resulted in the death of the victim." "Eligibility Phase" Verdict Form (Step One). As to "statutory aggravating factors," the jury found that "[t]he defendant committed the offense in question after substantial planning and premeditation" *only* as to Counts **5** and **10**, which charged the killing of Terry DeGeus, but did not so find for the other eight counts, which charged the killings of Nicholson and the Duncans, on which this "statutory aggravating factor" had also been asserted. The jury also found that the killings of Gregory Nicholson in **Counts 1** and **6**, Lori Duncan in **Counts 2** and **7**, and Terry DeGeus in **Counts 5** and **10**, the only killings for which this "statutory aggravating factor" was submitted, had each been committed "in an especially heinous, cruel, or depraved manner," in that each killing involved *both* "torture" and "serious physical abuse." Finally, the jury found that, in the killings of Kandi Duncan in **Counts 3** and **8**, and Amber Duncan in **Counts 4** and **9**, the only killings for which this "statutory aggravating factor" was submitted, "[t]he victim was particularly vulnerable due to her young age." "Eligibility Phase" Verdict Form, Step Two.

In light of these "eligibility" verdicts on all ten counts, Johnson's trial continued into the "penalty phase" for all ten counts.

### 5. The "penalty phase"

The "penalty phase" of Johnson's trial began immediately after the "eligibility" verdicts on the afternoon of May 31, 2005, with the reading of Preliminary "Penalty Phase" Jury Instructions, which had, again, been prepared in consultation with the parties, and the parties' opening arguments. The following day-and-a-half were devoted to presentation of the government's "penalty phase" case, which consisted of fourteen witnesses, including relatives of the victims who provided "victim impact" testimony, and thirty-four exhibits. Johnson began presenting her "penalty phase" case on the afternoon of June 2, 2005, and her case continued through the next three-and-one-half trial days. Johnson's "penalty phase" case consisted of twenty-six witnesses, including Johnson's daughter by Dustin Honken and other members of her family, and eighty-five exhibits. Scheduling problems required a hiatus in the trial until June 20, 2005, when the court read the Final "Penalty Phase" Jury Instructions and the parties presented their closing arguments. The "penalty phase" of Johnson's trial was submitted to the jury at 11:54 a.m. on June 20, 2005.

The jury returned its "penalty phase" verdict the next day, June 21, 2005, at 3:35 p.m., unanimously recommending the death penalty for the killing of Lori Duncan, as charged in **Counts 2** and **7**, Kandi Duncan, as charged in **Counts 3** and **8**, Amber Duncan, as charged in **Counts 4** and **9**, and Terry DeGeus, as charged in **Counts 5** and **10**, but recommending "[a] sentence of life imprisonment without possibility of parole"[9]

---

[9]The parties had agreed that this would be the wording of the alternative to a death sentence that would be submitted to the jury.

for the killing of Gregory Nicholson, as charged in **Counts 1** and **6**. More specifically, in Step One of the "Penalty Phase" Verdict Form (docket no. 593), concerning "non-statutory aggravating factors," the jurors rejected a finding that "[t]he defendant would be a danger in the future to the lives and safety of other persons" as to all counts, but unanimously found the other three "non-statutory aggravating factors" asserted by the government as to all counts on which they were asserted, obstruction of justice (**Counts 1** through **10**), aiding abetting multiple murders in a single episode (**Counts 1** through **8**), and injurious effect upon the victim's family (**Counts 1** through **10**).[10] In Step Two, all jurors rejected three of Johnson's "mitigating factors" as to all counts,[11] but at least one juror found each of the other eighteen "mitigating factors" expressly asserted by counsel for one or more counts, and two jurors identified Johnson's suicide attempt as an additional

---

[10]These "non-statutory aggravating factors" were phrased as follows: "The defendant obstructed justice by preventing the victim from providing testimony or information to law enforcement officers or by retaliating against the victim for cooperating with authorities"; "[t]he defendant aided and abetted the intentional killing of more than one person in a single criminal episode"; and "[t]he effect of the crime upon the victim's family was injurious." *See* "Penalty Phase" Verdict Form, Step One.

[11]The "mitigating factors" rejected by all jurors as to all counts were the following: "(1) even though Angela Johnson is guilty as an aider and abettor, her participation was relatively minor as compared to Dustin Honken's role in these murders"; "(12) Angela Johnson suffers from anxiety and depression as a result of experiences endured in childhood, and these mental conditions have hampered her ability to make intelligent, thoughtful, and wise choices in many of the important decisions in her life"; and "(19) although she is guilty of these murders, Angela Johnson was pregnant by Dustin Honken with her daughter, Marvea, at the time of the murders and, as a result, was in a disadvantaged position to resist Mr. Honken, leave him, or turn him in to authorities, which she offers as an explanation of her conduct, not as an excuse" (although the mark for this "mitigating factor" on **Count 10** could be either a zero or a numeral 6).

"mitigating factor."[12] However, no juror found "[a]ny residual or lingering doubts as

[12]The "mitigating factors" found by at least one juror for at least one count were the following: "(2) Angela Johnson does not have a prior criminal record" (six jurors for all ten counts); "(3) there is a strong maternal bond between Angela Johnson and her daughters, Alyssa and Marvea, and this mother-daughter relationship will continue to survive and flourish if Angela Johnson is sentenced to life imprisonment without possibility of parole" (twelve jurors for all ten counts); "(4) another person, Dustin Honken, who is equally or more culpable in the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus, will not be punishable by death for those murders" (three jurors for **Counts 1** and **6** for the killing of Nicholson, **Counts 2** and **7** for the killing of Lori Duncan, and **Counts 5** and **10** for the killing of DeGeus, but no jurors so found for the counts charging the killings of Amber and Kandi Duncan); "(5) two victims, Greg Nicholson and Terry DeGeus, consented to the conduct, methamphetamine manufacturing and distribution, that significantly contributed to the circumstances of their deaths" (seven jurors each for the killings of Nicholson and DeGeus in **Counts 1** and **6** and **5** and **10**, respectively, and three jurors each for the killings of Lori Duncan in **Counts 2** and **7**, Kandi Duncan in **Counts 3** and **8**, and Amber Duncan in **Counts 4** and **9**); "(6) Angela Johnson was physically and psychologically abused as a child by her mother and other adults who engaged in exorcisms, casting out of spirits, and other unusual religious practices upon her" (six jurors for all ten counts); "(7) Angela Johnson was inappropriately touched, fondled, and sexually abused by Ted Dillo during the time the Johnson family spent with the Dillos in Chanute, Kansas, when Angela Johnson was approximately nine years old" (one juror for all ten counts); "(8) if Angela Johnson is incarcerated in a federal penitentiary for life, she would not be a danger to the lives and safety of others" (six jurors for all ten counts); "(9) Angela Johnson was raised in a single-parent household by an emotionally unstable mother who subjected her children to unusual fasting practices, long periods of abandonment and physical detachment, and occasional physical abuse, resulting in Angela Johnson being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem" (five jurors for all ten counts); "(10) Angela Johnson was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, causing her great fear and traumatic stress" (four jurors for all ten counts); "(11) Angela Johnson has loving, lasting relationships with her mother, Pearl Jean Johnson, and her four siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, which will continue into old age if Angela Johnson is

(continued…)

to Angela Johnson's guilt or innocence or her role in the offenses, even though those doubts did not rise to the level of 'reasonable doubts' under the instructions given to [the

---

[12](...continued)

sentenced to life imprisonment without possibility of parole" (six jurors for all ten counts); "(13) Angela Johnson is very much loved by her daughters, Alyssa and Marvea, and that her death would have a profoundly disturbing effect on their young lives, now and for years to come" (twelve jurors for all ten counts); "(14) Angela Johnson has felt remorse for the role that she played in the deaths of Greg Nicholson, Lori Duncan, Terry DeGeus, and particularly Kandi and Amber Duncan" (three jurors each for **Counts 1** and **6** for the killing of Gregory Nicholson and **Counts 2** and **7** for the killing of Lori Duncan, five jurors each of **Counts 3** and **8** for the killing of Kandi Duncan and **Counts 4** and **9** for the killing of Amber Duncan, and four jurors for **Counts 5** and **10** for the killing of Terry DeGeus); "(15) Angela Johnson is loved and cherished by her mother, Pearl Jean Johnson, and her siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, all of whom would suffer grievously should Angela Johnson be sentenced to death" (four jurors for all ten counts); "(16) Angela Johnson has been addicted to methamphetamine for most of her adult life, a drug which has profoundly affected her judgment, her personality, her relationships, and her ability to deal with difficult self-esteem and psychological issues, which have plagued her since childhood" (four jurors for all ten counts); "(17) Angela Johnson has demonstrated that she can lead a productive, worthwhile life in prison through her kindness and helpfulness to other inmates, her interest in Bible study and religion, her artistic endeavors, and the furtherance of her education by obtaining a G.E.D. while incarcerated after having dropped out of school years earlier in the ninth grade" (twelve jurors for all ten counts); "(18) in spite of her problems with drugs, men, and her own depression, Angela Johnson has always held a steady job and has consistently worked to provide for the care and comfort of her daughters, Alyssa and Marvea" (seven jurors for all ten counts); "(20) despite her own personal problems, past drug addiction, and present incarceration, Angela Johnson has always been a good mother to her daughters, in that she communicates with them regularly, stays as active as possible in their lives, and attempts to pass on the values and beliefs that will help her daughters avoid her own fate" (twelve jurors for all ten counts); and "(21) there are other factors in Angela Johnson's background or character that mitigate in favor of a sentence of life imprisonment without possibility of parole and against the death penalty" (four jurors for all ten counts).

jurors] during the 'merits phase' of the trial," which the court had also submitted as an additional "mitigating factor." "Penalty Phase" Verdict Form, Step Two.

Consequently, absent relief on her post-trial motions, appeal, or post-conviction relief proceedings, Johnson will suffer the death penalty for the killings of Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus, but life imprisonment for the killing of Greg Nicholson.

## D. Post-Trial Proceedings

While awaiting the "penalty phase" verdict, the court extended Johnson's deadline for post-trial motions to and including July 29, 2005. *See* Minutes for June 21, 2005 (docket no. 595). Subsequently, following a hearing on another matter, the court granted Johnson a further extension to and including August 19, 2005, to file her post-trial motions. *See* Minutes for June 23, 2005 (docket no. 607); Order of June 23, 2005 (docket no. 608). On August 19, 2005, Johnson filed her Motion For Judgment Of Acquittal Or For New Trial (docket no. 634), identifying thirty-six grounds for relief from her conviction and penalties. Johnson did not accompany that motion with any supporting brief, in violation of local rules. *See* N.D. IA. L.CR.R. 47.1(a) (incorporating N.D. IA. L.R. 7.1 concerning motion procedure into criminal cases); N.D. IA. L.R. 7.1(d) (specifying that, with any motion except for those specifically excepted, "the moving party must serve and file a brief containing a statement of the grounds for the motion and citations to the authorities upon which the moving party relies"). However, she did file a separate request for an extension to and including August 29, 2005, to file such a supporting brief (docket no. 635). The court granted the requested extension, but noted that it would not set deadlines for the government's response and any reply by Johnson until Johnson's initial brief was actually filed. *See* Order of August 22, 2005 (docket no.

637). Also on August 19, 2005, Johnson filed her Motion In Arrest Of Judgment (docket no. 636), asserting two flaws in the charging documents that she asserts require relief from the judgment against her. That motion was accompanied by a brief.

After a further one-day extension of time to do so, Johnson filed her brief in support of her Motion For Judgment Of Acquittal Or New Trial on August 30, 2005 (docket no. 644). That same day, the government filed its Resistance To Defendant's Motion In Arrest Of Judgment (642). On September 1, 2005, the court set a deadline of September 30, 2005, for the government's resistance to Johnson's Motion For Judgment Of Acquittal Or New Trial, exclusive of the purported juror misconduct issue identified as Johnson's thirty-sixth ground for relief, and a deadline of October 21, 2005, for any reply by Johnson. Order of September 1, 2005 (docket no. 646). By separate order of the same date, the court established a separate briefing schedule for the purported juror misconduct issue, under which Johnson was given to and including September 12, 2005, to supplement her request for investigation and an evidentiary hearing on that issue, and the government was given to and including September 22, 2005, to file a response to the defendant's supplement.

On September 12, 2005, Johnson filed a brief concerning her request for investigation and an evidentiary hearing on her purported juror misconduct issue (docket no. 655), and the government filed a response to that brief on September 22, 2005 (docket no. 657). Johnson filed a reply in further support of her request for investigation and an evidentiary hearing on her purported juror misconduct issue on September 26, 2005 (docket no. 658).

On September 30, 2005, the government filed its Resistance To Defendant's Motion For Judgment Of Acquittal Or New Trial (docket no. 660), and Johnson filed a reply in further support of that motion on October 24, 2005 (docket no. 668). By order dated

October 19, 2005 (docket no. 665), the court denied, at least for the time being, Johnson's request for an evidentiary hearing on the alleged juror misconduct issue, and instead, set a briefing schedule on the merits of the alleged juror misconduct issue. In the same order, the court set oral arguments on *all* of the issues raised in Johnson's post-trial motions for November 16, 2005, in Sioux City, Iowa. The oral arguments were subsequently moved to Cedar Rapids, Iowa, to accommodate schedules, but without changing the scheduled date. *See* Order of November 2, 2005 (docket no. 669).

Although the October 19, 2005, order gave Johnson to and including October 31, 2005, to file a supplemental brief on the merits of her alleged juror misconduct issue, Johnson did not file any such supplemental brief. Nevertheless, the government filed its supplemental brief on the issue on November 10, 2005, on the deadline set by the court for the government's "responsive" brief. Johnson did not file a reply in further support of the alleged juror misconduct issue, either.

The government was represented in this case by Assistant United States Attorney C.J. Williams in Cedar Rapids, Iowa, and Assistant Iowa Attorney General Thomas Henry Miller in Des Moines, Iowa, who appeared as a Special Assistant United States Attorney in this case. At the oral arguments on November 16, 2005, Mr. Williams presented the government's arguments. Defendant Angela Johnson was represented in this case by Alfred E. Willett of Terpstra, Epping & Willett in Cedar Rapids, Iowa; Dean A. Stowers of Rosenberg, Stowers & Morse in Des Moines, Iowa; and Patrick J. Berrigan of Watson & Dameron, L.L.P., in Kansas City, Missouri. At the oral arguments on November 16, 2005, defendant Johnson was personally present and all of her counsel contributed to the oral arguments.

Johnson's post-trial motions are now fully submitted. The court will consider each of Johnson's challenges to her conviction in turn, beginning with the issues raised in her

August 19, 2005, Motion In Arrest Of Judgment (docket no. 636). The court will then turn to the issues raised in Johnson's separate August 19, 2005, Motion For Judgment Of Acquittal Or For New Trial (docket no. 634).

## III. THE MOTION IN ARREST OF JUDGMENT

### A. Grounds For The Motion

Rule 34 of the Federal Rules of Criminal Procedure provides for a motion in arrest of judgment as follows:

> **Rule 34. Arresting Judgment**
>
> **(a) In General.** Upon the defendant's motion or on its own, the court must arrest judgment if:
>> **(1)** the indictment or information does not charge an offense; or
>> **(2)** the court does not have jurisdiction of the charged offense.
>
> **(b) Time to File.** The defendant must move to arrest judgment within 7 days after the court accepts a verdict or finding of guilty, or after a plea of guilty or nolo contendere, or within such further time as the court sets during the 7-day period.

FED. R. CRIM. P. 34. Thus, a motion in arrest of judgment "must be based upon failure of the indictment to charge an offense or upon a finding that the court was without jurisdiction of the offense." *United States v. Witted*, 454 F.2d 642, 646 (8th Cir. 1972).

In her August 19, 2005, Motion In Arrest Of Judgment (docket no. 636), Johnson contends that the indictment charging her with capital offenses failed to charge those offenses in two respects: (1) the indictment failed to charge the essential element of a "substantive connection" between the killings and the drug conspiracy or the CCE; and (2) the indictment failed to charge an offense cognizable under 21 U.S.C. § 848(e) when

it was amended during jury selection on April 29, 2005, to charge only "aiding and abetting" the killings. The court will consider each of these contentions in turn. However, the court must first consider the government's contention that Johnson's Motion In Arrest Of Judgment is untimely, because if the government is correct, this court does not have jurisdiction to consider the merits of the motion.

## B. Timeliness

### 1. Arguments of the parties

In its resistance to Johnson's Motion In Arrest Of Judgment, the government points out that Rule 34 of the Federal Rules of Criminal Procedure provides that a motion in arrest of judgment must be filed within seven days after the court accepts the verdict or within such further time as the court sets during the seven-day period. The government also points out that the verdict was returned in this case on June 21, 2005, and that, during the seven-day period following the verdict, Johnson requested, and the court granted, an extension of time to file post-trial motions pursuant to Rules 29(c) and 33(b)(2), but Johnson never requested nor received an extension of time to file a motion in arrest of judgment pursuant to Rule 34. The government contends that the deadline for filing a Rule 34 motion is jurisdictional and that, consequently, where there was no timely motion, as is the case here, the court does not have jurisdiction to consider an untimely motion. Finally, the government contends that, to the extent that there might be a conflict between the seven-day deadline in Rule 34 and the portion of Rule 12(b)(3) providing that jurisdiction of the court may be challenged at any time, that conflict is of no moment here, because Johnson claims only defects in the indictment, not that the court lacked jurisdiction. Johnson did not file a reply in support of her Motion In Arrest Of Judgment disputing the government's assertion that the motion was untimely.

## 2.    *Analysis*

The government is correct that Rule 34 expressly provides that "[t]he defendant must move to arrest judgment within 7 days after the court accepts a verdict or finding of guilty . . . or within such further time as the court sets during the 7-day period." FED. R. CRIM. P. 34(b). It is readily apparent that Johnson never expressly requested an extension of time to file a Rule 34 motion in arrest of judgment. Indeed, the minutes of the trial for June 21, 2005 (docket no. 595), reflect that the court granted Johnson's oral request for an extension of time to file post-trial motions pursuant to Rule 33(b)(2), and Johnson's subsequent oral request for a further extension referenced only Rules 29(c) and 33(b)(2). *See* Order of June 23, 2005 (docket no. 608) (granting an oral request to extend deadlines for Rule 29(c) and 33(b)(2) post-trial motions). Nevertheless, the court believes that Johnson both intended to request, and the court intended to grant, extensions to file any and all post-trial motions. *See, e.g.,* Order of June 23, 2005 (docket no. 608) (granting the defendant's oral request "for an extension of her deadline to file post-trial motions, if any," without restriction on the basis for such post-trial motions).

Moreover, Johnson asserted in her Motion In Arrest Of Judgment that, because of the failure of the indictment to charge an offense cognizable under 21 U.S.C. § 848(e), where it charged only "aiding and abetting" the intentional killings, the court "lacks jurisdiction." *See* Motion In Arrest Of Judgment (docket no. 636), 1. Although nowhere in her supporting brief did Johnson cite any authority for the proposition that the alleged defect deprived the court of jurisdiction, the court finds that the Eighth Circuit Court of Appeals has, in other contexts, held that lack of jurisdiction may be premised on a contention that the indictment, on its face, failed to charge a federal offense. *See, e.g., United States v. Pemberton*, 405 F.3d 656, 659 (8th Cir. 2005) ("Even if Pemberton's characterization of [18 U.S.C.] § 1153(a) as jurisdictional is correct, it is well settled '[i]n

50

order for a defendant who has pleaded guilty to sustain a challenge to the district court's jurisdiction, he must establish that the face of the indictment failed to charge a federal offense.'") (quoting *Mack v. United States*, 853 F.2d 585, 586 (8th Cir. 1988) (citation omitted)); *United States v. Fitzhugh*, 78 F.3d 1326, 1330 (8th Cir. 1996) ("[One] type of jurisdictional defect occurs when 'the indictment on its face fails to state an offense.'") (quoting *O'Leary v. United States*, 856 F.2d 1142, 1143 (8th Cir. 1988)), *cert. denied*, 519 U.S. 902 (1996). Thus, Johnson has made challenges to the sufficiency of the indictment that implicate the court's jurisdiction. Finally, the court finds that the time limits in Rule 34 cannot supersede the specific provision of Rule 12(b)(3) that specifies that certain motions must be made before trial, but then expressly states that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." *See* FED. R. CRIM. P. 12(b)(3)(B); *see also United States v. Wolff*, 241 F.3d 1055, 1056-67 (8th Cir. 2001) (under a prior version of the rule, "Rule 12(b)(2) provides that a challenge to the court's jurisdiction may be 'noticed by the court at any time during the pendency of the proceedings.'").

Therefore, giving Johnson the benefit of the doubt, the court finds that Johnson's Motion In Arrest Of Judgment is timely, because Johnson intended to request, and the court intended to grant, extensions of time to file any and all post-trial motions, and in the alternative, because Johnson's Rule 34 motion does challenge the jurisdiction of the court, where she alleges that the indictment failed to charge a federal offense.

### C. Failure To Charge A "Substantive Connection"

#### 1.      Arguments of the parties

As to the merits of her Motion In Arrest Of Judgment, Johnson contends that the indictment was not constitutionally sufficient, because it did not satisfy her Fifth Amendment right to be tried only upon charges found by a grand jury, where it did not allege the essential element of a "substantive connection" between the killings and the underlying drug conspiracy or CCE. Johnson points out that the indictment contains no express allegation of such a "substantive connection." Moreover, she asserts that it does not matter that this element was added by judicial interpretation rather than by the express terms of the statute. Indeed, she contends that it is for this very reason that merely tracking the language of the statute in the indictment was insufficient, because neither "engaging in" nor "in furtherance of" is sufficiently definitive to allege the essential "substantive connection" element. Similarly, she contends that proper instructions stating the "substantive connection" element did not cure the deficiency in the indictment. Johnson asserts that such a fatal flaw in the indictment as failure to allege the "substantive connection" element requires dismissal.

In response, the government contends that the indictment sufficiently pleaded the required nexus between the killings and the underlying CCE and drug conspiracy. The government asserts that this court properly ruled, when Johnson raised this issue literally on the eve of trial, that the indictment's allegations that the killings occurred while Johnson was "engaged in and working in furtherance of" the CCE and drug conspiracy adequately incorporated the concept of "substantive connection" and tracked the statutory language, and that any reasonable reading of the indictment made clear that the government was charging Johnson with murder in connection with, and not just contemporaneous to, the ongoing CCE or drug conspiracy. Moreover, the government contends that the court

properly instructed the jury that a "substantive connection" between the killings and the CCE or drug conspiracy was required and properly defined "substantive connection." Where Johnson's pretrial assertion of this defect in the indictment failed, the government contends that, when the challenge is renewed post-trial, the court must liberally construe the indictment in favor of upholding it, unless the indictment is so defective that no reasonable construction can be said to charge an offense. Where Johnson's pretrial motion was denied as both untimely and without merit, the government contends that the court should liberally construe the indictment, because her belated pretrial motion deprived the government of the opportunity to remedy any defect before jeopardy attached. Ultimately, however, the government contends that the indictment was sufficient for the reasons stated by the court. Indeed, the government points out that this court found that a "substantive connection" is an essential element of the "conspiracy murder" and "CCE murder" offenses, even though there is a split in the circuits over whether "substantive connection" is a separate element or is merely incorporated into the "while engaging in" element.

### 2. *Analysis*

As the government points out, the court has already addressed and rejected the merits of Johnson's assertion that the indictment was deficient in that it did not expressly charge the necessary "substantive connection" element in its Order of April 11, 2005 (docket no. 412) (published at *United States v. Johnson*, 377 F. Supp. 2d 686 (N.D. Iowa 2005)). Although the court reiterated in its April 11, 2005, Order the statement in its August 2002 ruling, *see United States v. Johnson*, 225 F. Supp. 2d 1022, 1058 (N.D. Iowa 2002), that a "substantive connection" between the killings and the drug conspiracy or the CCE is an essential element of a capital offense under 21 U.S.C. § 848(e)(1)(A), the court nevertheless found that Johnson's argument was waived by untimely assertion and that the superseding indictment did adequately charge the necessary "substantive connection."

More specifically, the court held that Johnson had known that a "substantive connection" is an element of the § 848 offenses charged in her case since at least this court's ruling in August of 2002; she had asserted other challenges to the § 848 offenses without raising this issue; and she was, at that time, attempting to raise the issue well after the deadline for pretrial motions in this case. The court also observed that Johnson had not asserted any "good cause" for her failure to raise the argument sooner, and the court could find none. For these reasons, the court found that the supposed deficiency of the indictment had been waived. The court reiterates these conclusions here.

Moreover, in its April 11, 2005, Order, the court also rejected Johnson's argument on the merits. In that ruling, the court relied primarily on the decision of the Eleventh Circuit Court of Appeals in *United States v. Chandler*, 996 F.2d 1073 (11th Cir. 1993), *cert. denied*, 512 U.S. 1227 (1994), to hold that the indictment in this case charged that each of the murders was committed while Johnson was "engaging in" a drug conspiracy, Second Superseding Indictment, Counts 1-5, or while "working in furtherance of" a CCE, *id.*, Counts 6-10, and as such, was sufficient, because it tracked the statutory language. *See Chandler*, 996 F.2d at 1097. This court also noted that the Eighth Circuit Court of Appeals holds that an indictment that tracks the language of a statute is sufficient. *See, e.g., United States v. Hill*, 386 F.3d 855, 859 (8th Cir. 2004) ("The indictment tracks this [statutory] language, and we fail to see how an indictment under § 922(q)(1) that tracks the statutory elements is defective."). Finally, this court reasoned that, as in *Chandler*, "any reasonable reading of the indictment makes it clear that the government was charging [Johnson] with a murder in connection with, and not just contemporaneous to, the ongoing continuing criminal enterprise [or conspiracy]." *Chandler*, 996 F.2d at 1097. Thus, as in *Chandler*, "[t]he necessary connection between the murder and the enterprise [or conspiracy] was . . . present in the indictment." *Id.* For these same reasons, the court

now reaffirms its conclusion that the indictment in this case did adequately charged the necessary "substantive connection" element.

The only "new" argument Johnson now raises is that, in some circumstances, an indictment that merely tracks the statutory language may still be insufficient, where an essential element is not included in the statutory language, citing *United States v. Opsta*, 659 F.2d 848, 849-51 (8th Cir. 1981). In *Opsta*, the court held that an indictment for involuntary manslaughter was insufficient, even though it tracked the statutory language, because it did not allege the essential element of criminal intent, where such criminal intent was not expressly stated in the statute. *See Opsta*, 659 F.2d at 850. However, this court's prior reasoning defeats this argument, as well. As this court explained in its prior ruling, and reiterates here, the indictment in this case was sufficient not just because it tracked the statutory language, but because "any reasonable reading of the indictment makes it clear that the government was charging [Johnson] with a murder in connection with, and not just contemporaneous to, the ongoing continuing criminal enterprise [or conspiracy]." *Chandler*, 996 F.2d at 1097. Thus, as in *Chandler*, "[t]he necessary connection between the murder and the enterprise [or conspiracy] was . . . present in the indictment." *Id.*

The court finds that Johnson's renewed argument that the indictment did not adequately allege a "substantive connection" between the killings and the drug conspiracy or CCE does not warrant arresting judgment, because there was no failure to charge an offense on this ground, and hence, no lack of jurisdiction. *See* FED. R. CRIM. P. 34 (standards for arrest of judgment); *Witted*, 454 F.2d at 646 (same).

## D. Failure To Charge A Cognizable "Aiding And Abetting" Offense

### 1.    Arguments of the parties

Johnson's second ground for arresting judgment in this case is that the indictment did not charge an offense cognizable under 21 U.S.C. § 848(e), once the indictment was amended to charge only "aiding and abetting" the intentional killings.  Although Johnson acknowledges that courts have held that "aiders and abettors" are liable under 21 U.S.C. § 848(e), she contends that the plain language of the statute indicates that the "aiding and abetting" statute, 18 U.S.C. § 2, is not applicable to a § 848(e) offense.  She contends that this is so, because § 848(e) parallels most of the language of § 2, but does *not* include "aiding and abetting."  Had Congress intended "aiding and abetting" liability to apply to a § 848(e) offense, Johnson argues, there would have been no reason to include the truncated language from § 2 in § 848(e), or Congress would have included *all* of the language of § 2.  Thus, Johnson asserts that there is no clear intention to impose "aiding and abetting" liability for a § 848(e) offense, and indeed, an implicit intention to the contrary.

In response, the government points out that Johnson never challenged the indictment pretrial on this ground, although she did move in limine to exclude all evidence that she acted as a principal.  The government also points out that no court has taken the position that Johnson now asserts, and indeed, all of the decisions addressing the issue are to the contrary.  Finally, the government asserts that the grand jury expressly and sufficiently charged "aiding and abetting" liability for the § 848(e) offenses.  Thus, the government contends that there is no defect in the indictment on this ground, either.

## 2.    *Analysis*

While Johnson did not raise this precise issue in a pretrial motion, she did assert in the course of preparation of "merits phase" jury instructions that she could not be held liable for "CCE murder" or "conspiracy murder" under § 848(e)(1)(A) on an "aiding and abetting" theory, because 18 U.S.C. § 2 (the "aiding and abetting" statute) does not apply to the § 848(e)(1)(A) murder offenses.  As Johnson recognized then, and the government pointed out in its resistance to her motion in arrest of judgment, the case law is against Johnson, even though other "CCE offenses" may not be subject to "aiding and abetting" liability. *See United States v. Walker*, 142 F.3d 103, 113 (2d Cir.) ("aiding and abetting liability [is] available" for CCE-murder), *cert. denied*, 525 U.S. 896 (1998); *see also United States v. Tipton*, 90 F.3d 861, 898 & n.18 (4th Cir. 1996) ("The alternative means to 'intentional killing' that are provided in § 848(e)(1)(A) as elements of the offense simply replicate—for whatever reason—the alternative means, in addition to aiding and abetting, that make one 'punishable as a principal' under the generally applicable provisions of 18 U.S.C. § 2(a)."), *cert. denied*, 520 U.S. 1253 (1997); *United States v. Villarreal*, 963 F.2d 725, 731 (5th Cir.) ("Although the plain language of the statute clearly is intended to reach 'bosses' or 'kingpins,' as Reynaldo argues, it does not follow that Congress intended aiders and abettors to be excused.  To the contrary, the language of the statute leads to the conclusion that Congress intended that aiders and abettors would be held criminally liable under the statute."), *cert. denied*, 506 U.S. 927 (1992); *United States v. Pietra*, 795 F. Supp. 546, 554-55 (E.D.N.Y. 1992) (noting that the Second Circuit Court of Appeals had rejected "aiding and abetting" liability for § 848(a) and (c) offenses, but finding that the language of § 848(e) was sufficiently different to permit "aiding and abetting" liability).

57

More specifically, the Second Circuit Court of Appeals explained in *Walker* that, notwithstanding that the court had held that "aiding and abetting" liability is inapplicable to violations of §§ 848(a) and (c), "§ 848(e) is broader in scope than §§ 848(a) and (c)."

> Section 848(e)(1)(A) provides enhanced sentencing for:
>> (A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results,. . . .
>
> 21 U.S.C. § 848(e)(1)(A). Walter Diaz was convicted for murder on Count 3 under the second prong of § 848(e)(1)(A) as a "person engaging in an offense punishable under section 841(b)(1)(A)." This prong mirrors the other sections of § 848 in requiring that the defendant be "engaging in" a large narcotics conspiracy at the time of the murder. However, unlike the other sections of § 848, § 848(e)(1)(A) expressly includes language of aiding and abetting liability which applies to all prongs under the section. *See* 21 U.S.C. § 848(e)(1)(A) ("any person . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual"); *see also* 18 U.S.C. § 2. Additionally, § 848(m) provides mitigating factors applicable only to § 848(e). One of the factors to be considered is the fact that "the defendant is punishable as a principal in the offense which was committed by another, but the defendant's participation was relatively minor." Therefore, by the plain language of the statute, § 848(e)(1)(A) demonstrates clear intent to include liability for aiding and abetting. The district court was correct in instructing the jury that aiding and abetting liability was available under Count 3, and in fact, Diaz did not specifically challenge this jury instruction on appeal.

*Walker*, 142 F.3d at 113 (footnote omitted); *accord Tipton*, 90 F.3d at 898 & n.18 (also noting that the language of § 848(e)(1)(A) "replicates" the language of § 2, thereby

permitting "aiding and abetting" liability for a § 848(e)(1)(A) offense); *Villarreal*, 963 F.2d at 731 (also relying on the language of § 848(e)(1)(A) and § 848(m)(3) to hold that Congress clearly intended "aiding and abetting" liability to apply to § 848(e)(1)(A) offenses). This court found the reasoning in *Walker* persuasive in the course of preparing the jury instructions in this case, and finds it so now. Therefore, this court reiterates its conclusion that "aiding and abetting" liability is available for the § 848(e)(1)(A) offenses with which Johnson was charged and for which she was convicted.

Moreover, there is no question that the indictment in this case expressly and adequately charged "aiding and abetting" liability for the § 848(e) offenses in this case. Thus, Johnson cannot contend that the allegation of "aiding and abetting" liability was somehow deficient, where "aiding and abetting" liability is available under the statute.

Thus, Johnson's second ground to arrest judgment in this case also fails, because "aiding and abetting" liability is available for a § 848(e) offense. Because such liability is available, the indictment did not fail to charge an offense where it was amended to charge *only* "aiding and abetting" liability for "CCE murder" and "conspiracy murder," and the court did not lack jurisdiction. *See* FED. R. CRIM. P. 34 (standards for arrest of judgment); *Witted*, 454 F.2d at 646 (same).

Because the court finds neither of Johnson's grounds for arrest of judgment to be persuasive, Johnson's Motion In Arrest Of Judgment will be denied in its entirety.

## IV. THE MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL

In her separate August 19, 2005, Motion For Judgment Of Acquittal Or For New Trial (docket no. 634), Johnson "moves the court to enter judgment of acquittals with respect to each of the counts in the indictment due to insufficient evidence of guilt, and,

if denied, to enter judgment of acquittal as to capital murder due to a lack of evidence on the additional facts necessary to establish a capital offense, and, if denied, strike the death penalty as an available punishment, and, if denied, to grant a new trial in whole or as to the penalty phase only for the reasons set forth [in her motion and brief]." Defendant's Motion For Judgment Of Acquittal Or For New Trial (docket no. 634), 1. Johnson then identifies thirty-six separate errors that she contends entitle her to the relief requested. Those grounds, in the order in which the court will consider them, are set out in the chart beginning on page 11. Before considering the standards applicable to Johnson's thirty-six allegations of error, the court must determine whether Johnson has waived any of the alleged errors.

## A. Waiver

"'[W]aiver is the "intentional relinquishment or abandonment of a known right."'" *United States v. Brown*, 108 F.3d 863, 866 (8th Cir. 1997) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993), in turn quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Waiver means that the defendant is not entitled to post-trial or appellate review, even for plain error. *United States v. Beeks*, 224 F.3d 741, 747 (8th Cir. 2000); *United States v. Tulk*, 171 F.3d 596, 600 (8th Cir. 1999); *United States v. Mathison*, 157 F.3d 541, 545-46 (8th Cir. 1998), *cert. denied*, 525 U.S. 1089 (1999); *United States v. Dunnaway*, 88 F.3d 617, 618 (8th Cir. 1996). Whether or not a defendant waived an error is a mixed question of law and fact, requiring review of factual findings for abuse of discretion and *de novo* review of legal conclusions. *Brown*, 108 F.3d at 866. A party does not necessarily waive an alleged error by acceding to the court's ruling on that error during trial or accepting some relief offered by the court during trial. *See United States v. Gardner*, 396 F.3d 987, 989 (8th Cir. 2005) (the prosecutor did not waive an assertion that

his comment were no improper by apologizing to the court during trial, because the prosecutor had only "bow[ed] to reality," and then argued post-trial that the comment was not improper), *cert. denied*, ___ U.S. ___, 126 S. Ct. 153 (2005); *Brown*, 108 F.3d at 866 (the defendant had not waived an issue of exposure of the jury to extrinsic information by acceding to a limiting instruction, where the defendant did not learn that the extrinsic information had actually affected the jurors' decisions, despite the limiting instruction, until after trial). On the other hand, a party may waive an alleged error during trial, for example, by expressly stating that the party is not arguing about it. *See Beeks*, 224 F.3d at 747. Similarly, numerous courts, including the Eighth Circuit Court of Appeals, have held, in criminal and habeas cases, that a party waives an issue for post-trial relief by failing to brief that issue or failing to do so adequately. *See, e.g., Sweet v. Delo*, 125 F.3d 1144, 1159 (8th Cir. 1997) (a habeas petitioner "waived [a] claim by failing to argue it with any specificity whatsoever"), *cert. denied sub nom. Sweet v. Bowersox*, 523 U.S. 1010 (1998), ; *United States v. Bonilla-Mungia*, 422 F.3d 316, 319 & n.1 (5th Cir. 2005) (citing cases from the Fifth Circuit and other circuits in which the court held that the government had waived an argument by failing to brief it post-trial); *see also Salazar-Regino v. Trominski*, 415 F.3d 436, 452 (5th Cir. 2005) (habeas petitioners waived an issue by failing to brief it adequately, where their entire argument consisted of a case citation, without explanation of how the cited decision should apply to their case, and they failed to mention that the opinion they cited had been overruled); *Ramirez v. Debs-Elias*, 407 F.3d 444, 447 & n.3 (1st Cir. 2005) (to avoid waiver, a party must brief an issue in more than a "perfunctory manner," citing *United States v. Bongiorno*, 106 F.3d 1027, 1034 (1st Cir. 1997).

In this case, despite extensions of time to file post-trial motions, and assurances from the court that the defense could take all the time reasonably necessary to prepare

post-trial motions, Johnson initially filed her motion for judgment of acquittal or new trial without any accompanying brief, in violation of local rules. *See* N.D. IA. L.CR.R. 47.1(a) (incorporating N.D. IA. L.R. 7.1 concerning motion procedure into criminal cases); N.D. IA. L.R. 7.1(d) (specifying that, with any motion except for those specifically excepted, "the moving party must serve and file a brief containing a statement of the grounds for the motion and citations to the authorities upon which the moving party relies"). Instead, along with her motion for judgment of acquittal or new trial, Johnson filed a request for additional time to file her brief in support of her motion for judgment of acquittal or new trial. The court granted Johnson the ten additional days that she requested within which to file her supporting brief. Even then, Johnson had to request, and was granted, another additional day to file her supporting brief. Despite the various extensions, when the supporting brief was ultimately filed, it shockingly did no more than recite from the motion eight of Johnsons allegations of error (Grounds Nos. 11, 21, 22, 23, 24, 26, 28, and 29) with absolutely *no* additional supporting argument, and for six further allegations of error (Grounds Nos. 2, 5, 6, 7, 31, and 34), the brief offered little or nothing more than token argument, providing little or no additional specificity, citation to pertinent parts of the record, or citation of supporting authority. In light of the applicable local rules and authority cited above, such as *Sweet*, 125 F.3d at 1159, the court finds that Johnson has waived fourteen of her allegations of error, Grounds Nos. 11, 21, 22, 23, 24, 26, 28, and 29 for failure to provide *any briefing at all* in support of the allegations of error, and Grounds Nos. 2, 5, 6, 7, 31, and 34 for failure to provide *adequate* briefing.

Showing more caution than the three defense counsel displayed, the court will nevertheless address *on the merits* each of Johnson's allegations of error in the motion for judgment of acquittal or new trial, notwithstanding her clearly inadequate briefing of fourteen of those allegations.

### B. *Applicable Standards*

Before considering any of Johnson's thirty-six claimed errors, however, the court must first articulate the applicable standards for a judgment of acquittal and the applicable standards for a new trial.

### 1. *Judgment of acquittal*

Rule 29(a) of the Federal Rules of Criminal Procedure provides, in pertinent part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which *the evidence is insufficient to sustain a conviction.*" FED. R. CRIM. P. 29(a) (emphasis added). While Rule 29(a) expressly provides for such a motion before the case is submitted to the jury, *see id.*, Rule 29(c) provides, in pertinent part, that "[a] defendant may move for judgment of acquittal, or renew such a motion . . . within any . . . time the court sets during the 7-day period" after a guilty verdict or discharge of the jury. FED. R. CRIM. P. 29(c)(1). Johnson has filed such a timely motion for judgment of acquittal within the extended time the court authorized.

As the Eighth Circuit Court of Appeals has explained, "A motion for a judgment of acquittal should be *denied* where the evidence, viewed in the light most favorable to the government, is such that a reasonable jury could have found each of the essential elements of the crime beyond a reasonable doubt." *United States v. Moyer*, 182 F.3d 1018, 1021 (8th Cir. 1999) (emphasis added) (citing *United States v. Hood*, 51 F.3d 128, 129 (8th Cir. 1995), and *United States v. Huntsman*, 959 F.2d 1429, 1436-37 (8th Cir. 1992), *cert. denied*, 506 U.S. 870 (1992)), *cert. denied*, 530 U.S. 1203 (2000). To put it another way, "'[a] motion for judgment of acquittal should only be *granted* where the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any essential elements of the crime charged.'" *United States v. Pardue*, 983 F.2d 843, 847 (8th Cir. 1993) (quoting *United*

*States v. Mundt*, 846 F.2d 1157, 1158 (8th Cir. 1988), with citation omitted and emphasis added), *cert. denied*, 509 U.S. 925 (1993); *accord United States v. Lopez*, 384 F.3d 937, 943 (8th Cir. 2004) ("'In reviewing a challenge to the sufficiency of the evidence, we may reverse a jury's verdict only where a reasonable fact-finder must have harbored reasonable doubt relating to the government's proof on at least one of the essential elements of the offense.' *United States v. Jensen*, 141 F.3d 830, 833 (8th Cir. 1998)."), *petition for cert. filed* (Nov. 11, 2005) (NO. 05-7632). The court must "give the jury's verdict the benefit of reasonable inferences gathered from the record." *Lopez*, 384 F.3d at 943. Thus, in either the trial court or the appellate court, the standard is the same:

> [T]he test is whether "a reasonable fact finder could have found guilt beyond a reasonable doubt." *United States v. Garrett*, 948 F.2d 474, 476 (8th Cir. 1991) (citation omitted). Under this standard, the district court has "very limited latitude." *United States v. Jewell*, 893 F.2d 193, 194 (8th Cir. 1990). In deciding a motion for judgment of acquittal, the court can neither weigh the evidence nor assess the credibility of the witnesses. *Burks v. United States*, 437 U.S. 1, 16, 98 S. Ct. 2141, 2150, 57 L. Ed. 2d 1 (1978).

*Pardue*, 983 F.2d at 847.

### 2. New trial

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial *if the interest of justice so requires*." FED. R. CRIM. P. 33(a) (emphasis added). Although a new trial may be based on newly discovered evidence, *see* FED. R. CRIM. P. 33(b)(1) (stating the time for filing of a motion for new trial based on "newly discovered evidence"); *see also United States v. Gianakos*, 404 F.3d 1065, 1079 (8th Cir.) (stating showings required to obtain a new trial based on newly discovered evidence), *reh'g*, 415 F.3d 912 (8th Cir.

2005), *cert. denied*, ___ U.S. ___, 2005 WL 3144340, 74 U.S.L.W. 3323 (Nov. 28, 2005) (NO. 05-7081), that is not the only ground. *See, e.g.,* FED. R. CRIM. P. 33(b)(2) (stating the time to file a motion for new trial "grounded on any reason other than newly discovered evidence").

"The granting of a new trial under Rule 33 is a remedy to be used only 'sparingly and with caution.'" *United States v. Dodd*, 391 F.3d 930, 934 (8th Cir. 2004) (quoting *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002), in turn quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). Somewhat more specifically,

> The Rule specifies that the remedy should be granted only where "the interest of justice so requires." Fed.R.Crim.P. 33. The decision to grant a Rule 33 motion is within the sound discretion of the District Court, and we will reverse only for an abuse of that discretion. *Campos*, 306 F.3d at 579-80. The District Court's discretion is broad in that it may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Id.* at 579. This discretion is abused, however, if the District Court fails to consider a factor that should have been given significant weight, considers and gives significant weight to an improper or irrelevant factor, or commits a clear error of judgment in considering and weighing only proper factors. *Id.* at 580.

*Dodd*, 391 F.3d at 934. *"Unless the district court ultimately determines that a miscarriage of justice will occur*, the jury's verdict must be allowed to stand." *Campos*, 306 F.3d at 579 (emphasis added) (citing *United States v. Lacey*, 219 F.3d 779, 783 (8th Cir. 2000)); *accord Ortega v. United States*, 270 F.3d 540, 547 (8th Cir. 2001) ("A district court may grant a new trial under Rule 33 '"only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred."'") (quoting *Lacey*, 219 F.3d at 783, in turn quoting *United States v. Brown*, 956 F.2d 782, 786 (8th Cir. 1992)).

With these standards in mind, the court turns to the alleged errors that Johnson asserts should entitle her to judgment of acquittal or a new trial, either in whole or in part, in this capital case.

## C. Allegedly Erroneous Pretrial Rulings

Johnson asserts that three of the court's pretrial rulings were erroneous, entitling her to judgment of acquittal or a new trial. Those allegedly erroneous rulings are the following: (1) not granting a change of venue, thereby denying her the right to a fair and impartial trial (Johnson's ground no. 5); (2) failing to strike legally insufficient allegations from Counts 6 through 10 as requested in her December 23, 2004, motion and by submitting those allegations to the jury (Johnson's ground no. 11); and (3) failing to strike the death penalty after the government amended the indictment during jury selection, for the reasons argued in her May 1, 2005, filing (Johnson's ground no. 21). The court will consider these alleged errors in turn.

### 1. Ground No. 5: Denial of motions for change of venue

#### a. Background

As her first allegation of error in the court's pretrial rulings, and her fifth ground for judgment of acquittal or new trial, Johnson contends that the court erred in denying her original and supplemental motions for a change of venue. Johnson first moved for a change of venue on November 4, 2004 (docket no. 204), asserting that pretrial publicity concerning co-defendant Honken's trial and her own alleged involvement in the charged offenses would make it impossible to obtain an impartial jury in this district for her trial. After directing the parties to brief additional issues, the court denied that part of the motion seeking a change of venue pursuant to Rule 21(b) (change of venue for convenience of the parties and witnesses), but reserved ruling on that part of the motion seeking a change of

venue pursuant to Rule 21(a) (change of venue for prejudice). *See* January 3, 2005, Memorandum Opinion And Order Regarding Pretrial Motions (docket no. 264) (published at *United States v. Johnson*, 354 F. Supp. 2d 939 (N.D. Iowa 2005)). The court also directed that juror questionnaires be sent to 600 potential jurors in the Western Division and to 600 potential jurors in the Eastern Division (including the Cedar Rapids, Waterloo, and Dubuque subdivisions) of the Northern District of Iowa, in an attempt to determine the extent to which pretrial publicity might have impacted potential jurors in each division. The goal was to determine whether it would be possible to obtain an impartial jury in any division of this district or whether venue should be changed to another district, perhaps even in another state. The parties subsequently received approximately 1099 responses, in varying degrees of completeness, to the 1200 juror questionnaires sent out.

The court held a supplemental hearing on February 11, 2005. At the hearing, the government asserted that its tally of the juror questionnaires sent to potential jurors showed only 13.51% of potential jurors in the Western Division of the Northern District of Iowa and only 14.09% of potential jurors in the Eastern Division of the Northern District of Iowa had indicated that they had "any beliefs or opinions about the guilt or innocence of Angela Johnson." Similarly, according to the defendant's expert, only approximately 15% of potential jurors in the Western Division and 14% in the Eastern Division had "any belief or opinions about the guilt or innocence of Angela Johnson." Following the hearing, on February 14, 2005, the court entered another ruling (docket no. 323), denying Johnson's motion for a change of venue without prejudice to renewal during jury selection.

Johnson supplemented her motion for a change of venue for the last time on April 12, 2005, the day jury selection began. *See* docket no. 416. However, the court does not remember and, at oral arguments, the defense attorneys admitted that they were not sure, whether the defense team ever renewed the motion for a change of venue in the course of

jury selection or objected to the jury before it was empaneled on the ground that the venire was so rife with bias toward Johnson, owing to pretrial publicity or for any other reason, that Johnson could not obtain a fair trial in this venue. A review of the Realtime Transcript shows that most, if not all, prospective jurors where questioned about what, if any, pretrial publicity for this case or publicity from Honken's trial they had been exposed to. Prospective Juror 545 specifically stated that he was aware of the ruling on Johnson's motion for a change of venue, *see* Realtime Transcript for April 12, 2005, and Prospective Juror 124 was aware of a possible change of venue. *See id.* for April 29, 2005. There was also a lengthy discussion between the court and defense counsel on the afternoon of April 20, 2005, after the questioning of Prospective Juror 379, about pretrial publicity, and specifically, whether such publicity had presented any facts from Honken's trial that would not be presented in Johnson's trial, but there was no renewal of the motion for a change of venue at that time, even though Johnson did move to strike the juror for cause, *inter alia*, on the ground that he had been exposed to pretrial publicity. *See* Realtime Transcript for April 20, 2005.

Although Johnson did not renew her motion for a change of venue after the start of jury selection, her counsel did request additional peremptory challenges in the course of jury selection, in part, because of pretrial publicity and the court's failure to grant a change of venue. The court denied that request, as it had the pretrial motions for a change of venue, and the trial proceeded in Sioux City, Iowa.

### b. *Arguments of the parties*

In her brief on her motion for judgment of acquittal or new trial, Johnson simply asserts that the prior record and briefing are adequate to support her contention that the court erred in denying her motion for a change of venue. She asserts that she disagrees with the court's prior ruling and, therefore, requests reconsideration. The government,

likewise, rests on its prior briefing and arguments and asserts that the court's prior rulings were correct, because Johnson does not claim that there is any new evidence or authority bearing on this issue.

### c.    *Analysis*

In its February 14, 2005, ruling on this issue, based on review of the responses to the juror questionnaires and consideration of the parties' arguments, the court concluded that Johnson had not yet been able to meet the high threshold of proof required to show that this was one of the rare and extreme cases in which the court could presume inherent prejudice based on pretrial publicity at the first tier of the analysis of a motion for a change of venue pursuant to Rule 21(a). *See, e.g., United States v. Nelson*, 347 F.3d 701, 707-08 (8th Cir. 2003) (stating this two-tiered analysis for appellate review), *cert. denied*, ___ U.S. ___, 125 S. Ct. 486 (2004). In that ruling, the court concluded, further, that (1) Johnson had not identified *any* individual press reports or series of press reports that could be characterized as "inflammatory and accusatory," *see, e.g., United States v. Allee*, 299 F.3d 996, 1000 (8th Cir. 2002); (2) the percentage of affected jurors in either division, only 14% to 15%, was simply too low to warrant a presumption of prejudice, *see, e.g, Nelson*, 347 F.3d at 709 (29% of jurors with "strong or fixed" opinions was too low); and (3) Johnson's assertion that prejudice could be "read into" the jurors' responses to various questions was not persuasive. The court now reaffirms each of these conclusions. Moreover, the court now adds that the extensive *voir dire* of jurors actually appearing for jury selection in no way revealed the kind of prejudice that Johnson asserted would result from pretrial publicity or the kind of prejudice that would require a change of venue.

Moreover, the court finds that Johnson waived the issue by failing to renew or reurge her motion for a change of venue at the conclusion of jury selection on the ground that the *voir dire* of potential jurors demonstrated that the pool was so tainted with

prejudice that she could not obtain a fair trial in this district. As the court observed in its pretrial ruling, at the second tier of the analysis of a motion for a change of venue, if the court concludes that no presumption of prejudice is warranted pretrial, the court must look at the *voir dire* testimony of potential trial jurors to determine if the potential jurors demonstrate such actual prejudice that it would be an abuse of discretion to deny a timely change-of-venue motion. *Nelson*, 347 F.3d at 707-08. In the pretrial ruling, the court also expressly denied Johnson's November 4, 2004, Motion For Change Of Venue (docket no. 204) "without prejudice to renewal during jury selection," noting that, in order to prevail on such a renewed motion, Johnson would have to show that "actual prejudice" in the jury pool, such that she could not receive a fair trial in this district, could be inferred. *See* Order of February 14, 2005. Thus, the door was left wide open for Johnson to renew her motion for a change of venue during or at the conclusion of jury selection, but she never walked through it. Several courts have held that such a failure to reurge a motion for a change of venue during jury selection constitutes waiver. *See*, *e.g.*, *Gomez v. McGrath*, 2005 WL 207209 (E.D. Cal. Aug. 25, 2005) (in a federal habeas corpus proceeding, the federal district court noted that the state appellate court had rejected the claim of error by the trial court on the ground that petitioner had waived a change of venue claim "by failing to renew the motion after the trial court denied it without prejudice to its renewal after the jury had been voir dired on issues related to the motion") (citing *People v. Gomez,* No. C019221, slip op. at 4-5 (Cal. Ct. App. Nov. 1, 1997); *Green v. Commonwealth*, 266 Va. 81, 580 S.E.2d 834 (Va. 2003) (holding in a capital case that the defendant waived his argument that the trial court erred when it denied his motion for a change of venue where the trial court took the motion under advisement, but the defendant failed to seek a ruling on the motion and failed to renew the motion after the jurors had been qualified) *cert. denied*, 540 U.S. 1194 (2004); *People v. Maury*, 30 Cal. 4th 342,388-89 133 Cal. Rptr.

2d 561, 603 (2003) (holding that the defendant must renew a motion for a change of venue after *voir dire* to preserve the issue for appeal), *cert. denied*, 540 U.S. 1117 (2004); *People v. Burnham*, 2001 WL 936764, *1 (Mich. Ct. App. Aug. 17, 2001) (holding that the defendant waived the issue of change of venue where the trial court denied the motion for a change of venue without prejudice, stating that it was willing to reconsider the motion at any time during the jury selection process, but the defendant never renewed the motion for a change of venue); *State v. Couture*, 587 N.W.2d 849, 852 (Minn. Ct. App. 1999) (holding that, "[w]here a defendant if given the opportunity to renew a motion for a change of venue immediately prior to trial but fails to do so, the right to challenge venue is waived."); *Commonwealth v. Nutter*, 760 N.E.2d 814, 2001 WL 1662124, *1 (Mass. Ct. App. Dec. 28, 2001) (unpublished table decision) (holding that the issue of change of venue was waived where the defendant's motion for a change of venue was denied without prejudice to its renewal during jury selection, but the motion was not renewed during empanelment of the jury). Thus, the court finds that Johnson waived this issue, even though the court has also addressed it on the merits.

In short, the issue of a change of venue for prejudice pursuant to Rule 21(a) was either waived, the requirements for such a change of venue were never met in this case, or both. Thus, the denial of Johnson's motion for a change of venue was neither contrary to the "interest of justice" nor a "miscarriage of justice," such that a new trial is required. *Campos*, 306 F.3d at 579 ("Unless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand."); *accord Ortega*, 270 F.3d at 547; *Lacey*, 219 F.3d at 783.

This part of Johnson's motion for a new trial will be denied.[13]

## 2. Ground No. 11: Failure to strike and submission to the jury of legally insufficient allegations in Counts 6 through 10

### a. Background

As her eleventh ground for judgment of acquittal or new trial, Johnson asserts that the court erred in failing to strike legally insufficient allegations from Counts 6 through 10 as she had requested in a motion filed December 23, 2004, and further erred in submitting the challenged allegations to the jury. Thus, this portion of Johnson's post-trial motion reiterates her assertion in her December 23, 2004, Motion To Strike Allegations Contained In Counts 6-10 (docket no. 254). In her original motion, Johnson sought an order striking the violations of federal narcotics laws, as elements of the underlying CCE offense, alleged in paragraphs 1, 2, and 4 of each of the Counts in question, on the ground that those allegations lacked sufficient specificity as to such matters as time, place, or persons involved, and that such insufficiency could not be saved by a bill of particulars.

In a ruling originally filed February 18, 2005 (docket no. 325), and corrected *nunc pro tunc* on March 10, 2005 (docket no. 357) (published at *United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005)), the court denied the motion as untimely. Although the court expressed its hope that the government would voluntarily provide a clearer specification of the challenged violations underlying the CCE offense, based on clarifications from the Honken trial and preparation for trial in this case, the court declined to order the government to do so.

---

[13]Although the court does not believe that this ground for relief is cognizable as a request for judgment of acquittal pursuant to Rule 29, to the extent that Johnson seeks judgment of acquittal on this ground, judgment of acquittal will also be denied.

The government did not voluntarily amend the allegations in question to make them more specific. Therefore, those allegations were submitted to the jury essentially as pleaded in the Second Superseding Indictment (docket no. 233) in Final Jury Instruction No. 7, ¶¶ (1), (2) & (4)). *See* docket no. 520. The jury ultimately found each of the alleged violations in question had been proved as part of the series of violations required for a CCE and that each had been committed both before and after the killings. *See* Verdict Form (docket no. 527), Counts 6 Through 10: "CCE Murder," Step 2 (Existence Of The CCE: Series Of Violations). However, the jury also found nine other violations had been committed as part of the series of violations, and that four of those violations had been committed either before or both before and after the killings. *Id.*

### b. *Arguments of the parties*

Johnson offered no argument whatsoever in support of this allegation of error in her brief on post-trial motions. The government asserts that the court correctly denied Johnson's pretrial motion on this issue, and that Johnson has not asserted that any new evidence or authority has arisen to call into doubt the court's prior ruling. Therefore, the government asserts that the court should deny Johnson's post-trial motion on this ground for the same reasons set forth in the court's March 10, 2005, order.

### c. *Analysis*

The court reiterates its prior conclusion in its February 18, 2005, ruling on this issue, as corrected on March 10, 2005, that the challenged paragraphs were, indeed, vague, alleging little more than that at places unknown on dates unknown within a six-year period some or all of the alleged participants in the CCE distributed methamphetamine, possessed methamphetamine with intent to distribute it, or used communications facilities to facilitate the commission of drug offenses. However, the court also reiterates its conclusion that striking the allegations was not an appropriate remedy, because Johnson

had waived the issue by failing to object to the November 26, 2002, order of Magistrate Judge Paul A. Zoss. Judge Zoss's ruling had denied the portion of Johnson's request for a bill of particulars seeking specification of the locations, substance, time, place, and date of each overt act in paragraphs 1 through 18 of Counts 6 through 10 of the Superseding Indictment. *See* Order of November 26, 2002 (docket no. 147). Thus, that portion of the ruling directly addressed the pertinent issue more than two years before Johnson attempted to resurrect it in anticipation of trial. The court also reiterates that the allegations in paragraphs 1, 2, and 4 of the Second Superseding Indictment had only changed, as compared to the Indictment pending at the time of Judge Zoss's ruling, to the extent that allegations of the timeframe of the alleged violations were stated *more specifically*. In short, the court concluded before, and reiterates now, that Johnson litigated the very issue she attempted to resurrect in her December 23, 2004, and is attempting to resurrect yet again in her post-trial motions, she lost, and she failed to pursue timely review, thereby waiving the issue.

Moreover, where the issue has been waived, as it has been here, it will not be reviewed, even for plain error. *United States v. Tulk*, 171 F.3d 596, 600 (8th Cir. 1999). Yet, even if the issue were reviewable, and even if it was error to submit the challenged violations, the court would still conclude that Johnson is not entitled to either judgment of acquittal or a new trial on this ground. As noted above, the jury also found nine other violations had been committed as part of the series of violations, and that four of those violations had been committed either before or both before and after the killings. Because only three violations were required to satisfy the "continuing series of violations" element of a CCE, *see, e.g., United States v. Jackson*, 345 F.3d 638, 645 (8th Cir. 2003) (identifying the requirements for proof of a CCE), the jury found sufficient violations, even without the three challenged violations, to sustain the verdicts.

Therefore, Johnson is not entitled to judgment of acquittal on this ground, because a reasonable fact finder could have found her guilty (and, in fact, did so), even without the challenged violations. *Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476). Nor has there been any "miscarriage of justice" requiring a new trial, because the findings of the jury on other alleged violations that Johnson does not challenge here were sufficient to sustain the verdicts. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). Johnson's motion for judgment of acquittal or new trial on this ground will be denied.

### 3.   Ground No. 21:   Failure to strike the death penalty after the indictment was amended during jury selection

#### a.   Background

The last pretrial ruling that Johnson challenges, as her twenty-first ground for judgment of acquittal or new trial, is that the court erred in failing to strike the death penalty after the government amended the indictment during jury selection for the reasons she asserted in her May 1, 2005, filing on the same issue. As explained above, in Section II.C.1., on page 32, prior to Johnson's trial, the government withdrew its allegations that Johnson was a "principal" in the murders and, instead, proceeded to trial only on the theory that Johnson "aided and abetted" each of the "conspiracy murders" and "CCE murders." *See* Government's April 29, 2005, Motion To Strike Language From Indictment (docket no. 449); Order, April 29, 2005 (docket no. 450) (granting motion to strike). Thereafter, on May 1, 2005, Johnson filed a Renewed Motion To Strike Death Penalty (docket no. 453). Johnson's May 1, 2005, Renewed Motion renewed her similar

motion, filed December 8, 2004 (docket no. 230), which the court had denied by order dated February 18, 2005 (docket no. 325)), as corrected *nunc pro tunc* on March 10, 2005 (docket no. 357) (published at *United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005)).

In her May 1, 2005, Renewed Motion, filed during jury selection, Johnson asserted that, in light of the change in the government's case, the court should strike the death penalty for all counts on the grounds of "intra-case proportionality" and "the interests of justice," where a jury convicted Dustin Honken as the "principal" in the killings, but reached a verdict for the death sentence only for the killings of the two children. Because she was charged only as an "aider and abettor," Johnson argued that it would be improper for her to face the death penalty on charges on which the "principal" was only given a life sentence, and even where the "principal" was given the death sentence, she contended that she was charged with a lesser degree of involvement, so that she should only be exposed to a lesser punishment. The government resisted this motion at oral arguments on the ground that the voluntary restriction of the government's case to the "aiding and abetting" theory did not change the correctness of the court's prior conclusion that the appropriate penalty under the circumstances is a jury question.

In a written ruling filed May 3, 2005 (docket no. 462) (published as *United States v. Johnson*, 378 F. Supp. 2d 1049 (N.D. Iowa 2005)), the court denied Johnson's renewed motion to strike the death penalty.

### b.    *Arguments of the parties*

In support of the post-trial reincarnation of this issue, Johnson only refers to the arguments she made on this issue in her May 1, 2005, Renewed Motion. The government contends that, because Johnson's post-trial motion fails to assert any new authority or to

make any new argument, the court should summarily deny the post-trial motion on the same grounds that it denied the May 1, 2005, motion.

> ### c.    *Analysis*

The court finds no basis to retreat from its February 18, 2005, March 10, 2005, and May 3, 2005, rulings on this issue, and Johnson has stated none.  The court acknowledged in its May 3, 2005, ruling that, in its February 18, 2005, order (as corrected *nunc pro tunc* on March 10, 2005) denying Johnson's original motion to strike the death penalty, the court had relied, in part, on the fact that Johnson was charged as both a "principal" and as an "aider and abettor."  However, the court noted that it had also denied Johnson's original motion on the ground that the statutory scheme for capital offenses under 21 U.S.C. § 848(e)(1)(A) expressly contemplates the argument that Johnson believes should bar the death penalty in her case and places it *before the jury* as a *mitigating factor* in determination of the appropriate penalty in the "penalty phase."  *See* 21 U.S.C. § 848(m)(8) (identifying as a mitigating factor whether a co-defendant "equally culpable in the crime, will not be punished by death").  This court found, further, that the jury's determination on this mitigating factor is to be made after consideration of all of the evidence, including the "merits phase" and "penalty phase" evidence, not by the court pretrial.  Therefore, the court reaffirmed its conclusion that Johnson's disproportionate punishment and injustice arguments were more properly directed to the jury or to the appellate court on post-trial review than to this court on pretrial motions.  The court also concluded that, even assuming that it had the authority to bar the government from seeking the death penalty, the court would not exercise such authority on the merits of the arguments Johnson was asserting.  Finally, the court concluded that it lacked authority to intrude upon prosecutorial discretion in this matter.

The court now reiterates and affirms each of these conclusions. Johnson has not shown any more authority than she did the first two times she raised the issue that the court has the authority to intrude upon prosecutorial discretion to the extent of barring the government from seeking the death penalty where the government satisfies statutory and constitutional prerequisites, such as charging facts supporting the increased penalty in the indictment, *see generally Apprendi v. New Jersey*, 530 U.S. 466 (2000) (when the government wishes to seek penalties in excess of those applicable by the elements of an offense alone, the government must charge the facts supporting the increased penalties in the indictment and prove the facts beyond a reasonable doubt), and giving notice of its intent to seek the death penalty for a § 848 offense "a reasonable time before trial." *See* 21 U.S.C. § 848(h). Moreover, the court again declines to hold that alleged "intra-case proportionality" and "the interests of justice," as articulated by Johnson, require the court to strike the death penalty in the circumstances of these two cases, either as they appeared before trial or as they were developed at trial.

To put it another way, the court cannot find that proof that Johnson only "aided and abetted" Honken in the killings would be legally insufficient to sustain a conviction under 21 U.S.C. § 848(e)(1)(A), or legally insufficient to sustain a jury's selection of the death penalty as the appropriate punishment, where the jury was expressly authorized by statute to consider as a mitigating factor whether someone "equally culpable in the crime, will not be punished by death," 21 U.S.C. § 848(m)(8), and that mitigating factor was, in fact, submitted to the jurors for their consideration. *See* Final "Penalty Phase" Instruction No. 3 - Step Two: "Mitigating" Factors ("(4) another person, Dustin Honken, who is equally or more culpable in the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus, will not be punishable by death for those murders"). The jury was clearly unmoved by this mitigating factor, as only three jurors found it as to the murders of the adults in Counts 1

and 6, for Gregory Nicholson, 2 and 7, for Lori Duncan, and 5 and 10, for Terry DeGeus, but no jurors found this mitigating factor as to the murders of the children in Counts 3 and 8, for Kandi Duncan, and 4 and 9, for Amber Duncan, and even those jurors who found the mitigating factor clearly did not find that it justified the lesser punishment that Johnson contends is the maximum to which she should have been exposed. In short, the court finds that both the jury's consideration of this mitigating factor, as opposed to a pretrial determination by the court that this factor required the court to strike the death penalty, and the jury's conclusion that this mitigating factor did not justify lesser penalties than were imposed upon the "principal," Honken, were thoroughly justified by the law and the facts in this case.

Thus, Johnson is not entitled to either judgment of acquittal or withdrawal of the death penalty. *See* FED. R. CRIM. P. 29(a) (judgment of acquittal must be entered if the evidence is insufficient to sustain a conviction). Similarly, there was no "miscarriage of justice" in the court's failure to strike the death penalty in this case, such that Johnson would be entitled to a new trial. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). Johnson's motion for judgment of acquittal or new trial on this ground will also be denied.

### *D. Alleged Errors During Jury Selection*

Next, the court will consider Johnson's assertion of errors during or in relation to jury selection. Johnson asserts four such errors in this case: (1) that the portion of Rule 24 of the Federal Rules of Criminal Procedure pertaining to peremptory challenges in capital cases violates equal protection and due process (Johnson's ground no. 7); (2) that the court denied her the right to a fair and impartial jury by not granting her additional

peremptory challenges (Johnson's ground no. 6); (3) that the court erroneously struck three jurors for cause (Johnson's ground no. 8); and (4) that the court erroneously denied challenges for cause to sixteen jurors (Johnson's ground no. 9). The court will consider these alleged errors in turn.

### 1. *Ground No. 7: Rule 24 violates equal protection*

#### a. *Background*

As her seventh ground for relief, Johnson contends that the peremptory challenge rule in capital cases violates equal protection and due process as she had argued in her pretrial filings. On December 30, 2004, the government filed a Motion For Equal Number Of Peremptory Challenges And Request For Pretrial Ruling (docket no. 261) in response to the court's suggestion, during the hearing on the "first round" of pretrial motions, that the court might provide Johnson with additional peremptory challenges to counteract the effects of pretrial publicity, if the court ultimately denied Johnson's motion for change of venue, and in response to the court's invitation for the government to respond to that suggestion. Johnson resisted the government's motion on January 7, 2005 (docket no. 276), also asserting, *inter alia*, that Rule 24(b) violates equal protection, because it provides the parties in a capital case with equal numbers of peremptory challenges, but provides defendants in non-capital cases with more challenges than the prosecution. Johnson asserted, further, that "strict scrutiny" must be applied to this "equal protection" challenge. As noted above, during jury selection, Johnson ran out of peremptory challenges for both trial and alternate jurors well before the government did.

#### b. *Arguments of the parties*

Johnson contends that her previous submissions concerning the manner in which the provisions of Rule 24 concerning peremptory challenges in capital cases violate equal protection adequately address the issue. She adds only that she disagrees with the court's

prior rulings rejecting her arguments and requests reconsideration. Again, the government states that, because Johnson has not cited any new evidence or new authority bearing on the issue, the government will also rest on its own prior pleadings and the record made at trial. Therefore, the government urges the court to reaffirm its prior ruling and to deny this portion of Johnson's post-trial motion.

### c. *Analysis*

Once again, the court finds no basis to retreat from its ruling rejecting Johnson's "equal protection" challenge to the allocation of peremptory challenges for capital cases in Rule 24. *See* Order of February 18, 2005 (docket no. 325), and corrected *nunc pro tunc* on March 10, 2005 (docket no. 357) (published at *United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005)). In its prior order, the court held that the issue for "equal protection" purposes is why Rule 24 gives the defendants in the two *different* categories, capital defendants and non-capital defendants, *different* "protection" in the form of different numbers, and different ratios, of peremptory challenges. Specifically, Rule 24(b)(1) provides that "[e]ach side has 20 peremptory challenges when the government seeks the death penalty," but Rule 24(b)(2) provides that, for "other felony cases," "[t]he government has 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges." The court found that the Advisory Committee provided no explanation of why Rule 24(b) authorizes the same number of peremptory strikes for each side in the trial of a capital defendant, but authorizes more for the defendant than for the prosecution in "other felony cases."

Nevertheless, this court found no case, and Johnson had cited none (and still has cited none), holding that capital defendants are a suspect class. Thus, the court reiterates its conclusion that failure to establish that capital defendants are a "suspect class" eliminates one basis for "strict scrutiny." In her original motion, Johnson also asserted

that Rule 24(b) implicated her right to a fair and impartial jury, which she asserted is a "fundamental right" entitling her to "strict scrutiny" of her "equal protection" challenge. In its prior ruling, this court noted that, while there is no "constitutional" right to peremptory challenges, the Supreme Court has held that such challenges constitute a "necessary part of trial by jury." *See Swain v. Alabama*, 380 U.S. 202, 219 (1965); *accord Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) ("We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury."). Thus, peremptory challenges are one means of attempting to ensure the defendant's "fundamental right" of a fair trial, but peremptory challenges do not, in and of themselves, have a constitutional status.

Even if Johnson had identified a "fundamental right," the court found, and now reiterates, that Johnson has not explained, nor could she do so convincingly, how granting the parties the same number of peremptory challenges somehow undermined her right to a fair trial, such that Rule 24 would impinge on the fundamental right she had identified, particularly where a capital defendant is granted twice as many peremptory challenges as a defendant in any "other felony case." *See* FED. R. CRIM. P. 24(b)(1) (granting a capital defendant 20 peremptory challenges) & (b)(2) (granting defendants in any "other felony case" only ten peremptory challenges). Therefore, the court concluded in its prior ruling, and reiterates here, that Johnson's conclusory assertion that "strict scrutiny" should apply here and her equally conclusory assertion that Rule 24(b) fails to provide equal protection under the "strict scrutiny" standard (or any other standard) are both unconvincing.[14]

---

[14]The court also found in its prior ruling that, in *United States v. Tuck Chong*, 123 F. Supp. 2d 559 (D. Haw. 1999), the United States District Court for the District of Hawaii rejected precisely the same kind of "equal protection" challenge that Johnson was

(continued...)

Thus, for essentially the same reasons that the court rejected Johnson's "equal protection" argument concerning Rule 24(b) pretrial, the court now rejects that challenge post-trial. To put it another way, there was no "miscarriage of justice" in the court's adherence to Rule 24(b)(1) in apportioning each side twenty peremptory challenges, so that Johnson cannot show that she is entitled to a new trial. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). Johnson's motion for a new trial on this ground will also be denied.[15]

### 2. Ground No. 6: Failure to grant Johnson additional peremptory challenges

#### a. Background

The second error in jury selection that Johnson asserts, as her sixth ground for judgment of acquittal or new trial, is her contention that the court denied her the right to a fair and impartial jury by not granting her additional peremptory challenges. This contention relies on the court's denial of her request, in her January 7, 2005, resistance

---

[14](...continued)
asserting, but this court did not, and does not, find the reasoning in that case entirely satisfactory. Specifically, this court is not convinced that Rule 24(b) distinguishes only between *offenses* rather than *defendants*, as the court in *Tuck Chong* suggested. *See id.* at 562. Even though all defendants in one category, either capital or non-capital, are granted the same number of peremptory challenges, it seems to this court, as explained above, that the issue for "equal protection" purposes is why the defendants in the two *different* categories, capital and non-capital, are given *different* "protection" in the form of different numbers, and different ratios, of peremptory challenges.

[15]Although the court does not believe that this ground for relief is cognizable as a request for judgment of acquittal pursuant to Rule 29, to the extent that Johnson seeks judgment of acquittal on this ground, judgment of acquittal will also be denied.

(docket no. 276) to the government's motion for equal numbers of peremptory challenges, for additional peremptory challenges in the event that her motion for change of venue was not granted, and also relies on the court's denial on the record of her oral request for additional peremptory challenges when she ran out during jury selection.

In her resistance to the government's motion for equal numbers of peremptory challenges, Johnson argued that, if venue was not changed, the court was required to craft a procedure that would guarantee her constitutional right to a fair and impartial trial and that such a remedy could and should include granting her additional peremptory challenges. She asserted that the pretrial publicity problem was one that affected her, not the government, not least because the government had objected to change of venue in her case. Indeed, Johnson contended that the government had waived any argument that it should receive additional peremptory challenges by opposing change of venue. She also asserted that the court retained the discretion to grant the defendant more than the 20 peremptory challenges provided by Rule 24(b)(1). In the course of jury selection, Johnson argued that the speed with which she had been required to use her peremptory challenges indicated that she would be prejudiced if she was not granted additional peremptory challenges before the pool of "qualified" potential jurors was complete.

The court rejected Johnson's arguments, offered in resistance to the government's motion, in its Order of February 18, 2005 (docket no. 325), and corrected *nunc pro tunc* on March 10, 2005 (docket no. 357) (published at *United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005)). The court also rejected on the record Johnson's request for additional peremptory challenges during jury selection. *See* Minutes, April 22, 2005 (Jury Selection - Day 9) (defendant exhausted her "on the fly" peremptory challenges).

84

### b.  Arguments of the parties

Johnson again asserts that the record she has previously made is adequate to warrant post-trial relief and that the court's prior rulings to the contrary were incorrect and should be reconsidered.  Again, the government contends that, because Johnson has not cited any new evidence or additional authority bearing on the issue, the court should simply deny Johnson's motion on this ground.

### c.  Analysis

In its pretrial ruling on this matter, the court denied Johnson's requests for additional peremptory challenges for several reasons.  First, this court recognized that Rule 24(b)(1) provides that the parties in a capital case should have equal numbers of peremptory challenges.  *See* Fed. R. Crim. P. 24(b)(1).  Similarly, although the Eighth Circuit Court of Appeals had expressly recognized in *United States v. Blom*, 242 F.3d 799 (8th Cir.), *cert. denied*, 534 U.S. 880 (2001), that increasing the number of peremptory challenges may be an appropriate means for the court to counteract the problems of pretrial publicity in a single-defendant case, the court in *Blom* had approved the district court's decision to increase the number of peremptory challenges *for each side*.  *See Blom*, 242 F.3d at 804.  Thus, the court concluded that Rule 24(b)(1) and the decision in *Blom* suggest that, if it is appropriate to grant additional peremptory challenges to offset pretrial publicity, both parties should enjoy the same increase in peremptory challenges.  Second, the court concluded that the government did not waive a right to an equal number of peremptory challenges by resisting the change of venue on the basis of pretrial publicity.  Rather, the government's resistance was not necessarily based on a view that the pretrial publicity would *not* burden the government, but on the government's belief that, notwithstanding the pretrial publicity and the ensuing difficulty of picking an unbiased jury in this district, the citizens of this district had a right to see justice done in a trial in this

district. Finally, because Johnson had not shown that granting her the same number of peremptory challenges as the government constituted an "equal protection" violation, the court concluded that, if the court determined that pretrial publicity or other considerations warranted granting additional peremptory challenges beyond those expressly authorized by Rule 20(b)(1), the court would grant both parties the same number of additional peremptory challenges. The court now reaffirms each of these conclusions post-trial to hold that it was appropriate to deny Johnson's pretrial motion for additional peremptory challenges and, instead, to grant the parties equal numbers of peremptory challenges.

Furthermore, in the course of jury selection, the court found nothing that warranted granting the parties additional peremptory challenges, on the basis of pretrial publicity or any other basis. For example, the court does not recall that it ever denied a request by Johnson or the government to excuse a juror for cause on the ground that the juror had been exposed to excessive pretrial publicity or had been unduly influenced by such pretrial publicity. Indeed, the court found that the incidences of jurors who were aware of any pretrial publicity in this case was surprisingly low. Moreover, Johnson's comparatively rapid use of her peremptory challenges did not appear to the court to be based on exposure of jurors to pretrial publicity, but upon Johnson's impressions or misimpressions of the jurors' views on death penalty issues.[16] Thus, events during jury selection bore out the court's decision to deny Johnson's pretrial request for additional peremptory challenges as well as Johnson's request during jury selection for additional peremptory challenges, when she had used up her allotted "on the fly" challenges.

---

[16] It appeared to the court that several of the potential jurors that Johnson used her peremptory challenges to strike would have been excellent jurors for the defense. Therefore, the court was perplexed at the time, and remains so now, by the defense team's rapid use of Johnson's "on the fly" peremptory challenges.

As to further grounds for reaffirming the decision to deny Johnson's request during jury selection for additional peremptory challenges, the court notes that Johnson agreed to the procedure of allocating fifteen peremptory challenges to be used "on the fly" and then "reserving" the remaining five peremptory challenges for each party to be used to reduce the panel of "qualified" potential jurors to the twelve trial jurors required. Thus, Johnson has waived any objection to the manner in which the available peremptory challenges were allocated. Also, because Johnson still had five "reserved" peremptory challenges available to her at the time that she ran out of "on the fly" peremptory challenges, she cannot make a credible showing that she was unduly prejudiced by the lack of additional "on the fly" challenges. To put it another way, the "reserved" peremptory challenges provided her with sufficient opportunity to protect her interest in a fair trial, even after she ran out of "on the fly" peremptory challenges. *See Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) ("We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury.").

In short, the court finds no "miscarriage of justice" that would warrant a new trial in this case arising from the court's denials, pretrial and during trial, of Johnson's requests for additional peremptory challenges. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). Johnson's motion for a new trial on this ground will also be denied.[17]

---

[17]Again, the court does not believe that this ground for relief is cognizable as a request for judgment of acquittal pursuant to Rule 29. However, to the extent that Johnson seeks judgment of acquittal on this ground, judgment of acquittal will also be denied.

### 3. Ground No. 8: Challenges for cause erroneously granted

#### a. Background

Johnson's third allegation of error in jury selection, and her eighth ground for judgment of acquittal or new trial, is that the court erroneously struck for cause prospective jurors 533, 458 and 769, thereby denying Johnson her right to a fair trial before a fair and impartial jury comprised of a cross-section of the community in violation of the Sixth, Eighth, and Fourteenth Amendments. The court will summarize the pertinent portions of the *voir dire* of each of these jurors in turn.

*i. Prospective Juror 533.* Prospective Juror 533 stated in her questionnaire that she had been a pen-pal of a female prisoner who had been convicted of shooting a co-worker and that she had helped the prisoner after she got out of prison. In her questionnaire, prospective Juror 533 also stated that "[t]here must be at least two witnesses who saw the crime (murder) or it is only circumstantial." She also stated that only God can take a life, that she did not know if she could ask for the death penalty, that she would find it difficult to ask for the death penalty, and that she "always hope[s] and pray[s] for repentance and forgiveness in these cases." Prospective Juror 533 had also written in the margin of her questionnaire next to the question eliciting responses to possible aggravating and mitigating factors, "Life in Prison."

Neither party requested the transcript of this prospective juror's *voir dire*. However, Johnson characterizes the *voir dire* of prospective Juror 533 as showing that this prospective juror had a strong preference for eyewitness testimony in order to impose the death penalty, but that the prospective juror also told the court that she could view the evidence and make a decision without eyewitness testimony if necessary. Moreover, Johnson asserts that, in response to a direct question about whether she could consider both punishments, prospective Juror 533 answered, "Yes," and that she reaffirmed this position

by stating that she could consider imposing the death penalty. The government, however, states that counsel's notes from *voir dire* of this prospective juror indicate that the potential juror stated that she could not vote for the death penalty under any circumstances, unless it was "like a Hitler," and that she reaffirmed during *voir dire* her assertions in her questionnaire that only God can impose death and that circumstantial evidence is insufficient to prove a murder. The government contends that this prospective juror also stated that she would have difficulty following instructions telling her that there was no difference between direct and circumstantial evidence and that she did not think that she could impose the death penalty.

The court sustained the government's motion to strike prospective Juror 533 for cause on the basis that she was substantially impaired in her ability to follow the court's instructions.

*ii.* ***Prospective Juror 458.*** The transcript of the *voir dire* of prospective Juror 458 reveals that he had been on medication for "paranoid thoughts" for about twenty years and that he had trouble with hearing about or seeing violence. This prospective juror initially indicated, in response to questions by the government, that he would not have any qualms about taking responsibility for a death penalty verdict, that death was the appropriate punishment in "extreme circumstances," and that he believed that he could fairly consider both life imprisonment and death. However, in response to questioning by defense counsel, prospective Juror 458 stated that, about 99% of the time, he would choose life over death. Also in response to a question from defense counsel about whether he would consider the death penalty as the appropriate punishment in a case of intentional murder, prospective Juror 458 stated that he would "have to say no," at least in part, because he also believed in "mercy," and he believed that living with the guilt would be penalty enough. In response to questions by the court, prospective Juror 458 stated that

he would "have a hard time giving the death sentence," and that, using a football analogy frequently used by the parties and the court during jury selection, he would place himself on the 5-yard line toward the "life imprisonment" end zone. The court then sustained the government's motion to strike this juror for cause.

   ***iii.*** ***Prospective Juror 769***. The transcript of the *voir dire* of prospective Juror 769 reveals that this juror gave confused and inconsistent answers concerning her ability to consider both life imprisonment and the death penalty. In response to questions by defense counsel, prospective Juror 769 initially indicated that she could consider both potential punishments and clarified that she did not believe that a confession was required before it would be appropriate to impose the death penalty. However, in response to questions by the prosecutor, prospective Juror 769 began to waiver, stating that she could consider both possible punishments, then that she did not know if she would automatically impose the death penalty for the intentional murder of children, then that she would automatically impose life imprisonment for a person who had not "actually squeezed the trigger," then that she also could consider the death penalty for an "aider and abettor." In response to the last question by the prosecutor, prospective Juror 769 stated that she could not fairly consider the death penalty if she was required to sign the verdict form.

   The court professed itself confused by prospective Juror 769's answers to counsels' questions. In response to questions by the court, prospective Juror 769 again gave a range of contradictory answers about whether she could or could not fairly consider both penalties, and she was clearly emotionally upset and conflicted, and even became teary, although she did not weep openly. At the conclusion of the court's first round of questioning, the government moved to strike this prospective juror for cause, which Johnson resisted. The court then brought this prospective juror back for further questioning to attempt to clarify whether or not signing the verdict form would prevent her

from considering the death penalty.  Prospective Juror 769 stated that she would find it very hard to live with signing a verdict for the death penalty, and that it would affect her ability to vote, although she stated that she could sign a verdict for the death penalty if she was required to.  After further argument, in which the government again asserted that the juror was impaired and Johnson again resisted striking her, the court ultimately held that prospective Juror 769 not only could not fairly consider both penalties, but that she was substantially impaired in her ability to consider *either* penalty, because her thoughts and answers were so inconsistent and inconclusive.

### b. Arguments of the parties

Johnson reiterates post-trial her contentions that each of these jurors was improperly stricken.  Johnson argues that prospective Juror 533 indicated a strong preference for eyewitness testimony in order to impose the death penalty, but that she also told the court that she could still view the evidence and make a decision without eyewitness testimony, if necessary.  Moreover, Johnson argues that, in response to direct questions, prospective Juror 533 stated that she could consider both punishments.  Johnson also contends that prospective Juror 458 recognized that there was a place for the death penalty in extreme cases, that it could be an appropriate punishment for some murders, and that he could consider imposing the death penalty for capital murder, even if he was on the "5-yard line" on the life without parole side of the football field.  As to prospective Juror 769, Johnson argues that this prospective juror always maintained that she could and would consider both possible punishments.  In short, Johnson contends that, while each of these prospective jurors displayed some scruples about the death penalty, none was subject to disqualification under the *Witherspoon* "substantial impairment" standard.  Thus, she contends that striking these prospective jurors was error.

The government, on the other hand, contends that its motions to strike all three prospective jurors were properly granted, because each prospective juror demonstrated that his or her views on the death penalty would prevent or substantially impair the performance of his or her duties in accordance with the jurors' instructions or oath. The government points out that Prospective Juror 533 had religious beliefs that were inconsistent with her ability to follow the proper evidentiary standard in this case or to fairly consider the death penalty as an option; that Prospective Juror 458 stated that he could not impose the death penalty; and that Prospective Juror 769 gave such ambiguous and inconsistent answers that she was substantially impaired. Moreover, the government contends that the court's credibility findings and evaluations of the prospective jurors are entitled to a presumption of correctness at this point and that Johnson has not overcome that presumption. Rather, the government contends that the totality of each juror's *voir dire* testimony demonstrates the correctness of the court's evaluations. Therefore, the government contends that each of these prospective jurors was properly stricken.

> ### c. *Analysis*

> ### i. *The standard for an "impartial" juror*.
The Sixth Amendment guarantees the defendant the right to trial "by an impartial jury." U.S. CONST. AMEND VI. "Voir dire serves the purpose of assuring a criminal defendant that this right will be protected." *United States v. Ortiz*, 315 F.3d 873, 888 (8th Cir. 2002) (citing *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)), *cert. denied*, 540 U.S. 1073 (2003). "Impartiality [of jurors] is presumed 'so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.'" *United States v. Wright*, 340 F.3d 724, 733 (8th Cir. 2003) (quoting *United States v. Evans*, 272 F.3d 1069, 1078 (8th Cir. 2001), *cert. denied*, 535 U.S. 1029 (2002), in turn quoting *Lockhart v. McCree*, 476 U.S. 162 (1986)). As the Eighth Circuit Court of Appeals has explained, "[t]he test

for assessing impartiality asks whether the prospective juror 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Wright*, 340 F.3d at 733 (quoting *United States v. Johnson*, 906 F.2d 1285, 1288 (8th Cir. 1990), with internal quotation marks omitted).

In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Supreme Court held that, not only is a capital defendant entitled to an impartial jury, but such a defendant is also entitled to strike for cause any juror who will *automatically* vote for death if the defendant is convicted, without regard to the facts or the court's instructions on the law. *See United States v. Paul*, 217 F.3d 989, 1004 (8th Cir. 2000) (pursuant to *Morgan*, "[a] defendant subject to the death penalty may properly challenge for cause any juror 'who will automatically vote for the death penalty in every case' and who will not consider aggravating and mitigating circumstances as required by the instructions") (quoting *Morgan*, 504 U.S. at 729). In *Morgan*, the Court also reiterated that, in order to "death qualify" the jury, as required by *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the prosecution is entitled to discover whether a prospective juror would automatically vote *against* the death penalty no matter what the facts of the case were, and may strike for cause any juror who would do so. *Morgan*, 504 U.S. at 722-23. *See generally Ortiz*, 315 F.3d at 892 (summarizing the standards for death-qualification of individual jurors).

*ii.      The standard for erroneous rulings on motions to strike jurors*. The Eighth Circuit Court of Appeals has recently reiterated the standards for determining whether a court erroneously denied or granted a motion to strike a prospective juror for cause, as follows:

> As a general rule, "'a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his

oath.'" *United States v. Ortiz*, 315 F.3d 873, 892 (8th Cir. 2002) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)), [*cert. denied*, 538 U.S. 1042 (2003)]. "Moreover, bias does not have to be evident from voir dire with unmistakable clarity because many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear." *Id.* (internal quotations and citation omitted). Thus, we must afford substantial deference to the district court and affirm its judgment where the decision is fairly supported by the record. *See Swindler [v. Lockhart]*, 885 F.2d [1342,] 1345 [(8th Cir. 1989)] ("[T]he question whether a venireman is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venireman's state of mind. . . . [S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference. . . ." (quoting *Wainwright v. Witt*, 469 U.S. 412, 428-29, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985))). "Because the trial judge is in the best position to analyze the demeanor and credibility of a venireman, we will not reverse a court's ruling absent an abuse of discretion." *Ortiz*, 315 F.3d at 888.

        \* \* \*

We reiterate that:

> [t]he question whether a jury was actually impartial is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed. Because a determination of this kind is essentially one of credibility, and therefore largely one of demeanor, the trial court's resolution of the question is entitled to special deference and may be overturned only for manifest error.

*Pruett [v. Norris]*, 153 F.3d [579,] 587 [(8th Cir. 1998)] (internal quotations and citations omitted); *see also United States v. Moore*, 149 F.3d 773, 780 (8th Cir. 1998)

(concluding that district court's credibility determination concerning juror partiality "cannot be manifest error; indeed it is virtually unassailable on appeal"), *cert. denied*, 525 U.S. 1030, 119 S. Ct. 570, 142 L. Ed. 2d 475 (1998) and 525 U.S. 1082, 119 S. Ct. 826, 142 L. Ed. 2d 684 (1999).

*Nelson*, 347 F.3d at 710-11; *accord Wright*, 340 F.3d at 733 ("The district court has substantial discretion in conducting voir dire, so most rulings on juror challenges are reviewed for abuse of discretion. *United States v. Blom*, 242 F.3d 799, 805 (8th Cir. 2001), *cert. denied*, 534 U.S. 880 (2001). We will not interfere with the district court's discretion to strike jurors for cause 'absent a showing of actual prejudice.' *United States v. Johnson*, 906 F.2d 1285, 1288 (8th Cir. 1990)."). Equivocal responses may provide sufficient support for a court's decision to strike a juror for cause, because the court is entitled to resolve ambiguities about a juror's ability to be fair and impartial by striking the juror. *See Nelson*, 347 F.3d at 712 (jurors "strong responses against the death penalty in the jury questionnaires in combination with their equivocal responses given during voir dire provide fair support for the district court's decision [to strike them].") (citing *Moore*, 149 F.3d at 780, and *Antwine v. Delo*, 54 F.3d 1357, 1369 (8th Cir. 1995), *cert. denied sub nom. Bowersox v. Antwine*, 516 U.S. 1067 (1996)).

    ***iii.***   ***Application of the standards***. The court reiterates its findings that each of the prospective jurors that Johnson contends was improperly stricken either strongly suggested, or expressly stated, that he or she could not follow the court's instructions, could not be death-qualified, *Morgan*, 504 U.S. at 722-23 (the prosecution is entitled to exclude a prospective juror who would automatically vote against the death penalty no matter what the facts of the case were), or gave answers that were so ambiguous or equivocal that it appeared that the juror's views would prevent or substantially impair the juror from performing his or her duties in accordance with the instructions and jurors'

oath. *Nelson*, 347 F.3d at 710 (a juror may be challenged for cause if his or her views would prevent or substantially impair the performance of the juror's duties in accordance with the juror's instructions and oath). Thus, the court reiterates its conclusion that each of the prospective jurors Johnson now identifies was properly stricken.

More specifically, Juror 533's religious beliefs substantially impaired her ability to apply the proper evidentiary standards, because she expressed a belief that eyewitness testimony was required by scripture to impose the death penalty. Her religious beliefs also prevented her from fairly considering both life imprisonment and the death penalty as available punishments, because she believed that only God could impose death. Based on this prospective juror's demeanor, the court does not find entirely credible her averments during *voir dire* that she could apply the correct standards and fairly consider both potential penalties, notwithstanding her contrary beliefs. *See Nelson*, 347 F.3d at 710-11 (the determinations of demeanor and credibility are for the trial court and are entitled to deference, and the court is not required to believe protestations of impartiality). While Prospective Juror 533 may not have revealed bias with unmistakable clarity, such unmistakable clarity is not required, *see Nelson*, 347 F.3d at 710, and the court was entitled to resolve ambiguities about this prospective juror's ability to be fair and impartial by striking the juror for cause. *Id.* at 712 (equivocal responses provide sufficient support for a court's decision to strike a juror for cause). Here, Prospective Juror 533's equivocations and ambiguities led the court to find that this juror could not apply the proper standards and could not be impartial. *Id.* ("As a general rule, a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.") (internal quotation marks and citations omitted). The court

now reaffirms those findings and its conclusion that this prospective juror should be stricken.

The issue with regard to Prospective Juror 458 is, if anything, clearer. This prospective juror plainly demonstrated that he could not follow the court's instructions or fairly consider both potential penalties. *Id.* This prospective juror stated that he would impose a life sentence about 99% of the time; that he started on the "5-yard line" on the life without parole side of the football field; that he would "have to say no" in answer to the question of whether he would consider the death penalty as appropriate punishment for intentional murder, because he also believed in "mercy"; and that he would "have a hard time" giving the death sentence. Whatever averments or equivocations this prospective juror may have made about his ability to follow the court's instructions and to fairly consider both penalties simply were not sufficiently credible to change the court's conclusion, either at the time or with hindsight, that this prospective juror should be stricken. *Id.* at 712 (equivocal responses provide sufficient support for a court's decision to strike a juror for cause).

Finally, the court stands by its conclusion that Prospective Juror 769 was the quintessential example of a juror whose answers were so equivocal, ambiguous, and inconsistent, that the court was entitled, if not absolutely required, to remove her for cause. *See id.* (the court is entitled to resolve ambiguities about a juror's ability to be fair and impartial by striking the juror).

Consequently, the court concludes that it properly granted the government's motion to strike each of these prospective jurors for cause, and holds that the exclusion of these prospective jurors did not implicate the "interest of justice," such that Johnson should receive a new trial. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," if the jury's verdict is

allowed to stand, despite the exclusion of these prospective jurors from the panel. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Therefore, Johnson's motion for new trial on the basis of improperly granted peremptory challenges will also be denied.[18]

### 4.     Ground No. 9: Challenges for cause erroneously denied

Johnson's fourth allegation of error in jury selection, and her ninth ground for judgment of acquittal or new trial, is that the court erroneously denied challenges for cause to jurors 52, 64, 228, 301, 379, 403, 495, 528, 548, 576, 600, 617, 653, 788, 797, and 800,[19] thereby depriving Johnson of her right to a fair trial before a fair and impartial jury comprised of a cross-section of the community in violation of the Sixth, Eighth, and Fourteenth Amendments. However, before summarizing the *voir dire* testimony of the prospective jurors in question, the court must first determine the prospective jurors on whom this claim can be based.

#### a.     Jurors on whom the claim can be based

Under controlling law, the court need not consider a contention that the court erroneously denied a defendant's motions to strike a juror for cause, unless that juror actually served on the panel that convicted the defendant and entered a verdict for the death

---

[18]Again, the court does not believe that this ground for relief is cognizable as a request for judgment of acquittal pursuant to Rule 29. However, to the extent that Johnson seeks judgment of acquittal on this ground, judgment of acquittal will also be denied.

[19]Johnson originally asserted that the court improperly "qualified" Prospective Jurors 109 and 293 over her objections. However, Johnson now states that her counsel's notes reveal that no defense motion to strike either of these prospective jurors was ever made during jury selection. However, she also asserts that she inadvertently omitted Prospective Juror 548 from her original list of challenges erroneously denied, and requests that the court now consider her objection to that prospective juror, as well.

sentence. *See United States v. Nelson*, 347 F.3d 701, 711 (8th Cir. 2003) ("Nelson argues that the district court unconstitutionally denied his for-cause challenges to jurors 21, 38, 114, and 116. Nelson used peremptory challenges to strike each of these jurors and thereby prevented them from sitting on the penalty phase jury. As such, Nelson's argument has no merit.") (citing *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000), as "holding that where the district court erroneously fails to remove a juror for cause, 'that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right,'" and *United States v. Paul*, 217 F.3d 989, 1004 (8th Cir. 2000), *cert. denied*, 534 U.S. 829 (2001), as concluding under similar facts that the right to exercise peremptory challenges was not impaired and that the Sixth Amendment right to fair trial was not violated because the venirepersons did not serve on the petit jury), *cert. denied*, ___ U.S. ___, 125 S. Ct. 486 (2004); *United States v. Ortiz*, 315 F.3d 873, 892 (8th Cir. 2002) ("[T]he necessity of using a peremptory strike does not establish actual prejudice."), *cert. denied*, 540 U.S. 1073 (2003). In other words, if Johnson removed a challenged juror with a peremptory challenge after her motion to strike that juror for cause had been denied, she cannot now challenge the denial of her motion to strike for cause. However, Johnson strenuously disputes the correctness of the governing law.

More specifically, in her initial brief in support of her motion for judgment of acquittal or new trial, Johnson argues that she was forced to use fourteen of her peremptory challenges on these sixteen prospective jurors, significantly reducing her ability to use peremptory challenges on otherwise qualified jurors, contrary to the purpose for which peremptory challenges are designed and intended to be used. In other words, Johnson contends that, by denying her motions to strike these unqualified jurors for cause,

the court denied her a full panel of qualified jurors against whom to exercise her peremptory challenges.

This contention was one of only two issues that Johnson addressed in her reply brief. In her reply, Johnson clarifies that she faced an unconstitutional "Catch-22," between using peremptory challenges or allowing unqualified jurors to be selected. In this case, she contends that she was forced to use seventy-five percent of her peremptory challenges to strike unqualified jurors, thus prejudicing her ability to obtain a fair jury. She contends that cases holding that a defendant cannot complain about an allegedly unqualified juror that the defendant removed by exercising a peremptory challenge, at least in the context of capital cases, defy logic and exhibit a callous disregard of fairness, where the defendants' lives were literally at stake. She contends that the "Hobson's choice" of not removing a demonstrably unqualified juror or using a precious peremptory challenge is constitutionally untenable, not least because appellate and habeas decisions in capital cases reveal that counsel has no choice but to strike the unqualified juror. She contends that, in this case, she was left outnumbered four to one on remaining peremptory challenges against the remaining prospective jurors, which furthered the imbalance in favor of the death penalty over life imprisonment, contrary to due process.

The first, and simplest, answer to Johnson's contentions is that, as explained above, controlling law is otherwise than she might wish it to be. Thus, even were the court persuaded by Johnson's contentions, which it is not, it would be constrained by governing law to consider only her challenges to jurors who actually served on her jury, not her challenges to jurors she removed with peremptory challenges. Second, Johnson's argument, while impassioned, is unpersuasive. As a legal principle, there is nothing unfair or contrary to due process in requiring a capital defendant to use a peremptory challenge against a prospective juror that the court has declined to excuse for cause. As the court

100

noted above, there is no "constitutional" right to *any* peremptory challenges, even if the Supreme Court has held that such challenges constitute a "necessary part of trial by jury." *See Swain v. Alabama*, 380 U.S. 202, 219 (1965); *accord Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) ("We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury."). Thus, peremptory challenges, which are not a "constitutional" right, provide a means for removing jurors that the defendant may consider "unqualified," but the court does not. Failure to exercise an available remedy, use of a peremptory challenge, under such circumstances reasonably constitutes waiver of the alleged error.

Also, there was no unfairness of a constitutional magnitude in this case for at least two reasons. First, the result of compelling Johnson to exercise peremptory challenges when the court refused to strike certain jurors was not a "four to one" disparity between the parties in remaining peremptory challenges, because the government forfeited unused "on the fly" peremptory challenges upon qualification of sufficient prospective jurors, and the parties then began again with five "reserved" peremptory challenges *each* to reduce the "qualified" panel to the twelve trial jurors. Moreover, the court simply cannot find, in this case, that Johnson was forced to use fourteen of her "on the fly" peremptory challenges to strike "unqualified" prospective jurors when the court declined to strike those prospective jurors for cause. While Johnson plainly disagrees, the court cannot find, even with hindsight, that each and every one—or indeed, any—of the jurors that Johnson unsuccessfully challenged for cause should actually have been removed for cause.

Therefore, Johnson cannot prevail on a claim of error based on the court's refusal to strike Prospective Jurors 52, 64, 228, 301, 379, 403, 495, 528, 548, 576, 617, 653, 788, and 800, all of whom she later excluded with peremptory challenges. Consequently,

the remainder of the court's analysis will focus entirely on the decisions not to strike Prospective Jurors 600 and 797.

### b. Background

*i.* ***Prospective Juror 600***. As revealed by the defense's subsequent motion to strike this juror for cause, the key question was whether Prospective Juror 600 was substantially impaired because he would place himself in the shoes of the victim's family members. The pertinent part of his *voir dire* testimony for present purposes, therefore, focuses on the question of this prospective juror's statements concerning victim-impact evidence.

Prospective Juror 600 stated that he "would like to think [he] would have an open mind towards [victim-impact] testimony," that he was "not sure it would completely sway" him, but that he "would like to hear that type of testimony also." He expressly stated that he would "not necessarily" find victim-impact evidence determinative of the appropriate punishment, although he admitted that he was "somewhat" struggling with that question. Ultimately, he stated that, "once again, on the justice side, we must look at the facts and understand the facts." He responded to defense counsel's question about whether he was placing himself in the victims' family members shoes by stating, "Yeah. That's a possibility, yes." He also stated that it was possible that the fact that two of the alleged victims were children might "possibly" hinder his impartiality, because he believed that we are responsible for our children, and because he was a father himself. However, when asked if the fact that children were involved settled the issue of punishment for him, he stated, "I would say no, no. I—as far as the sentencing and the punishment, no. I think the facts will come out as the facts."

Defense counsel moved to strike this juror for cause because of what defense counsel perceived to be his inability to weigh victim-impact testimony the same as other

evidence, making him substantially impaired as a juror. The government opposed the motion to strike on the ground that the juror indicated that he could fairly consider all of the evidence. The court denied the defense motion, because the court found that the prospective juror was entitled to give victim-impact testimony greater weight than other evidence and that the prospective juror had shown that he was not substantially impaired in his ability to consider all of the evidence in the case or to follow the court's instructions. Juror 600 ultimately served as a trial juror in this case.

      *ii.*     **Prospective Juror 797**. The pertinent part of the *voir dire* of Prospective Juror 797 is quite brief. After this prospective juror had been questioned by both parties, and had been allowed to step outside while the parties and the court considered her status, the following colloquy between the court and counsel occurred:

> THE COURT: Any challenge for cause by the defense?
> MR. STOWERS: No, Your Honor.
> THE COURT: By the government[?]
> MR. WILLIAMS: No, Your Honor.
> THE COURT: Okay. Thank you.

Excerpt Of Transcript Of Trial, Individual Questioning Of Prospective Juror 797, April 14, 2005 (docket no. 656), p. 18, *ll.* 20-24. Thus, Johnson's defense counsel did not move to strike this prospective juror for cause at the conclusion of the individual questioning of this juror.

      Thereafter, Prospective Juror 797 was informed that she was "still in our jury pool" and would be required to return for more questioning later in the day. *Id.* at p. 19. Johnson's defense team did not raise an objection immediately after Prospective Juror 797 was so informed, has not cited to or provided the court with any portion of the transcript from later that day indicating that defense counsel ever challenged Prospective Juror 797 for cause, and did not respond in her reply brief to the government's contention that the

defense had never moved to strike this juror for cause.  Indeed, the court finds from a review of the Realtime Transcript for the afternoon of April 14, 2005, that the defense expressly stated that it had no challenges for cause to the remaining prospective jurors after group questioning, *see* Realtime Transcript, April 14, 2005, p. 287, *ll*. 21-23, and that the defense did not object to advancement to the "qualified" pool of Prospective Juror 797 along with two other prospective jurors.  *See id*. at p. 290, *ll*. 16-22.  Thus, the court has no basis to find that counsel ever moved to strike this prospective juror for cause, and need give no further consideration to Johnson's challenge to this juror.

          *c.*       *Arguments of the parties*

In her initial post-trial brief, Johnson asserts that the prospective jurors that the court had declined to strike for cause, including Jurors 600 and 797, were either so biased in support of the death penalty as to be impaired under *Wainwright v. Witt*, 469 U.S. 412 (1985), or so unwilling to give real consideration to mitigation evidence that they could not meet the requirements of *Eddings v. Oklahoma*, 455 U.S. 104 (1982), or both.  However, Johnson made no juror-specific arguments on this point, so it is difficult to tell which of the purported failings she believes applies to Prospective Juror 600, the only prospective juror that Johnson actually moved to strike for cause whom she did not ultimately exclude with a peremptory challenge.

In its resistance, the government contends that, while Prospective Juror 600 demonstrated a natural human emotion that children as victims would make it difficult for him, he also repeatedly indicated that he could still fairly and reasonably consider life imprisonment, as well as death, as an appropriate punishment.  The government contends that this prospective juror also indicated that, despite his natural empathy for the victims' family members, he was not substantially impaired by that empathy from considering life

imprisonment as an option. The government also contends that the court's credibility judgment should not be disturbed on post-trial review.

Johnson addressed again in her reply brief what she considered to be the constitutional violation in ignoring her post-trial challenges to jurors against whom she had ultimately used peremptory challenges. However, she did not identify with any further specificity the basis on which she contends that Prospective Juror 600 should have been stricken for cause.

### d.    *Analysis*

Again, the court finds no basis to consider further Johnson's allegation of error for failure to strike Prospective Juror 797 for cause when the record reveals that Johnson never made a contemporaneous request to strike this prospective juror for cause. Moreover, Johnson has not now identified any basis for supposing that failure to strike this prospective juror for cause *sua sponte* was somehow plain error. Thus, the court's analysis will be directed to Johnson's post-trial reiteration of her challenge to prospective, and ultimately trial, Juror 600.

There may have been some equivocation in Juror 600's *voir dire* testimony about the effect that victim-impact evidence would have on his perception of his own ability to consider all of the evidence. Although a prospective juror's equivocation may entitle the court to resolve the matter by striking the juror, *see Nelson*, 347 F.3d at 712, the court finds that, taking all of Juror 600's questioning into account, Juror 600's apparent equivocation was the result of a conscientious person, aware of the stakes, acknowledging some reasonable self doubts about his response to certain kinds of evidence. His statements clearly were *not* unequivocal statements to the effect that—or equivocal statements from which it could reasonably be inferred that—this juror could not be fair and impartial or knew that he could not be fair and impartial in considering both possible

105

penalties, even in a case involving the murder of children. *See Nelson*, 347 F.3d at 710-11 (citing *Swindler*, 885 F.2d at 1345, which states, *inter alia*, "determinations of demeanor and credibility . . . are peculiarly within a trial judge's province"). The court has difficulty imagining that such a self-aware and self-critical juror was not precisely the kind of juror that *both* sides would have wanted on the panel deciding a case in which the stakes were so high. Moreover, the court finds that there is no basis to conclude that this juror indicated that he would not consider mitigating evidence, as required by *Eddings v. Oklahoma*, 455 U.S. 104 (1982), nor is there any evidence that this juror was so biased in support of the death penalty as to be impaired under *Wainwright v. Witt*, 469 U.S. 412 (1985).

Consequently, the court concludes that it properly denied Johnson's motion to strike this juror for cause, and holds that neither the presence of this juror on Johnson's panel, nor the failure to remove for cause any of the other jurors that Johnson challenged, implicates the "interest of justice," such that Johnson's motion for new trial should be granted. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," if the jury's verdict is allowed to stand, despite the presence of Juror 600 on the panel and despite the court's failure to remove for cause any of the other prospective jurors whom Johnson contends should have been removed for cause. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Therefore, Johnson's motion for new trial on this ground will also be denied.[20]

---

[20]Again, the court does not believe that this ground for relief is cognizable as a request for judgment of acquittal pursuant to Rule 29. However, to the extent that Johnson seeks judgment of acquittal on this ground, judgment of acquittal will also be denied.

### E. Alleged Errors During The "Merits Phase"

Johnson asserts that eleven different errors during the "merits phase" of her trial require a judgment of acquittal or new trial. Those errors are the following: (1) the evidence was insufficient to support the "merits phase" verdicts, requiring judgment of acquittal (Johnson's ground no. 1); (2) the verdicts were against the weight of the evidence, requiring a new trial (Johnson's ground no. 4); (3) the court erred in admitting evidence of Honken's 1997 guilty plea, conviction, and offense details and in allowing the government to argue that such evidence established essential elements of the offenses charged against Johnson (Johnson's ground no. 13); (4) the court erred in admitting, without a limiting instruction, evidence of alleged criminal activity and bad acts by Johnson and others after the date of the killings (Johnson's ground no. 14); (5) the court erred in admitting hearsay statements by Greg Nicholson, Dustin Honken, and Terry DeGeus (Johnson's ground no. 15); (6) the court erred in admitting the testimony of Rick Held concerning Honken's alleged purchase of a firearm (Johnson's ground no. 16); (7) this court and the Eighth Circuit Court of Appeals erred in allowing into evidence the testimony of jailhouse informant Robert McNeese and other fruits of his evidence (Johnson's ground no. 17); (8) one of the prosecutors violated the court's ruling in limine concerning Johnson's alleged role in the offense and violated her right against self-incrimination by making improper closing arguments (Johnson's ground no. 18); (9) the court erred by failing to exclude all evidence that Johnson was the "principal" in the charged offenses (Johnson's ground no. 22); (10) the court violated Johnson's due process rights by reading to and providing the jurors with a detailed set of Preliminary Jury Instructions (Johnson's ground no. 12); and (11) the court gave "merits phase" Jury Instructions that were erroneous in four different respects (Johnson's ground no. 19). The court will consider each of these grounds in turn.

### 1.    Ground No. 1: Insufficiency of the "merits phase" evidence

Johnson's first allegation of error in the "merits phase," and indeed, her first ground for judgment of acquittal or new trial, is that the evidence, when viewed in the light most favorable to the "merits phase" verdicts, was not sufficient to establish the elements of the offenses charged beyond a reasonable doubt as required by due process. This ground for relief plainly seeks a judgment of acquittal. *See, e.g.,* FED. R. CRIM. P. 29(a) ("[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which *the evidence is insufficient to sustain a conviction.*") (emphasis added).

#### a.    Arguments of the parties

In support of her motion for judgment of acquittal, Johnson contends that the evidence was not sufficient to support the convictions on either the "conspiracy murder" charges in **Counts 1** through **5**, or the "CCE murder" charges in **Counts 6** through **10**. As to the "conspiracy murder" charges, Johnson contends that the evidence showed that any conspiracy terminated not later than March 1993, when Honken, Nicholson, Cutkomp, Solland, and Patrick were arrested and charged, and Solland, Patrick, and Nicholson commenced cooperating with authorities. She also argues that the evidence showed that the manufacturing conspiracy ended by late 1992, when Cutkomp left Arizona, the methamphetamine laboratory was shut down, and Dustin Honken informed his brother that he was getting out of the methamphetamine-making business. Johnson argues that the record is devoid of any methamphetamine-making activity after March 1993, and that there is no evidence of further drug activity of any kind until the fall of 1995. Johnson also argues that there is no evidence that she was "engaging in" the charged conspiracy in either July 1993 or November 1993, when the killings allegedly occurred. She contends that evidence that she aided and abetted Honken in killing persons to prevent their testimony against Honken for a conspiracy that was the subject of the 1993 indictment

might have sufficed to convict Johnson of the charges in that indictment, but such evidence is insufficient to prove the capital charges in this case.

As to the "CCE murder" counts, Johnson contends that there was not sufficient evidence that she was "working in furtherance" of Honken's CCE at the time of the killings or even that the CCE existed in July or November of 1993 when the killings occurred. She also contends that the evidence was clear that Patrick, Solland, Reyerson, and Johnson herself, were not organized, supervised, or managed by anyone, let alone by Honken, and that other alleged participants in the CCE had, at best, buyer-seller relationships that are insufficient to make them participants. She reiterates that the CCE, if it ever existed, ceased to exist when Nicholson, Patrick, and Solland began to cooperate with authorities after their arrests in March 1993. She also contends that Jeff Honken's involvement in Dustin Honken's drug activities was insufficient to show that he was a member of the CCE. Next, she contends that there was no ongoing activity of the CCE, if it ever existed, during the time of the killings.

Finally, Johnson contends that there was no sufficient evidence that the killings resulted from or were caused by her actions or conduct, and no sufficient evidence of a substantive connection between the killings, particularly the killings of the Duncans and DeGeus, and the underlying conspiracy or CCE.

The government disputes each of these contentions, pointing to evidence presented at trial that the government contends demonstrates the continued existence of the drug conspiracy and the CCE during and through the killings in 1993. The government argues, first, that there was overwhelming evidence that a single drug conspiracy began in 1992 and continued at least until 1996, and that Johnson fails to comprehend that killing witnesses is, itself, an act in furtherance of a drug conspiracy. The government contends that the conspiracy did not end in 1992 when Cutkomp left Arizona, even if Cutkomp

109

initially intended to leave the conspiracy, because Honken had no intent to end his drug manufacturing enterprise. Rather, by that time, Honken had become involved with Johnson and had told his brother that Johnson had better connections than Terry DeGeus. Also, at this time, Honken was still distributing pounds of methamphetamine to Greg Nicholson and Terry DeGeus. Although the methamphetamine laboratory in Arizona was dismantled, the government points out that the equipment and chemicals were stored, not destroyed. The government also points out that taped conversations between Honken and Nicholson in March 1993 demonstrated that Honken was planning future drug deliveries and was still collecting a drug debt from Nicholson. Cutkomp testified that, as soon as Honken was released from jail pending trial on the 1993 charges, Honken immediately moved forward with his plans to continue manufacturing and distributing methamphetamine, not least because he wanted money to pay an attorney and to try to buy off witnesses.

Next, the government contends that the evidence shows that, during the period of the killings, Honken sent Cutkompt to Arizona twice to collect the equipment and chemicals that Jeff Honken had not destroyed in the immediate panic after Dustin Honken's arrest. Moreover, after Honken and Johnson killed Nicholson and the Duncans, Honken and Johnson made another trip to Arizona to pick up chemicals and equipment to manufacture methamphetamine. The government also contends that the murder of DeGeus in November of 1993 was for the purpose of preventing DeGeus from jeopardizing Honken's continued drug operations as well as to prevent him from informing law enforcement officers about Honken's past activities, not just for "personal reasons," as Johnson contends, because any such "personal reasons," such as the beatings and stalkings to which DeGeus purportedly subjected Johnson, had ceased well before DeGeus was murdered.

Once Honken had retrieved equipment and chemicals, the government contends that the evidence shows that he and Cutkomp renewed their efforts to manufacture controlled substances at Honken's father's house and at Johnson's residence. The government contends that the evidence shows that Johnson assisted the conspiracy by providing seed money to purchase equipment, ingredients, and books. The government asserts that the evidence also shows that, while the conspirators experimented with making other controlled substances, such as "ecstasy," they also continued to try to produce methamphetamine. Also, in the spring of 1995, Honken recruited Dan Cobeen to participate in the enterprise, but had to obtain Johnson's approval before Cobeen could participate. Finally, in late 1995, Honken set up a methamphetamine manufacturing operation in his garage, but that methamphetamine laboratory was seized by law enforcement officers during a search in February 1996.

In short, the government contends that the evidence showed that the conspiracy to manufacture methamphetamine never ended until Honken's arrest in 1996, even if Honken's efforts were hampered or forced into dormancy while he was on pretrial release in 1993. Even if some people fell out of the conspiracy, the government contends that others of the core group, such as Honken, Cutkomp, and Johnson, remained. The government also contends that efforts to conceal the conspiracy, for example, by killing witnesses, even during a period of dormancy of the methamphetamine manufacturing operations, was conduct in furtherance of the conspiracy that continued the existence of the conspiracy.

Similarly, the government argues that there was sufficient evidence that the CCE existed at the time of the murders and beyond, that Johnson was working in furtherance of the CCE at the time of the killings, and that the killings were substantively connected

to the CCE. Again, the government points to the evidence of Johnson's participation in the drug enterprise before, during, and after the killings.

The government also disputes the contention that the evidence is insufficient to demonstrate Honken's management, organization, or supervision of sufficient participants. Specifically, the government contends that it only needed to show that Honken fulfilled one of those roles, and that the evidence was, at the very least, sufficient to show that Honken organized sufficient participants, and more specifically, that he organized and managed Johnson's participation in the CCE. The government points to evidence that Honken decided to manufacture methamphetamine, how to do it, what process and chemicals to use, how much to produce, who should sell it, how much of it and to whom it should be sold, and how much to charge for it. The government points to evidence that Honken also decided how to get the methamphetamine to his distributors and recruited participants and evidence that Honken controlled the contacts between other members of the CCE, so as to reduce collusion among them and to insulate the enterprise from betrayal by one dealer. The government also asserts that there was evidence that Honken fronted drugs to Nicholson, DeGeus, and Johnson, placed them in his debt while they peddled drugs for him, and ran an operation involving such a quantity of drugs as to indicate a management relationship. Moreover, the government argues that the evidence shows that Honken organized and managed the killings in furtherance of the CCE, including Johnson's activities in helping to discover the location of Nicholson, luring DeGeus to a meeting with Honken, and helping to kill the victims and dispose of their bodies.

As to Johnson's contention that the government did not prove that sufficient members of the CCE were involved at the time of the killings, the government contends that there is simply no such requirement in governing law. Rather, the government contends that the supervisory relationship did not have to exist at the same time with

respect to all five persons and all five persons did not have to act together. The government contends that it is illogical to suppose that the head of a CCE could avoid CCE liability by eliminating participants; rather, the issue is whether there was a continuous series of illegal acts driven by a single impulse involving, over its course, sufficient participants. Evidence fulfilling the actual requirements exists here, the government argues. The government also contends that the killings were still in furtherance of the CCE, to the extent that they were intended to conceal the CCE, even if sufficient participants did not remain at the time of or after the killings.

### b. Analysis

### i. Insufficiency of the evidence on the "conspiracy murder" counts. 

As explained in more detail above, the test on a motion for judgment of acquittal is an objective one, "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'" *Pardue*, 983 F.2d at 847 (quoting *Garrett*, 948 F.2d at 476). The court finds that a reasonable fact finder in this case, as in the case of co-defendant Dustin Honken, could easily have found guilt beyond a reasonable doubt, because of the overwhelming avalanche of evidence supporting Johnson's conviction on the "conspiracy murder" charges. This is so, notwithstanding Johnson's key contention, which like Honken's, is that the evidence shows that the underlying conspiracy ceased to exist after Honken's arrest in March 1993, so that there were two or more conspiracies, not one, as the government alleges, during the period alleged in the "conspiracy murder" counts of the Indictment, and the charged conspiracy did not exist at the time of the killings.

As the Eighth Circuit Court of Appeals recently explained, whether one or more conspiracies existed must be determined in "the totality of the circumstances, 'including the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts

occurred.'" *United States v. Ellerman*, 411 F.3d 941, 946 (8th Cir. 2005) (quoting *United States v. McCarthy*, 97 F.3d 1562, 1571 (8th Cir. 1996)). The circumstances may also distinguish between co-conspirators acting at a later time to keep drug-trafficking a secret, *i.e.*, a separate conspiracy to conceal the drug-trafficking crimes, and co-conspirators affirmatively attempting to conceal evidence of the drug-trafficking, as a continuing aspect of the drug-trafficking conspiracy. *United States v. Smith*, 32 F.3d 1291, 1294 (8th Cir. 1994). Where the co-conspirators "'intended from the first to exert strenuous efforts to prevent discovery of the crime and of their involvement in it,'" those efforts, "taken contemporaneously with the drug transaction itself, were a part of the original conspiracy and may properly be considered in assessing the sufficiency of the evidence." *Id.* (quoting *United States v. Masters*, 924 F.2d 1362, 1368 (7th Cir.), *cert. denied*, 509 U.S. 912 (1993)); *accord United States v. Manfre*, 368 F.3d 832, 839 (8th Cir. 2004) ("'[E]fforts to conceal an ongoing conspiracy . . . can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end.'") (quoting *United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000)); *United States v. Williams*, 87 F.3d 249, 254 (8th Cir. 1996) ("A conspiracy is ongoing where 'acts of concealment were undertaken to preserve the conspiracy and foil attempts at detection.' [*United States v. Lewis*, 759 F.2d 1316, 1342 (8th Cir.), *cert. denied sub nom. Milburn v. United States*, 474 U.S. 994 (1985).] Such a case generally exists where the conspiracy is a continuing arrangement with a series of objectives, and concealment is essential to and in furtherance of the survival of its operation."), *cert. denied*, 525 U.S. 850 (1998).

The question of whether single or multiple conspiracies existed is a fact question for the jury. *Ellerman*, 411 F.3d at 945. The court instructed the jurors in Johnson's case, consistent with prevailing case law, on the manner in which the jurors were to make the

necessary determination of whether single or multiple conspiracies existed.[21]  The jury

[21]The pertinent portion of the instruction on "Nature Of The Conspiracies" stated the following:

> The prosecution must prove that the charged conspiracy existed.  It is not enough for the prosecution to prove that some other conspiracy existed or might have existed.  A single conspiracy may have existed, even if all the members did not know each other, or never met together, or did not know what roles all the other members played.  A single conspiracy may also have existed even if different members joined at different times, or the membership of the group changed.  Similarly, just because there were different subgroups operating in different places, or many different criminal acts committed over a long period of time, does not mean that there was more than one conspiracy.  However, these are all factors that you may consider in determining whether more than one conspiracy existed.

> A single conspiracy may exist if the alleged co-conspirators shared common purposes under a general agreement and that all members of the conspiracy provided mutual assistance or were interdependent.  Mutual assistance or interdependence is shown if the activities of each alleged co-conspirator facilitated the endeavors of other alleged co-conspirators or facilitated the venture as a whole, reflecting the conspirators' shared interests and a knowing coordination of efforts to produce a result in harmony with those shared interests.  On the other hand, if the evidence shows only that the alleged co-conspirators engaged in similar acts for similar reasons, or were sometimes assisted by the same people, or knew each other, or interacted with a central or common player, or bought or sold only small quantities of drugs among themselves, then the evidence fails to indicate mutual assistance or interdependence among the alleged co-conspirators, and no single conspiracy existed among them.

(continued…)

was also instructed on the requirements for proof of "conspiracy murder," *see* Preliminary "Merits" Jury Instruction No. 5, "aiding and abetting" such a murder, *see* Final "Merits" Jury Instruction No. 5, and the required "substantive connection" between the killings and the underlying drug conspiracy. *See* Final "Merits" Jury Instruction No. 6. The court cannot find that the jurors' findings pursuant to each of these instructions was not supported by the evidence.

More specifically, in its resistance to this part of Johnson's post-trial motion for judgment of acquittal or new trial, the government has identified evidence that it argues demonstrates that there was a single, overarching conspiracy, including concealment efforts. The court cannot say, based on its own review of the evidence, that no reasonable fact finder could have found, based on the evidence identified by the government, that a single, overarching conspiracy, as charged in **Counts 1** through **5** of the Indictment, existed, that the killings were committed while Johnson was engaging in that conspiracy, and that the killings were substantively connected to that conspiracy, as required by the pertinent jury instructions. The court has reviewed both evidence cited by the government and other evidence, which in its totality shows nearly continuous manufacturing and distribution of methamphetamine, or attempts to do so, as well as attempts to conceal those activities, involving many of the same people. A reasonable fact finder could likewise have rejected Johnson's efforts to separate or compartmentalize this evidence into separate conspiracies, as well as Johnson's attempts to distance herself from the conspiracy and to

---

[21](...continued)
"Merits" Jury Instructions (docket no. 512), Preliminary Jury Instruction No. 6 - Requirements For Proof: "Conspiracy" Defined; *and compare* 8th Cir. Model 5.06G.

show that there was supposedly no substantive connection between the killings and the conspiracy.

The court also finds that there was sufficient evidence for a reasonable jury to conclude that the killings resulted from Johnson's conduct. The evidence showed that Johnson assisted in, facilitated, and actively encouraged—in short, that she "aided and abetted"—Honken's discovery of Nicholson's residence, Honken's acquisition of a firearm, Honken's entry into the Duncan residence, the removal of Nicholson and the Duncans from that residence, and the killings of each of these victims. The evidence also shows that Johnson lured DeGeus into the fatal meeting with Honken, well knowing and intending that DeGeus's death would result from the meeting, and participated in and urged that result.

Finally, while the court and even the government acknowledged at oral arguments that the evidence of Johnson's precise role in the killings was "ambiguous," because there were no surviving eyewitnesses other than Honken and Johnson, that ambiguity does not mean that the evidence was insufficient to convict Johnson of "aiding and abetting" the killings. As the government pointed out, the circumstantial evidence that Johnson intended and participated in the killings is remarkably strong, such that a reasonable juror could easily conclude that Johnson "aided and abetted" the killings while engaging in the underlying drug conspiracy.

Therefore, Johnson is not entitled to judgment of acquittal on **Counts 1** through **5** of the Indictment. *Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476). Johnson's motion for judgment of acquittal based on insufficiency of the evidence to support the "conspiracy murder" charges in **Counts 1** through **5** will be denied.

*ii.*   *Insufficiency of the evidence on the "CCE murder" counts*.  Johnson asserts, as did Honken, that the CCE had ended well before the first episode of killings in July 25, 1993.   Johnson is correct, of course, that to prove "CCE murder," the government must also prove the existence of the underlying CCE.  *See, e.g., United States v. Honken*, 271 F. Supp. 2d 1097, 1116 (N.D. Iowa 2003).  Johnson is also correct that, to prove the existence of the underlying CCE, the government was required to prove that Honken—as the only organizer, supervisor, or manager identified by the government—organized, supervised, or managed five or more other persons with whom he acted in concert.  *See, e.g, United States v. Johnson*, 225 F. Supp. 2d 1009, 1019-20 (N.D. Iowa 2002); 21 U.S.C. § 848(c).  However, the court finds Johnson's arguments about insufficiency of the evidence to support her convictions for "aiding and abetting" the "CCE murders" as unpersuasive as her arguments concerning "conspiracy murder."

Where Johnson goes astray, as did Honken before her, is in her contention that the government cannot prove either sufficient participants in the CCE or Honken's leadership role over them.  The court agrees with the government that more than sufficient evidence was presented at trial from which a reasonable fact finder could find that Jeff Honken, Tim Cutkomp, Angela Johnson, Greg Nicholson, Terry DeGeus, David Patrick, Aaron Reyerson, and Gary Solland were all members of the CCE, not merely customers of some drug-trafficking enterprise involving Honken, and that Honken organized, supervised, or managed each of them.  *See Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476).  Moreover, the jury found, and the evidence supports their finding, that DeGeus, Jeff Honken, David Patrick, Aaron Reyerson, and Gary Solland were participants in the CCE before the killings of Nicholson and the Duncans, and that Timothy Cutkomp and Angela Johnson were participants of the CCE both before

*and* after the killings of all five victims, such that the CCE existed before the killings and continued to exist during and after the killings.

Moreover, the jury was instructed on "aiding and abetting" a "CCE murder," *see* Final "Merits" Jury Instruction No. 5, and the required "substantive connection" between the killings and the underlying CCE. *See* Final "Merits" Jury Instruction No. 6. The evidence reasonably supports the jury's finding that the killings were substantively connected to the CCE and that the killings resulted from Johnson's conduct. As the court noted above, in reference to the "conspiracy murder" charges, the evidence showed that Johnson assisted in, facilitated, and actively encouraged—in short, that she "aided and abetted"—Honken's discovery of Nicholson's residence, Honken's acquisition of a firearm, Honken's entry into the Duncan residence, the removal of Nicholson and the Duncans from that residence, the killings of each of these victims, and the disposal of their bodies. The evidence also shows that Johnson lured DeGeus into the fatal meeting with Honken, well knowing and intending that DeGeus's death would result from the meeting, and participated in and urged that result. Also as stated above, in reference to the "conspiracy murder" charges, while the court and even the government acknowledged at oral arguments that the evidence of Johnson's precise role in the killings was "ambiguous," because there were no surviving eyewitnesses other than Honken and Johnson, that ambiguity does not mean that the evidence was insufficient to convict Johnson of "aiding and abetting" the killings. As the government pointed out, the circumstantial evidence that Johnson intended and participated in the killings is remarkably strong, such that a reasonable juror could easily conclude that Johnson "aided and abetted" the killings in furtherance of the underlying CCE.

Therefore, Johnson is not entitled to judgment of acquittal on **Counts 6** through **10** of the Indictment. *Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is

"whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476). Johnson's motion for judgment of acquittal based on insufficiency of the evidence to support the "CCE murder" charges in **Counts 6** through **10** will be denied.

### 2. Ground No. 4: The "merits" verdicts were against the weight of the evidence

Johnson's second allegation of error in the "merits phase," and her fourth ground for judgment of acquittal or new trial, is that the weight of the evidence is against the jury's verdicts and findings and a miscarriage of justice has occurred, such that a new trial, in whole or in part, is warranted. As additional argument in support of this contention, Johnson asserts only that the court has the authority to grant a new trial, even where the evidence, viewed in the light most favorable to the verdicts, does not mandate a judgment of acquittal. Johnson is correct, *see Dodd*, 391 F.3d at 934 (the court may grant a new trial even where there is substantial evidence to sustain the verdict), but that contention is unavailing here. For the same reasons that the court held above that the evidence was not insufficient to support Johnson's convictions on all counts in the Indictment, for purposes of her motion for judgment of acquittal, the court also finds that the "merits" verdicts on the ten capital counts were not against the weight of the evidence. Even having independently "'weigh[ed] the evidence [and] disbelieve[d] witnesses,'" *see id.* (quoting *Campos*, 306 F.3d at 579), the court concludes that the "interest of justice" is not implicated here, such that Johnson's motion for new trial should be granted, because the "merits" verdicts on the ten capital counts are not against the weight of the evidence any more than those verdicts were insufficiently supported by the evidence. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," therefore, if the jury's verdicts are allowed to stand

on the evidence presented. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Johnson's motion for new trial on this ground will also be denied.

### 3.     Ground No. 13:   The admission of, and argument from, evidence of Honken's guilty plea, conviction, and offense details

As her third allegation of error during the "merits phase" of her trial, and her thirteenth ground for relief on her post-trial motion for judgment of acquittal or new trial, Johnson contends that the admission of evidence of Honken's guilty plea, conviction, and offense details, as well as the government's *res judicata* argument that Honken's guilty plea and conviction established essential elements of the offenses charged against Angela Johnson, violated her due process rights, including her right to confront and cross-examine witnesses against her. Because Johnson contends that the admission of this evidence was "reversible error," owing to the government's argument from this evidence, it appears that Johnson is seeking a new trial on this ground.

#### a.     Background

On December 10, 2004, Johnson filed a Motion In Limine Re:   Prior Determinations Of Guilt And Punishment Re:  Dustin Honken (docket no. 234).  This motion sought exclusion, during jury selection, opening statements, trial, or closing arguments, of evidence of the following matters:  (1) Honken's guilty plea and sentence in 1997 on drug-trafficking offenses or details of that conviction, and (2) the "penalty phase" verdicts against Honken rendered by a jury in late 2004 in the companion case involving the murder of the same witnesses Johnson was charged with murdering.  The court addressed this motion in its Order of February 18, 2005 (docket no. 325), as corrected *nunc pro tunc* on March 10, 2005 (docket no. 357) (published at *United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005)).

In its order, the court found that, in the course of litigating Johnson's December 10, 2004, motion, the parties had agreed that the fact of Honken's conviction in 1997 was relevant, but that his sentence on that conviction was not. On the other hand, the court noted that the parties disputed the extent to which the "particular crimes" with which Honken was charged and to which he pleaded guilty in 1997 were or were not relevant. The court concluded, first, that the fact that Honken was charged with distributing and attempting to manufacture methamphetamine was relevant to the context of Honken's statements to Cutkomp and Cobeen (although the court was less convinced, before evidence was presented, of the relevance of those statements to Johnson's case), and second, that Johnson had not articulated in what way she would be prejudiced if the jury learned the charges to which Honken pleaded guilty in 1997, where she had not been charged with those same offenses. Therefore, the court granted that part of Johnson's December 10, 2004, motion pertaining to Honken's conviction in 1997 to exclude evidence or comment about Honken's sentence for that conviction, but denied that part of the motion as to evidence of the specific charges against him. The court also found that the parties had agreed that neither Honken's conviction nor the jury verdict for a death sentence in late 2004 in the companion case involving charges that were nearly identical to those against Johnson would be admissible in the "merits phase" of Johnson's case. Therefore, the court granted that part of Johnson's December 10, 2004, motion regarding Honken's 2004 conviction and jury verdict for a death sentence, excluded any such evidence, and stated that it would instruct Johnson's jury that it must give separate consideration to the charges against Johnson.

In the course of trial, the government was allowed to introduce Exhibits 303 and 304, which were a judgment and amended judgment reflecting Honken's conviction on the 1996 charges. Also, in the course of his "merits phase" closing argument on May 23,

2005, one of the prosecutors argued that, as part of the proof of the thirteen violations that allegedly constituted the series of offenses for the underlying CCE, the jury could find that Honken's guilty plea to two federal felony drug offenses, as reflected in Exhibits 303 and 304, was evidence that established some of the necessary violations. *See* Realtime Transcript for May 23, 2005, at approximately 11:57 a.m.; *see also id.* (at approximately 12:00, the prosecutor suggested that Honken's guilty plea established the sixth alleged violation). There was no contemporaneous objection to this argument by Johnson's defense team, nor any such objection at the end of the prosecutor's closing argument. *See id.*

### b. Arguments of the parties

In her brief in support of her post-trial motion for judgment of acquittal or new trial, Johnson appears to suggest that this ground for post-trial relief pertains only to Honken's 1997 conviction and offense details. However, she repeatedly refers to Honken's "convictions," which muddies the waters. Nevertheless, what is clear is that Johnson contends that it is well-settled that one person's guilty plea or conviction cannot be used as substantive evidence of the guilt of another, although a co-defendant's plea or conviction may be introduced for proper purposes, such as to reflect on the co-defendant's credibility as a witness, to show the witness's acknowledgment of participation in the offense, or for impeachment. In this case, however, Honken never testified, and Johnson contends that she was prejudiced by the government's argument that Honken's guilty plea and conviction were substantive proof of the elements of the charges against her, where the prosecutor argued that Honken's guilty plea and conviction established the existence of the methamphetamine conspiracy component of both the "conspiracy murder" and "CCE murder" charges. Johnson contends, further, that allowing the government to argue that elements of her charges had been established by Honken's 1997 conviction violated her

123

right to due process and her right to confrontation, because the government's argument had the effect of allowing the government to use evidence from a previous trial to which Johnson was not a party, at which she was not present, and at which she had no opportunity to cross-examine witnesses, as though it were a binding adjudication against her. Johnson contends that, given the "interconnectedness" of the 1996 charges against Honken and the capital charges against her, it was reversible error for the court to allow the prosecution to present evidence of Honken's 1997 conviction on those charges and to argue that such evidence satisfied elements of the charges against her.

In its responsive brief, the government argues that it was necessary for the jury to know that Honken was charged with distributing methamphetamine and attempting to manufacture methamphetamine to put in context statements that Honken made to Tim Cutkomp and Dan Cobeen, at the very least. The government points out that Honken was charged in the same indictment with the same crimes as Tim Cutkomp, who testified as a government witness. Thus, in examining Cutkomp, the nature of the charges against him was necessarily and properly disclosed, and the fact that Honken had been convicted of the charges also necessarily came out, because evidence was presented about events during and surrounding his sentencing hearing. Moreover, the government contends that Johnson was not prejudiced, because Johnson was *not* charged with the offenses for which Honken was convicted in 1997. The government contends that it also *did not* argue that Johnson must be guilty of "conspiracy murder" or "CCE murder" on the basis that Honken was convicted of a drug conspiracy in 1997. The government also argues that, given the evidence that it presented about the conspiracy to distribute methamphetamine and Honken's methamphetamine laboratories, the disclosure to the jury of the charges against Honken in 1996 and his conviction on some of those charges in 1997 did not prejudice Johnson in any way. Finally, the government contends that, even if it was error for the

jury to learn of Honken's 1997 drug conviction, that error was harmless in light of the overwhelming evidence of Johnson's guilt on the charges against her.

At oral arguments, Johnson reiterated that, in the course of the prosecutor's closing argument, as he was going through the elements of the offenses, the prosecutor asserted that Honken's plea and conviction in 1997 established the conspiracy underlying the charges against Johnson, leaving only the question of Johnson's involvement in the conspiracy. Johnson contends that this is exactly why the evidence of Honken's conviction was inadmissible, because it could not be used to establish any element of the charges against Johnson.

At oral arguments, the government responded that it did not recall the prosecutor's precise comments during closing arguments. However, the government asserted that the comment was proper, because Johnson did not request a limiting instruction and, given the overall weight of the evidence, even if the comment was improper, it made no difference to the outcome of the trial.

### c.    *Analysis*

*i.    Applicable law*. Some time ago, the Eighth Circuit Court of Appeals observed, "Ordinarily, one person's guilty plea or conviction may not be used as substantive evidence of the guilt of another." *United States v. Roth*, 736 F.2d 1222, 1226 (8th Cir. 1984) (citing *United States v. Wiesle*, 542 F.2d 61, 62 (8th Cir. 1976)). As this court observed in its March 10, 2005, ruling, the rule excluding evidence of a co-defendant's guilty plea or conviction on similar charges is "'founded upon the notion that [such evidence] has only slight probative value on the question of the defendant's guilt, but is extremely prejudicial.'" *United States v. Hutchings*, 751 F.2d 230, 239 (8th Cir. 1984) (McMillian, concurring) (quoting *United States v. Miranda*, 593 F.2d 590, 594 (5th Cir. 1979)). Thus, the Eighth Circuit Court of Appeals has more recently stated that, although

the trial court has "broad discretion" to determine the admissibility of evidence, "[i]f a guilty plea of a codefendant is brought into a trial, either directly or indirectly, 'trial courts must ensure it is not being offered as substantive proof of the defendant's guilt.'" *United States v. Jones*, 145 F.3d 959, 964 (8th Cir.) (quoting *United States v. Rogers*, 939 F.2d 591, 594 (8th Cir.), *cert. denied*, 502 U.S. 991 (1991)), *cert. denied*, 525 U.S. 988 (1998). The court then explained why this is so and what is the appropriate analysis for a claim that a co-defendant's plea was improperly admitted:

> The defendant's right to a fair trial may be seriously prejudiced if such pleas are mentioned at trial. [*Rogers*, 939 F.2d at 594]. The facts and circumstances of how a plea was used at trial must be carefully scrutinized by the appellate court. *Id.* "It is essential to consider such factors as whether the court gave the jury a limiting instruction, 'whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, and whether the introduction of the plea was invited by the defense counsel.'" *Id.*

*Jones*, 145 F.3d at 964 (applying these factors to hold that the failure of the trial court to give a cautionary instruction about co-defendants' pleas was not plain error); *Boykin v. Leapley*, 28 F.3d 788, 790 (8th Cir. 1994) (holding, in a *habeas* action, that the state properly made a co-defendant's conviction part of its case, where it had charged the defendant with aiding and abetting the same offense, and the defendant had made the co-defendant's guilt part of his own case, by arguing that only the co-defendant had committed the offenses he was charged with aiding and abetting).

Even if the evidence was erroneously admitted, the court must consider whether the error was harmless. *United States v. Mack*, 343 F.3d 929, 935 (8th Cir. 2003) ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting

*United States v. Oleson*, 310 F.3d 1085, 1091 (8th Cir. 2002), *cert. denied*, 538 U.S. 1048 (2003)), *cert. denied*, 540 U.S. 1226 (2004). As the Eighth Circuit Court of Appeals recently explained, "An evidentiary error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.'" *United States v. Crenshaw*, 359 F.3d 977, 1003-04 (8th Cir. 2004) (quoting *United States v. Carroll*, 207 F.3d 465, 470 (8th Cir. 2002), *cert. denied*, 531 U.S. 849 (2000)).

Just as trial courts have "broad discretion" to admit evidence, "[t]rial courts have broad discretion in controlling closing arguments, and they will only be reversed if there has been a clear abuse of that discretion." *United States v. Davis*, 417 F.3d 909, 911 (8th Cir. 2005) (citing *United States v. Wesley*, 798 F.2d 1155, 1156 (8th Cir. 1986)). However, "[a] conviction will be overturned on the basis of inappropriate prosecutorial comments only if they have affected the overall fairness of the defendant's trial." *Id.* (citing *United States v. Young*, 470 U.S. 1, 11-12, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)). The Eighth Circuit Court of Appeals has also explained the appropriate analysis for a claim that the prosecutor made improper comments, as follows:

> In determining whether reversal is merited, we consider whether the prosecutor's comments were actually improper within the context of the trial and, if so, whether they were so prejudicial that the defendant was deprived of his right to a fair trial. *United States v. Eldridge*, 984 F.2d 943, 946 (8th Cir. 1993). Prejudice is determined in light the misconduct's cumulative effect, the strength of the evidence of the defendant's guilt, and the curative actions of the trial court. *Id.* at 946-47. In reviewing objections to the government's closing argument we must think about "the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 12, 105 S. Ct. 1038.

*Davis*, 417 F.3d at 911-12. Although statements or arguments to which no timely objection is made are reviewed for "plain error," if the statements were not "sufficiently prejudicial to require a new trial under the abuse of discretion standard, [the court] do[es] not need to determine whether any of the statements require plain error review." *Id.* at 912 n.3.

Thus, as to both improper admission of the evidence and improper argument from that evidence, the court must consider whether there was an error, and what effect, if any, that error had.

> ii. *The admission of Honken's 1997 guilty plea and details of the offenses*.

In this case, it is clear that Honken's 1997 guilty plea and some of the details of the offenses to which he pleaded guilty were directly brought into Johnson's trial, so that the court must "scrutinize" the purposes for which that evidence was injected into Johnson's trial. *See Jones*, 145 F.3d at 964 (the court must "scrutinize" the purposes for which evidence of a co-defendant's guilty plea was directly or indirectly injected into the trial). As the court explained in its March 10, 2005, pretrial ruling on this issue, the fact that Honken was charged with distributing and attempting to manufacture methamphetamine was relevant to the context of Honken's statements to Cutkomp and Cobeen, although the court was less convinced then, before evidence was presented, of the relevance of those statements to Johnson's case. Thus, the government has offered legitimate reasons, other than to use Honken's conviction as substantive proof of Johnson's guilt, for offering the evidence of Honken's 1997 guilty plea. *See id.* (the court must consider whether there was a proper purpose in introducing the fact of the guilty plea). No limiting instruction was given, but Johnson's counsel conceded at oral arguments that none was requested. *Id.* (also considering this factor). Thus, the court starts from the premise that the evidence was probative of an issue in this case and that it was offered for that proper purpose, rather

than improperly as substantive evidence of Johnson's guilt. *See Jones*, 145 F.3d at 964 (where evidence of a co-defendant's guilty plea is admitted, "'trial courts must ensure that it is not being offered as substantive proof of the defendant's guilt'") (quoting *Rogers*, 939 F.2d at 594); *Roth*, 736 F.2d at 1226 ("Ordinarily, one person's guilty plea or conviction may not be used as substantive evidence of the guilt of another."). In other words, the evidence of Honken's 1997 conviction was properly admitted for the purposes for which the government asserted that it was being proffered.

However, Johnson has pointed out that, while the evidence may have been originally proffered for legitimate reasons other than to use it as substantive proof of her guilt, the prosecutor then *actually used* the evidence as substantive evidence of her guilt in his closing argument, by suggesting that Honken's 1997 guilty plea established the existence of the underlying drug conspiracy. This court had held in this case that proof of the underlying conspiracy was a substantive element of the "conspiracy murder" and that the existence of the underlying CCE was a substantive element of the "CCE murder" charges. *See United States v. Johnson*, 225 F. Supp. 2d 1009 (N.D. Iowa 2002) (so holding). Thus, there was a relationship between some conspiracy and the capital charges in this case that would make proof of that conspiracy substantive evidence of Johnson's guilt on the charged offenses.[22] The court cannot hold that Johnson "invited" introduction of

---

[22]This court also held, in Honken's case, that the 1996 conspiracy charge, to which Honken pleaded guilty, was *not* the "same" conspiracy as the conspiracy underlying the "conspiracy murder" and "CCE murder" charges against him, which were also pending against Johnson, but even if it was the "same" conspiracy, the "conspiracy murder" and "CCE murder" charges were not the "same" offenses. *See United States v. Honken*, 381 F. Supp. 2d 936, 966-67 (N.D. Iowa 2005) (even assuming that the conspiracy underlying the capital offenses was he "same" as the conspiracy to which Honken had previously pleaded guilty, the capital offenses were not the "same" offenses for prior jeopardy

(continued...)

than improperly as substantive evidence of Johnson's guilt. *See Jones*, 145 F.3d at 964 (where evidence of a co-defendant's guilty plea is admitted, "'trial courts must ensure that it is not being offered as substantive proof of the defendant's guilt'") (quoting *Rogers*, 939 F.2d at 594); *Roth*, 736 F.2d at 1226 ("Ordinarily, one person's guilty plea or conviction may not be used as substantive evidence of the guilt of another."). In other words, the evidence of Honken's 1997 conviction was properly admitted for the purposes for which the government asserted that it was being proffered.

However, Johnson has pointed out that, while the evidence may have been originally proffered for legitimate reasons other than to use it as substantive proof of her guilt, the prosecutor then *actually used* the evidence as substantive evidence of her guilt in his closing argument, by suggesting that Honken's 1997 guilty plea established the existence of the underlying drug conspiracy. This court had held in this case that proof of the underlying conspiracy was a substantive element of the "conspiracy murder" and that the existence of the underlying CCE was a substantive element of the "CCE murder" charges. *See United States v. Johnson*, 225 F. Supp. 2d 1009 (N.D. Iowa 2002) (so holding). Thus, there was a relationship between some conspiracy and the capital charges in this case that would make proof of that conspiracy substantive evidence of Johnson's guilt on the charged offenses.[22] The court cannot hold that Johnson "invited" introduction of

---

[22]This court also held, in Honken's case, that the 1996 conspiracy charge, to which Honken pleaded guilty, was *not* the "same" conspiracy as the conspiracy underlying the "conspiracy murder" and "CCE murder" charges against him, which were also pending against Johnson, but even if it was the "same" conspiracy, the "conspiracy murder" and "CCE murder" charges were not the "same" offenses. *See United States v. Honken*, 381 F. Supp. 2d 936, 966-67 (N.D. Iowa 2005) (even assuming that the conspiracy underlying the capital offenses was he "same" as the conspiracy to which Honken had previously pleaded guilty, the capital offenses were not the "same" offenses for prior jeopardy

(continued...)

Honken's guilty plea for purposes of proving the existence of the underlying conspiracy, simply by asserting that the underlying conspiracy did not exist. *Compare Boykin*, 28 F.3d at 790 (the defendant also used the co-defendant's plea defensively to suggest that he alone was guilty of the crime and, thus, invited the government's use of the co-defendant's plea). Therefore, to the extent that the government did use of the evidence of Honken's guilty plea as substantive proof of the underlying conspiracy, that use was improper. *See Jones*, 145 F.3d at 964 (where evidence of a co-defendant's guilty plea is admitted, "'trial courts must ensure that it is not being offered as substantive proof of the defendant's guilt'") (quoting *Rogers*, 939 F.2d at 594); *Roth*, 736 F.2d at 1226 ("Ordinarily, one person's guilty plea or conviction may not be used as substantive evidence of the guilt of another.").

On the other hand, Johnson did not request a limiting instruction, even after the improper use was made of the evidence, so none was given. *See id.* (considering whether a limiting instruction was given). Indeed, Johnson never objected to the allegedly improper argument at the time that it was made. Johnson nevertheless contends that she was prejudiced by the government's actual use of the evidence of Honken's 1997 guilty plea and details of the offenses to which he pleaded guilty, because she had not been a

---

[22](...continued)
purposes); *United States v. Honken*, 271 F. Supp. 2d 1097, 1115 (N.D. Iowa 2003) (holding that the prior conspiracy to which Honken had pleaded guilty was not the "same" as the conspiracy underlying the capital offenses). The court will assume, however, for purposes of Johnson's post-trial motions, that the conspiracy to which Honken pleaded guilty in 1997 was the "same" as, or overlapped some part of, the conspiracy underlying the capital offenses against Johnson. Thus, for purposes of Johnson's post-trial challenge to this evidence, the court will not rely on its pretrial conclusion that Johnson had not articulated in what way she would be prejudiced if the jury learned of the charges to which Honken pleaded guilty in 1997, where she had not been charged with those same offenses.

party to or otherwise been allowed to confront the evidence of the underlying conspiracy when Honken pleaded guilty to the prior charges.

The court concludes that, even if the admission of the evidence of Honken's 1997 guilty plea was erroneous, because the government subsequently made improper use of the evidence, the admission of that evidence was harmless in this case. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the verdicts against her. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). As the government points out, there was other, overwhelming evidence of the existence of the underlying drug conspiracy. Thus, the prosecutor's comment that Honken's 1997 guilty plea established the existence of the underlying conspiracy could have done no more than confirm the conclusion to be drawn from copious other evidence, which Johnson was able to confront; hence, the challenged evidence had no influence, or only a slight influence, on the verdicts, and no effect on her substantial rights. *See id.*

*iii.* ***The prosecutor's argument concerning Honken's 1997 conviction.*** For much the same reason that the admission of the evidence of Honken's 1997 guilty plea was harmless, even if the government improperly used it as substantive evidence of Johnson's guilt, the prosecutor's improper comment does not require any relief, and certainly not reversal of Johnson's conviction. The prosecutor's improper comment simply did not

"affect[ ] the overall fairness of the defendant's trial." *Davis*, 417 F.3d at 911 (stating this standard for determining whether or not improper prosecutorial argument requires reversal). While the comment may have been "actually improper" within the context of the trial, the comment was not so prejudicial that it deprived Johnson of her right to a fair trial. *See id.* (if the comment was "actually improper," the court must consider whether the defendant's right to a fair trial was prejudiced); *see also id.* at 912 n.3 (if the statements were not "sufficiently prejudicial to require a new trial under the abuse of discretion standard, [the court] do[es] not need to determine whether any of the statements require plain error review").

Specifically, the cumulative effect of the comment was slight at best, where it was made essentially in passing, and the other evidence of the existence of the underlying conspiracy, besides Honken's 1997 guilty plea, was very substantial. *Id.* (determining "prejudice" on the basis of cumulative effect, strength of the evidence, and curative actions by the court). Although no curative action was taken by the court, *id.*, Johnson did not request a limiting instruction, or even object at the time to the allegedly improper argument, and indeed, such a limiting instruction or objection for such a passing faux pas would have been more likely to draw undue attention to the improper comment than the comment itself. Ultimately, where the prosecutor's closing argument was otherwise consistently fair, and the other evidence on the issue of the existence of the underlying conspiracy was overwhelming, the court must conclude that the probable effect that the prosecutor's improper comment would have had on the jury's ability to judge the evidence fairly was slight to nonexistent. *Id.* (requiring consideration of the probable effect of the comment on the jury's ability to judge the evidence fairly).

Therefore, even though admission of evidence of Honken's 1997 guilty plea was improper, owing to the improper use that the prosecutor made of that evidence in closing

arguments, the court finds that there is no "miscarriage of justice" in this case warranting a new trial on this ground. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). This portion of Johnson's motion for judgment of acquittal or new trial will also be denied.

### 4. Ground No. 14: The admission of "bad acts" evidence

Johnson's fourth allegation of error during the "merits phase" of her trial, and her fourteenth ground for judgment of acquittal or new trial, is that the court erred in allowing evidence of alleged criminal activity and other bad acts by her and by other persons that occurred after the date of the killings to be received in evidence without a limiting instruction. In her brief in support of her motion, Johnson identifies the pertinent evidence as follows: (1) all evidence of drug activity by her and by others following the 1993 killings; (2) evidence of her alleged conduct at Honken's sentencing; (3) evidence concerning an attempted firearm purchase from Rick Held; and (4) evidence of the alleged threat to Jeff Honken. Johnson contends that the error in the admission of this evidence without a limiting instruction was of such a magnitude that a new trial is warranted.

### a. Background

On May 2, 2005, after jury selection had begun, Johnson filed her Motion In Limine Re: Subsequent Bad Acts (docket no. 460). In that motion, she sought to exclude evidence of alleged criminal conduct and bad acts committed by herself and other persons listed as co-conspirators and participants in the CCE offense subsequent to the killings charged in the indictment on the grounds that such evidence was not relevant to proving the material elements of the offenses charged, was not admissible as evidence of other crimes, wrongs, or acts to prove that she acted in conformity therewith, and involved acts committed by others, so that the potential prejudice and confusion of such evidence of bad acts of herself and others after the killings outweighed any probative value of that

133

evidence. In the alternative, Johnson requested that the court give a limiting instruction modeled on 8th Cir. Model 2.08. Johnson's brief accompanying her motion did not clarify the nature of the evidence that she was seeking to exclude. The court denied the motion on the record on May 3, 2005, noting that the motion was untimely, that Johnson had offered no good cause to excuse the untimeliness of the motion, and that, even if the motion was not untimely, it lacked sufficient specificity. *See* Minutes of May 3, 2005 (docket nos. 461 & 462 (amended)) (Day 15 of Jury Selection).

### b.    *Arguments of the parties*

In support of this portion of her post-trial motion for judgment of acquittal or new trial, in addition to slightly less vague identifications of the evidence in question than she provided in her motion during jury selection, Johnson reiterates that the evidence in question was not relevant to the particular charges in the indictment and to the extent that it was relevant, it was subject to the limitations of Rule 403. She also argues that the evidence, if admitted, should have been the subject of an appropriate Rule 404(b) limiting instruction, for which she contends that she submitted proposed language. Johnson contends that, in fact, far more evidence of bad acts by herself and others *after* the alleged killings than *before* the killings was admitted in this case. Although she does not clarify in what way the evidence was irrelevant to the charges against her, she now contends that, if the evidence was properly admitted, the court was "duty-bound" to give some form of limiting instruction. She contends that the volume and nature of the "bad acts" evidence was such that the error in failing to give a limiting instruction requires a new trial.

In its response, the government contends that Johnson has failed to allege that any of the evidence admitted at trial was not already addressed by her pretrial motion or to cite any new legal authority to support her argument. Therefore, the government reasserts its

134

prior arguments and requests that the court reaffirm its denial of Johnson's pretrial motion on the grounds previously stated by the court.

### c. Analysis

*i.    Untimeliness.*  The court has no hesitancy about reaffirming its conclusions that Johnson's eleventh hour motion in limine concerning "bad acts," filed on May 2, 2005, after jury selection had begun, was untimely, that Johnson offered no explanation for the untimeliness, and that, even had the motion been considered timely, it was too vague to allow the court to determine what evidence was at issue and what grounds might exist for the admissibility or inadmissibility of that evidence.  The motion was proffered months after the January 7, 2005, deadline for such pretrial motions to which the parties and the court had agreed.  Also, Johnson has not pointed to any evidence of "bad acts" by herself or others after the alleged killings that was only disclosed at the last minute.  Rather, because much of the evidence that Johnson appeared to be challenging was essentially the same as evidence admitted in Honken's trial months earlier, and was also plainly disclosed in the discovery files and witness and exhibit lists in this case, Johnson cannot claim that any "surprise" excused her belated request to exclude this evidence.  Moreover, the court simply cannot be expected to read defense counsel's mind to determine what evidence defense counsel *might* be challenging to make a pretrial ruling on admissibility of evidence.  Consequently, the court reaffirms its conclusion that it was proper to leave Johnson with the duty to challenge during trial any "bad acts" evidence that she deemed inadmissible.

Furthermore, Johnson's attempt to clarify post-trial some of the evidence that she believes should not have been admitted without a limiting instruction is only slightly more illuminating.  Johnson now asserts that the evidence in question was the following:  (1) all evidence of drug activity by her and by others following the 1993 killings; (2) evidence of

her alleged conduct at Honken's sentencing; (3) evidence concerning an attempted firearm purchase from Rick Held; and (4) evidence of the alleged threat to Jeff Honken. Notwithstanding the untimeliness of the original motion and some continuing lack of specificity in the post-trial reincarnation of that motion, the court will consider whether these various categories of evidence were improperly admitted without a limiting instruction.

*ii.* ***Evidence of drug activity after the killings***.  As to the first category of evidence, all evidence of drug activity by Johnson and others after the killings, Johnson had contended at various times prior to and during the trial, and in particular, during jury instructions conferences, that the underlying conspiracy and CCE, including sufficient predicate offenses and participants, must all have existed prior to the killings, and that, consequently, any "bad acts," even in furtherance of the conspiracy or the CCE, after the killings were irrelevant and/or unduly prejudicial.  More specifically, Johnson seemed to suggest that each offense in the series of offenses underlying the CCE must have been undertaken by Honken and all five or more of his underlings, and all must have occurred before the killings.  The court noted in its April 27, 2005, letter to counsel regarding revisions to the Preliminary "Merits" Jury Instructions that Johnson had cited no authority in support of this proposition.  Indeed, the court noted that the case law was to the contrary, because the cases suggested, instead, that proof of a CCE or CCE murder does not require proof that the organizer, supervisor, or manager and the five or more other persons all acted together at any one time or in any one place. Rather, the court was more persuaded by the government's suggestion that an offense could be part of the series of offenses if it was committed by any one of the members of the CCE at any time, so long as the offense was related to the other offenses in the series.  The court will reiterate here how it reached this conclusion.

First, several Circuit Courts of Appeals, including the Eighth Circuit Court of Appeals, have made clear that the organizer, supervisor, or manager does not have to organize all five participants at the same time or at any single place. *See, e.g., United States v. Rockelman*, 49 F.3d 418, 420 (8th Cir. 1995); *see also United States v. Almaraz*, 306 F.3d 1031, 1040 (10th Cir. 2002), *cert. denied*, 537 U.S. 1031 (2002); *United States v. Avery*, 128 F.3d 966, 973-74 (6th Cir. 1997). Thus, it cannot be a requirement that all six or more required participants for a CCE actually took part in each and every one of the three or more related violations constituting the requisite series. Second, at least two Circuit Courts of Appeals have expressly held that a defendant may be convicted under the CCE statute even though the predicate offenses were actually committed by other members of the conspiracy and not by him. *See, e.g., United States v. Escobar-de Jesus*, 187 F.3d 148, 174 n.25 (1st Cir. 1999) ("Escobar also suggests that the November 21, 1989 incident cannot constitute a predicate offense for the purposes of the CCE statute because he did not supervise at least five people during that particular incident. However, 'the supervisory relationship . . . need not have existed at the same time with regard to all five persons, and the five persons need not act together.' *United States v. Lueth*, 807 F.2d 719, 731 (8th Cir. 1986). . . .; *see also Richardson [v. United States]*, [526 U.S. 813, 823-24,] 119 S. Ct. [1707,] 1713 [(1999)] (statutory requirements of derivation of income or resources and action in concert with five or more persons do not need to be satisfied with respect to each underlying crime)."), *cert. denied*, 528 U.S. 1176 (2000); *United States v. Holland*, 925 F.2d 1458, 1991 WL 12157, **2 (4th Cir.) (table op.) ("[A] defendant may be convicted under the CCE statute even though the predicate offenses were actually committed by other members of the conspiracy and not by him.") (citing *United States v. Jones*, 763 F.2d 518, 524-25 (2d Cir.), *cert. denied*, 474 U.S. 981 (1985)), *cert. denied*, 502 U.S. 969 (1991); *see also Avery*, 128 F.3d at 972-73 1997 (rejecting the contention

that each member of the CCE must have, himself or herself, committed three or more predicate violations). Third, at least two Circuit Courts of Appeals have recently held that "*Pinkerton* liability," which attributes the acts of one person to another when there is a conspiracy, applies to CCE defendants. *See, e.g., United States v. Souffront*, 338 F.3d 809, 836-37 (7th Cir. 2003), *cert. denied sub nom. Martinez v. United States*, ___ U.S. ___, 124 S. Ct. 2893 (2004); *United States v. Joyner*, 201 F.3d 61, 70 (2d Cir. 2000), *cert. denied sub nom. Atkinson*, 540 U.S. 1127 (2004). Finally, logically, a killing could have been committed while engaging in or in furtherance of a conspiracy or CCE, even if the conspiracy or CCE was only nascent. For example, if the central figure of the conspiracy or CCE murdered competitors, or had someone murder competitors, to clear a market, so that he or she could initiate or expand drug operations into that market, and the central figure's drug enterprise only thereafter involved sufficient participants and violations to constitute a CCE, the central figure would have unquestionably committed the murders "in furtherance" of the CCE or conspiracy and there is unquestionably a "substantive connection" between the killings and the CCE or conspiracy, because it is precisely the killings that cleared the way for the operations of the CCE or conspiracy. Thus, there is simply no requirement under controlling or guiding precedent or under a logical reading of the statute that all events and players required for the CCE or conspiracy must already have been in place at the time of the "CCE murders" or "conspiracy murders."

The consequence of this conclusion is that actions of participants in the CCE or conspiracy after the killings were relevant in Johnson's trial to show not only the existence of the CCE or conspiracy, but the effect of the killings on the CCE or conspiracy—*i.e.*, the "substantive connection" between the killings and the CCE or conspiracy. In this case, the evidence of "bad acts" after the killings by participants in the conspiracy or CCE,

including Johnson, helped demonstrate the continued existence or resurgence of the CCE or conspiracy after a period of dormancy caused by Honken's arrest in 1993. A reasonable juror could have found from the evidence in this case that it was the killings that made that continued existence or resurgence of the CCE or conspiracy possible, so that the killings were "substantively connected" to the CCE or conspiracy. The evidence was, thus, plainly relevant.

The evidence also was not unduly prejudicial, because it was evidence of the CCE or conspiracy itself, and hence, was evidence of the charged offenses. As the Eighth Circuit Court of Appeals has explained, "One of the exceptions to the general rule that evidence of other crimes committed by a defendant is inadmissible is when the proof provides the context in which the charged crime occurred—'the res gestae.'" *United States v. Fleck*, 413 F.3d 883, 890 (quoting *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984)). More specifically, "'A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge.'" *Id.* (again quoting *Moore*, 735 F.2d at 292). Here, the evidence of drug activity, by Johnson and others, after the charged killings plainly provided necessary context and established the elements of the existence of the CCE or conspiracy and the substantive connection between the killings and the CCE or conspiracy.

Furthermore, even if the court abused its "broad discretion" in admitting this evidence, the error was harmless. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the

verdicts. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). The jury ultimately found, on the basis of sufficient evidence, that sufficient participants committed sufficient violations for the CCE and conspiracy to have existed before and during the killings, so that the jury was not required to rely on or be influenced by post-killing "bad acts" evidence to find that the CCE and conspiracy existed. Finally, because the evidence was not improperly admitted, it was not improperly admitted without a limiting instruction.

*iii.* ***Other challenged evidence***. The analysis of the remaining categories of evidence that Johnson now asserts should not have been admitted without a limiting instruction can be briefer. Evidence of Johnson's alleged conduct at Honken's sentencing was properly admitted to counter Johnson's contentions that she was "under Honken's thumb" and, hence, that she was no real threat to anyone when not pushed to illegal conduct by Honken. Also, the jury received a sufficient limiting instruction with regard to this evidence, because the jury was instructed that Johnson was on trial for the charged "conspiracy murders" and "CCE murders," not for anything else. *See* Preliminary "Merits" Jury Instruction No. 2. Thus, this evidence was neither improperly admitted nor improperly admitted without a limiting instruction.

Similarly, evidence concerning an attempted firearm purchase from Rick Held was properly admitted to show Johnson's involvement with Honken and to show Honken's attempt to acquire a firearm in furtherance of the underlying CCE or conspiracy. The court finds that there was sufficient evidence to find that the caller who told Rick Held that "Dustin does not need the pup any more," apparently referring to a handgun that Honken had asked Held to acquire for him, was Angela Johnson, for the reasons stated on

the record, and that, whoever the caller was, the evidence at trial was sufficient to support the admission of this evidence either as "co-conspirator hearsay" statements in furtherance of the conspiracy, or as statements not offered for their truth, and thus, not hearsay.

Finally, evidence of the alleged threat to Jeff Honken was also admissible. That evidence, like other bad acts evidence addressed above, was relevant to show the continued existence of the CCE or conspiracy after the 1993 killings and to show that one of the purposes of the conspiracy throughout its existence had been concealment.

Again, these categories of evidence were plainly relevant. Nor was admission of these categories of evidence unduly prejudicial, because the evidence was either evidence of the existence of the CCE or conspiracy and, hence, of the charged offenses, *see Fleck*, 413 F.3d at 890, or was fair rebuttal evidence to a contention raised by Johnson herself. Furthermore, even if the court abused its "broad discretion" in admitting these categories of evidence, the error was harmless. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the verdicts. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). There was other, overwhelming evidence of Johnson's guilt, such that the jury was not required to rely on or be influenced by the evidence in these categories to reach its conclusion. Finally, because the evidence was not improperly admitted, it was not improperly admitted without a limiting instruction.

Johnson's motion for new trial on this ground will also be denied.

**5.    *Ground No. 15:  The admission of hearsay***

The fifth error during the "merits phase" of the trial that Johnson asserts, and her fifteenth ground for judgment of acquittal or new trial, is that the court erred in receiving various hearsay statements made by Greg Nicholson, Dustin Honken, and Terry DeGeus in violation of the Confrontation Clause.  This contention, again, reiterates arguments that Johnson raised pretrial and that the court rejected.

**a.    *Background***

On November 15, 2004, the government filed its Request For Hearing And Pretrial Ruling Regarding Admissibility Of Out Of Court Statements Made By Decedents Gregory Nicholson And Terry DeGeus (docket no. 207), which Johnson resisted on December 2, 2004 (docket no. 223).  As in Honken's case, the government explained that, prior to his death, Terry DeGeus made several statements to others about the nature and extent of the drug-trafficking conspiracy in which he was involved with Honken and Johnson; where he was going the evening that he disappeared, including specific statements that he was meeting Angela Johnson; and his concerns about being indicted by or called as a witness before a federal grand jury.  The government also explained that Gregory Nicholson made various statements to law enforcement officers and testified before a grand jury about his relationship with Honken and others, including Angela Johnson, and their drug-trafficking activities.  The government sought a ruling that these statements were admissible, *inter alia*, under "forfeiture by wrongdoing" and "co-conspirator hearsay" exceptions to the hearsay rule.  Johnson resisted the government's contentions that these statements were admissible under either the Federal Rules of Evidence or the Confrontation Clause under a "forfeiture by wrongdoing" exception or "co-conspirator hearsay" exception.  However, after an extensive analysis of the parties' contentions, the court ruled that the hearsay

statements by DeGeus and Nicholson would be admissible at trial. *See* January 3, 2005, Memorandum Opinion And Order Regarding Pretrial Motions (docket no. 264) (published at *United States v. Johnson*, 354 F. Supp. 2d 939 (N.D. Iowa 2005)). Such statements were admitted at trial over Johnson's renewed hearsay and Confrontation Clause objections.

Although Johnson asserted a pretrial challenge to the admissibility of Honken's 1997 guilty plea, there is no record that she asserted a hearsay objection to that evidence pretrial. The court considered the admissibility of evidence of Honken's 1997 conviction in its Order of February 18, 2005 (docket no. 325), as corrected *nunc pro tunc* on March 10, 2005 (docket no. 357) (published at *United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005)), and ruled that the evidence was admissible for the reasons recapitulated above, in reference to Johnson's Ground No. 13, beginning at page 121.

At trial, Johnson objected to admission of the transcript of Honken's guilty plea, Exhibit 302, "based on federal rule of evidence 802 and also that it violates this defendant's right of confrontation under the Sixth Amendment." Realtime Transcript, May 10, 2005, at approximately 9:20 a.m. However, the court overruled that objection. Johnson subsequently renewed her pretrial objections to Exhibits 303 and 304, the judgment and amended judgment from Honken's guilty plea to the 1996 charges, when they were offered into evidence, but the court overruled the renewed objections. *See id.* at approximately 9:23 a.m.

### b. *Arguments of the parties*

In her brief in support of her post-trial motion for judgment of acquittal or new trial, Johnson reurges all of the grounds for excluding this evidence that she raised before or during trial. She also contends that there is simply no "murder victim" exception to a defendant's right to confront and cross-examine witnesses, as the court found in its pretrial

ruling. She also contends that the "forfeiture by wrongdoing" exception to the Sixth Amendment Confrontation Clause is too narrow to allow the admission of the statements in question here. She also argues that the court allowed prior statements by Honken to be used at her trial, including his 1997 guilty plea transcript and a variety of alleged co-conspirator statements, but under no stretch would evidence from Honken's guilty plea proceedings fall under the co-conspirator hearsay exception or any other constitutionally-recognized exception. Thus, she contends that the erroneous admission of this evidence warrants a new trial.

In response, the government points out that, once again, as to the statements by Nicholson and DeGeus, Johnson makes no new arguments and cites no new authorities. As to Honken's guilty plea transcript, the government contends that Johnson has failed to identify the statements she contends were not co-conspirator hearsay. Moreover, the government points out that Honken's guilty plea transcript does not even mention Johnson, and indeed, merely reflected his guilty plea to drug conspiracy charges with almost no discussion of the facts. Therefore, the government urges the court to deny Johnson's motion for judgment of acquittal or new trial on this ground, as well.

> ### c. *Analysis*

> *i.* *Admissibility of statements of Nicholson and DeGeus*. The court has already considered and rejected, in a detailed ruling, Johnson's pretrial contentions that the statements of Nicholson and DeGeus were inadmissible hearsay. *See Johnson*, 354 F. Supp. 2d at 959-70. The court reaffirms its pretrial reasoning, which has only been confirmed by the evidence presented at trial. Therefore, the court will reiterate here only those portions of the prior ruling concerning the admissibility of these statements that are pertinent to Johnson's abbreviated post-trial arguments.

The court reiterates, first, that Nicholson's and DeGeus's statements not only could, but did indeed, fall within the "forfeiture by wrongdoing" hearsay exception. This exception applies to "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." FED. R. EVID. 804(b)(6). In *United States v. Emery*, 186 F.3d 921 (8th Cir. 1999), *cert. denied*, 528 U.S. 1130 (2000), the Eighth Circuit Court of Appeals explained that "[t]he rule contains no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence. Instead, it establishes the general proposition that a defendant may not benefit from his or her wrongful prevention of future testimony from a witness or potential witness." *Emery*, 186 F.3d at 926. As this court also explained in its prior ruling on this issue, the *Emery* decision also defeats Johnson's contention that the exception cannot apply unless the "wrongdoing" upon which the exception is based is different from the "wrongdoing" charged in the case, or there would be a "murder victim's" exception. In *Emery*, the court held that the exception *is* applicable to a missing witness's statements even in a trial for the murder of that witness, not just in a trial for the underlying crimes about which the defendant allegedly feared that the missing witness would testify. *Id.* (involving a charge of killing a federal informant in violation of 18 U.S.C. § 1512(a)(1)(C)). This court now adds that the "forfeiture by wrongdoing" exception also does not allow the admission of any statement by any "murder victim" in any proceeding, thus creating some umbrella "murder victim's" exception. Rather, as *Emery* explains and FED. R. EVID. 804(b)(6) requires, the murder victim's statements are only admissible against a defendant who wrongfully prevented future testimony from that witness or potential witness. *See Emery*, 186 F.3d at 926 (the "forfeiture by wrongdoing" exception applies where the defendant has wrongfully procured the absence of the witness or potential witness); FED. R. EVID. 804(b)(6) (the "forfeiture

by wrongdoing" exception applies to "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness").

In her post-trial briefing, Johnson does not attempt to show that the *Emery* decision is wrong or distinguishable. Thus, the court reaffirms its reliance on *Emery* in its decision to admit the statements of Nicholson and DeGeus.

The *Emery* decision also sets out a procedure that is designed for precisely the purpose of establishing that a defendant's wrongdoing justifies application of the exception. *See Emery*, 186 F.3d at 926-27 (setting out a procedure for conditional admission of evidence pursuant to the "forfeiture by wrongdoing" exception and ultimate determination of the admissibility of such evidence). While the court only stated this procedure in its pretrial ruling, it must now show that the procedure was applied during Johnson's trial and that the procedure leads to the conclusion that the admission of Nicholson's and DeGeus's statements pursuant to the "forfeiture by wrongdoing" exception was proper.

In *Emery*, the court explained the procedure for admitting evidence under this exception, as follows:

> Mr. Emery also disputes the procedure that the trial court used to admit this hearsay evidence. He contends that the trial court should have held a preliminary hearing outside the presence of the jury, at which the prosecution would have had to prove by clear and convincing evidence that Mr. Emery procured Ms. Elkins's unavailability. The trial court, instead, admitted the evidence at trial in the presence of the jury contingent upon proof of the underlying murder by a preponderance of the evidence. In doing so, the trial court followed cases dealing with the hearsay statements of co-conspirators: In those cases, evidence is admitted conditionally subject to proof by a preponderance of the evidence that the defendant and the declarant were

146

co-conspirators. *See United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978).

We agree with the trial court that a procedure adapted from the co-conspirator cases was appropriate in the present context. *See [United States v.] White*, 116 F.3d [903,] 911-12 [(D.C. Cir.) (*per curiam*), *cert. denied*, 522 U.S. 960 (1997)]. In so ruling, we are motivated by the functional similarity of the questions involved and by the fact that the repetition necessarily inherent with a preliminary hearing would amount to a significant waste of judicial resources. *See id.* at 914-16. The trial court did not therefore err in denying Mr. Emery a preliminary hearing.

The co-conspirator cases also provide guidance with respect to the issue of the relevant standard of proof. Although one federal appellate court has compared the situation in cases like the present one to the admissibility of in-court identifications that follow tainted out-of-court identifications, and has required proof of predicate facts by clear and convincing evidence, *see United States v. Thevis*, 665 F.2d 616, 629-30 (5th Cir. 1982), *cert. denied*, 456 U.S. 1008, 102 S. Ct. 2300, 73 L. Ed. 2d 1303, 458 U.S. 1109, 102 S. Ct. 3489, 73 L. Ed. 2d 1370, 459 U.S. 825, 103 S. Ct. 57, 74 L. Ed. 2d 61 (1982), we again follow the model of co-conspirator cases, and thus require proof by a preponderance of the evidence. *See Bell*, 573 F.2d at 1044. In so deciding, we align ourselves with the majority of circuits that have considered this question. *See, e.g., White*, 116 F.3d at 912, and *[United States v.] Houlihan*, 92 F.3d [1271,] 1280 [(1st Cir. 1996), *cert. denied*, 519 U.S. 1118 (1997)].

*Emery*, 186 F.3d at 926-27.

In Johnson's case, this court also admitted the evidence of Nicholson's and DeGeus's statements at trial in the presence of the jury contingent upon proof of the underlying murder by a preponderance of the evidence. *Cf. id.* (setting forth such a procedure). As the court explained above, in reference to Johnson's contention that the

evidence was insufficient to support her conviction on any of the capital offenses, *see supra*, beginning on page 108, the prosecution proved, at least by the preponderance of the evidence, that Johnson "aided and abetted"—that is, either engaged or acquiesced in—the killings of Nicholson and DeGeus, thereby wrongfully procuring their unavailability as witnesses against her. *See Emery*, 186 F.3d at 926-27 (authorizing the conditional admission of evidence pursuant to the "forfeiture by wrongdoing" exception contingent upon the proof by the preponderance of the evidence at trial of the murder or acquiescence in the murder of the witness by the defendant); FED. R. EVID. 804(b)(6) (the "forfeiture by wrongdoing" exception applies to "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness"). Thus, admission of Nicholson's and DeGeus's statements pursuant to this hearsay exception was proper.

Moreover, contrary to Johnson's revived contentions, the court reiterates that admission of Nicholson's and DeGeus's statements pursuant to the "forfeiture by wrongdoing" exception of Rule 804(b)(6) comports with Confrontation Clause requirements. Before *Crawford v. Washington*, 541 U.S. 36 (2004), was handed down, the Eighth Circuit Court of Appeals observed in *Emery* that "forfeiture by wrongdoing" not only forfeits any hearsay objection, but forfeits the right of confrontation. *Emery*, 186 F.3d at 926. Specifically, the court noted "that it is well established that a defendant's misconduct may work a forfeiture of his or her constitutional right of confrontation, *see Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970), and that the right of confrontation is forfeited with respect to any witness or potential witness whose absence a defendant wrongfully procures." *Id.* (citing *United States v. Carlson*, 547 F.2d 1346, 1359 (8th Cir. 1976), *cert. denied*, 431 U.S. 914 (1977); *United States v. White*, 116 F.3d 903, 911 (D.C. Cir. 1997) (*per curiam*), *cert. denied*, 522 U.S. 960 (1997), and

*United States v. Houlihan*, 92 F.3d 1271, 1279-80 (1st Cir. 1996), *cert. denied*, 519 U.S. 1118 (1997)). Subsequently, in *Crawford*, the Supreme Court reaffirmed that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds." *Crawford*, 541 U.S. at 62. Thus, Johnson's contention that the "forfeiture by wrongdoing" exception cannot "trump" the Confrontation Clause is plainly contrary to *Crawford*. Moreover, as the government contends, Johnson's contention that *Crawford* only recognized such an exception where the defendant had had a prior opportunity to confront the now missing witness is rebutted by the Supreme Court's reliance in *Crawford* on no such factual circumstance, but upon "equitable grounds." *Id.* Therefore, the Confrontation Clause stood as no bar to the admission of any of Nicholson's or DeGeus's statements falling within the "forfeiture by wrongdoing" hearsay exception in Rule 804(b)(6).

Furthermore, even if the court abused its "broad discretion" in admitting these statements into evidence, the error was harmless. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the verdicts. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). Although the hearsay statements of Nicholson and DeGeus were particularly powerful evidence, making it seem counterintuitive that admission of such evidence, if erroneous, could be harmless, the court nevertheless finds that there was other,

overwhelming evidence of Johnson's guilt, such that the jury was not required to rely on or be influenced by the evidence of Nicholson's and DeGeus's statements to reach its conclusion.

Therefore, Johnson is not entitled to a new trial on the basis of purportedly erroneous admission of hearsay statements of Nicholson and DeGeus.

*ii.* ***Admissibility of Honken's 1997 guilty plea.*** The court may resolve Johnson's "hearsay" challenge to the admission of Honken's 1997 guilty plea more perfunctorily. Johnson leaps to the conclusion that neither the co-conspirator hearsay exception nor any other hearsay exception was applicable to evidence of Honken's 1997 guilty plea, including the transcript of his guilty plea proceedings. However, Johnson leaps to that conclusion without demonstrating that any of the challenged evidence of or from Honken's 1997 guilty plea was, in fact, hearsay. More specifically, Johnson has not shown that the government offered any of this evidence for its truth, rather than for some other non-hearsay purpose. *See* FED. R. EVID. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Because Johnson has not even identified with any specificity the evidence of Honken's 1997 conviction that she is now challenging, it is impossible for the court to determine the merits of her contention that no "co-conspirator" or other hearsay exception is applicable to that evidence.

Furthermore, even if the court abused its "broad discretion" in admitting this evidence, the error was harmless. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the

verdicts. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). Again, there was other, overwhelming evidence of Johnson's guilt, such that the jury need not have relied on Honken's 1997 guilty plea and evidence from his guilty plea in reaching its verdicts.

Therefore, Johnson is not entitled to a new trial on this ground, either.

### 6.   Ground No. 16:   The admission of Rick Held's testimony concerning Honken's purchase of a firearm

Johnson's sixth allegation of error during the "merits phase" of her trial, and her sixteenth ground for judgment of acquittal or new trial, is that the court erred in admitting the testimony of Rick Held concerning Honken's firearm purchase and Held's conversation with an unknown female caller in violation of the Rules of Evidence and the Confrontation Clause. Johnson did not challenge the admissibility of this evidence pretrial.

#### a.   Background

During the "merits phase," the court admitted the testimony of Rick Held that he had purchased a semi-automatic pistol for Dustin Honken, with whom he worked at the Kraft plant in Mason City, using money given to him by Honken. Held testified that Honken told him the handgun was for his girlfriend, who lived in Des Moines, for her protection. Held testified that, after he had purchased the handgun, he told Honken that he could retrieve it at any time. However, Held testified that a few days after Honken's arrest for violations of conditions of his pretrial release, Held received a telephone call from an unknown female who identified herself as Honken's girlfriend. Held testified that the caller told him, "Dustin does not need the pup any more." Held testified that he

understood this statement to mean that Honken did not need the handgun. The court admitted the evidence under the "co-conspirator hearsay" exception.

### b.    *Arguments of the parties*

In one of her more extended arguments for post-trial relief, Johnson contends that the court erred in admitting Rick Held's testimony about the handgun. Johnson contends that, at the time of the alleged telephone call to Held by the unknown female, Honken had at least two girlfriends, herself and Cathy Rick. She also contends that Cathy Rick is at least as likely a candidate to be the unknown female caller as herself, because Steven Vest testified that Cathy Rick had offered to help Honken kill witnesses and escape from prison. Also, aside from the obvious ambiguity of the message from the unknown female caller, Johnson contends that there was insufficient foundation as to the identity of the female caller for this testimony to be relevant under Rule 402 of the Federal Rules of Evidence. Moreover, she contends that the testimony was far more prejudicial than probative, because it suggested that she was helping Honken in his "diabolical" plans to escape from prison and kill witnesses, and because it suggested that, as late as 1998, she and Honken were still working together in a conspiratorial plot to obstruct justice.

The first inference is untenable, Johnson contends, because there is no other evidence that she had any part in Honken's plans to escape and then kill witnesses, police and laboratory technicians, and the families of prosecutors. Instead, she contends that Mr. Vest testified that she was high on Honken's list of witnesses to be executed. Thus, she contends that Held's testimony "dramatically" contradicts Vest's account. Furthermore, Johnson points out that she was obviously unable to cross-examine the unidentified "girlfriend" whom the government asserted, without a scintilla of evidence, was her. She contends that it is "unfathomable that testimonial statements of unidentified witnesses—also untested by the crucible of cross-examination—would have been allowed into evidence, as

was done here." Consequently, she contends that Held's testimony about the phone conversation with the unknown female should have been excluded pursuant to Rules 402, 802, 901, and the Confrontation Clause.

The government, on the other hand, contends in its resistance to Johnson's motion for judgment of acquittal or new trial that the court properly admitted Held's testimony about the telephone conversation with the woman who identified herself as Honken's girlfriend. The government asserts that there was sufficient evidence to demonstrate that Johnson was that woman, but even if she was not, there was sufficient evidence to demonstrate that the call was made by a co-conspirator.

More specifically, the government asserts that there was abundant evidence at trial that Johnson was Honken's girlfriend, and that Tim Cutkomp testified that Johnson was living in Urbandale, a suburb of Des Moines. The government also points out that there was evidence at trial that Johnson had previously purchased a gun for Honken, had helped him conduct surveillance of Greg Nicholson, and had helped him murder five people. The government also points out that there was evidence from Tim Cutkomp that Johnson knew of Honken's subsequent plans to kill witnesses and destroy evidence, that she urged Honken to "get on with" killing Dan Cobeen, was present when Cutkomp and Honken prepared to conduct surveillance of the location at which they believed the government was holding its evidence, and that she was part of the plan to drive them to the site so that they could destroy evidence. In contrast, the government contends that there was no evidence that Cathy Rick had aided Honken in any illegal activity. Thus, the government contends that there was sufficient evidence for the court and the jury to conclude that the unknown female caller was Johnson.

Even if Johnson was not the caller, the government contends that Held's evidence concerning the telephone call was admissible, because it was not introduced for the truth

of the matter asserted, *i.e.*, that Honken did not need "the pup." Instead, the government contends that the statement was offered to establish the link between Honken and the handgun purchased by Held, and whether or not Honken wanted "the pup" was irrelevant to that purpose. Therefore, the statement simply was not hearsay and was properly admitted.

### c. *Analysis*

*i.*    *"Testimonial" hearsay*. The court reiterates its conclusion that the evidence of Held's conversation with an unknown female caller to the effect that Honken did not want "the pup," which Held understood to refer to a handgun that Honken had asked him to purchase, was properly admitted. This is so, because, among other reasons, contrary to Johnson's contentions, by no stretch of the imagination did Rick Held's testimony include "testimonial" hearsay, so that the admission of this evidence was far from "unfathomable."

The Supreme Court held in *Crawford v. Washington*, 541 U.S. 36 (2004), that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. Unfortunately, the Court in *Crawford* left for another day precisely the question that may be key here: a comprehensive definition of "testimonial." *Id.* ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'") & n.10 (acknowledging that "our refusal to articulate a comprehensive definition in this case will cause interim uncertainty," but reasoning that such uncertainty could "hardly be any worse than the status quo"). Nevertheless, the Court provided some clues as to what is and what is not a "testimonial" statement.

First, the Court stated in its conclusion, "Whatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand

jury, or at a former trial; and to police interrogations," because "[t]hese are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id*. Thus, it is plain that such statements are "testimonial," and their admissibility over Confrontation Clause objections is therefore controlled by *Crawford*.

Second, there are clues to the meaning of "testimonial" in the Court's analysis of the "focus" of the Confrontation Clause on "use of *ex parte* examinations as evidence against the accused." *Id*. at 50. The Court explained,

> *This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, ex parte examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.*
>
> The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused—in other words, those who "bear testimony." 1 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid*. *An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.*
>
> *Various formulations of this core class of "testimonial" statements exist*: "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for

Petitioner 23; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois*, 502 U.S. 346, 365, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3. *These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it.* Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

*Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.* Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not sworn testimony, but the absence of oath was not dispositive. . . .

That interrogators are police officers rather than magistrates does not change the picture either. . . . The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace.

*In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.*

*Crawford*, 541 U.S. at 51-53 (emphasis added). Thus, to the extent that the Confrontation Clause was concerned with out-of-court statements, the Court recognized that the nature of "testimonial" hearsay was that it was in the nature of a formal statement against the accused, with the expectation that the statement would be used against the accused at trial,

rather than a casual remark to an acquaintance. Statements made by a witness in an interrogation by law enforcement officers clearly fall within this definition. The statement to Held by the unknown female caller, on the other hand, was nothing like a formal statement against Johnson, and there is not the merest hint of an expectation that the statement would be used against Johnson or anyone else at trial; rather, the statement by the unknown female caller was plainly in the nature of a "casual" remark to an acquaintance, in the sense that there was no intention to make a formal statement against Johnson or anyone else.

Furthermore, the Supreme Court also appeared to recognize in *Crawford* that "statements in furtherance of a conspiracy" are "not testimonial." *See id.* 56 ("But there is scant evidence that exceptions [to the hearsay rule] were invoked to admit *testimonial* statements against the accused in a *criminal* case. Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy. We do not infer from these that the Framers thought exceptions would apply even to prior testimony.") (emphasis in the original); *see also United States v. Reyes*, 362 F.3d 536, 541 n.4 (8th Cir. 2004) ("[Under *Crawford*] co-conspirator statements are nontestimonial. [*Crawford*, 541 U.S. at 56.] *Crawford* did not provide additional protection for nontestimonial statements, and indeed, questions whether the Confrontation Clause protects nontestimonial statements at all. *Id.* at [68]."), *cert. denied sub nom. Burton v. United States*, 542 U.S. 945 (2004). Thus, if the government established that the statement to Held by the unknown female caller was made in furtherance of a conspiracy in which Johnson was also a member, then that statement was "non-testimonial," and *Crawford* does not apply. In Johnson's case, the government presented evidence that the statement to Held about "the pup" was in furtherance of Honken's conspiracy, which Cutkomp's testimony showed Johnson also participated in,

to destroy evidence and wreak vengeance on witnesses, law enforcement officers, and prosecutors, and more particularly, in furtherance of the objective of concealing that conspiracy. Thus, as a co-conspirator statement in furtherance of the conspiracy, the statement was "non-testimonial," and did not implicate the Confrontation Clause issues set forth in *Crawford*.

*ii.* ***Admissibility***. Even if the evidence is not "testimonial" hearsay, Johnson contends, as did Honken before her, that there was insufficient evidence that the caller was Angela Johnson or that the statements in the call were in furtherance of any conspiracy between Johnson and Honken or anyone else. The court, however, finds that there was sufficient evidence to find that the caller was Angela Johnson, for the reasons stated on the record. The court also finds that, whoever the caller was, the evidence at trial was sufficient to support the admission of this evidence either as "co-conspirator hearsay" statements in furtherance of the conspiracy, or as statements not offered for their truth, and thus, not hearsay. Johnson was Honken's "girlfriend," even if there were other candidates for that designation at the time; she was also living in a suburb of Des Moines at that time; and, contrary to Johnson's contentions, and in accord with the government's, there was sufficient evidence that Johnson was a member of the conspiracy to destroy evidence and wreak vengeance on those who had crossed Honken and Johnson. The court also agrees with the government that whether or not Honken "want[ed] the pup" was irrelevant to the purposes for which the government offered this evidence, such that the statement was not offered for its truth. Rather, as the government contends, the evidence was offered to show the link between Honken and the handgun purchased by Held. Thus, the statement either fell within a well-recognized hearsay exception for "non-testimonial" hearsay, pursuant to the "co-conspirator" hearsay exception, or it simply was not hearsay at all. In either circumstance, this evidence was properly admitted.

Again, even if the ruling admitting this evidence was an abuse of discretion, the admission of this evidence under the "co-conspirator hearsay" exception was also harmless. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091); *see also United States v. Womack*, 191 F.3d 879, 883 (8th Cir. 1999) (admission of evidence pursuant to the "co-conspirator hearsay" exception is reviewed for abuse of discretion). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the verdicts. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). Again, there was other, overwhelming evidence of Johnson's guilt, such that the jury need not have relied on Held's testimony in reaching its verdicts.

Johnson's motion for judgment of acquittal or new trial on the ground that the court improperly admitted Held's testimony will also be denied.

### 7.      Ground No. 17:  The admission of evidence from McNeese

Johnson's seventh allegation of error during the "merits phase" of her trial, and her seventeenth ground for judgment of acquittal or new trial, is that this court and the Eighth Circuit Court of Appeals erred in allowing into evidence the testimony of jailhouse informant Robert McNeese and other fruits of his evidence. This ground revives issues extensively litigated pretrial. *See United States v. Johnson*, 196 F. Supp. 2d 795 (N.D. Iowa 2002) (ruling on defendant's motion to suppress evidence from jailhouse informant as to indictment on non-capital offenses), *rev'd*, 338 F.3d 918 (8th Cir. 2003), *rev'd*, 352

F.3d 339 (8th Cir. 2004) (panel rehearing), *cert. denied*, ___ U.S. ___, 125 S. Ct. 76 (2004); *United States v. Johnson*, 225 F. Supp. 2d 1022 (N.D. Iowa 2002) (ruling on defendant's motion to suppress evidence from jailhouse informant as to subsequent indictment on capital offenses), *rev'd*, 352 F.3d 339 (8th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S. Ct. 76 (2004). The court is not convinced by Johnson's argument that neither this court nor the Eighth Circuit Court of Appeals ever truly addressed her argument that the interrogation by McNeese violated her *Miranda* rights as explained in *Edwards v. Arizona*, 451 U.S. 477 (1981). Similarly, this court cannot reverse the decision of the Eighth Circuit Court of Appeals with regard to Johnson's Sixth Amendment rights. Under the circumstances, the court concludes that nothing further would be gained by a detailed discussion of this ground for relief, where the court merely followed the mandate of the Eighth Circuit Court of Appeals in admitting the evidence in question, and Johnson does not contend that this court overstepped or erroneously applied the mandate of the Eighth Circuit Court of Appeals on this issue.

Therefore, Johnson is not entitled to judgment of acquittal or new trial on this ground.

### 8. Ground No. 22: The admission of evidence that Johnson was the "principal" in the offenses

What the court here treats as Johnson's eighth allegation of error during the "merits phase" was actually identified by Johnson as a "penalty phase" error and her twenty-second ground for relief in her motion for judgment of acquittal or new trial. That ground is that the court erred in failing to exclude all evidence and suggestion that Johnson was the "principal" in the charged offenses for the reasons argued in her May 1, 2005, motion. Johnson offered no separate argument in support of this ground for relief in either her brief or her oral arguments on post-trial motions.

The court believes that this ground for relief is properly a "merits phase" issue, not a "penalty phase" issue, for two reasons. First, in relation to her eighteenth ground for relief, discussed next, Johnson asserts that one of the prosecutors violated the court's ruling in limine concerning Johnson's alleged role in the offense by suggesting, *during his "merits phase" closing argument*, that Johnson may have been the person who pulled the trigger on one or more of the killings.[23] Second, Johnson has not identified any other incident, during the "merits phase" or during any other part of her trial, such as the "penalty phase," in which the prosecutor suggested or elicited evidence to the effect that Johnson was the "principal" in the killings. Therefore, the court will consider this ground for relief in what the court believes is its proper context, as a "merits phase" issue.

### a.    *Background*

On May 1, 2005, shortly before jury selection concluded, Johnson filed her Motion In Limine Re: Evidence That Defendant Was A Principal (docket no. 454). In that motion, Johnson sought an order barring any evidence or argument that "suggest[ed]" that she was a "principal" in the intentional killings of the individuals listed in the Second Superseding Indictment, in light of the government's decision to strike allegations charging her as a "principal" on the ten capital charges against her and to proceed to trial only on an "aiding and abetting" theory as to each count. The government resisted Johnson's motion at oral arguments on May 2, 2005.

---

[23]The difference between Johnson's eighteenth ground for relief and her twenty-second ground for relief, to the extent that a difference can be discerned where Johnson offered no separate argument in support of her twenty-second ground, is that her twenty-second ground challenges the court's admission of evidence that she was "the principal," while her eighteenth ground, instead, challenges the prosecutor's purported comment during his closing argument that she may have been "the principal."

On May 3, 2005, the court entered a written ruling on Johnson's motion. *See* May 3, 2005, Order Regarding Defendant's Motion In Limine Re: Evidence That Defendant Was A Principal (docket no. 463) (published at *United States v. Johnson*, 377 F. Supp. 2d 689 (N.D. Iowa 2005)). In that ruling, the court found that the government could not properly be precluded—at least not pretrial—from *presenting evidence* that Johnson acted as a "principal," although the court held that the government was estopped from *arguing* that Johnson was the "principal" in any of the killings.

Johnson has not identified any evidence that she was the "principal" that was ever admitted in any phase of her trial. Indeed, she contends, in support of her eighteenth ground for relief, that there was no evidence whatsoever offered or admitted at trial that would have supported the prosecutor's comment in his closing argument that she may have been the person who pulled the trigger. On the other hand, the government notes, in its resistance to Johnson's eighteenth ground for relief, that there was testimony, for example, from Sara Bramow, that Johnson said she "took out" Lori Duncan.

### b.    *Arguments of the parties*

As mentioned above, Johnson did not assert any new argument in support of her contention that the court improperly admitted evidence that she was the "principal" in the charged offenses. Instead, she expressly relied on a contention that such evidence was improperly admitted for the reasons set forth in her May 1, 2005, motion in limine seeking to preclude any such evidence. Therefore, the court will reprise briefly Johnson's arguments in support of her pretrial motion in limine.

In her May 1, 2005, motion, Johnson argued that, under the circumstances in which the government had stricken allegations that Johnson was the "principal" and was proceeding to trial only on an "aiding and abetting" theory, allowing evidence or argument that she was the "principal" in the offenses would violate her due process right to a fair

trial. This was so, she contended, because admitting such evidence or argument would allow the government to assert patently inconsistent arguments about her involvement in the offense. She also contended that the government should not be allowed to present evidence that she was a "principal," where the government itself did not find that evidence sufficiently credible to pursue a theory that she was a "principal" in any of the killings. Finally, she contended that evidence that she acted as a "principal" would be unduly prejudicial and confusing, where the government was asserting at trial only an "aiding and abetting" theory.

In its resistance to Johnson's pretrial motion, the government contended that all three of Johnson's premises were flawed. The government contended that its theories in the case against separately indicted co-defendant Dustin Honken and this case were not inconsistent, where Honken was charged as both a "principal" and "aider and abettor," and the government had argued in Honken's trial that Honken and Johnson were both participants in the killings. The government also contended that its theory of the case against Johnson was not inconsistent with the charges in the Second Superseding Indictment, where the government had simply decided not to pursue one of the charged alternative theories of liability, liability as a "principal." The government next contended that the decision to drop the "principal" theory was not based on its evaluation of the credibility of its evidence supporting that theory, but on the strategic ground that the "aiding and abetting" theory would be easier to prove. Finally, the government contended that evidence that Johnson acted as a "principal" was relevant and admissible, even where the government intended to proceed only on an "aiding and abetting" theory, because such evidence tended to prove Johnson's knowledge of and involvement in the charged offenses and was inextricably intertwined with other testimony about her involvement, such that it was both relevant and not unduly prejudicial or confusing. In its post-trial brief, the

163

government argues that Johnson has not offered any new arguments or authorities in support of this portion of her motion, so that the court should deny her post-trial motion for the reasons that the court had denied her pretrial motion.

### c.    *Analysis*

According to Johnson, there was no evidence whatsoever that she may have been "the principal." Therefore, logically, Johnson cannot credibly assert that such nonexistent evidence was improperly admitted or prejudicial. Furthermore, to the extent that there was any evidence at trial that could have implied that Johnson was the "principal," such as Sara Bramow's testimony that Johnson told her that she "took out" Lori Duncan, the court finds that such evidence was properly admitted at trial for the same reasons that the court declined to bar the government from presenting such evidence in its pretrial ruling. *See* May 3, 2005, Order Regarding Defendant's Motion In Limine Re:  Evidence That Defendant Was A Principal (docket no. 463) (published at *United States v. Johnson*, 377 F. Supp. 2d 689 (N.D. Iowa 2005)).

More specifically, evidence suggesting that Johnson was the "principal," rather than an "aider and abettor," was not patently inconsistent with the government's theory of the case in the trial of Johnson's co-defendant, Dustin Honken, or patently inconsistent with the government's original theory in this case, where Johnson was originally indicted as both a "principal" and, alternatively, as an "aider and abettor," so that there was no due process violation, particularly where the issue of Johnson's level of involvement was ultimately left to the jury to resolve. *See  Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir.) (recognizing that there was no due process violation where an "inconsistency" in a witness's testimony related only to the defendant's level of involvement in the offense and the jury was left to resolve that inconsistency), *cert. denied sub nom. Gammon v. Smith*, 531 U.S. 985 (2000).

Second, the court is also unpersuaded by Johnson's contention that the government must have presented in this case inconsistent evidence that it knew or believed to be false to support a "principal" liability theory. *See id.* at 1049 ("The due process requirement will cast into doubt a conviction obtained by a prosecutor's knowing or reckless use of false testimony."). The court again finds that this argument proves too much: Reasonable trial strategy to pursue one theory over another, not knowledge or belief that any "principal" liability evidence was not credible, could explain the government's choice, and the government in fact asserted pretrial that it had elected to go to the trial on the "aiding and abetting" theory precisely because that theory presented the most factual possibilities for conviction. Participation ranging from acting to "aid" the killings to acting as the "triggerperson" would satisfy the required factual standard for "aiding and abetting" liability, if the *mens rea* requirements were met, thus widening the possible factual scenarios that would warrant conviction. *See, e.g., United States v. Espinoza*, 349 F.3d 525, 529 (8th Cir. 2003) ("To convict [a defendant] of aiding and abetting, the Government had to prove that he associated himself with the unlawful venture, that he participated in it as something he wished to bring about, that he sought by his actions to make it succeed, and that he shared the criminal intent of the principal.").

Finally, having seen the evidence at trial, the court finds that admission of the extremely limited evidence suggesting that Johnson acted as a "principal" in the killings was not subject to exclusion pursuant to Rule 403 of the Federal Rules of Evidence. *See* FED. R. EVID. 403 (relevant evidence may be excluded if its probative value is outweighed by the danger of undue prejudice). The very limited evidence suggesting that Johnson acted as the "principal" was plainly probative of her "knowledge" and her "participation" in the killings, and thus, was relevant to whether or not she was liable as an "aider and abettor." *See Espinoza*, 348 F.3d at 529 (the aider and abettor must have

"associated himself with the unlawful venture" and have known and intended the outcome of the crime, as well as participating in it). Moreover, evidence that Johnson actually acted as a "principal" rather than an "aider and abettor" was not *unduly* prejudicial or confusing, even if it showed a degree of participation beyond what was required to find her guilty as an "aider and abettor," because it was evidence that was inextricably bound up with the actual criminal events, not evidence on some tangential matter. Finally, such evidence was not potentially unduly confusing, where it was extremely limited, even if the jury was required to resolve apparently conflicting testimony about Johnson's level of involvement in the charged killings, because that was precisely what a jury may reasonably be expected to do. *See United States v. Albanese*, 195 F.3d 389, 390-91 (8th Cir. 1999) ("inconsistent" statements of a witness about the defendant's level of involvement in the offense were properly presented to the jury).

Moreover, even if somehow erroneous, admission of such evidence was harmless. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091); *see also United States v. Womack*, 191 F.3d 879, 883 (8th Cir. 1999) (admission of evidence pursuant to the "co-conspirator hearsay" exception is reviewed for abuse of discretion). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the verdicts. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). Again, the evidence suggesting that Johnson acted as the "principal," rather than as an "aider and abetter,"

such as Sara Bramow's testimony that Johnson said she "took out" Lori Duncan, was extremely limited.  In contrast, there was other, copious, and overwhelming evidence that Johnson "aided and abetted" Honken's murder of Nicholson, the Duncans, and DeGeus, so that the jury's guilty verdicts under the "aiding and abetting" theory, which was the only theory actually submitted, need not have been affected in any way by evidence suggesting that Johnson was the "principal" in the killings.

Therefore, Johnson's motion for judgment of acquittal or new trial on the ground that the court improperly admitted evidence that she was the "principal" in the offenses will also be denied.

### 9.  Ground No. 18:  The closing argument allegedly in violation of Johnson's right against self-incrimination

In what the court believes is a companion ground to the one considered just above, Johnson's ninth allegation of error during the "merits phase," and her eighteenth ground for judgment of acquittal or new trial, is that one of the prosecutors violated the court's ruling in limine concerning Johnson's alleged role in the offense, and violated her right against self-incrimination, by making improper closing arguments.  Johnson explains that this ground is based on the prosecutor's suggestions, during closing arguments, that Johnson may have been the person who pulled the trigger in one or more of the killings and that she had made "no claim of innocence" to various people who testified about things that Johnson allegedly told them concerning the murders.  While Johnson does not specify the relief that she believes should flow from this alleged error, it appears that she is seeking a new trial on this ground.

### a.  Background

In its May 3, 2005, Order Regarding Defendant's Motion In Limine Re:  Evidence That Defendant Was A Principal (docket no. 463) (published at *United States v. Johnson*,

167

377 F. Supp. 2d 689 (N.D. Iowa 2005)), the court noted that the government had acknowledged at oral arguments that it *would not argue* that Johnson was a "principal" in any of the offenses, and the court stated that it would simply hold the government to its word. Therefore, the court granted Johnson's motion to the extent that the court held that the government was estopped from arguing that Johnson acted as a "principal" rather than an "aider and abettor" in the alleged killings by its election to go to trial only on an "aiding and abetting" theory.

Notwithstanding this portion of the court's May 3, 2005, ruling, Johnson contends that one of the prosecutors asserted during closing arguments in the "merits phase" of Johnson's trial that she may have been the person who pulled the trigger in one or more of the killings after all. The court can find no direct comment by the prosecutor to the effect that Johnson was "the shooter" or possible "shooter" for any of the killings in the realtime transcript. However, the court does find from the transcript that the prosecutor made repeated statements during his closing argument that the jury should "assume" that Dustin Honken "pulled the trigger" for all of the killings, that even if the jury were to "believe" that Honken was the one who "pulled the trigger," Johnson was culpable for the killings, and that Honken "may have been" the one who pulled the trigger. *See* Realtime Transcript for May 23, 2005, at approximately 11:29 a.m. (closing); *see also id.* at approximately 2:18 p.m. (rebuttal). The court cannot find any comparable references in the prosecutor's "eligibility phase" or "penalty phase" arguments that even remotely suggest that Johnson, rather than Honken, could have been the person who pulled the trigger for any of the killings.

In the course of closing arguments in the "merits phase," the prosecutor also displayed to the jury on the overhead projector a slide entitled "CRIMINAL INTENT" and subheaded "Admissions of Guilt." That slide then listed the names of eight witnesses

168

(Gaubatz, McNeese, Bramow, S. Johnson, W. Jacobson, Baca, Hoover, and Yager) with the notation "no claim of innocence" by each name, reflecting the government's position that Johnson's comments to these witnesses about the murders had not included any claim of innocence. Johnson contends that she made a contemporaneous objection to this slide and argument, but the court overruled that objection. The Realtime Transcript does show that, in the course of the prosecutor's closing argument, one of Johnson's attorneys did object to the description of the testimony of Gaubatz, McNeese, Bramow, Baca, Hoover, and Yager as including "no claim of innocence" on the ground that it was a "misstatement of the record" and that it would be "contrary to [Johnson's] Fifth Amendment right under the United States Constitution," but the court overruled that objection. Realtime Transcript for May 23, 2005, at approximately 11:39 a.m.

### b. Arguments of the parties

In her brief on her post-trial motion for judgment of acquittal or new trial, Johnson contends that the comment by the prosecutor concerning Johnson's failure to claim innocence to various witnesses, coupled with the prosecutor's suggestion that she may have been "the shooter," violated the ruling on the pertinent motion in limine and violated her Fifth Amendment right against self-incrimination. Johnson contends that even ambiguous references, such as comments that evidence was "uncontradicted" or "undisputed," are impermissible when they manifest the prosecutor's intention to draw attention to the fact that the defendant did not testify, and may improperly suggest that the defendant failed to rebut a particular point, thereby disparaging the defendant's right against self-incrimination. Johnson contends that the prosecutor's comments in this case that she made no claim of innocence to various witnesses were such that the jury would naturally and necessarily take those comments as comments on her failure to testify. When the comments about her failure to claim innocence are coupled with the comments that she was

169

"the shooter," in what Johnson contends was the complete absence of any evidence on that issue and in violation of the ruling on her motion in limine, Johnson contends that the prosecutor's "toxic intent" is evident. Therefore, she contends that the government violated her Fifth Amendment right against self-incrimination and her due process rights under the Eighth and Fourteenth Amendments.

On behalf of the government, the prosecutor asserted that he did not recall that either of the prosecutors ever claimed that Johnson was or could have been "the shooter." The government's theory of the case was, instead, that Honken pulled the trigger during the murders and that Johnson aided and abetted him. Although the government pointed out that there was testimony, for example, from Sara Bramow, that Johnson said she "took out" Lori Duncan, the government contends that it never departed from its theory that Johnson's role in the offenses was that she aided and abetted Honken in the murders, and this was the only theory submitted to the jury in the jury instructions. Even supposing that the comment that Johnson was "the shooter" was made, the government contends that Johnson has failed to indicate how this comment violated her constitutional rights.

As to supposed comments on Johnson's failure to assert her innocence to various witnesses, the government contends that the chart was not an impermissible comment on Johnson's right to remain silent, because it merely reflected that, in statements that Johnson made to witnesses who subsequently cooperated with the government, Johnson did not proclaim her innocence. Thus, the government contends that there was no direct or indirect comment on Johnson's right to remain silent. The government also contends that Johnson failed to make any objection when the government elicited testimony from various witnesses that Johnson never claimed to be innocent when she made admissions to the witnesses. Thus, the government contends that it was permissible for the prosecutor to make and use charts created from competent testimony summarizing the testimony of the

witnesses. Moreover, the government contends that the chart did not refer to anything that Johnson did or did not do in the course of trial, such that it contained no reference at all to Johnson not testifying. Finally, even assuming that the arguments were improper, the government contends that any error was harmless.

In her oral arguments in support of her post-trial motions, Johnson contended that her defense counsel made a contemporaneous objection to the prosecutor's use of the chart showing witnesses to whom Johnson had purportedly made no claim of innocence, but the court overruled her objection. She asserted that her objection specifically referenced the Fifth Amendment, so that it was broad enough to encompass the arguments that she now makes. Johnson contends that the prosecutor then emphasized his contention that Johnson had made no claim of innocence to these witnesses in the course of his closing arguments.

In its oral arguments, the government asserted that the chart was nothing more than a summary of the witnesses' testimony, so that the issue is whether Johnson objected at the time that the testimony came in. The government also asserted that there is a difference between asking whether Johnson claimed that she was innocent while confessing to persons who were not or who Johnson did not know were law enforcement officers or agents and commenting on Johnson's right to remain silent in response to questions by law enforcement officers after she had been advised of her rights.

In rebuttal, Johnson argued that many of the witnesses testified only to snippets of conversation involving Johnson that they overheard, not about full-blown conversations with Johnson, so that it was unfair to suggest any inference from a failure of the snippet to include an assertion by Johnson of her innocence.

### c.    *Analysis*

The court set out above, beginning on page 127, the standards for determining whether or not improper arguments by the prosecutor require post-trial relief. As explained more fully above, the court must consider whether there was an error, and what effect, if any, that error had. *See Davis*, 417 F.3d at 911 (stating the standards for determining whether or not improper prosecutorial argument requires reversal). Similarly, the Eighth Circuit Court of Appeals recently stated, in a case that also allegedly involved violation of a defendant's right against self-incrimination, that to warrant a new trial on the ground that the prosecutor made an improper comment on a defendant's right to remain silent, "the defendant must demonstrate that a prosecutor's comment was both improper and prejudicial to the defendant's substantial rights." *United States v. Gardner*, 396 F.3d 987, 988 (8th Cir. 2005). Therefore, because the general standards are already set out elsewhere, the court turns, first, to the specific question of what constitutes improper argument implicating a defendant's right against self-incrimination.

### i.    *Violation of the right against self-incrimination*.    As the Eighth Circuit Court of Appeals recently explained,

> The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The core protection afforded by the Fifth Amendment is a prohibition on compelling a criminal defendant to testify against himself at trial. *See, e.g., Chavez v. Martinez*, 538 U.S. 760, 767, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003) (plurality opinion). "To give full effect to this protection, the Supreme Court has held that 'the fifth amendment . . . forbids . . . comment by the prosecution on the accused's silence . . . .'" *United States v. Moore*, 104 F.3d 377, 385 (D.C. Cir. 1997) (omissions in original)

(quoting *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965)).

*United States v. Frazier*, 408 F.3d 1102, 1109 (8th Cir. 2005), *petition for cert. filed* (Oct. 20, 2005) (NO. 05-7207); *Gardner*, 396 F.3d at 988 ("It is well established that 'the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.'") (quoting *Griffin v. State of California*, 380 U.S. 609, 615 (1965)). This rule against comment by the prosecution on the accused's silence applies "to both direct and indirect comments on a defendant's failure to testify." *Gardner*, 396 F.3d at 989. The prosecutor's comments must be evaluated in the context of the entirety of the closing arguments and the evidence introduced at trial. *Id.*; *United States v. Smith*, 266 F.3d 902, 906 (8th Cir. 2001).

Johnson does not contend that the prosecutor's comments about her failure to claim innocence to various witnesses was a "direct" comment on her exercise of her rights against self-incrimination. However, a prosecutor may not "indirectly" comment on a defendant's right to remain silent or failure to testify, either, if that comment "'manifest[s] the prosecutor's intent to call attention to a defendant's failure to testify.'" *Robinson v. Crist*, 278 F.3d 862, 866 (8th Cir. 2002). Moreover, "[w]hen the prosecutor has neither directly commented on the defendant's silence, nor demonstrated an intent to draw attention to that silence, the issue is whether 'the jury would naturally and necessarily understand the comments as highlighting the defendant's failure to testify.'" *Gardner*, 396 F.3d at 989 (quoting *Herrin v. United States*, 349 F.3d 544, 546 (8th Cir. 2003) (emphasis added), *cert. denied*, ___ U.S. ___, 124 S. Ct. 2832 (2004)); *Robinson*, 278 F.3d at 866 (for "indirect" comments, the defendant must show either that the prosecutor's intent was to call attention to the defendant's failure to testify or must show that the comment would naturally and necessarily be taken by the jury as a comment on the defendant's failure to

testify). A comment is "naturally and necessarily" taken as a comment on the defendant's failure to testify when "no one other than the defendant could have refuted the evidence in question." *Id.* at 992. However, "'the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury *necessarily* would have done so.'" *Id.* (quoting *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir.), *cert. denied*, 519 U.S. 862 (1996)) (emphasis in the original quotation). Therefore, the Eighth Circuit Court of Appeals has cautioned that "'a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)).

Johnson is correct that a comment in closing argument that the government's evidence was "unrefuted, uncontradicted, or unexplained" may constitute an "indirect" comment on the defendant's failure to testify. *Gardner*, 396 F.3d at 991. Although Johnson relies on cases involving such comments, the allegedly improper comments at issue in her case simply are not of that nature. Thus, her reliance on such cases is not illuminating. While "[i]n general, 'the government may comment on the failure of the defense, as opposed to the defendant, to counter or explain the evidence [unless] the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify,'" *id.* at 991 (quoting *United States v. Guzman*, 781 F.2d 428, 432 (5th Cir.) (quotation omitted), *cert. denied*, 475 U.S. 1143 (1986), and also citing *United States v. Johnson*, 713 F.2d 633, 651 (11th Cir. 1983), *cert. denied*, 465 U.S. 1081 (1984)), there are no such comments at issue here, either. Instead, Johnson's contention is that the prosecutor improperly commented that various witnesses had testified that Johnson made no claim of innocence when confessing to them her involvement in the murders.

It is not clear to the court how the prosecutor's comment that Johnson had made no claim of innocence to various witnesses is even a comment on her right to remain silent or her right not to testify; rather, it is a comment on a historical fact that was apparent from the evidence. The court also finds that Johnson has not shown how, when, or why her right to remain silent had attached *as to any of these witnesses*. At the time that she made the comments to these witnesses, Johnson was not being interrogated by law enforcement officers, nor could any of these witnesses—with the possible exception of Robert McNeese, depending on the time at which he heard comments from Johnson—have been considered an agent of the government. Apparently, Johnson's contention is that the comment was one that would "naturally and necessarily" be taken as a comment on her failure to testify, because "no one other than [Johnson] could have refuted the evidence in question." *Gardner*, 396 F.3d at 992. The court will assume, for the sake of argument, that the comment was improper for this reason. *But see id.* (the comment must be more than possibly or probably viewed by a jury as a comment on the defendant's right against self-incrimination; it must *necessarily* be understood by the jury in this way, and the court must not "lightly infer" that an ambiguous remark has its most damaging meaning).

Even assuming, for the sake of argument, that the observation that Johnson had made no claim of innocence to various witnesses was somehow an indirect comment on her exercise of her right against self-incrimination, the court finds that Johnson has failed to meet the further requirement for relief, a showing that the purportedly improper comment caused her harm or prejudice. *See Davis*, 417 F.3d at 911 (stating the standards for determining whether or not improper prosecutorial argument requires reversal as proof of an improper comment and harm); *id.* at 912 n.3 (if the statements were not "sufficiently prejudicial to require a new trial under the abuse of discretion standard, [the court] do[es] not need to determine whether any of the statements require plain error review"); *Gardner*,

396 F.3d at 988 (also stating that, in a case involving alleged violation of a defendant's right against self-incrimination, that to warrant a new trial on the ground that the prosecutor made an improper comment on a defendant's right to remain silent, "the defendant must demonstrate that a prosecutor's comment was both improper and prejudicial to the defendant's substantial rights").  Johnson has not even articulated how the comment allegedly prejudiced her, unless it is her suggestion that the comment, in conjunction with a comment that Johnson may have been "the shooter," indicates a "toxic intent" on the part of the prosecution.  However, this assertion simply begs the question of what prejudice the supposed "toxic intent" on the part of the prosecution caused Johnson.

Furthermore, where, as here, the contention that a comment by the prosecutor is an "indirect" comment on the defendant's failure to testify or right to remain silent is "tenuous at best," an instruction to the jury that the defendant has the privilege not to testify may be sufficient to eliminate any potential prejudice.  *Robinson*, 278 F.3d at 866 (where the defendant's contention of violation of his right against self-incrimination was "tenuous at best," this instruction was "an additional safeguard" that demonstrated that there was no substantial and injurious effect to the alleged reference to the defendant's failure to testify).  Here, the jury was so instructed.  *See* Final "Merits" Jury Instruction No. 11 - Defendant's Decision Not To Testify (stating that, because the prosecution bears the burden of proof, and "[t]he defendant has a constitutional right to remain silent," the jury could not discuss or consider in any way when deliberating and arriving at its verdict "the fact that the defendant did not testify").  Therefore, Johnson has made no credible claim of prejudice from the allegedly improper closing argument that certain witnesses testified that Johnson had not made any claim of innocence to them.

Thus, Johnson is not entitled to a new trial on this ground.

*ii.* ***The prosecutor's argument that Johnson may have been "the shooter."***

Johnson is on more solid ground in asserting that any comment by the prosecutor that Johnson may have been "the shooter" would have violated the letter and spirit of the court's May 3, 2005, Order Regarding Defendant's Motion In Limine Re: Evidence That Defendant Was A Principal (docket no. 463) (published at *United States v. Johnson*, 377 F. Supp. 2d 689 (N.D. Iowa 2005)). In that order, the court held that the government was estopped from arguing that Johnson acted as a "principal" rather than an "aider and abettor" in the alleged killings by its election to go to trial only on an "aiding and abetting" theory. Thus, any comment by the prosecutor in his closing argument that Johnson may have been "the shooter" would have been clearly improper. *See Davis*, 417 F.3d at 911 (first prong of the inquiry concerning whether or not improper prosecutorial argument requires reversal is proof of an improper comment).

The problem with this contention is that the court finds no such direct statement by the prosecutor that Johnson may have been "the shooter" in the prosecutor's "merits phase" closing argument. Instead, as noted above, the court does find from the transcript that the prosecutor made repeated statements during his closing argument that the jury should "assume" that Dustin Honken "pulled the trigger" for all of the killings, that even if the jury were to "believe" that Honken was the one who "pulled the trigger," Johnson was culpable for the killings, and that Honken "may have been" the one who pulled the trigger. *See* Realtime Transcript for May 23, 2005, at approximately 11:29 a.m. (closing); *see also id.* at approximately 2:18 p.m. (rebuttal). These statements are, at the very most, very indirect suggestions that Johnson may have been the triggerperson for one or more of the killings.

Even assuming, for the sake of argument, that the prosecutor's actual statements carry sufficient implication that Johnson may have been the triggerperson for one or more

177

of the killings, Johnson has failed to demonstrate that she was prejudiced by a passing suggestion to the jury that she may have been "the shooter." *See Davis*, 417 F.3d at 911 (proof of harm or prejudice from the improper argument is the second requirement for relief); *see also id.* at 912 n.3 (if the statements were not "sufficiently prejudicial to require a new trial under the abuse of discretion standard, [the court] do[es] not need to determine whether any of the statements require plain error review"); *Gardner*, 396 F.3d at 988 (same). Again, Johnson's argument that the comment, coupled with the comment that several witnesses heard no claim of innocence when Johnson confessed to them, shows the prosecution's "toxic intent" simply begs the question of what prejudice Johnson suffered because of that supposed "toxic intent." Moreover, the clear thrust of the government's case was that Johnson was an "aider and abettor" in the murders, the court only instructed the jury on such an "aiding and abetting" theory, and there was overwhelming evidence that Johnson did act as an "aider and abettor" in the killings. Thus, Johnson cannot show that she was prejudiced by a passing comment by the prosecutor that she may have been "the shooter" in one or more of the killings.

Therefore, Johnson's motion for new trial on this ground will also be denied.

### 10.    The "merits phase" jury instructions

Johnson's remaining allegations of errors in the "merits phase" of her trial on capital offenses all relate to alleged errors in the "Merits Phase" Jury Instructions. The court will consider these alleged errors in turn after setting forth the standards for determining whether jury instructions were erroneous and under what circumstances relief must be afforded to a defendant for such erroneous instructions.

### a.  *Applicable standards*

As the Eighth Circuit Court of Appeals very recently reiterated, "'In order to preserve the issue of whether a particular jury instruction should or should not have been issued, an attorney must make a timely objection, explaining the grounds upon which the instruction should or should not issue.'" *United States v. Tobacco*, 428 F.3d 1148, 1150 (8th Cir. 2005) (quoting *United States v. Kirkie*, 261 F.3d 761, 770 (8th Cir. 2001)); *United States v. Looking Cloud*, 419 F.3d 781, 788 (8th Cir. 2005). Where timely objection is made, post-trial review of a court's formulation of jury instructions is for "abuse of discretion." *United States v. Walker*, 428 F.3d 1165, 1171 (8th Cir. 2005). Under this standard of review, the reviewing court will "consider whether the instructions 'correctly state the applicable law.'" *Id.* (quoting *United States v. Milk*, 281 F.3d 762, 768 (8th Cir. 2002). The court's instructions will be affirmed on "abuse of discretion" review "'if the instructions, taken as a whole, fairly and adequately submitted the issues to the jury.'" *United States v. Thomas*, 422 F.3d 665, 668 (8th Cir. 2005) (quoting *United States v. Florez*, 368 F.3d 1042, 1044 (8th Cir. 2004)). The judgment must be reversed "only where an abuse of discretion is prejudicial to one of the parties." *Walker*, 428 F.3d at 1171 (citing *United States v. Whitehead*, 176 F.3d 1030, 1037 (8th Cir. 1999)).

On the other hand, where no timely objection is made to preserve the error in the instructions, the reviewing court will review for "plain error." *Tobacco*, 428 F.3d at 1150; *United States v. Larsen*, 427 F.3d 1091, 1095 (8th Cir. 2005) (also applying "plain error" review in such circumstances). On "plain error" review, the reviewing court must also "read the instructions as a whole to determine whether they fairly and adequately stated the relevant law." *United States v. Olguin*, 428 F.3d 727, 728 (8th Cir. 2005). Thus, the reviewing court "will not correct an error not raised at trial unless there is (1) error, (2) that is plain, (3) that affects substantial rights, and (4) that affects the fairness

and integrity of judicial proceedings." *Id.* at 728 n.3 (citing *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)).

Like jury instructions, verdict forms to which timely objection is made are reviewed for "abuse of discretion." *United States v. Martinson*, 419 F.3d 749, 753 (8th Cir. 2005 (citing *United States v. Moore*, 149 F.3d 773, 779 (8th Cir. 1998); *United HealthCare Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 574 (8th Cir. 1996)). Also like jury instructions, verdict forms to which no timely objection was made are also reviewed only for "plain error," requiring consideration of the same factors identified above for "plain error" review of jury instructions. *Id.* (citing *United States v. Davis*, 237 F.3d 942, 944 (8th Cir. 2001), and holding that "plain error" review of verdict forms requires determination of whether there was plain error and an effect on substantial rights, which requires proof that the error affected the outcome of the proceedings, citing *United States v. Olano*, 507 U.S. 725, 734 (1993)).

With these standards in mind, the court turns to a review of Johnson's allegations of errors in the "merits phase" jury instructions in her case.

### b.  *Ground No. 12: The preliminary jury instructions*

*i.*  *Background*.  As her twelfth ground for judgment of acquittal or new trial, Johnson asserts that the court denied her a fair trial in violation of due process by reading to the jury and providing each of the jurors with an extensive and detailed set of Preliminary Instructions.  As has been the court's custom in every trial since the undersigned was appointed a United States District Court Judge in 1994, before opening arguments in this case, the court read to the jurors, provided each of the jurors with a copy of, and allowed the jurors to keep with them throughout the trial detailed Preliminary

"Merits Phase" Jury Instructions.[24]   No party has ever before objected to such a procedure.

As in other cases before this court, the final version of the Preliminary "Merits Phase" Jury Instructions was the result of the court's submission to the parties of numerous drafts, each accompanied by a cover letter explaining the court's rationale for including certain instructions, in certain form, in each draft, including the court's reasons for adopting or rejecting various proffered instructions from the parties.  Specifically, the court provided the parties in this case with draft Preliminary "Merits Phase" Jury Instructions and accompanying cover letters on April 22, 25, 26, 27, and 29, 2005.  The court also held various conferences, off and on the record, concerning the Preliminary "Merits Phase" Jury Instructions, and the parties were allowed to make objections to the "final" version of those Instructions on the record before they were read to the jury.

In the Preliminary Jury Instructions themselves, the court explained to the jury that the purpose of the Preliminary Jury Instructions was "to help [the jurors] better understand the trial and [their] role in it," and instructed the jurors to "[c]onsider these instructions, together with all written and oral instructions given to [them] during or at the end of the trial, and apply them as a whole to the facts of the case."  Preliminary "Merits Phase" Jury Instruction No. 1.  Then, among other things, the Preliminary Jury Instructions set forth the charges against Johnson; the necessary elements for proof of those charges;

---

[24]Indeed, in trials that are expected to be relatively short and that involve only one or two straight-forward charges, this court often uses "front-end-loaded" Jury Instructions, in which the court reads and provides to the jurors, before opening arguments, all of the substantive instructions, including instructions on the nature and elements of the offenses, the definition of evidence, reasonable doubt, and the presumption of innocence, reserving only instructions on deliberations to be read after the conclusion of closing arguments.  No party has ever objected to such a procedure, either.

definitions of evidence, the presumption of innocence, factors to determine the credibility of witnesses, and the burden of proof; and conduct of the jurors during trial. In addition, these instructions included the following caution to the jurors:

> [P]lease remember that the preliminary instructions on the charged offenses provide only a preliminary outline of the requirements for proof of each offense. At the end of the "merits" phase of the trial, I will give you final written instructions on these matters. Because the final written instructions are more detailed, you should rely on those final instructions, rather than these preliminary instructions, where there is a difference.

Preliminary "Merits Phase" Jury Instruction No. 4, p. 6. In the instruction on the jury's conduct during trial, the court also stated the following:

> [D]o not make up your mind during the trial about what the verdict should be. Keep an open mind until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence.

Preliminary "Merits Phase" Jury Instruction No. 17, p. 34. Johnson contends, and the court finds, that she vigorously objected to use of such Preliminary Jury Instructions.

*ii.* ***Arguments of the parties***. Johnson contends that the purpose of such detailed Preliminary Jury Instructions was to allow the jurors to follow along with the government's evidence and to determine her guilt as the trial went along, rather than having to wait for juror deliberations at the close of all of the evidence. Johnson contends that the dangers of such a procedure include the following: (1) it provides the jurors with a "written checklist" or "playbook" of the government's case to which jurors can refer as the trial progresses; (2) it encourages jurors to determine the facts and to make judgments regarding a defendant's guilt long before group deliberations are appropriate; (3) it forces the defendant to disclose defense strategies before trial that she might otherwise reserve

until trial, including specific theories of her defense; and (4) it hinders the presumption of innocence, and indeed, fosters a presumption of guilt, because it includes detailed allegations of the defendant's wrongdoing. Johnson pointed to no authority to support these contentions.

The government asserts that Johnson's various arguments are based on nothing but conjecture and speculation. In response to Johnson's various contentions, the government asserts the following: (1) that Johnson has not explained how a "checklist" or "playbook" was bad for her, particularly where the Preliminary Jury Instructions contained repeated statements that the defendant is presumed innocent and that the government bears the burden of proof, and the Preliminary Jury Instructions could only have aided the jury in their task, while aiding the defendant, by ensuring that the jury understood what the government had to prove and how heavy that burden of proof was; (2) that Johnson's concern about premature deliberation ignores Preliminary Jury Instruction No. 17, which specifically instructed the jurors to keep an open mind during the trial about what the verdict should be on any count until the jurors were sent to the jury room to deliberate and had discussed the evidence; (3) that nothing in the Preliminary Jury Instructions forced Johnson to disclose, or to disclose prematurely, her defense strategies, because nothing in the Preliminary Jury Instructions set forth her defense strategies; (4) that there was no hindrance to the presumption of innocence or fostering of a presumption of guilt, where the charges and elements of the offenses were not set out repeatedly, although there were repeated references to the presumption of innocence and the burden of proof upon the government; (5) that Circuit Courts of Appeals have recognized that providing jurors with preliminary jury instructions is a well-reasoned modern trend and that it is both common and logical to advise jurors in Preliminary Jury Instructions of the nature of pending

charges and the elements of those offenses; and (6) that Johnson has failed to show any prejudice arising from the court's use of Preliminary Jury Instructions.

    ***iii.***    ***Analysis***. Because Johnson made objections to giving Preliminary "Merits Phase" Jury Instructions to the jury, the question is whether the court abused its discretion in giving such Instructions. *Walker*, 428 F.3d at 1171. However, Johnson's present contention is not that the Preliminary "Merits Phase" Jury Instructions were not correct statements of the applicable law, but that it was an abuse of discretion for the court to give such instructions at all. *Compare id.* (the "abuse of discretion" standard of review requires the court to consider whether the instructions correctly state the applicable law). Where Johnson's present assertion of error is not premised on an incorrect statement of the applicable law, she must, at the very least, establish that *giving* the Preliminary "Merits Phase" Jury Instructions prejudiced her. *Id.* This she cannot do.

    First, as the government points out, Johnson has cited no authority for her contentions of prejudice. On the other hand, nearly three decades ago, the Fifth Circuit Court of Appeals recognized that providing the jury with Preliminary Jury Instructions "is not only not error . . . , it is a well-reasoned modern trend to give instructions outlining the issues and the law involved prior to the taking of testimony." *United States v. Bynum*, 566 F.2d 914, 924 (5th Cir.), *cert. denied*, 439 U.S. 840 (1978). The court explained that "it is the obligation of the court to do all within its power to assist the jury in understanding the issues involved and the application of the law," and that Preliminary Jury Instructions "seem very appropriate" for such purposes. *Id.* at 924 n.7. While Johnson contends that the Preliminary "Merits Phase" Jury Instructions were prejudicial, because they were a "checklist" or "playbook" *for the government*, she seems to miss the fact that they were equally a "checklist" or "playbook" *for her*, because a well-informed jury was more likely to notice holes in the government's proof than a jury left in ignorance

of what evidence might matter or what factual issues would need to be resolved until the end of a long and complicated trial like this one. While Johnson may have preferred a jury that was ignorant of the applicable law, due process and fundamental justice certainly do not require one, particularly where, as here, the jury was repeatedly reminded of the burden of proof upon the government and the presumption of the defendant's innocence.

Second, the court is wholly unpersuaded by Johnson's contentions that the detailed Preliminary "Merits Phase" Jury Instructions in this case would have fostered premature deliberations and determinations of guilt, or would otherwise have undermined the presumption of innocence. Again, the jury was repeatedly reminded of the burden of proof and the presumption of innocence. The jury was also advised that the Preliminary "Merits Phase" Jury Instructions were just that, preliminary, and the jury was expressly cautioned to consider the preliminary instructions in conjunction with all other instructions and to wait until the case was submitted to them and they had discussed the evidence before deciding any issues. The jury is presumed to have followed these instructions, and Johnson has presented nothing to rebut that presumption but conjecture and speculation. *See United States v. Betterton*, 417 F.3d 826, 832 (8th Cir. 2005) ("'A jury is presumed to follow its instructions.'") (quoting *United States v. Flute*, 363 F.3d 676, 678 (8th Cir. 2004)).

Third, the court finds equally unfounded Johnson's contention that the detailed Preliminary "Merits Phase" Jury Instructions in this case forced her to disclose, or to disclose prematurely, her defense strategies. Again, as the government points out, nothing in those preliminary jury instructions purported to set forth Johnson's defense strategies.

In the complete absence of any credible demonstration of prejudice, *see Walker*, 428 F.3d at 1171 (requiring proof that an abuse of discretion in instructing the jury was

prejudicial to one of the parties for relief to be granted), this assertion of error is frivolous, and relief thereon will be denied.

### c.    Ground No. 19:    Substantive errors in the "Merits Phase" Jury Instructions

As her nineteenth ground for post-trial relief, Johnson contends that the court made the following substantive errors in the Preliminary and Final "Merits Phase" Jury Instructions:   (a) the instructions did not adequately define that the underlying drug offenses had to have been proven to have existed before the killings and had to be actively continuing at the time of the killings; (b) the instructions on CCE murder failed to adequately protect Johnson's right to an unanimous verdict with respect to the predicate drug offenses comprising the alleged series; (c) the instructions on CCE murder failed to advise the jurors properly with respect to the insufficiency of proof of a buyer-seller relationship vis-à-vis Dustin Honken; and (d) the instructions did not require that the killings resulted from the conduct or actions of Angela Johnson.  Johnson makes separate arguments in support of each of these contentions, and the court will, therefore, consider them separately.   However, the court must first provide some additional background concerning the drafting and content of the Final "Merits Phase" Jury Instructions.

As with the Preliminary "Merits Phase" Jury Instructions, the court prepared and provided to the parties, during the trial, various drafts of the Final "Merits Phase" Jury Instructions, which took into account the parties' proffered instructions.  The drafts dated May 12, 13, and 16, 2005, were accompanied by cover letters explaining the court's rationale for the instructions.  Also, the court held various conferences with the parties, off and on the record, concerning the Instructions.  Before the Final "Merits Phase" Jury Instructions were read to the jury, the parties were allowed to make objections to the "final" version of those Instructions on the record.

186

As a conceptual matter, the Final "Merits Phase" Jury Instructions did not repeat the "elements" instructions for the capital offenses; instead, the Final "Merits Phase" Jury Instructions included cross-references to the pertinent "elements" instructions in the Preliminary "Merits Phase" Jury Instructions. The focus of the Final "Merits Phase" Jury Instructions, therefore, was clarification of key case-specific issues, including the meaning of "intent" and "knowledge"; the meaning of "possession," "distribution," and "delivery"; "aiding and abetting"; the requirement of a "substantive connection" between the killings and the underlying conspiracy or CCE; the elements of the offenses allegedly comprising the series of violations for the underlying CCE; the meaning of the "organizer, supervisor, or manager" requirement of the CCE; "recorded conversations"; special "impeachment" instructions; and the defendant's decision not to testify. The court reserved until after the parties' closing arguments the last two Final "Merits Phase" Jury Instructions concerning the jurors' "duty to deliberate" and "duty during deliberations." Attached to the Final "Merits Phase" Jury Instructions was a "tabular" Verdict Form, which included numerous special interrogatories to elicit as much information as possible from the jury concerning their factual findings and verdicts.

With this context in mind, the court turns to consideration of Johnson's allegations of substantive errors in the Preliminary and Final "Merits Phase" Jury Instructions.

   *i.*     ***Active continuance of drug offenses***.  Johnson's first contention concerning a substantive error in the "Merits Phase" Jury Instructions is that those instructions did not adequately define that the prosecution was required to prove that the underlying drug offenses must have existed before the killings and must have been actively continuing at the time of the killings.  In support of this contention, Johnson reiterates her contention that the killings could not have been "in furtherance of" or while "engaging" the underlying drug conspiracy or CCE, because of the cessation of drug activity by Honken's

enterprise from his arrest in 1993 until at least 1995. Johnson contends, here, that the court's instructions never squarely addressed this issue in an adequate way, which requires a new trial in the interests of fairness. The government responds that the murders themselves constituted evidence of the continuing conspiracy or CCE and that acts done to silence witnesses are in furtherance of or while engaging in the conspiracy or CCE.

In the court's view, both parties have missed the point. While Johnson makes another impassioned assertion that the evidence was inadequate to prove the "in furtherance" or "engaging in" elements of the offenses, she has failed to demonstrate in what way the court's *instructions* on "working in furtherance of" or "engaging in" requirements were legally erroneous. *Walker*, 428 F.3d at 1171 (the first issue for determining whether instructions were an abuse of discretion is whether the instructions "correctly state the applicable law"); *and compare Olguin*, 428 F.3d at 728 (on "plain error" review, the reviewing court must also "read the instructions as a whole to determine whether they fairly and adequately stated the relevant law."). Moreover, the court expressly instructed the jurors that, to prove "conspiracy murder," the prosecution was required to prove, *inter alia*, that "from about 1992, but not later than the date of the alleged killings, to about 1998, the defendant was engaged in a conspiracy to commit a drug crime," and explained, further, that this element required proof of the existence of the underlying conspiracy that had been alleged and "that the defendant was guilty of th[at] conspiracy." *See* Preliminary "Merits Phase" Jury Instruction No. 5, p. 7. Similarly, the court expressly instructed the jurors that, to prove "CCE murder," the prosecution was required to prove, *inter alia*, that "at the time of the alleged killings, the defendant was working in furtherance of a continuing criminal enterprise (CCE)," and that "working in furtherance" of a CCE meant "that the CCE existed, and that the defendant worked to promote, help forward, or advance the interests of the CCE, even though she was not

necessarily a member of the CCE," and more specifically still, that "the prosecution must prove that Angela Johnson was aware of the CCE and knowingly and intentionally acted for the purpose of promoting or advancing the CCE." *See* Preliminary "Merits Phase" Jury Instruction No. 7, p. 15. Thus, there were no erroneous instructions, because the jury was instructed that it must find the precise circumstances and connections that Johnson contends were somehow missing from the instructions. Johnson's nebulous assertion that the court's instructions somehow failed to address the issues adequately simply does not identify any legal error in the instructions with sufficient specificity to afford her relief.

In short, there has been no "miscarriage of justice" in this case based on this alleged error in the instructions and the "interest of justice" does not require a new trial on this ground. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)).

      *ii.*    ***Unanimous verdict on predicate CCE offenses***. As her next allegation of error in the "Merits Phase" Jury Instructions, Johnson contends that the instructions on CCE murder failed to adequately protect her right to an unanimous verdict with respect to the predicate drug offenses comprising the alleged series. Johnson contends that the predicate offenses were so vaguely defined that the twelve jurors could have found that those offenses were proved relying on twelve different circumstances. She contends that alleged violations 1 through 4 involved non-specific offenses over a six-year time period, but only violation 3, a conspiracy, was a continuing offense rather than a discrete offense. She contends that violations 5 and 6 actually merged into a single offense, so that violations 1, 2, 5, and 6, were indistinguishably merged into violation 3. Under these circumstances, she contends that it was impossible for the jury to reach an unanimous verdict on any of the underlying violations that supposedly constituted the series of violations for the underlying CCE. Instructions that merely recited the offenses vaguely

189

defined in the Indictment, she contends, violated due process.  The government, however, contends that the time to challenge the defects in the Indictment was long before trial, and that the court rejected the pertinent pretrial challenges Johnson did make to the specificity of the Indictment.  Even if the first six offenses merge into one, the government contends that Johnson's argument for relief is "moot," because the jury still found more than the three offenses necessary to constitute a CCE.  The parties' oral arguments on this issue were consistent with their written arguments.

While Johnson's prior allegation of error in the Instructions was a reiteration of her post-trial contentions regarding insufficiency of the evidence, her present contention is a reiteration of her pretrial contention that the Indictment was unconstitutionally vague.  As the court explained above, beginning on page 73, Johnson waived her comparable contention that the court erred by failing to strike insufficient allegations of violations in support of the underlying CCE for Counts 1 through 6.  Johnson cannot revive that contention by recasting it as an objection to the jury instructions.  Similarly, even if it was error for the court to submit these violations to the jury, Johnson has failed to demonstrate that she was prejudiced, or that there was any effect on her substantial rights, as required to obtain relief under either "abuse of discretion" or "plain error" review of jury instructions.  *See Walker*, 428 F.3d at 1171 (erroneous instructions require reversal under an abuse of discretion standard only where the abuse of discretion prejudiced one of the parties); *Olguin*, 428 F.3d at 728 n.3 ("plain error" in jury instructions requires proof, *inter alia*, that the plainly erroneous instruction affected the defendant's substantial rights and the fairness and integrity of the judicial proceedings).  This is so, because the jury found sufficient, unchallenged violations identified in the instructions to support the jury's finding that the underlying CCE existed.

Therefore, there has been no "miscarriage of justice" in this case based on this alleged error in the instructions, either, and the "interest of justice" does not require a new trial on this ground.  *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)).

*iii.*      ***Lack of a buyer-seller instruction***.  Johnson also contends that the "Merits Phase" Jury Instructions on CCE murder failed to advise the jurors properly with respect to the insufficiency of proof of a buyer-seller relationship vis-à-vis Dustin Honken. Johnson contends that she requested, and the court improperly rejected, an instruction that proof of a buyer-seller relationship alone would not be sufficient to show the requisite control over the buyer required by CCE law.  Because a reasonable juror could have found that the evidence showed no more than a buyer-seller relationship between Honken and some of the alleged participants in the CCE, Johnson contends that this error was material and prejudicial, requiring a new trial on at least the "CCE murder" counts.  The government contends that the court properly instructed on the meaning of "organizer, supervisor, or manager" for purposes of a CCE and that the evidence did not support an instruction on a buyer-seller relationship.

Johnson did proffer, and the court ultimately rejected, an instruction stating that proof of a buyer-seller relationship was insufficient to show that Honken supervised, organized, or managed the "buyer" for purposes of proving that the CCE existed.  In the course of preparing the "Merits Phase" Jury Instructions, however, the court did provide the parties with various versions of such an instruction, for example, in the May 16, 2005, draft.  However, the trial transcript reflects that the court ultimately decided not to include such an instruction for two reasons:  (1) the court was not convinced that the evidence warranted such an instruction; and (2) the court's instruction on "organizer, supervisor, or manager" did not foreclose Johnson from arguing that a mere buyer-seller relationship

was insufficient to establish Honken's control over certain participants. *See* Realtime Transcript for May 17, 2005, at approximately 7:44 a.m. (instruction conference with the parties including discussion of the buyer-seller instruction issue); *id.* for May 18, 2005, at approximately 2:36 p.m. (same); *id.* for May 23, 2005, at approximately 7:56 a.m. (reflecting that the court had decided not to include a specific buyer-seller instruction).

As the court explained to the parties in its May 16, 2005, letter accompanying a revised draft of the Final "Merits Phase" Jury Instructions, the court had no quibble with the defendant's statement that the mere relationship of a seller of methamphetamine to a buyer of methamphetamine is not enough to establish that the seller is the organizer, supervisor, or manager of his or her customers. *See United States v. Jackson*, 345 F.3d 638, 646 (8th Cir. 2003) ("[A] mere buyer-seller relationship is not sufficient to satisfy the management element."). The court's problem was that the defendant's statement was incomplete or misleading. As the Eighth Circuit Court of Appeals has made clear, where the relationship "was beyond that of a mere buyer-seller," sufficient evidence exists from which a jury could find that the person in question acted as an organizer, supervisor, or manager. *Id.* at 647. The court also noted elsewhere, in its April 22, 2005, letter to the parties concerning the Preliminary "Merits Phase" Jury Instructions, that the Eighth Circuit Court of Appeals had recently rejected the Seventh Circuit Model Instruction concerning a buyer-seller relationship, which was also proffered by the defendant here, because "in this circuit, a buyer-seller instruction 'does not apply to a defendant who received a large, distributable quantity of drugs.'" *United States v. Adams*, 401 F.3d 886, 898 (8th Cir. 2005) (quoting *United States v. Montano-Gudino*, 309 F.3d 501, 505-06 (8th Cir. 2002)), *cert. denied Parker v. United States*, ___ U.S. ___, 126 S. Ct. 492 (2005). The evidence at trial showed more than a "mere buyer-seller relationship" between Honken and the alleged participants in the CCE, and instead, showed that each such

alleged participant received large, distributable quantities of drugs, or that the relationship otherwise went beyond a mere buyer-seller relationship, such that Honken supervised, organized, or managed those participants. Under these circumstances, a "mere buyer-seller" instruction was not warranted by the evidence. *Adams*, 401 F.3d at 898; *Jackson*, 345 F.3d at 646.

Furthermore, the court ultimately instructed the jurors on the meaning of "organizer, supervisor, or manager," by explaining in Final "Merits Phase" Jury Instruction No. 8 that "the prosecution must prove that Dustin Honken occupied some managerial position or performed a central role in the CCE. To do so, the prosecution must prove that Dustin Honken exerted some type of influence over five or more other persons, as shown by those individuals' compliance with his directions, instructions, or terms for performing the activities of the CCE." This instruction was an accurate statement of the applicable standard in this Circuit. *See Jackson*, 345 F.3d at 646 ("This element of the CCE statute is satisfied if 'the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms.'") (quoting *United States v. Possick*, 849 F.2d 332, 335 (8th Cir. 1988)); *United States v. Roley*, 893 F.2d 992, 994 (8th Cir. 1990) (also quoting *Possick*). Thus, there is no "error" in this instruction on which Johnson can hang her hat. *Walker*, 428 F.3d at 1171 (the issue for determining whether instructions were an abuse of discretion is whether the instructions "correctly state the applicable law"); *and compare Olguin*, 428 F.3d at 728 (on "plain error" review, the reviewing court must also "read the instructions as a whole to determine whether they fairly and adequately stated the relevant law.").

Moreover, the court reiterates its conclusion that this language was sufficiently broad to allow Johnson to make her argument that only a buyer-seller relationship existed

between Honken and various alleged participants and that such a buyer-seller relationship was not enough to establish the necessary "organizer, supervisor, or manager" relationship under the *Jackson* standard stated in the pertinent Instruction. Thus, Johnson cannot show that she was prejudiced or that her substantial rights were affected by this instruction. *See Walker*, 428 F.3d at 1171 (erroneous instructions require reversal under an abuse of discretion standard only where the abuse of discretion prejudiced one of the parties); *Olguin*, 428 F.3d at 728 n.3 ("plain error" in jury instructions requires proof, *inter alia*, that the plainly erroneous instruction affected the defendant's substantial rights and the fairness and integrity of the judicial proceedings).

Therefore, there has been no "miscarriage of justice" in this case based on this alleged error in the Instructions, and the "interest of justice" does not require a new trial on any of the charges on this ground. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)).

  *iv.*  ***Failure to instruct that the killings resulted from Johnson's conduct***. Johnson's final allegation of a substantive error in the "Merits Phase" Jury Instructions is that the Instructions did not require that the killings resulted from the conduct or actions of Angela Johnson. Johnson contends that she proffered instructions, as her Proposed Jury Instructions Nos. 1, 2, 15, and 16, filed on April 8, 2005, expressly stating that the killings in question had to have resulted from Johnson's conduct or actions. Instead, the court merely instructed using the statutory language that "such killing resulted." Johnson contends that the court's language merely begged the question, "resulted from what?" She contends that the ordinary meaning of the statutory language was that the killings had to result from the defendant's conduct, *i.e.*, that the statute established a "causation" requirement. She also contends that there was no showing that any action or conduct on

194

her part caused any of the killings. She contends that this defect deprived her of a finding on an essential component of proof and necessitates a new trial.

The government, however, contends that Johnson's construction would eliminate liability for persons who "aid and abet" others in intentional killings in furtherance of a CCE or while engaging in a conspiracy. The government contends that "aiding and abetting" liability does apply to "conspiracy murder" and "CCE murder" offenses defined in 21 U.S.C. § 848(e). To prove "aiding and abetting" liability, the government contends that it was not required to prove that the defendant's conduct directly resulted in the commission of the crime. The government also contends that the court properly instructed the jury on "aiding and abetting" liability for these offenses in Final "Merits Phase" Jury Instruction No. 5.

Johnson addressed this issue again in her reply brief, as one of only two issues that she felt required further written argument. Johnson contends in her reply that this court expressly ruled in a pretrial order that the government was required to prove that the killings actually resulted from the defendant's actions. *See United States v. Johnson*, 225 F. Supp. 2d 1009, 1017 (N.D. Iowa 2002) (citing *United States v. Walker*, 142 F.3d 103, 113 (2d Cir. 1998)). She contends that the court should have used this precise language in its instruction and that its failure to do so requires a new trial.

Johnson is correct that, in a pretrial ruling on the sufficiency of the indictment, the court identified the elements of "conspiracy murder," in violation of 21 U.S.C. § 848(e)(1)(A), as follows:

> [T]he jury must find the following four elements beyond a reasonable doubt: "(1) that [the defendant] was guilty of the narcotics conspiracy as [described in the indictment]; (2) the drug conspiracy involved at least [the quantity of the controlled substance triggering punishment under 21 U.S.C.

> § 841(b)(1)(A) ]; (3) while engaging in the drug conspiracy involving the specified quantity of drugs, [the defendant] either intentionally killed or counseled, demanded, induced, procured, or caused the intentional killing [the identified victim]; and (4) that the killing of [the victim] actually resulted from [the defendant's] actions." *United States v. Walker*, 142 F.3d 103, 112 (2d Cir.), *cert. denied*, 525 U.S. 896, 119 S. Ct. 219, 220, 142 L. Ed. 2d 181 (1998).

*Johnson*, 225 F. Supp. 2d at 1017. However, that does not mean that the court was married to this formulation of the elements for purposes of the Jury Instructions in this particular case. The court ultimately concluded that a troubling inference could arise from language that the killings actually resulted from the defendant's action, to the effect that the defendant must actually have killed the victims. In contrast, the court formulated the *third* element of each of the § 848(e) offenses, for purposes of the Jury Instructions, to require the prosecution to prove that "the killing actually resulted," not only because that language reflected the statutory language, *see* 21 U.S.C. § 848(e)(1)(A) ("and such killing results"), but because it was particularly appropriate where Johnson was ultimately tried only as an "aider and abettor." As to the latter point, the language required the appropriate relationship between Johnson's conduct and the killings, *i.e.*, that she "aided and abetted" someone else who actually killed the victims, but did not require that Johnson be directly responsible for "pulling the trigger." Where this instruction tracked the statutory language in this regard, Johnson cannot show that the instruction was erroneous. *See Walker*, 428 F.3d at 1171 (the first issue for determining whether instructions were an abuse of discretion is whether the instructions "correctly state the applicable law"); *and compare Olguin*, 428 F.3d at 728 (on "plain error" review, the reviewing court must also "read the instructions as a whole to determine whether they fairly and adequately stated the relevant law.").

Moreover, the court ruled above, beginning on page 57, that a charge of "aiding and abetting" a § 848(e)(1)(A) offense is a cognizable offense. Johnson does not quibble with Final "Merits Phase" Jury Instruction No. 5 on "aiding and abetting," which formulated the elements as follows: "*One*, on or about the date alleged in the Count in question, Dustin Honken intentionally killed the victim identified in that Count"; "*[t]wo*, Angela Johnson knew that the killing of the victim in question was being committed or was going to be committed on the date in question"; "*[t]hree*, Angela Johnson knowingly acted in some way to cause, encourage, or aid in the killing of the victim"; and "*[f]our*, Angela Johnson acted with the purpose of causing the victim's death." The explanation to the *third* element explained, *inter alia*, that "the prosecution must prove beyond a reasonable doubt that the defendant acted to cause, encourage, or aid in the killing of the victim in question at or before the time that the killing was committed," and the explanation to the *fourth* element explained, *inter alia*, that "the prosecution must prove beyond a reasonable doubt that the defendant acted with the purpose of causing the victim's death." This "aiding and abetting" instruction, thus, instructed the jury on the proper link between Johnson's conduct and the killings, where she was charged only as an "aider and abettor," and Johnson does not now assert otherwise.

There was, consequently, no "miscarriage of justice" in this case based on this alleged error in the "Merits Phase" Jury Instructions, and the "interest of justice" does not require a new trial on any of the charges on this ground. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Moreover, the court has now rejected each and every one of Johnson's allegations of error in the "merits phase" of her trial, so that the court affirms Johnson's convictions on each of the ten capital counts against her. Therefore, the court will now move on to consider Johnson's allegations of error in the "eligibility phase" of her trial, which was the first step toward jury

determination of the punishment that Johnson should suffer for the crimes of which she had been convicted.

### F. Alleged Errors In The "Eligibility Phase"

The court reads Johnson's Motion For Judgment Of Acquittal Or New Trial to allege two errors in the "eligibility phase" of Johnson's trial:  (1) her second ground for relief, which expressly asserts that the evidence, when viewed in the light most favorable to the "eligibility phase" verdicts, was not sufficient to establish those factors found by the jury beyond a reasonable doubt as required by due process; and (2) her fourth ground for relief, which alleges more generally that the weight of the evidence is against the jury's verdicts and findings in each of the phases, and that a miscarriage of justice has occurred, such that a new trial, in whole or in part, is warranted.  The court will consider these alleged errors in turn.

The background to these allegations of error is set forth above, beginning on page 39, where the court discussed the "eligibility phase" of Johnson's trial in some detail, including the "gateway" and "statutory" aggravating factors found by the jury.  It suffices to reiterate here that the jury found as a "gateway" aggravating factor, for all ten counts, that "[t]he defendant intentionally engaged in conduct intending that the victim in question be killed or that lethal force be employed against the victim, which resulted in the death of the victim"; and that, as to "statutory aggravating factors," the jury found that only the killing of Terry DeGeus was committed "after substantial planning and premeditation," and that the killings of all of the adult victims had been committed "in an especially heinous, cruel, or depraved manner," in that each killing involved *both* "torture" and "serious physical abuse."  The court will now consider Johnson's challenges to the sufficiency and weight of the evidence supporting these findings.

198

### 1. Ground No. 2: Insufficiency of the evidence of "eligibility" factors

#### a. Arguments of the parties

In support of her contention that the evidence, when viewed in the light most favorable to the "eligibility phase" verdicts, was not sufficient to establish those "eligibility" factors found by the jury, Johnson argues that the evidence did not show that she acted with the intention that any of the victims would be killed or that lethal force would be employed against them; rather, she contends that the evidence showed that this was *not* her intent. She also argues that there was insufficient evidence of any substantial "planning and premeditation" concerning the killing of Terry DeGeus and insufficient evidence to prove beyond a reasonable doubt that any of the adult victims was either "tortured" or subjected to "serious physical abuse." Because the ground for relief is cast in terms of insufficiency of the evidence, the court construes it to be an argument for judgment of acquittal on the issue of Johnson's eligibility for the death penalty on any of the offenses for which she was convicted. *See, e.g.,* FED. R. CRIM. P. 29(a) ("[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which *the evidence is insufficient to sustain a conviction*.") (emphasis added).

In response, the government asserts that Johnson's allegations about insufficiency of the evidence are merely conclusory. In contrast, the government details the evidence that it believes more than adequately supports the jury's challenged findings. First, as to the "gateway aggravating factor" of "intent that the victims be killed or that lethal force be used against them," the government points to evidence that Johnson helped Honken hunt down Gregory Nicholson, and engaged in weeks of surveillance to find him, and then helped Honken kill Nicholson and anybody else who happened to be with Nicholson. The government contends that a reasonable jury could have concluded from evidence that Johnson borrowed Gaubatz's car on the night Nicholson and the Duncans disappeared that

Johnson did so for the purpose of concealing her identity, and jurors could conclude from evidence that Johnson went prepared with rope and duct tape that there is no basis for her contention that she believed that Honken only intended to obtain a videotaped statement from Nicholson exonerating Honken. The government also points to evidence that Johnson lured Terry DeGeus to his fatal meeting with Honken at a remote location, knowing that she had previously acquired a Tec-9 firearm for Honken, a firearm with no legitimate purpose, which suggests that she knew and intended that the firearm would be used to kill one or more people. Moreover, the government points out that Johnson lured DeGeus to the meeting with Honken knowing that Honken had already killed four other people.

The government also contends that, as to the challenged "statutory aggravating factors," there was sufficient evidence of "substantial planning and premeditation" for the killing of DeGeus, including the evidence mentioned just above. In addition, the government points out that Honken and Johnson had seven days after Johnson was questioned by the Grand Jury about Honken's drug-trafficking relationship with DeGeus before DeGeus was killed to figure out how to kill him; that Johnson had plenty of time to consider her actions while driving DeGeus from the country club where she found him to the meeting in the country with Honken; and that the evidence that DeGeus was not killed immediately upon his arrival at the meeting with Honken shows that Johnson also had time to consider what was likely to happen, particularly in light of Honken's prior murders of four other people. Indeed, the government asserts that the remote location of the meeting and the preparations to dispose of DeGeus's body all suggested that DeGeus's murder was "planned and premeditated."

Finally, the government contends that the evidence was sufficient for a reasonable jury to find that the murders of the adults were "committed in an especially heinous, cruel, or depraved manner," as this "statutory aggravating factor" and the component issues of

"torture" and "serious physical abuse" were defined in the Jury Instructions. The government contends that the evidence was unquestionably sufficient to establish that Nicholson and Lori Duncan were bound and gagged, which constituted physical abuse of which the victims were aware, and that they were abducted together in fear of their own and the children's imminent death, which likewise inflicted severe mental pain and suffering. In addition, the government points to evidence that Nicholson suffered a parimortem fracture of his neck and at least one gunshot wound more than was necessary to kill him, while Lori Duncan suffered a fracture of her pelvic bone, a spiral fracture to a bone in her left hand, and at least one more gunshot wound than was necessary to kill her. With regard to DeGeus, the government asserts that it presented evidence from which a reasonable jury could have found beyond a reasonable doubt that DeGeus was shot repeatedly and, while still conscious, beaten with a baseball bat.

Based on this evidence, the government contends that this portion of Johnson's motion for judgment of acquittal or new trial is without merit.

### b. *Analysis*

*i.* ***Insufficient evidence of the "gateway aggravating factor."*** In the "eligibility phase" of Johnson's trial, the only "gateway aggravating factor" asserted by the government for each capital count was that Johnson "intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim." 21 U.S.C. § 848(n)(1)(C); *see also id.* at § 848(k) (stating that the jury must find one of the aggravating factors in § 848(n)(1) before the defendant is eligible for the death penalty). Drawing upon Eighth Circuit Model Criminal Instruction 12.06, the court formulated an instruction on this "gateway aggravating factor," which stated, in pertinent part, the following:

The "Gateway Aggravating Factor" in question for each Count in this case is the following:

The defendant intentionally engaged in conduct intending that the victim in question be killed or that lethal force be employed against the victim, which resulted in the death of the victim.

> To prove this factor, the prosecution must prove that the defendant deliberately acted with a conscious desire that the victim be killed or that lethal force be employed against the victim, which in turn caused the victim's death. "Lethal force" means an act or acts of violence capable of causing death.

"Eligibility Phase" Jury Instruction No. 3. The Instruction then continued with an explanation of the meaning of "intentionally." *Id.* Johnson does not contend that this Instruction was erroneous. The jury found that this factor had been proved as to all ten capital counts.

Thus, the question is whether the government elicited evidence from which a reasonable jury could have found that this "gateway aggravating factor" had been proved beyond a reasonable doubt for each of the victims. *See Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476). The court finds that the evidence on this factor, much of which was identified by the government in response to Johnson's argument, was presented in this case. *Id.* While Johnson may have put on evidence that she did not intend the deaths of any of the victims, the jury was not required to believe that evidence, and the jury clearly did not. The court cannot say that the jury's rejection of Johnson's argument was unreasonable in light of the evidence to which the government points or that the evidence was not sufficient for the jury to find beyond a reasonable doubt that this factor had been proved. Thus, Johnson is not entitled to

judgment of acquittal on her eligibility for the death penalty on any of the offenses on the ground that there was insufficient evidence to support findings on the "gateway aggravating factor" that she intended the killings or that lethal force would be used against the victims.

ii.     *Insufficient evidence of "planning and premeditation."*  In the "eligibility phase," the jury was also instructed on "statutory aggravating factors."  Among the "statutory aggravating factors" submitted to the jurors for each capital count was that "[t]he defendant committed the offense after substantial planning and premeditation."  21 U.S.C. § 848(n)(8); *see also id.* at § 848(k) (for the defendant to be eligible for the death penalty, the jury must also find at least one other factor set forth in § 848(n)(2) through (12)).  The pertinent instruction on the "planning and premeditation" factor was as follows:

> For **Counts 1 through 10**, the defendant committed the offense in question after substantial planning and premeditation.
>> "Planning" means mentally formulating a method for doing something or achieving some end.  "Premeditation" means thinking or deliberating about something and deciding whether to do it beforehand.  "Substantial" planning and premeditation means a considerable or significant amount of planning and premeditation.

"Eligibility Phase" Jury Instruction No. 4.  Again, this instruction is drawn from the pertinent Eighth Circuit Model Criminal Instruction, Instruction 12.07I, and again, Johnson does not assert that this Instruction was erroneous.  The jury found this factor only as to the killing of DeGeus, as charged in **Counts 5** and **10**.

Again, the court finds, that sufficient evidence on this factor, much of which was identified by the government in its response to this allegation of error, was presented in

203

this case for a reasonable jury to have found it beyond a reasonable doubt as to the killing of DeGeus. *See Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476). While Johnson argued that the evidence did not support such a finding for any of the murder victims, and was successful as to the killings of Nicholson and the Duncans, the jury was not required to believe that evidence or accept it as to all of the victims, and the jury clearly did not believe or accept it as to DeGeus. The court cannot say that the jury's rejection of Johnson's argument as to DeGeus was unreasonable in light of the evidence to which the government points or that the jury's finding as to DeGeus could not have been made beyond a reasonable doubt on the evidence presented. Thus, Johnson is not entitled to judgment of acquittal on her eligibility for the death penalty for the killing of DeGeus on the basis that the evidence was insufficient to show the "statutory aggravating factor" of substantial planning and premeditation of DeGeus's killing.

     ***iii.    Insufficient evidence of "torture" or "substantial physical abuse."*** Another "statutory aggravating factor" asserted by the government for the killings of each of the adult victims was that the defendant committed each killing "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." 21 U.S.C. § 848(n)(12); *see also id.* at § 848(k) (for the defendant to be eligible for the death penalty, the jury must also find at least one other factor set forth in § 848(n)(2) through (12)). The pertinent instruction on the "heinous, cruel, and depraved" factor was the following:

> **For Counts 1 and 6** (Gregory Nicholson), **2 and 7** (Lori Duncan), and **5 and 10** (Terry DeGeus) **only,** the defendant committed the offense in question in an especially

heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of the victim.

"Heinous" means extremely wicked or shockingly evil, where the killing was accompanied by such additional acts of torture or serious physical abuse of the victim as to set it apart from other killings. "Cruel" means that the defendant intended to inflict a high degree of pain by torturing the victim in addition to killing the victim. "Depraved" means that the defendant relished the killing or showed indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim. The word "especially" means highly or unusually great, distinctive, peculiar, particular, or significant, when compared to other killings. Pertinent factors in determining whether a killing was "especially heinous, cruel, or depraved" include the following: an infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing; the needless mutilation of the victim's body; the senselessness of the killing; and the helplessness of the victim.

To establish that the defendant killed the victim "in an especially heinous, cruel, or depraved manner," the prosecution must prove that the killing involved either torture or serious physical abuse to the victim.

"Torture" includes mental as well as physical abuse of the victim. In either case, the victim must have been conscious of the abuse at the time it was inflicted, and the defendant must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, in addition to the killing of the victim. "Severe mental pain or suffering" means prolonged mental harm caused by or resulting from intentionally inflicting or threatening to inflict severe physical pain or suffering, the threat of imminent death,

or the threat that another person will imminently be subjected to death, or severe physical pain or suffering.

"Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body. Serious physical abuse—unlike torture—may be inflicted either before or after death and does not require that the victim be conscious of the abuse at the time it was inflicted. However, the defendant must have specifically intended the abuse in addition to the killing.

In order to find that this factor has been proved, you must unanimously agree as to which alternative—torture or serious physical abuse—the prosecution has proved beyond a reasonable doubt. In other words, all twelve of you must agree that the Count in question involved torture and was thus heinous, cruel, or depraved, or all twelve of you must agree that the Count in question involved serious physical abuse to the victim and was thus heinous, cruel, or depraved, or all twelve of you must agree that the Count in question involved both torture and serious physical abuse of the victim and was thus heinous, cruel, or depraved.

This aggravating factor is not applicable to the murder of Kandi Duncan in **Counts 3 and 8** or the murder of Amber Duncan in **Counts 4 and 9**.

"Eligibility Phase" Jury Instruction No. 4. Again, this instruction is drawn from the pertinent Eighth Circuit Model Criminal Instruction, Instruction 12.07F, and again, Johnson does not assert that this Instruction was erroneous. The jury found this aggravating factor as to the murders of all of the adult victims.

Again, the court finds that sufficient evidence on this factor, much of which was identified by the government in response to Johnson's allegation of error, was presented in this case for a reasonable jury to have found it beyond a reasonable doubt as to the

killings of each of the adult victims. *See Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476). While Johnson argued that the evidence did not support such a finding for any of the adult murder victims, the jury was not required to believe her argument, and clearly did not do so. The court cannot say that the jury's rejection of Johnson's argument as to any of the adult victims was unreasonable in light of the evidence to which the government points or that the jury's finding as to those victims could not have been made beyond a reasonable doubt on the evidence presented. Thus, Johnson is not entitled to judgment of acquittal on her eligibility for the death penalty on the killings of the adult victims on the basis that the evidence was insufficient to show the "statutory aggravating factor" that those killings were "committed in an especially heinous, cruel, or depraved manner."

### 2. Ground No. 4: The "eligibility phase" verdicts were against the weight of the evidence

Johnson also asserts, as part of her fourth ground for relief, that the weight of the evidence is against the jury's verdicts and findings in the "eligibility phase," and that a miscarriage of justice has occurred, such that a new trial, at least on her eligibility for consideration of the death penalty on any of the capital offenses, is warranted. Johnson does not, however, make a separate argument concerning the weight of the evidence in the "eligibility phase." The government asserts that the "eligibility phase" verdicts were not against the weight of the evidence, but likewise does not assert any separate argument on this point.

Although the court has the authority to grant a new trial, even where the evidence, viewed in the light most favorable to the verdicts, does not mandate a judgment of acquittal, *see Dodd*, 391 F.3d at 934 (the court may grant a new trial even where there is

substantial evidence to sustain the verdict), the court will not do so here. For the same reasons that the court held above that the evidence was not insufficient to support the "eligibility phase" verdicts in any of the particular ways that Johnson asserted, for purposes of her motion for judgment of acquittal, the court also finds that the "eligibility phase" verdict on each of the ten capital counts was not against the weight of the evidence. Even having independently "'weigh[ed] the evidence [and] disbelieve[d] witnesses,'" *see id.* (quoting *Campos*, 306 F.3d at 579), the court concludes that the "interest of justice" is not implicated here, such that Johnson's motion for new trial should be granted as to the "eligibility phase," because the "eligibility phase" verdicts simply were not against the weight of the evidence any more than they were insufficiently supported by the evidence. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," therefore, if the jury's "eligibility phase" verdicts on all ten counts are allowed to stand on the evidence presented. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Johnson's motion for new trial, at least on the "eligibility phase," on this ground will also be denied.

### G. Alleged Errors In The "Penalty Phase"

As indicated in the chart beginning on page 11, which reorganizes Johnson's allegations of errors by phases of the trial, Johnson asserts that no less than seventeen errors in the "penalty phase" of her trial warrant judgment of acquittal or new trial, at least on the appropriate penalty in her case. Although the court will not relist each of those seventeen alleged errors here, the court will consider each one separately.

### 1.    Ground No. 3:  Insufficiency of the "penalty phase" evidence

#### a.    Arguments of the parties

Johnson's first allegation of error in the "penalty phase," and her third ground for judgment of acquittal or new trial, is that the evidence, when viewed in the light most favorable to the "penalty phase" verdicts, was not sufficient to establish the aggravators found by the jury beyond a reasonable doubt as required by due process.  In support of this allegation of error, Johnson explains that she "takes issue" with the "obstruction/retaliation aggravator" with respect to the Duncans and DeGeus.  She contends that this aggravator plainly would not apply to Lori, Kandi, and Amber Duncan, because they had not cooperated with authorities nor was justice obstructed by their killings.  Johnson contends that every killing would prevent the victim from testifying, so the aggravator must mean more than just killing the victim.  As to DeGeus, Johnson contends that the evidence was unclear whether or not he was cooperating with the government at the time of his death, whether he had any intention to do so, or whether Johnson knew of any past or intended future cooperation or testimony by DeGeus.  She contends that, because the jury improperly weighed aggravators not proved by the evidence, she is entitled to at least a new "penalty phase" trial.

The government, however, contends that there was more than sufficient evidence to support each of the challenged findings.  The government concedes that killing a person to prevent that person from being a witness to his or her own murder or assault cannot be what the "obstruction/retaliation" aggravator means.  However, the government contends that the Duncans and DeGeus were killed to prevent them from testifying or providing information to law enforcement officers about *other* crimes by Honken and/or Johnson.  Here, the government contends that the evidence showed that the Duncans were killed to prevent them from testifying against Honken and Johnson about the murder of Gregory

Nicholson. The government notes that Johnson fails to identify any other possible motive for the killing of the Duncans. Similarly, the government contends that the evidence shows that DeGeus was killed to prevent him from becoming a government cooperator, just seven days after Johnson was questioned in the Grand Jury proceedings about the drug connection between Honken and DeGeus. Although hatred could have been a motive for Johnson to participate in the beating and killing of DeGeus, if that had been her motive, the government asserts that she logically would have acted on it long before DeGeus was actually killed, either while she and DeGeus were still involved in their violent relationship or shortly after they were separated. Thus, on the evidence presented, the government contends that a reasonable jury could have rejected any motive for the killing of DeGeus other than to silence a potential cooperator with the government. In short, the government contends that there was sufficient evidence to sustain the challenged "penalty phase" verdicts.

### b. *Analysis*

One of the "non-statutory aggravating factors" asserted by the government in the "penalty phase" for each of the ten capital counts in this case was that "[t]he defendant committed the offense with the intent to prevent the victim from or retaliate against the victim for providing information and assistance to law enforcement authorities in regard to the investigation or prosecution of the commission or possible commission of another offense." *See* Second Notice Of Intent To Seek The Death Penalty Under Title 21 United States Code, Section 848 (docket no. 141). In Final "Penalty Phase" Jury Instruction No. 2, the jurors were instructed to consider, for each Count, whether "the defendant obstructed justice by preventing the victim from providing testimony or information to law enforcement officers or by retaliating against the victim for cooperating with authorities." This Instruction was based on Eighth Circuit Model Criminal Instruction 12.08, and this

"non-statutory aggravating factor" was not further defined in the instructions. Johnson does not contend that the instruction on this factor was erroneous or incomplete. The jury found this "non-statutory aggravating factor" as to all ten capital counts.

The court concludes that a reasonable jury could have found beyond a reasonable doubt from the evidence presented, including that identified by the government in its response to this alleged error, that the Duncans were each killed, not simply to prevent them from providing information to authorities or law enforcement officers about the assaults against them, but to "prevent[ them] from providing testimony or information to law enforcement officers" about other illegal conduct by Honken and Johnson, including the killing of Gregory Nicholson. *See Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476). Therefore, Johnson is not entitled to judgment of acquittal on the death penalty for the killings of the Duncans on the ground that insufficient evidence supported the jury's finding on this "non-statutory aggravating factor" as to those killings.

Similarly, a reasonable jury could have found beyond a reasonable doubt from the evidence presented, including the evidence identified above by the government, that DeGeus was killed, not simply to prevent him from providing information to authorities or law enforcement officers about the assault against him, but to "prevent[ him] from providing testimony or information to law enforcement officers" about other illegal drug-trafficking conduct by Honken and Johnson. Also, because Johnson had been questioned in front of the Grand Jury about the drug connection between Honken and DeGeus, a reasonable jury could have found beyond a reasonable doubt that Honken and Johnson had surmised that DeGeus either had already cooperated with law enforcement officers or might "crack" and provide information to law enforcement officers about Honken and

Johnson's drug activities. In other words, a reasonable jury could have found that DeGeus "knew too much" and was killed to prevent him from telling law enforcement officers what he knew or to retaliate against him for having possibly already done so. In short, it was not unreasonable for a jury to find beyond a reasonable doubt, on the evidence presented, that DeGeus was killed either to "prevent[ him] from providing testimony or information to law enforcement officers" about Honken and Johnson's drug activities, or to "retaliat[e] against [him] for cooperating with authorities" by providing such information. *See* Final "Penalty Phase" Jury Instruction No. 2. Because a reasonable jury could have so found beyond a reasonable doubt on the evidence presented, Johnson is not entitled to judgment of acquittal on the death-penalty part of the proceedings as to the killing of DeGeus. *See Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476).

This portion of Johnson's motion for judgment of acquittal or new trial will, therefore, be denied.

> ## 2. *Ground No. 4: The "penalty phase" verdicts were against the weight of the evidence*

Johnson also asserts, as part of her fourth ground for relief, that the weight of the evidence is against the jury's verdicts and findings in the "penalty phase," and that a miscarriage of justice has occurred, such that a new trial, at least on the "penalty phase" of her trial, is warranted. Johnson does not, however, make a separate argument concerning the weight of the evidence in the "penalty phase." The government asserts that the "penalty phase" verdicts were not against the weight of the evidence. Instead, the government asserts that the evidence, already summarized elsewhere, was sufficient for a reasonable jury to find that Johnson deserved the death penalty for the killings of the

Duncans and DeGeus. The government also asserts that it was the intent of Congress, and the ruling of the Supreme Court, that the determination of whether or not a person should suffer the death penalty for certain offenses should be left to the jury, not the judge. In this case, the government contends that the evidence is such that there is no basis to disturb the jury's determination that the death penalty is the appropriate punishment for Johnson for the killings of the Duncans and DeGeus.

Although the court has the authority to grant a new trial, even where the evidence, viewed in the light most favorable to the verdicts, does not mandate a judgment of acquittal, *see Dodd*, 391 F.3d at 934 (the court may grant a new trial even where there is substantial evidence to sustain the verdict), the court will not do so here. For the same reasons that the court held above that the evidence was not insufficient to support the "penalty phase" verdicts on all counts in any of the particular ways that Johnson asserted, for purposes of her motion for judgment of acquittal, the court also finds that the "penalty phase" verdicts for the death penalty on eight of the ten capital counts were not against the weight of the evidence, even if the court might have reached different verdicts on some or all of those counts. Even having independently "'weigh[ed] the evidence [and] disbelieve[d] witnesses,'" *see id.* (quoting *Campos*, 306 F.3d at 579), the court concludes that the "interest of justice" is not implicated here, at least not on the basis of the weight of the evidence presented. Thus, Johnson's motion for new trial as to the "penalty phase" will not be granted, because the "penalty phase" verdicts simply were not against the weight of the evidence any more than they were insufficiently supported by the evidence. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," therefore, if the jury's "penalty phase" verdicts are allowed to stand on the evidence presented. *See Campos*, 306 F.3d

at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Johnson's motion for new trial on this ground will also be denied.

**3.**     ***Ground No. 20:  The death penalty should be barred by advice to Johnson from a government agent***

In one of her more creative arguments, her third allegation of error in the "penalty phase," and her twentieth ground for relief in her motion for judgment of acquittal or new trial, Johnson contends that the death penalty should be barred in this case where the government's agent, Robert McNeese, advised her that she could not receive the death penalty as part of his effort, undertaken in concert with his government handlers, to obtain a confession and to discover the bodies of the five victims.  The court summarized Robert McNeese's involvement in this case above, beginning on page 23, and discussed whether or not his evidence or evidence generated from his information should have been admitted at Johnson's trial, beginning on page 159.  Johnson does not, however, identify any evidence supporting her contention that McNeese ever advised her that she could not receive the death penalty, and certainly has not identified any evidence that he was authorized or directed to do so by any government agents.

**a.**     ***Arguments of the parties***

Notwithstanding her lack of evidence that any such incident occurred, Johnson contends that allowing the death penalty to be pursued in the circumstances where a jailhouse informant, acting as a government agent, advised her that she could not receive the death penalty, in order to elicit a confession from her, would sanction outrageous government conduct in violation of due process and fundamental fairness.  Johnson contends that, in certain circumstances, even a mild promise of leniency has been deemed sufficient to bar a confession, because criminal defendants are too sensitive to inducement, and the possible impact of the promise is too great to ignore and too difficult to assess.

In short, she contends that McNeese's promise of leniency made her confessions to him "involuntary." She contends that it is particularly troubling that a government agent could promise a particular result, but not bind the government to that promise. She contends that the situation here is analogous to the Attorney General telling Mexico that the United States would not seek the death penalty against a murderer that the United States was seeking to extradite, then turning around and seeking the death penalty once the prisoner was handed over. She contends that fairness requires that the government should be held to the promises it makes, even if the promises come from the lips of Robert McNeese.

The government, on the other hand, contends that a jailhouse informant's incorrect statement of the law, assuming it ever occurred in this case, did not violate Johnson's rights. The government contends that Johnson's argument is really an untimely motion to suppress, alleging a violation of her Fifth Amendment rights. The government also contends that Johnson has completely failed to provide any evidence of when McNeese allegedly made the statement in question. The government points out that the Eighth Circuit Court of Appeals concluded that McNeese was not a government agent until after he was provided with instructions from government agents on September 11, 2000, and that the only inference that he ever gave such a statement that the government has found is that McNeese gave Johnson advice about the death penalty on August 20, 2000, before he was a government agent, citing Exhibit 5 from the April 12, 2001, Suppression Hearing. Finally, the government contends that Johnson has failed to demonstrate that McNeese's belief about the possible penalties constituted a promise, even if he was a government agent at the time he made the statement in question. The government argues that McNeese's erroneous statement of the law, based on his erroneous belief, simply was not offered as a promise or condition for Johnson to make a confession.

### b.     Analysis

The court finds that this allegation of error is riddled with deficiencies. First, Johnson has failed to demonstrate that the alleged statement or promise by McNeese was ever made. Second, she has failed to demonstrate that the alleged statement was actually a "promise" that Johnson could not receive the death penalty for the offenses with which she had been or could be charged, rather than just a mistaken opinion, or that it was otherwise a statement made to induce her to confess to him or as a condition on which she would confess to him. Third, she has failed to demonstrate that McNeese was acting as an agent of the government at the time that the statement was supposedly made, or that, if he was, such a false promise was authorized or directed by the government as within the scope of his agency. Fourth, as the government suggests, Johnson's assertion that her confessions to McNeese were induced by false promises of leniency is woefully untimely, because the parties extensively litigated the admissibility of McNeese's evidence years ago without this issue ever coming to the fore. Thus, there is no basis on the present record to assume that the supposed promise of leniency was ever made by a government agent with authority to do so, such that the court must now enforce that promise by striking the death penalty as an available penalty in this case. Based on the present record, therefore, Johnson is not entitled to a judgment of acquittal on the death verdicts on the basis of a supposed bargain with a government agent concerning the available penalty.

Therefore, the court concludes that Johnson is not entitled to any relief on the basis of this alleged error.

### 4.     Ground No. 23:  The admission of Mr. Vest's testimony

As her fourth allegation of error during the "penalty phase," and her twenty-third ground for judgment of acquittal or new trial, Johnson asserts that the court erred in allowing the testimony of Mr. Vest as to alleged jailhouse statements of Dustin Honken,

216

because such testimony violated the Confrontation Clause, was not constitutionally reliable, and its probative value was substantially outweighed by unfair prejudice. This ground for relief reiterates arguments that Johnson made in the midst of trial and that the court rejected in a published ruling. *See United States v. Johnson* 378 F. Supp. 2d 1051 (N.D. Iowa 2005) (order on defendant's motion to exclude hearsay testimony during "penalty phase" on Confrontation Clause, Due Process clause, and statutory grounds, recognizing that "trifurcation" of the trial would provide adequate protection for these constitutional rights). Johnson offers no additional argument whatsoever in support of this ground for post-trial relief. Although the government does summarize its prior arguments in support of the admissibility of this evidence in its post-trial brief, the court finds that little further analysis of this issue is required.

The court finds that the evidence at trial confirmed the court's grounds for admitting this testimony in the "penalty phase." Furthermore, considering this issue of whether the evidence was properly admitted from a post-trial perspective, and assuming that admission of the evidence was erroneous, the admission of that evidence was harmless in this case. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the "penalty phase" verdicts. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). First, the court reiterates its conclusion that admission of this evidence was not unduly prejudicial, and second, the

court notes that, even without Mr. Vest's testimony, there was other substantial evidence concerning Johnson's role in the killings from which the jury could reasonably have reached the same "penalty phase" verdicts that they actually reached in this case.

Therefore, Johnson's motion for judgment of acquittal or new trial on the basis of the improper admission of Mr. Vest's testimony will be denied.

**5.      *Ground No. 24:  The admission of a former clerk's testimony***

As her fifth allegation of error in the "penalty phase" of her trial, and her twenty-fourth ground for judgment of acquittal or new trial, Johnson contends that the court erred in allowing its former law clerk to testify to statements she purportedly overheard Johnson make in the law clerk's presence when the court itself was a witness to Johnson's subsequent letter of apology that had been misplaced or lost and where the court's remedy denied Johnson the opportunity to take the sting out of the evidence and created a false impression for the jury.  Johnson offered no explanation of the circumstances giving rise to this allegation of error and made no argument in support of it in her brief.  The government, however, explained in its brief, and the court is aware from participation in the trial, of the circumstances giving rise to this allegation of error.

**a.      *Background***

Johnson attended the last day of Dustin Honken's sentencing in 1998.  An employee of the Clerk's Office, who functioned as the undersigned's courtroom law clerk, overheard Johnson making statements in the hallway outside the courtroom after the hearing that she believed were threatening to the undersigned and others.  The law clerk is no longer employed by the courts, having completed her two-year term of employment.

The former clerk was listed as a government witness in the "penalty phase" of Johnson's trial, but Johnson objected to allowing her to testify before she was called.  To prevent potential prejudice, the court ordered the government to refer to the former clerk

only as an employee of the Clerk's Office at the time—which was technically true, because the clerk was employed and paid by the Clerk's Office, although her assigned duties were to act as the undersigned's courtroom deputy and to perform other "law clerk" tasks as assigned by the undersigned—and the court did not allow the government to elicit or allow the former clerk to testify that she was a "law clerk" under the undersigned's direct supervision. Also to avoid potential prejudice, the court barred the government from eliciting testimony that the former clerk believed that Johnson's threats had been directed at the undersigned. The former clerk's testimony followed immediately after the testimony of Alyssa Nelson that she had also heard Johnson making statements that sounded like threats to the government's agents and the prosecutor before, during, and after Honken's sentencing.

After Honken's sentencing, Johnson sent a letter to the court denying that she was threatening the undersigned and apologizing for her outburst outside of the courtroom after Honken's sentencing. No record of the letter was made, because the undersigned did not consider either the supposed threats or the letter to be of any consequence.

### b.     *Arguments of the parties*

As mentioned above, in her brief, Johnson did not assert any arguments in support of her allegation that the court erred by allowing the former clerk to testify, apart from the arguments embodied in the allegation of error itself. However, at oral arguments on Johnson's post-trial motions, the court asked counsel for Johnson in what way the court's remedy had been inadequate. Johnson's team clarified that the only inadequacy in the remedy was that it was not a complete exclusion of the evidence. Johnson's team also conceded that any false impression, which was that the former clerk was not under the undersigned's direct supervision, when she really was, was to Johnson's advantage, not to Johnson's disadvantage. Johnson's team also conceded that the court had made a full

disclosure of the subsequent letter and the reasons that it no longer exists and that the defense could have elicited testimony concerning the letter of apology, but did not do so. Thus, Johnson's argument boils down to an objection to the admission of any testimony from the former clerk and an objection to the apology letter being unavailable to complete the context of the former clerk's testimony.

In its brief, the government asserts that the only impression that a jury could reasonably have drawn from the former clerk's testimony, as it was limited by the court, and in context, immediately following Alyssa Nelson's testimony, was that the former clerk was testifying to apparent threats by Johnson to government agents and the prosecutor.  The government contends that the impression provided by the former clerk's testimony, as limited by the court, was accurate, and that any omission of the facts concerning the former clerk's relationship to the undersigned and the former clerk's belief that Johnson's threats were being made to the undersigned could only have worked to Johnson's benefit.  The government also asserts that testimony that a defendant made threats to law enforcement officers or government officials is admissible in the "penalty phase" of a trial on capital charges as evidence relevant to the defendant's future dangerousness.  At oral arguments, the government pointed out that the court's remedy had not limited the former clerk's testimony in any way that would have harmed Johnson and that the defense could have elicited testimony concerning Johnson's apology letter, had the defense team so desired.

### c. Analysis

The court finds that the testimony of the former clerk, as limited, was relevant to the issue of Johnson's future dangerousness, because it related to threats by Johnson to law enforcement officers and government officials.  *See Moore v. Johnson*, 225 F.3d 495, 500 (5th Cir. 2000).  Nor was the evidence, as limited, unduly prejudicial, *see* FED. R. EVID.

403 (relevant evidence may be excluded if it is unduly prejudicial), because the court limited any testimony that might have suggested that the former clerk had a close employment relationship with the undersigned or that Johnson's threats appeared to the former clerk to be directed toward the undersigned, and such a limitation could only have been to Johnson's benefit. Thus, Johnson's contention that the former clerk's testimony should have been excluded in its entirety is without merit.

Finally, even assuming that admission of the evidence was erroneous, the admission of that evidence was harmless in this case. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the "penalty phase" verdicts. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). The former clerk's testimony did little more than confirm the prior testimony of Alyssa Nelson that Johnson had threatened law enforcement officers and government officials during Honken's sentencing, and there was copious other evidence from which the jury could reasonably have found that Johnson posed a danger in the future.

Therefore, Johnson's motion for judgment of acquittal or new trial, at least for the "penalty phase," will be denied on this ground, as well.

**6.** **_Ground No. 25: The admission of a poem written by a murdered child's friend_**

As her sixth allegation of error during the "penalty phase" of her trial, and her twenty-fifth ground for judgment of acquittal or new trial, Johnson asserts that the court erred in allowing Robert Milbrath to read to the jury a poem by Brittany Asbe, a childhood friend of Amber Duncan, where Brittany Asbe was not a relative of any victim and such evidence was offered for its extreme emotional impact with the jury, thereby denying Johnson her due process right to a fair sentencing. This allegation of error requires a brief statement of the pertinent context.

> **_a._**     **_Background_**

Brittany Asbe was a childhood friend, indeed, the "best friend," of Amber Duncan, the six-year-old murder victim, and lived across the alley from Amber. At the very belated funeral for the murder victims, years after their disappearance, when their bodies had been discovered, Brittany Asbe read a poem that she had written about her friend. During the "penalty phase" of Johnson's trial, Robert Milbrath, Lori Duncan's brother and Amber's uncle, was allowed to read Brittany Asbe's poem into the record, over Johnson's objections. The poem ran as follows:

> She was only six when she left
> on a picnic, then the theft.
> She never would be able to get to the age of seven,
> For she was shot and sent to heaven.
> I never got to say good-bye.
> The nights I was scared, those nights I'd cry,
> Wishing to see her face again,
> Wishing that it'd never been.
> For my dear friend, I loved her so.
> I never wanted her to go.
> Only five and not aware,
> Of what would be ahead. Oh, what a scare.

Amber isn't just a color.  She was my friend.
Forever together until the very end.

Realtime Transcript for June 2, 2005, at approximately 1:10 p.m.  Mr. Milbrath was one of only six family members to present victim-impact testimony in the "penalty phase" of Johnson's trial and the victim-impact testimony, as a whole, lasted only approximately two hours.

### b.    Arguments of the parties

Johnson contends that evidence of the poem, which was more appropriate to a funeral than a capital murder trial, was overly inflammatory, emotional, and prejudicial.  Indeed, Johnson contends that it fell well beyond what the majority in *Payne v. Tennessee*, 501 U.S. 808 (1991), had ever envisioned as appropriate victim-impact evidence.  Johnson contends that the reading of the poem exceeded the wide latitude given prosecutors in presenting victim-impact evidence.  She also argues that the reading of the poem brought tears to the eyes of several jurors.

The government responds that there is no foundation for Johnson's contention that the reading of the poem made jurors cry.  The government also argues that evidence of the poem was admissible to show the specific harm caused by the defendant, within the meaning of *Payne*.  The government contends, more specifically, that the reading of the poem was entirely appropriate and not unduly prejudicial, because although Mr. Milbrath did not write the poem, he had heard it read at the funeral, and it was significant to him in describing who Amber was and the impact of her loss.  The government also contends that the victim-impact evidence, in its entirety, was so limited that Johnson cannot assert that the admission of the poem was excessive or cumulative.

At oral arguments, Johnson asserted that the poem improperly invited the jurors to associate themselves with the victims' families.  She also contended that the impact of the

poem was potentially greater when read by Amber's uncle rather than the author, because the jury could see the impact of the poem upon an otherwise strong and stoic man. The government, however, reiterated that the poem was only one small piece of a very limited victim-impact presentation and that it fit within the scope of admissible victim-impact evidence. The government also reiterated the argument that it had made for admission of this evidence during trial that having Mr. Milbrath, rather than the author, read the poem was intended to and did mitigate some of the potential emotional impact of the poem.

### c.    *Analysis*

The United States Supreme Court allowed admission of victim-impact evidence during the sentencing phase of a capital trial in its decision in *Payne v. Tennessee*, 501 U.S. 808 (1991). Thus, "'[i]t is clear from both the [Federal Death Penalty Act] and Supreme Court precedent that the government is allowed to present and a jury is allowed to consider victim impact evidence in reaching its sentencing decision in a capital case.'" *United States v. Nelson*, 347 F.3d 701, 713 (8th Cir. 2003) (quoting *United States v. Allen*, 247 F.3d 741, 778 (8th Cir. 2001), and citing 18 U.S.C. § 3593(a) and (c), which state that the government may present any evidence relevant to any aggravating factor listed in the notice of intent to seek the death penalty which "may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family," and also citing *Payne*, 501 U.S. at 827). Although the death-penalty provisions of the CCE statute, 21 U.S.C. § 848, lack comparable express statutory authorization of victim-impact evidence, *Payne* nevertheless provides such authorization in this case.

In *Payne*, the Supreme Court also recognized, however, that "[t]he defendant's due process rights can be infringed . . . where the victim impact evidence introduced is 'so

unduly prejudicial that it renders the trial fundamentally unfair.'" *Nelson*, 347 F.3d at 713 (quoting *Payne*, 501 U.S. at 825). To determine whether a defendant's due process rights have been so infringed, the Eighth Circuit Court of Appeals considers the "quantitative" and "qualitative" aspects of the victim-impact evidence presented. *Id.* at 713-14. For example, in *Nelson*, the court held that, "quantitatively," the victim-impact evidence consisted of only six witnesses and only approximately 101 of 1100 pages of trial transcript, and that the potential for undue prejudice was offset by the substantial evidence and numerous witnesses presented by the defendant. *Id.* at 713. The court also held that, "qualitatively," "the nature and scope of the victim impact evidence in this case is not meaningfully different than that allowed in *Payne* and decisions of this court," in that it fell within the broad, approved categories of "victim character evidence, emotional impact of loss, and religious references." *Id.* at 714. Consequently, the court held that the victim-impact evidence in that case did not render the defendant's "penalty phase" fundamentally unfair. *Id.*

Whatever the undersigned's personal reservations about the relevance of victim-impact evidence, it cannot be said, as Johnson contends, that Robert Milbrath's reading during the "penalty phase" of the poem written by Amber Duncan's childhood friend, or the victim-impact evidence in this case generally, exceeded the permissible scope of such evidence under *Payne* or *Nelson*, such that Johnson's due process rights were violated. *See Nelson*, 347 F.3d at 713 ("The defendant's due process rights can be infringed . . . where the victim impact evidence introduced is 'so unduly prejudicial that it renders the trial fundamentally unfair.'") (quoting *Payne*, 501 U.S. at 825). Contrary to Johnson's contention, the poem fell squarely within an approved category of victim-impact evidence, "emotional impact of loss." *See id.* at 714 (identifying this category of victim-impact evidence as one approved in decisions of the circuit court and the Supreme Court in

225

*Payne*).   While the poem was clearly moving, it fell far short of being "so unduly prejudicial that it rendered the trial fundamentally unfair" within the meaning of *Nelson*, 347 F.3d at 713, or *Payne*, 501 U.S. at 825.   Moreover, the court finds that the reading of the poem by Amber Duncan's uncle, rather than the author, lessened the "qualitative" impact, because it mitigated, rather than inflamed, the emotional impact of the poem.   The undersigned is in a unique position to make this judgment, because the court heard the poem read by Brittany Asbe herself during the "penalty phase" of Dustin Honken's trial. Thus, "qualitatively," the evidence was not outside the nature and scope of permissible victim-impact evidence and was not "meaningfully different" from evidence permitted in other capital cases.   *See Nelson*, 347 F.3d at 713.

Moreover, "quantitatively," the brief poem was not excessive or cumulative, where it was the only such item of evidence, the government put on only six family members to testify as to the impact of the killings, the government's entire victim-impact presentation lasted only about two hours out of a trial that had lasted weeks and a "penalty phase" that lasted several days, and Johnson's "penalty phase" presentation involved more witnesses and used more than twice as many trial days as the government's.   *Compare id.* at 713 (the victim-impact evidence consisted of only six witnesses and only approximately 101 of 1100 pages of trial transcript, and that the potential for undue prejudice was offset by the substantial evidence and numerous witnesses presented by the defendant).   Indeed, the government used admirable restraint in presenting such evidence in this case.

Therefore, Johnson's motion for judgment of acquittal or new trial, in the "penalty phase" or any other phase of her trial, on this ground will be denied.

### 7.    *Ground No. 26: The cross-examination of Chief Book*

As her seventh allegation of error in the "penalty phase" of her trial, and her twenty-sixth ground for judgment of acquittal or new trial, in the "penalty phase," if not all phases, Johnson asserts that the court erred in allowing testimony on cross-examination of Douglas Book that clearly bore no relation to his direct examination, that concerned allegedly recorded statements of the defendant of a purportedly threatening nature that were not the subject of any prior disclosure by the government, and whose probative value was greatly outweighed by unfair prejudice, all of which denied Johnson due process of law. Johnson offers no context nor argument in support of this contention apart from her formulation of the issue.

### a.    *Background*

The Realtime Transcript for June 8, 2005, reveals that Johnson called as a "penalty phase" witness Douglas Wayne Book, the Chief of Police in Forest City, Iowa, who testified that he had held that position since 1974. Johnson elicited testimony from Chief Book that his officers had had altercations with murder victim Terry DeGeus upon occasion in the years prior to his murder and that, on one occasion in 1985, Chief Book had discovered defendant Johnson in a ditch after she had been badly beaten by DeGeus, with whom Johnson was then living. Johnson declined to press charges, so Chief Book was unable to arrest DeGeus for the beating. Johnson apparently offered this evidence to suggest that she was abused and manipulated by men.

On cross-examination, at the point at which Johnson objected to Chief Book's testimony, the government attempted to elicit testimony about Chief Book's knowledge of a drug investigation in 1998 involving Johnson's alleged distribution of methamphetamine and possibly involving other members of her family. The government was allowed to elicit information from Chief Book that, while his investigation was continuing, a person whose

227

voice Chief Book recognized as Johnson's, and who may even have identified herself as Johnson, left messages on his telephone answering machine telling him to "back off" or he "could get hurt" and that he should leave her family alone. The government asserted that the evidence was relevant to show Johnson's own tendency to violence to counter her argument that she was manipulated by violent men. On redirect examination, Johnson elicited testimony that Chief Book did not think that the messages were sufficient to charge Johnson with anything and that he had not saved the recordings.

### b.      Arguments of the parties

As mentioned above, Johnson did not provide any argument in support of this contention apart from her formulation of the issue. However, the government did argue in its brief that the evidence was directly related to Chief Book's testimony on direct examination by Johnson, which had perhaps portrayed Johnson as a helpless victim of violent men, because it showed that, even in the absence of supposedly controlling, violent men, Johnson was violent or engaged in threats herself. The government also asserts that the tapes of the allegedly threatening phone messages could not be provided, because they had not been retained by Chief Book, and because the government had only learned of them during its interview of Chief Book in the course of the trial. The government also contends that there was no obligation upon the government to provide such tapes, because they were not exculpatory, but incriminating, even though Johnson was not charged with any crime for making threats to Chief Book, and that Johnson had a full opportunity to discover the same information, because Chief Book was her witness.

### c.      Analysis

At the time that the challenged evidence was offered, the court ruled that, although the testimony that the government wished to, and ultimately, did elicit from Chief Book may have been beyond the scope of direct examination, and thus, not proper cross-

examination, it could be proper rebuttal testimony. The court also ruled that the scope of cross-examination in the "penalty phase" was not limited to matters raised on direct examination under the relaxed evidentiary rules for the "penalty phase" under 21 U.S.C. § 848(j), which permits the court to admit any "information" in the "penalty phase" unless "its probative value is substantially outweighed by its danger of unfair prejudice, confusion of the issues, or misleading the jury." The court reaffirms these grounds for admission here. More specifically, the court finds that permitting Chief Book's testimony, even if it exceeded what might otherwise have been the proper scope of cross-examination, was appropriate, because it was in keeping with the relaxed evidentiary standards for the "penalty phase" under 21 U.S.C. § 848(j), in that the admission of such evidence did not impair the reliability of the "penalty phase," but instead increased the reliability of the "penalty phase" by providing full and complete information about the defendant and by allowing the required individualized inquiry concerning the appropriate sentence. *See United States v. Lee*, 374 F.3d 637, 648 (8th Cir.2004), *cert. denied*, ___ U.S. ___, 125 S. Ct. 2962 (2005); *United States v. Fell*, 360 F.3d 135 (2d Cir.2004), *cert. denied*, ___ U.S. ___, 125 S. Ct. 369 (2004).

Moreover, the court finds that, even if erroneous, admission of the evidence was harmless. *See Mack*, 343 F.3d at 935 ("'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.'") (quoting *Oleson*, 310 F.3d at 1091). This is so, because, in light of the entire record, Johnson's substantial rights were unaffected, and the error did not influence or had at most only a slight influence on the "penalty phase" verdicts. *See Crenshaw*, 359 F.3d at 1003-04 (defining the error in admitting evidence as "harmless" "'if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or

had only a slight influence on the verdict'") (quoting *Carroll*, 207 F.3d at 470). Specifically, there was more than sufficient other evidence from which reasonable jurors could have found beyond a reasonable doubt that Johnson was capable of violence on her own initiative, and not merely when under the influence of violent and controlling men, and that she was not merely a helpless victim of such men.

Nor can the court find any due process violation in the government's failure to turn over recordings of purportedly threatening telephone messages that no longer existed and that the government only discovered in the course of trial. As the government points out, Johnson had an equal opportunity to discover the information with which she claims that she was surprised, because Chief Book was her witness. Moreover, the government was not under any obligation to disclose the information about the recordings. A prosecutor simply has "no duty to disclose evidence that is 1) neutral, speculative or inculpatory, 2) available to the defense from other sources, 3) not in the possession of the prosecutor, or 4) over which the prosecutor has no actual or constructive control." *United States v. Flores-Mireles*, 112 F.3d 337, 340 (8th Cir.), *cert. denied*, 522 U.S. 938 (1997). The evidence in question here of the recorded threats to Chief Book falls into all of these categories, where it was inculpatory, it was available to Johnson through her witness, the government did not possess the tapes or information prior to trial, and the government had no actual or constructive control over the tapes or information. Thus, this evidence was not such that the prosecutor had a duty to disclose it. *Id.*

Therefore, Johnson is not entitled to judgment of acquittal or new trial, even in the "penalty phase," on the basis of this alleged error.

## 8. Ground No. 27: The treatment of defense experts by the court

As her eighth allegation of error during the "penalty phase," and her twenty-seventh ground for judgment of acquittal or new trial, Johnson contends that the trial court's conduct in interrupting and allegedly chastising defense experts Dr. Logan and Dr. Hutchinson *sua sponte* in the presence of the jury denied Johnson her due process right to a fair and impartial penalty proceeding. Johnson does provide her version of the events giving rise to this allegation of error, albeit without citations to the record, and the court recalls them clearly.

### a. Background

On June 7, 2005, Johnson called Dr. William S. Logan, M.D., as a mental health expert witness. After almost two hours of direct examination, the government began its cross-examination of Dr. Logan at 10:25 a.m. That cross-examination began with the following questions from the government and the challenged comment by the court:

> Q [BY THE PROSECUTOR]. Good morning, Doctor.
> A. Good morning.
> Q. I want to go back over some of the points you made during your testimony here this morning. One of the first things is you indicated you interviewed a number of people in addition to the defendant in this case in order to arrive at your opinions. Do you remember giving that testimony, sir?
> A. Yes, I do.
> Q. Those people were chosen by Mary Goody who was employed specifically to find mitigation evidence in this case; isn't that right?
> A. Yes, it is.
> Q. And the people that were chosen were friends and family of the defendant; isn't that right?
> A. Well, certainly people that knew her. Those would have been some of the same people I would have talked to if I'd been selecting people that certainly had contact with her.

Q. Sure. You didn't go out and find anybody who were enemies of the defendant—

THE COURT: You know, Doctor, that wasn't responsive to his question, so you need to answer the question he asks you and not volunteer information. Do you understand, Doctor?

THE WITNESS: Yes.

THE COURT: Okay. It wasn't responsive at all. He didn't ask you about who you would pick if you were picking witnesses, did he?

THE WITNESS: No, sir.

THE COURT: Okay. So then why did you answer it that way?

THE WITNESS: Primarily to convey that the picks were logical.

THE COURT: But it wasn't—

THE WITNESS: But I didn't make them.

THE COURT: That's right. And so you need to answer his questions, not some question you hoped he had asked you; okay?

THE WITNESS: Yes, sir.

THE COURT: Okay.

Q [BY THE PROSECUTOR]. So the fact is, Doctor, you didn't interview anybody who was an enemy of the defendant; right?

A. No.

Realtime Transcript for June 7, 2005, 10:25:38 a.m. to 10:27:02 a.m. According to the time markers on the Realtime Transcript, the entire quoted section took less than one-and-one-half minutes, and the portion of the quotation from the time the court intervened to the end took only thirty-six seconds. Johnson made no objection at the time to the court's comments and questions to this witness, nor did she object at the conclusion of the witness's testimony or at the next recess, even though she had ample time to do so outside of the presence of the jury. Nor did she object the following morning, when the

undersigned met with the lawyers and the defendant outside the presence of the jury to determine if the parties had any issues that they wanted to raise, in accordance with the court's long-standing practice during all trials, including Johnson's.

The next day, Johnson called Dr. Marilyn Hutchinson, another of her mental health expert witnesses, at approximately 10:53 a.m. At approximately 11:15 a.m., defense counsel placed an exhibit prepared by Dr. Hutchinson on the document display table, so that it was displayed for the jury on the large document display screen behind the witness box and on the monitors for the witness, counsel, and the court. Dr. Hutchinson turned around in her seat, with her back to the jury and the judge, to look at the document as displayed on the large screen. This incident, including the exchange between the court and the witness, was recorded in the Realtime Transcript as follows:

> Q [BY DEFENSE COUNSEL]. And in connection with [a model the witness employed in analyzing Johnson's childhood], did you prepare an exhibit that might aid you in explaining this model to the jurors?
>
> A. Well, I didn't personally prepare it, but I copied one.
>
> Q. You copied one and brought it with you.
>
> A. Yes, I did.
>
> THE COURT: It's on the screen in front of you.
>
> [DEFENSE COUNSEL]: Thank you, Judge.
>
> THE WITNESS: Yeah, I was just checking that it was up there. That's pretty cool.
>
> [DEFENSE COUNSEL]: I didn't see it. I apologize.
>
> THE COURT: That's not your job; okay?
>
> THE WITNESS: Okay.
>
> Q [BY DEFENSE COUNSEL]. Dr. Hutchinson, on the screen in front of you and on the overhead, there is a document. Let me see if I can bring it down.
>
> A. That's fine. Thank you.

Realtime Transcript for June 8, 2005, from 11:15:16 a.m. to 11:16:24 a.m. According to the time markers on the Realtime Transcript, the entire quoted section took just over one minute.

Again, Johnson made no objection at the time to the court's comments to this witness and counsel concerning display of the exhibit. However, forty-five minutes later, while Dr. Hutchinson was still on the stand, but after the court had excused the jury for its noon break, defense counsel did raise the matter again, as follows:

> [DEFENSE COUNSEL]: I raise this reluctantly, but I raise it because I'm concerned about it. Today when Dr. Hutchinson turned around and looked at the screen—
>
> THE COURT: Yeah.
>
> [DEFENSE COUNSEL]; —the Court in my view addressed her—maybe curtly might be the nicest way I could describe it in terms of "that's not your job." Yesterday a similar incident took place with Dr. Logan. I didn't raise an objection at that time, and the record will reflect what was said with Dr. Logan.
>
> But my concern is—and I'm sure the Court does not intend this, but the jurors have spent a good deal of time with the Court. I suspect based on the treatment the Court has provided them, which has been gracious to say the least, they have a very high view of the Court presently. They don't know these experts from Adam until they come in and testify. And when the Court addresses them in what I would have to describe at least as a hostile manner right at the beginning of their testimony for what I perceive in my humble opinion to be very minor infractions, it sets a tone with the expert that's very difficult for me to overcome.
>
> Again, I'm going to presume, do presume, that the Court—that this is just a matter of perhaps some annoyance with these individuals, but I very much fear the effect that it has on the jurors, and we still have at least one more expert to go.

So I'm just going to note it for the record because I fear later on appeal if I don't somebody's going to ask me about it. But—and they probably will based on my silence regarding Dr. Logan, but I do have a concern about it, and I'd ask the Court to at least consider it. If our experts are acting inappropriately, I'd be happy to address it at the bench or in some fashion where the jurors are not left with the impression that the Court right away is unhappy with them for some perceived reason. And I just wanted to state that before our break.

THE COURT: Anything else you'd like to say?

[DEFENSE COUNSEL]: Nothing else, Your Honor.

THE COURT: Okay. Thank you. We'll be in recess.

Realtime Transcript for June 8, 2005, at 12:03:02 p.m. to 12:05:04 p.m.

### *b.*     *Arguments of the parties*

Johnson characterizes the incident with Dr. Logan as the court interrupting the proceedings to "publicly berate" Dr. Logan for being non-responsive and questioning Dr. Logan "in an accusatory way" as to why he was not answering the prosecutor's questions. Johnson also characterizes the incident as an "embarrassing scene" that "went on for two or three minutes," during which defense counsel was "afraid to intervene for fear of exacerbating the situation in front of the jury." She also contends that the court "pounced" on Dr. Hutchinson and asked her in a "harsh" manner, "What are you doing?!," and when Dr. Hutchinson purportedly said she was making sure the jurors' screen was showing her chart, the court responded, "That's not your job!" She contends that counsel again "dared not object" in front of the jury "for fear of additional outbursts from the Court," although she did make a record during the subsequent recess. Although Johnson graciously suggests that the court simply lost its temper instead of deliberately attempting to humiliate the defense experts in front of the jury, she contends that the court's excessive reactions to minor infractions by the experts suggested that the court

235

"obviously *disliked* the defense experts," and that nobody in the courtroom, least of all the jurors, could have perceived the two exchanges differently. Defendant's Brief In Support Of Motion For Judgment Of Acquittal Or For New Trial (docket no. 644) at 39. Johnson also contends that the court, for whatever reason, singled out two of the defendant's three mental health experts for unprecedented hostility during the "penalty phase" of the trial. Because these were critical witnesses for the defense, she contends that the prejudice from the court's conduct was "immeasurable" and suggested that the court thought the witnesses were "worthless." Johnson also argues that the prejudice was never cured by any explanation or apology from the court. Consequently, Johnson contends that she was denied her rights to due process under the Eighth and Fourteenth Amendments.

The government, on the other hand, argues that there was nothing improper about the court's comments to the two experts. Instead, the government asserts that the court's comments were well within the court's inherent power to control the presentation of evidence. The government also contends that Johnson has failed to establish any prejudice to her from the court's comments to the experts. The government points out that this was a long and complex trial involving eighty-five witnesses and over three hundred exhibits, so that the court's comments were a small fraction of the trial record, and that, in such a trial, the court was necessarily required to exercise tight control over the presentation of evidence to the jury. The government also points out that Dr. Logan gave a clearly unresponsive answer to a prosecutor's question, which the court was entitled to address, and that no "berating" of the witness or "accusatory" questions were involved. Rather, in the government's view, the court gave this expert an opportunity to explain why he had not directly answered the prosecutor's question. The government also points out that Johnson mischaracterizes the duration of this incident, and also mischaracterizes the court's conduct in the incident involving Dr. Hutchinson, which did not involve any

"pouncing" or "harsh" comments or any "outbursts" of anger.  The government asserts that Johnson's hypersensitivity to the way that her experts were treated does not demonstrate any inappropriate conduct by the court.  Next, the government points out that the court instructed the jury that nothing the court had said or done was intended to suggest that the court had any opinion on what the jurors' decision should be.  Thus, the government contends that the jurors received a proper instruction, which eliminated any danger that they would read anything into the court's comments.  Finally, the government asserts that nothing in the incidents to which Johnson points suggests that the court had any intent to disparage her or her witnesses in the eyes of the jury or to prevent the jury from exercising its own judgment on any issue.

       *c.*      *Analysis*

"In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia v. United States*, 289 U.S. 466, 469 (1933).  However, a trial court's "egregious comments" that "result[ ] in highly prejudicial error" will "warrant reversal." *Id.* at 472.  To put it another way, if the court has "so far injected itself into the trial as to give the jury the impression that it favor[s] the prosecution," the court may "thereby deprive[ ] the defendant[ ] of a fair trial." *Alidani v. Dooley*, 365 F.3d 635, 640 (8th Cir. 2004) (citing *United States v. Singer*, 710 F.2d 431 (8th Cir. 1983) (*en banc*)).  On the other hand, "a few isolated and arguably improper comments" will not warrant relief.  *Id.*  Nor will quoting occasional "snippets" of comments from a lengthy trial demonstrate that the court's actions, comments, and rulings were one-sided and prejudicial to the defendant, such that they resulted in a fundamentally unfair proceeding.  *United States v. Coon*, 187 F.3d 888, 897 (8th Cir. 1999), *cert. denied sub nom. Riley v. United States*, 529 U.S. 1017 (2000); *United States v. Van Dyke*, 14 F.3d 415, 417 (8th Cir.

1994) ("'We have always been reluctant to disturb a judgment of conviction by reason of a few isolated, allegedly prejudicial comments of a trial judge, particularly in a long trial.'") (quoting *United States v. Leuth*, 807 F.2d 719, 727 (8th Cir. 1986)). Thus, the reviewing court will "'balance and weigh the comments of the judge against the overall fairness of the trial' to determine whether [the defendant] was adversely affected." *United States v. Goolsby*, 209 F.3d 1079, 1081 (8th Cir. 2000) (quoting *Van Dyke*, 14 F.3d at 417-18, with citations in *Van Dyke* omitted); *Coon*, 187 F.3d at 897 (the question is whether, viewing the trial record in its entirety, the reviewing court must conclude that the trial judge persistently interjected himself on the side of the prosecution).

While various cases address a court's comments on evidence, that is not the kind of comment by the court at issue here. Instead, this is a case in which the defendant contends that, by certain conduct and comments, the court showed hostility toward defense witnesses. The Eighth Circuit Court of Appeals has recognized that "[t]here is certainly a distinction to be drawn between cases of excessive judicial intervention in the questioning of witnesses, and cases in which a trial judge makes comments in the presence of the jury that appeal to bias or prejudice." *Rush v. Smith*, 56 F.3d 918, 922 (8th Cir.), *cert. denied*, 516 U.S. 959 (1995). The court explained further:

> There can be no doubt that the latter sort of judicial misconduct is a more potent contaminant. Aggressive questioning by the trial judge may, in some instances, actually benefit the truth-seeking function of the courts, though such active participation is not favored. Further, it is quite possible that a trial judge may be able to engage in such questioning without revealing his or her views on the merits of the case. However, when the trial judge's role loses it impartial character and tends to emphasize and accentuate one side's case over another's, a trial judge's participation becomes prejudicial and may require reversal. *See United States v.*

> *Bland*, 697 F.2d 262, 265 (8th Cir. 1983). The difference
> between this type of impropriety and the impropriety of
> comments which appeal to bias or racial prejudice is not one
> of degree, but of kind. Comments which appeal to such
> passions can never serve a salutary purpose. Even one
> instance of such comment, depending on the facts and
> circumstances of the case, may be sufficient to destroy the
> integrity of the entire proceeding. Outrageous comments of
> this sort will be exceedingly rare, but they unfortunately occur
> from time to time.

*Rush*, 56 F.3d at 922. The court in *Rush* found that it was faced with one such incident of outrageous conduct, revealing bias of the court. *Id.* The comment in question, which the appellate court found was plain error, was that "the races have a tendency to stick together," in reference to witnesses who purportedly corroborated the defendant's version of events. *Id.* at 923. The appellate court also observed that the trial court should not have commented to the jurors that the defendant's attorneys had "scolded" the judge for being late, "because of the danger that such characterization might unfairly disparage [the defendant] and his counsel in the eyes of the jury." *Id.* at 922.

Comments may be improper, even if they are not directed at the merits of the defendant's case, if they "effectively undermined the credibility of [the defendant's] corroborating witnesses." *Rush*, 56 F.3d at 923 (the court undermined the credibility of the defendant's witnesses, who like the defendant were all African-American, by stating that "the races tend to stick together"). Such an error affects the fundamental fairness of the trial, where it suggests an improper basis—such as the race of the defendant and his witnesses—for disregarding certain evidence. *Id.* Presumably, the same would be true if the court's comments effectively undermined the credibility of the defendant's expert witnesses, for example, if the comments suggested that the experts were somehow unworthy of belief or unworthy of consideration.

In contrast, the Eighth Circuit Court of Appeals has held that the trial court acted well within its discretion, where the challenged incidents "were appropriate efforts to control repetitive questioning, improper foundation, [or] the mischaracterizing by counsel of testimony or other evidence." *Coon*, 187 F.3d at 898. Also, directing a witness to behave in a certain way, such as directing a reluctant and soft-spoken witness to speak louder, also falls within the zone of appropriate control over the trial. *See Goolsby*, 209 F.3d at 1081. Thus, there was no prejudice, and even if there was, it did not effect the overall fairness of the trial to such a degree that a new trial was required, where the trial court made a single remark in the presence of a jury, consisting of the following: "'[I]f you would either look at me or look over at the jury, we can understand you a lot better. When you are talking down, over half your voice just goes down there and we don't hear it. You don't have to—you don't talk that loud anyway. Just look at me when you talk.'" *Id.* (quoting the trial court's comment). Similarly, there was no prejudice, and if there was some prejudice, no violation of fundamental fairness requiring a new trial, where the district court asked the defendant, when he testified, "to raise his voice," and also asked other witnesses, including the government's witnesses, to do the same, because of poor acoustics in the courtroom, or where the trial court told a witness that "his role was to answer questions, not ask them." *United States v. Jackson*, 41 F.3d 1231, 1232-33 (8th Cir. 1994).

Here, the court must first point out that Johnson has mischaracterized both incidents in which the court made comments to Johnson's experts that Johnson considers improper. First, Johnson mischaracterizes the duration of both incidents, neither of which lasted agonizing minutes. Second, as the portions of the transcript quoted above reveal, at no time during the examination of Dr. Hutchinson did the court say, "What are you doing?!," as Johnson contends. Third, each incident involved passing comments to the experts

concerning their proper roles and behavior on the stand, not interrogations. Johnson over dramatizes the tone of the court's comments as "harsh" and the nature of the court's conduct as "berating," "accusatory," or "pouncing" on the experts with absolutely no support in the record for such characterizations. Indeed, such characterizations are belied by the quotations from the Realtime Transcript, above, of the court's actual comments to these witnesses. The court may well have sounded impatient with the expert witnesses, because both of them were clearly experienced with testifying in front of a jury, so that both should have been well aware of their proper roles and proper deportment while in the witness box.[25] However, nothing like hostility suggesting bias toward these witnesses can reasonably be gleaned from the record. Certainly, Johnson grossly overstates things when she asserts that everyone present would necessarily have perceived the incidents to suggest that the court "obviously *disliked* the defense experts."[26]

Turning to more substantive issues, balancing the few isolated comments that Johnson challenges, including their nature and content, against the overall fairness of this very lengthy and complex trial, it is apparent that Johnson's rights were not adversely affected. *See Goolsby*, 209 F.3d at 1081 (the court must balance the judge's comments

---

[25]The court was often frustrated by the poor ability of the defense attorneys to use the courtroom technology and to train expert witnesses to use it, despite the repeated efforts of court personnel to train the lawyers for both sides before and during trial and despite the ready availability of the court's technology personnel—before, during, and after each trial session, and on-call at any other time that help might be needed—to address problems when they arose.

[26]Indeed, if Johnson's contention about the inevitable perception of the court's comments was even remotely true, or if the court's statements had, indeed, been "berating," "accusing," "harsh," or "pouncing," why did the defense team not offer evidence at the post-trial hearing to support these claims? The courtroom was full of people who could have testified as to their perception of the incidents in question.

against the overall fairness of the trial to determine whether the defendant's rights were adversely affect); *Coon*, 187 F.3d at 897 (same); *Van Dyke*, 14 F.3d at 417-18; *see also Alidani*, 365 F.3d at 640 ("a few isolated and arguably improper comments" from a lengthy trial will not warrant relief); *Coon*, 187 F.3d at 897 ("snippets" of comments from a lengthy trial will not demonstrate a fundamentally unfair proceeding). Indeed, there is nothing like the inherently prejudicial inference of bias toward certain witnesses, of the sort presented in *Rush*, 56 F.3d at 922-23, to be gleaned from any of this court's comments to Johnson's experts.

Even though comments that are not directed at the merits of the defendant's case may nevertheless effectively undermine the credibility of the defendant's witnesses, *cf. id.* at 923 (even though comments were not directed at the merits, they undermined the credibility of the defendant's "corroborating witnesses"), this court's comments plainly fell into the court's role as "governor of the trial," *see Quercia*, 289 U.S. at 469 (the trial judge "is not a mere moderator, but is the governor of the trial"), without reflecting unduly on the credibility of the experts or the consideration to be given to their testimony. This is so, because the court's comments were appropriate efforts to control and focus the testimony and conduct of the witnesses. *Cf. Coon*, 187 F.3d at 898 (the trial court engaged in "appropriate efforts to control repetitive questioning, improper foundation, and the mischaracterizing by counsel of testimony or other evidence"). This court's conduct in telling Dr. Hutchinson that display of exhibits for the jury was "not [her] job" was, in this court's view, on a par with the conduct of the trial court in *Goolsby*, 209 F.3d at 1081, in directing a soft-spoken witness to speak louder, because it simply directed the witness's behavior on the stand to assist the jurors to focus on and understand the witness's testimony. Similarly, the court's comment to Dr. Logan that one of his answers had been unresponsive to the prosecutor's question and that he needed to answer the prosecutor's

questions, not some question that Dr. Logan had hoped the prosecutor would ask him, was, in this court's view, on a par with the court's caution to a witness in *Jackson*, 41 F.3d at 1232-33, that "his role was to answer questions, not ask them."

Even assuming that the court's comments were somehow prejudicial, it is impossible for the court to find that anything that the court did in relation to these expert witnesses undermined the fundamental fairness of Johnson's "penalty phase," where these expert witnesses were allowed to express their opinions fully and fairly, and Johnson was permitted to put on these and numerous other witnesses and substantial testimony, essentially unimpeded. *See Goolsby*, 209 F.3d at 1081(even if the appellate court assumed that the conduct of the trial court caused some prejudice, the appellate court could find no violation of the fundamental fairness of the proceedings warranting relief); *Jackson*, 41 F.3d at 1232-33 (same). Indeed, the potential prejudice from any comment by a trial judge may be effectively mitigated by an instruction, such as the ones given in this case, that the jury should not take anything the trial judge may say or do or that the judge has done or said during trial as indicating what the trial court thinks of the evidence or what the trial court thinks the jury's verdict should be. *See United States v. Ray*, 250 F.3d 596, 602 (8th Cir. 2001), *cert. denied*, 535 U.S. 980 (2002); *see also* Preliminary "Penalty Phase" Jury Instruction No. 5 ("You must not take anything I said or did during the 'merits phase' of the trial or anything I may say or do during this 'penalty phase' as indicating what I think of the evidence or what I think the sentence on any of the Counts in question should be."); Final "Penalty Phase" Jury Instruction No. 9 ("Let me remind you again that nothing that I have said in these instructions—and nothing that I have said or done during either the "merits phase" or the "penalty phase" of the trial—has been said or done to suggest to you what I think your decision should be. I have no opinion about what your decision should be. That decision is your exclusive responsibility."). Again, the jury is presumed to have

followed these instructions, and Johnson has presented nothing to rebut that presumption but conjecture and speculation. *See United States v. Betterton*, 417 F.3d 826, 832 (8th Cir. 2005) ("'A jury is presumed to follow its instructions.'") (quoting *United States v. Flute*, 363 F.3d 676, 678 (8th Cir. 2004)). Thus, even if Johnson could somehow show that the comments of the court that she challenges were prejudicial, that prejudice was mitigated by proper instructions, such that no fundamental unfairness can ultimately be found warranting a new trial for the "penalty phase."

Therefore, Johnson's motion for judgment of acquittal or new trial, in the "penalty phase" or any other phase of her trial, on the ground that the court made improper comments in front of the jury to two of her expert witnesses must be denied.

### 9.    *Grounds Nos. 34 and 22:  The prosecutor's closing argument*

Johnson's ninth allegation of error in the "penalty phase" of her trial, and her thirty-fourth ground for judgment of acquittal or new trial, is that, during his "penalty phase" closing argument, counsel for the government engaged in prejudicial improper argument when he suggested that the statutory mitigator for "no prior criminal record" did not apply and was not proven, because Angela Johnson just "had not been caught," and when he further argued that the defense statutory mitigator concerning victim contributory responsibility was somehow created by the defense to "blame the victims," because Johnson contends that these arguments denigrated these mitigating factors and misled the jury, thereby denying her a fair "penalty phase." The court also finds it appropriate here to consider further Johnson's twenty-second ground for post-trial relief, which Johnson herself characterized, albeit perhaps inadvertently, as a "penalty phase" error, to the effect that the trial court erred in failing to exclude all suggestions that she was the "principal" in the offenses.

244

*a.      Background*

Although Johnson has not expressly identified the purportedly improper arguments by the prosecutor concerning certain of her mitigating factors, the court has reviewed the Realtime Transcript of the "penalty phase" closing arguments in search of such arguments. The court's search revealed that the prosecutor made the following argument concerning the "no criminal record" mitigator:

> [THE PROSECUTOR:]  No prior criminal record, this is an interesting mitigating factor.  Does she have a prior criminal record?  No, she doesn't.  You should find that factor.  But keep in mind it's not simply whether the defendant proved those factors.  You need to find, first of all, did they prove those factors and they've proved she had no prior record.  There's no evidence she had a prior criminal record. Then you have to determine what weight you give to that, what weight you give to those factors because simply because you find they proved it you should give it any weight.  This is one [untranscribed word] give no weight to for this reason.  The fact she has no prior criminal record is simply a product of the fact she was not caught.  We know from the testimony that she was distributing drugs for a year or two prior to these murders taking place.  We know she was distributing methamphetamine during that time period.  We know after these murders took place she continued to distribute drugs and we know even after Honken went to prison in 1996 the defendant on her own was out there distributing methamphetamine again.  We know that she tried to hire Mike Mittan to inflict violence on people to collect drug debts.  We know that she tried to hire them to kid nap another person.  So while she has no criminal record, that should carry no weight with you.

Realtime Transcript for June 23, 2005.  There was no timely objection to this portion of the prosecutor's argument by any of Johnson's three defense lawyers.

The court's review of the Realtime Transcript also reveals the following argument by the prosecutor concerning what he characterized as Johnson's attempt to blame Nicholson and DeGeus for their own deaths, because they had participated in drug-trafficking activities, including Johnson's timely objection:

> And in [mitigators] 5 and 10 she blames the victims. She says in 5 that Terry DeGeus and Greg Nicholson were involved in the drug trade and—
> [DEFENSE COUNSEL]: Truly sorry to interrupt, Your Honor, but I think that's completely inappropriate. That's a statutory mitigating factor as the Court knows and to [denigrate] it is inappropriate by the prosecutor.
> THE COURT: Objection's overruled.
> [THE PROSECUTOR]: She claims that these men were involved in the drug trade and the drug trade therefore led to the circumstances where they ultimately were killed. That's not what killed them. They were not murdered because they were involved in the drug trade. They were murdered because they were witnesses, not because they were involved in the drug trade [untranscribed phrase].

*Id.*

The court's review of the Realtime Transcript of closing arguments, however, does not reveal any point in the prosecutor's closing arguments where the prosecutor made an argument that could be characterized as suggesting that Johnson was the "principal" in the offense. Rather, the prosecutor made repeated assertions that Johnson, or an "aider and abettor" generally, could be just as culpable or more culpable for a killing than the person who actually pulled the trigger.

### b.  *Arguments of the parties*

Johnson did not assert in her brief any additional argument, other than what is embodied in her allegation of error itself, in support of her thirty-fourth ground for relief,

concerning improper argument about the "no prior criminal record" and "victim's contributory conduct" mitigators, and Johnson did little more at oral arguments on her post-trial motions than assert that she had made timely objections to the pertinent portion of the prosecutor's closing argument. Similarly, she did not clarify in her brief what her argument was concerning her twenty-second ground, improper suggestion that she was the "principal," other than to refer to the arguments in her May 1, 2005, motion. The court finds no express argument in Johnson's May 1, 2005, motion or brief concerning the potentially prejudicial impact, should the prosecutor argue in the "penalty phase" that Johnson was the "principal" in the offenses. Thus, the court's consideration of the possible improper impact of a prosecutor's argument in the "penalty phase" that Johnson may have been the "principal," when she had only been charged with and convicted as an "aider and abettor," has been re-raised here by the court *sua sponte* in an abundance of caution, because Johnson initially identified the issue as a "penalty phase" error.

The government contends, in response to Johnson's thirty-fourth ground for relief, concerning the "no prior criminal record" mitigator, that the government did not engage in improper argument. The government argues that it was proper for the prosecutor to suggest to the jurors that this mitigator should be given no weight, because the defendant *had* engaged in prior criminal conduct and simply had not been caught. The government contends that there is nothing "mitigating" about being so good or so lucky as not to get caught in criminal conduct. The government concedes that it "denigrated" this mitigator, to the extent that the government acknowledged that it was invalid or unimportant to the jury's determination, based on the evidence presented. As to argument concerning the "victim's contributory conduct" mitigator, the government contends that, during closing arguments, the prosecutor accurately characterized Johnson's argument to be blaming Nicholson and DeGeus for their deaths, because they had been involved in criminal

conduct with Honken and Johnson. Therefore, the government contends that it was proper for the prosecutor to argue that Nicholson and DeGeus were killed, not because of their involvement in drug-trafficking, but because they had been witnesses to drug crimes by Honken and Johnson, or because they might be informants against Honken and Johnson, or both. The government asserts that a person's consenting to participate in drug trafficking is simply not the same as that person's consenting to conduct that resulted in that person's death, citing *United States v. Beckford*, 962 F. Supp. 804 (E.D. Va. 1997). Thus, the government contends that these arguments concerning two of Johnson's mitigators were proper. The government also argues that it simply never argued during "penalty phase" closing arguments that Johnson was or might have been the "principal."

### c. Analysis

The court considered above, beginning on page 127, the standards applicable to determining whether or not a prosecutor had made an inappropriate argument and when such an argument requires post-trial relief. In essence, the court must determine whether there was an error, in the form of an improper argument, and what effect, if any, that error had. *Davis*, 417 F.3d at 911-12. The court finds no such errors here.

First, Johnson has simply failed to identify any improper argument in the prosecutor's "penalty phase" closing argument that she was the "principal," when she had only been tried and convicted as an "aider and abettor." Moreover, it was simply not error for the government to argue that, by "aiding and abetting" the killings in the ways the evidence showed that Johnson had, Johnson could be just as culpable or more culpable than the person who actually pulled the trigger. Indeed, because 21 U.S.C. § 848(m)(8) authorizes the jury to consider as a mitigating factor whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death," and Johnson specifically asserted this mitigating factor, the government was properly allowed to argue

that, on the evidence presented, Johnson might actually be more culpable than Honken for the killings in which Honken acted as the "principal" and Johnson acted as an "aider and abettor." Thus, there was no error and, consequently, no harm from any such error in this case. *See Davis*, 417 F.3d at 911-12.

Johnson's contentions that the prosecutor made improper closing arguments concerning certain mitigating factors are also unpersuasive. As the Tenth Circuit Court of Appeals recently recognized, "[a] prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant." *Malicoat v. Mullin*, 426 F.3d 1241, 1257 (10th Cir. 2005) (citing *Buchanan v. Angelone*, 522 U.S. 269, 279 (1998), as stating that "the extensive arguments of both defense counsel and the prosecutor on the mitigating evidence and the effect it should be given in the sentencing determination" indicated that the jury had considered that evidence; *Walker v. Gibson*, 228 F.3d 1217, 1243 (10th Cir. 2000), *cert. denied*, 533 U.S. 933 (2001), as stating, "[A] prosecutor is permitted to comment upon and to argue the appropriate weight to be given mitigating factors"; and *Fox v. Ward*, 200 F.3d 1286, 1300 (10th Cir.), *cert. denied*, 531 U.S. 938 (2000), as rejecting an allegation of misconduct when "the prosecutor merely commented on the weight that should be accorded to the mitigating factors" and "did not suggest that the jury was not permitted to consider the factors"). Here, the prosecutor specifically acknowledged that Johnson had no criminal record, and indeed, told the jury to find the mitigator had been proved as literally stated, but then properly argued that the jury should give no weight to that factor, because the evidence showed that Johnson had nevertheless been engaged in extensive prior criminal conduct, but had not been caught. Such an argument simply was not improper, because it did not foreclose the jury's consideration of the mitigating factor, nor did it "denigrate" the mitigating factor simply because the prosecutor argued that it should not be afforded the

weight that Johnson might have wished. Thus, the court finds no error, plain or otherwise, in the prosecutor's argument on this issue. *See Davis*, 417 F.3d at 911-12 (the court must first determine if there was an erroneous argument).

Similarly, the court finds no error, plain or otherwise, in the prosecutor's argument that Johnson was blaming Nicholson and DeGeus for their murders because they participated in drug-trafficking activity with Honken and Johnson. While Johnson is correct that 21 U.S.C. § 848(m)(9) authorizes consideration as a mitigating factor whether "[t]he victim consented to the criminal conduct that resulted in the victim's death," and that she asserted this statutory mitigating factor, that does not mean that the prosecutor improperly asserted that the mitigator did not apply. As the government points out, there is or may be a logical and factual distinction between consenting to participate in drug-trafficking conduct and consenting to the conduct that results in a person's death. *See United States v. Beckford*, 962 F. Supp. 804, 820-21 (E.D. Va. 804) (construing this mitigating factor, under § 848(m)(9), to be limited to criminal conduct that *caused* the victim's death, as opposed to an entire course of criminal conduct out of which the fatal event arose). Thus, the court cannot find that the prosecutor's argument concerning this mitigating factor was improper, because it simply pointed out this logical and factual distinction in this case. *See Davis*, 417 F.3d at 911-12 (the court must first determine if there was an erroneous argument).

Even supposing that one or more of the arguments Johnson has identified was actually improper, Johnson cannot show that she suffered harm or prejudice depriving her of a right to a fair "penalty phase" trial from such erroneous arguments. *See id.* (second determination before relief can be granted for an erroneous argument by the prosecutor is whether there was harm or prejudice from the argument). Here, Johnson was allowed a full and fair opportunity to put on her "penalty phase" evidence, she was allowed to, and

did, present strenuous arguments in support of her own interpretations of the evidence and the weight to be given to each of her mitigating factors, and the court instructed the jurors that it was for them to determine the weight to be given to each mitigating factor. *See* Final "Penalty Phase" Jury Instruction No. 2 - Step Three: Weighing the Factors.

Therefore, Johnson is not entitled to judgment of acquittal or new trial, even on the "penalty phase" of her trial, on the basis of improper closing arguments by the prosecutor.

### 10. *Ground No. 28: Denial of motion to allocute*

Johnson's tenth allegation of error in the "penalty phase," and her twenty-eighth ground for judgment of acquittal or new trial, in the "penalty phase," if not all phases, is that the court erred in denying her June 3, 2005, motion to allocute before the jury. Before oral arguments on Johnson's post-trial motions, the court brought to the parties' attention the decision of the Eighth Circuit Court of Appeals in *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), which the court suggested to the parties might foreclose Johnson's argument concerning a right to allocute to the jury. In *Purkey*, the Eighth Circuit Court of Appeals held that a defendant does not have either a constitutional or a statutory right to allocute to the jury during the sentencing phase of a capital trial. *Purkey*, 428 F.3d at 760-61. At oral arguments, Johnson's defense attorneys conceded that the *Purkey* decision did, indeed, foreclose their argument. Therefore, because the "claimed right [to allocute to the jury in a capital case] does not exist," *id.* at 760, the court will deny Johnson's motion for judgment of acquittal or new trial on this ground.

### 11. *Ground No. 29: Striking the "substantial influence" mitigator*

Next, Johnson asserts as her eleventh allegation of error in the "penalty phase," and her twenty-eighth ground for judgment of acquittal or new trial, that the court erred in striking the defense mitigating factor concerning Angela Johnson being under the substantial influence of Dustin Honken and thereby denied Johnson due process. Again,

Johnson made no argument in support of this contention in her brief or in her oral arguments.

### a.    Background

In the course of preparation of the "penalty phase" Jury Instructions, Johnson submitted the following as a mitigating factor:

> Angela Johnson contends that, on the date of the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan, she was under the substantial influence of Dustin Honken, which caused her unusual stress, anxiety and an impairment of her normal judgment.

The court, however, ultimately rejected this mitigating factor, and declined to submit it to the jury, on the ground that the court could find no evidence whatsoever to support it.

### b.    Arguments of the parties

Again, Johnson offered no argument, written or oral, in support of her contention that the court improperly rejected her "substantial influence" mitigating factor. The government, however, argues that the court properly rejected this mitigating factor, because there was no evidence that Honken exercised any undue influence over Johnson at the time of the murders. Indeed, the government points out that Johnson had instructed her mental health experts not to inquire into her state of mind or conduct at the time of the murders, and no experts or other witnesses testified as to such matters. Thus, the government contends that exclusion of this mitigator was well within the court's inherent power to act as a gatekeeper to determine what issues are properly submitted to a jury.

### c.    Analysis

In *Delo v. Lashley*, 507 U.S. 272 (1993) (*per curiam*), the Supreme Court considered similar circumstances. In *Lashley*, the defendant's lawyers "presented no proof that he lacked a significant criminal history," nor had the prosecutor, so the trial judge

refused to give the jury a "no significant history of prior criminal activity" instruction. *Id.* at 274. The Missouri Supreme Court affirmed, on the ground that mitigating factor instructions must be supported by some evidence. *Id.* The United States Supreme Court then "ma[d]e explicit the clear implication of our precedents: Nothing in the Constitution obligates state courts to give mitigating circumstance instructions when no evidence is offered to support them. Because the jury heard no evidence concerning Lashley's prior criminal history, the trial judge did not err in refusing to give the requested instruction." *Id.* at 277.

In this federal prosecution, this court was presented with the same circumstances as the state court in *Lashley*: Johnson presented no evidence in support of her contention that she was under Honken's substantial influence at the time of the killings of Nicholson and the Duncans. Moreover, Johnson had expressly foreclosed her mental health experts from inquiring into Johnson's conduct and mental state at the time of the killings and had asserted that her mental condition at the time of the killings would not be put in issue, in order to avoid Fifth Amendment self-incrimination concerns, so no evidence to support this mitigating factor was presented. Thus, the Constitution did not obligate this court, any more than it obligates state courts, to give a mitigating circumstance instruction when no evidence was offered to support it. *Id.*

Johnson's motion for judgment of acquittal or new trial, in the "penalty phase" or any other phase of her trial, on this ground will also be denied.

### 12. Ground No. 10: Instructions and argument that mitigating factors could be given "no weight"

Johnson's twelfth allegation of error in the "penalty phase," and her tenth ground for judgment of acquittal or new trial, is that the court erred in instructing the jurors, and allowing the prosecution to argue, that it was permissible for jurors to consider mitigating

circumstances, but that they could give the mitigators that they found "no weight" if they chose to do so. Although Johnson does not identify the instructions or arguments that she contends contained the fatal error, she does make an extensive argument in her brief concerning this alleged error.

### a. Background

Before considering Johnson's and the government's arguments concerning this alleged error, the court must first note that there is no "Penalty Phase" Jury Instruction that instructs the jurors that they can give "no weight" to any mitigating factor, if they so choose.[27] On the other hand, there were points in the prosecutor's closing argument

---

[27]The court's instruction on weighing of "mitigating factors" was Final "Penalty Phase" Jury Instruction No. 4. That Instruction, in its entirety, was as follows:

> In **Step Three**, for each Count, you must consider whether the "Gateway Aggravating Factor" and the one or more "Statutory Aggravating Factors" that you found for that Count during the "eligibility phase," together with any "Non-statutory Aggravating Factors" for that Count that you find to exist in **Step One** in this "penalty phase," taken together, sufficiently outweigh any "Mitigating Factors" that you find in **Step Two** so that a sentence of death is justified for that Count. In the absence of any "Mitigating Factors," you must consider whether the "Aggravating Factors" are themselves sufficient to justify a sentence of death. Based on your weighing of *all* of the factors, you will decide whether to impose a sentence of death or a sentence of life imprisonment without possibility of parole for the Count in question.

> For purposes of weighing all of the pertinent factors, I will now remind you of the "Gateway Aggravating Factor" and the "Statutory Aggravating Factors" that you unanimously found beyond a reasonable doubt had been proved in this case. First, for **Counts 1 through 10**, as a "Gateway Aggravating

(continued...)

Factor," you found that the defendant intentionally engaged in conduct intending that the victim in question be killed or that lethal force be employed against the victim, which resulted in the death of the victim. Second, as "Statutory Aggravating Factors," you found the following: For **Counts 1 and 6**, charging the killing of Gregory Nicholson, **Counts 2 and 7**, charging the killing of Lori Duncan, and **Counts 5 and 10**, charging the killing of Terry DeGeus, you unanimously found that the defendant committed the offenses in question in an especially heinous, cruel, or depraved manner in that it involved both torture and serious physical abuse; for **Counts 5 and 10**, charging the killing of Terry DeGeus, you also found that the defendant committed the offenses in question after substantial planning and premeditation; and for **Counts 3 and 8**, charging the killing of Kandi Duncan, and **Counts 4 and 9**, charging the killing of Amber Duncan, you found that the victims were particularly vulnerable due to their young age.

In determining the appropriate sentence, all of you must weigh the "Aggravating Factors" that you unanimously find to exist, and each of you must weigh any "Mitigating Factors," if any, that you individually find to exist. Each of you may also weigh any "Mitigating Factor" or "Mitigating Factors" that another or others of your fellow jurors find to exist, even if you did not yourself find that factor to be mitigating. In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy.

The process of weighing "Aggravating Factors" and "Mitigating Factors" against each other—or weighing "Aggravating Factors" alone, if you find no "Mitigating Factors"—in order to determine whether to impose a sentence of death or a sentence of life imprisonment without possibility of parole is not a mechanical process. You must not simply

(continued…)

(…continued)

count the number of "Aggravating Factors" and "Mitigating Factors" to reach your decision; rather, you must consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors. Thus, any of you may find that one "Mitigating Factor" outweighs all "Aggravating Factors" combined, or that the "Aggravating Factors" proved do not, standing alone, justify imposing a sentence of death on a particular Count. If one or more of you so find, then the death penalty *cannot* be imposed for that Count. On the other hand, you may find that a particular "Aggravating Factor" sufficiently outweighs all "Mitigating Factors" combined to justify a sentence of death on a particular Count. Each of you must decide what weight or value is to be given to a particular "Aggravating Factor" or "Mitigating Factor" in your decision-making process.

Your determination of the appropriate sentence for each Count is a decision that each of you must make independently, after consulting with your fellow jurors and individually engaging in the weighing process described in this Instruction. You cannot consider imposing a death sentence unless and until you personally find that the "Aggravating Factors" outweigh the "Mitigating Factors," or, in the absence of "Mitigating Factors," that the "Aggravating Factors" are themselves sufficient to justify a sentence of death.

*A determination to impose a death sentence must be unanimous.* If you each find that a death sentence should be imposed for a particular Count, then I am required to impose a death sentence for that Count.

On the other hand, if, after weighing the "Aggravating Factors" proved in the case and all of the "Mitigating Factors" found by any juror, any one of you finds that a sentence of death is not justified on a particular Count, then the death

(continued…)

when the prosecutor asserted that certain mitigating factors should be given "no weight," including the one quoted above, beginning on page 245, in which the prosecutor asserted that the "no criminal record" mitigator should be given "no weight," even though the jurors should find that it existed as a technical matter, because Johnson simply had not been caught while engaging in significant criminal activity prior to the killings.

### b.    Arguments of the parties

Because Johnson has not identified any instruction to the jury that the jurors should or could give "no weight" to any mitigating factors, and the court can find none, the court will not summarize Johnson's arguments that such an instruction was erroneous.[28]

---

[27](...continued)

> sentence *cannot* be imposed on that Count, and I will impose a sentence of life imprisonment without possibility of parole for that Count.
>
> Regardless of your findings with respect to "Aggravating Factors" and "Mitigating Factors," you are *never* required to impose a death sentence. Thus, even if you find that a sentence of death would be justified after this weighing process, you are never required to return a verdict imposing a sentence of death.
>
> Again, whether or not the circumstances of a particular Count justify a sentence of death or a sentence of life imprisonment without possibility of parole is a decision that the law leaves entirely to you.

Final "Penalty Phase" Jury Instruction No. 4. Johnson has not identified where in this or any other instruction, written or oral, the court ever told the jury that they could give "no weight" to any mitigating factors, and the court finds that there was no such instruction.

[28]The court will note, in passing, that in her formulation of this error, Johnson asserted that such a "no weight" instruction violates the Eighth and Fourteenth Amendments and the Supreme Court's mandate on the issue as set out in *Eddings v. Oklahoma*, 455 U. S. 104, 114-115 (1982), *Penry v. Lynaugh*, 492 U. S. 302, 327-328

(continued...)

Instead, the court will summarize here only Johnson's arguments as they pertain to improper argument by the prosecutor that a mitigating factor should be given "no weight."

Johnson's argument, at least as the court understands it to relate to improper argument by the prosecutor that certain mitigating factors should be given "no weight," is that such an argument violates the holdings of the Supreme Court that mere token consideration or a wink of an eye at mitigation on the juror's predetermined road to a death sentence is not enough. She contends that jurors must not only be allowed to "consider" mitigating factors, but must be allowed to give them "full effect," which she asserts means that the jurors must be willing and able to sentence a defendant to life because of the mitigating factors. She relies, for example, on *Simmons v. Bowersox*, 235 F.3d 1124 (8th Cir.), *cert. denied*, 534 U.S. 934 (2001), *and cert. denied*, 534 U.S. 1158 (2002), in which the court "recognize[d] that the sentencer ultimately determines the weight to be given relevant mitigating evidence and is merely prohibited from giving it no weight by excluding it from consideration." *Simmons*, 235 F.3d at 1137 (citing *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982)). In essence, Johnson's argument appears to be that a "no weight" argument runs afoul of the Supreme Court's holdings that the jury must not be precluded *from considering and giving effect* to each mitigating factor that they find, and that "giving effect" means that the jurors must be willing to choose a life sentence because of the mitigating factor. She contends that, in her case, unimpeded by the court and encouraged by the prosecution, the jurors instead winked at mitigation evidence on their way to sending her to her death.

---

[28](...continued)
(1989) (*Penry I*), and *Penry v. Johnson*, 532 U. S. 782, 797 (2001) (*Penry II*). However, again, the court gave no such instruction.

The government concedes that jurors must be able to fairly consider mitigating factors proved by the defendant in the "penalty phase" of the trial, but nevertheless asserts that the weight to be given both aggravating and mitigating factors is entirely for the jurors to decide, once they determine which factors have been proved to exist. Thus, the government asserts that jurors are free to give no weight to particular mitigating factors, and that the prosecution is entitled to so argue. The prosecution asserts that Johnson's argument begs the question of how much weight a mitigating factor must be given, but logic dictates that jurors must be free to consider the entire spectrum, from decisive weight to no weight at all. The government also asserts that Johnson is relying on a tortured interpretation of Supreme Court precedent. Language providing that jurors must be able to consider and give effect to mitigating factors, the government contends, does not mean that jurors must give some weight to every mitigator that they find. Ultimately, however, the prosecution asserts that, because the jurors were correctly instructed on the weighing process, any improper argument by the prosecutor was not prejudicial.

c. *Analysis*

Johnson is correct that, in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court held as follows:

> Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

259

*Eddings*, 455 U.S. at 113-115 (emphasis in the original; footnote omitted); *see also Simmons v. Bowersox*, 235 F.3d 1124, 1137 (8th Cir. 2001) (the court "recognize[d] that the sentencer ultimately determines the weight to be given relevant mitigating evidence and is merely prohibited from giving it no weight by excluding it from consideration," citing *Eddings*, 455 U.S. at 114-15), *cert. denied*, 534 U.S. 934 (2001), *and cert. denied*, 534 U.S. 1158 (2002). The court finds, however, that Johnson has misconstrued the import of *Eddings* and related decisions.

For example, the Seventh Circuit Court of Appeals recognized that there is a difference between the sentencer disregarding all categories or particular categories of mitigating evidence, which would violate *Eddings*, and considering but rejecting all of that evidence, which does not directly violate *Eddings*, although it may raise other concerns, if it shows that the sentencer's conduct was so imbued with exclusionary tendencies as to violate the constitutional requirements of *Eddings*. *See Wright v. Walls*, 288 F.3d 937, 944 (7th Cir.), *cert. denied*, 537 U.S. 1015 (2002); *see also Ward v. Whitley*, 21 F.3d 1355, 1364 (5th Cir. 1994) ("There is a fine line between the argument that a statutory mitigating circumstance merits no weight in the jury's ultimate decision and the argument that the mitigating circumstance should not be considered or is not mitigating. The former is permissible under Louisiana law; the latter is not.") (footnotes omitted), *cert. denied*, 513 U.S. 1192 (1995). Indeed, *Eddings* simply *does not say* that the sentencer must give some weight to every mitigating factor asserted by the defendant, or that the prosecutor cannot argue that a mitigating factor deserves no weight on the evidence presented, which seems to be Johnson's position. Rather, *Eddings* expressly states two limitations, neither of which was violated here.

First, under *Eddings*, "the sentencer [may not] refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings*, 455 U.S. at 114 (emphasis in the

original).  The prosecutor in Johnson's case did not assert that the jurors could not consider any mitigators asserted by Johnson *as a matter of law*, nor did the court's instructions preclude consideration of any mitigating factor *as a matter of law*, except, as explained above, where the court found that there was no evidence to support such a mitigator.  Rather, the prosecutor argued that certain mitigators were entitled to no weight in the jurors' consideration of the appropriate penalty, based on the evidence purportedly supporting those mitigators or related evidence.

Second, under *Eddings*, "[t]he sentencer[s] . . . may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight *by excluding such evidence from their consideration*." *Id.* at 114-15 (emphasis added).  This limitation is not, as Johnson appears to contend, that the sentencers cannot give a mitigating factor "no weight," or that the prosecutor cannot argue that a particular mitigating factor is entitled to "no weight."  Rather, this limitation is that the sentencers cannot give a mitigating factor "no weight" in a particular sense, specifically, "by excluding such evidence from their consideration." *Id.*  Here, the prosecutor did not urge or suggest that jurors should or must exclude any mitigating factor from their consideration; rather, he asserted that, giving such mitigating factors due consideration, in light of the evidence of those mitigators and other circumstances, the jurors should ultimately conclude that such mitigating factors were entitled to no weight in the ultimate balance.  In *Eddings*, the Supreme Court reiterated that the sentencer "may determine the weight to be given relevant mitigating evidence," *id.* at 114-15, and the prosecutor did no more than urge the jurors to make such a determination, in light of all of the evidence.  Thus, the prosecutor's argument was *not* improper under *Eddings* or any of the other cases cited by Johnson.

However, even if the prosecutor's argument was somehow erroneous, in that it crossed the line between urging the jurors to give certain mitigating factors "no weight,"

based on the evidence presented, and urging the jurors to exclude certain mitigating factors entirely from their consideration of the appropriate penalty, that error was ultimately harmless, because it did not prejudice Johnson. *See Davis*, 417 F.3d at 911 (proof of harm or prejudice from the improper argument is the second requirement for relief); *id.* at 912 n.3 (if the statements were not "sufficiently prejudicial to require a new trial under the abuse of discretion standard, [the court] do[es] not need to determine whether any of the statements require plain error review"); *see also Simmons*, 235 F.3d at 1137 (even though the prosecutor's comment, to the effect that the age of the defendant, who was a minor at the time of the killings, was aggravating rather than mitigating, was improper, the jurors were not precluded from considering the defendant's age as a mitigating factor, so that the comment did not ultimately violate the Eighth Amendment). This is so, because the court properly instructed the jurors on the weighing process. *See* Final "Penalty Phase" Jury Instruction No. 4 (quoted in full in footnote 27). Again, the jury is presumed to have followed these instructions, and Johnson has presented nothing to rebut that presumption but conjecture and speculation. *See Betterton*, 417 F.3d at 832 ("'A jury is presumed to follow its instructions.'") (quoting *Flute*, 363 F.3d at 678). Thus, even if Johnson could somehow show that the comments of the prosecutor that certain mitigators were entitled to "no weight" were erroneous, that error was mitigated by proper instructions, such that no prejudice can be shown.

Therefore, Johnson's motion for judgment of acquittal or new trial, in the "penalty phase" or any other phase of her trial, on this ground must be denied, where, contrary to Johnson's contentions, the court did not instruct the jurors that they could give certain mitigating factors "no weight," the prosecutor's argument that certain mitigating factors were entitled to "no weight" on the evidence presented was not improper, and even if the

prosecutor's argument was improper, that argument did not prejudice Johnson, where the jurors were given proper instructions on weighing of mitigating and aggravating factors.

### 13.    *Ground No. 30:  Placing the mitigators in a relatively negative light*

Johnson's thirteenth allegation of error in the "penalty phase," and her thirtieth ground for judgment of acquittal or new trial, in the "penalty phase," if not all phases, is that the court's instructional language concerning the mitigators in the "penalty phase," in comparison to the instructions concerning the aggravating factors at both the "eligibility" and "penalty" phases, placed the mitigators in a comparatively negative and weaker light than the aggravators.  The court must provide some background to this contention.

#### a.    *Background*

In the "Eligibility Phase" Jury Instructions, the court instructed the jury, *inter alia*, as follows:

> In this "eligibility phase," you must determine whether or not the government has proved beyond a reasonable doubt certain "aggravating factors."  These factors concern the circumstances of the crime.  An "aggravating factor" is a fact or circumstance that would tend to support imposition of the death penalty.  You must make a determination of whether or not the pertinent "aggravating factors" have been proved and whether the defendant is, therefore, eligible for consideration of a death sentence.

"Eligibility Phase" Jury Instruction No. 2.  The court subsequently identified the 21 U.S.C. § 848(n)(1) aggravating factor at issue in this phase—which had to be proved in **"Step One"** of the "eligibility phase" as to a particular count for the defendant to be eligible for consideration of the death penalty on that count—as a "Gateway Aggravating Factor."  "Eligibility Phase" Jury Instruction No. 3.  The court then explained, "This

'Gateway Aggravating Factor' is also sometimes called a 'threshold' aggravating factor, because the death sentence *cannot* be considered on a particular Count unless the prosecution proves this factor as to that Count." *Id.* (emphasis in the original). Similarly, for "**Step Two**" of the "eligibility phase," the court explained that the jury must determine whether the prosecution had proved beyond a reasonable doubt one or more "Statutory Aggravating Factors," that is, one or more of the factors set forth in 21 U.S.C. § 848(n)(8), (9), or (12) that the government was asserting in this case. *See* "Eligibility Phase" Jury Instruction No. 4. The court explained to the jury that "[t]hese aggravating factors are called 'statutory' aggravating factors, because they are expressly identified in the death penalty statute." *Id.* The jury was repeatedly instructed that the prosecution was required to prove these aggravating factors beyond a reasonable doubt, and that the jury had to find them unanimously, before the jury could consider them in "**Step Three**" to determine their "eligibility phase" verdicts. *See* "Eligibility Phase" Jury Instructions Nos. 2, 3, 4 & Verdict Form.

In "**Step One**" of the "Eligibility Phase" Verdict Form, the jurors were presented with the following query: "For each Count, do you unanimously find that the prosecution has proved the 'Gateway Aggravating Factor' beyond a reasonable doubt?" Similarly, in "**Step Two**" of that Verdict Form, the jurors were presented with the following query: "If you found the 'Gateway Aggravating Factor' for a particular Count, which one or more of the 'Statutory Aggravating Factors,' if any, do you unanimously find the prosecution has proved beyond a reasonable doubt for that Count?" After each query, the jurors were instructed, "Please put a **check mark** in the column for any Count for which you find that the [aggravating factor in question] has been proved." (Emphasis in the original.)

In the "penalty phase," the jurors were required to consider whether additional "Non-statutory Aggravating Factors" and "Mitigating Factors" had been proved, then

weigh all of the factors found in the "eligibility phase" and the "penalty phase" to determine the appropriate penalty. *See, e.g.,* Preliminary "Penalty Phase" Jury Instruction No. 2. The court explained in both the Preliminary and Final "Penalty Phase" Jury Instructions that the aggravating factors at issue in this phase "are sometimes called 'non-statutory' aggravating factors, because they are not identified by the death penalty statute, although they are identified by other applicable law." *See* Preliminary "Penalty Phase" Jury Instruction No. 2; Final "Penalty Phase" Jury Instruction No. 2. Although Johnson had made no similar request regarding the "Eligibility Phase" Jury Instructions, she did request that the court instruct the jurors that the prosecution "contend[ed]" that certain "Non-statutory Aggravating Factors" existed in this case, just as the court instructed the jurors that Johnson "contend[ed]" that certain "Mitigating Factors" existed, and the court acceded to that request. *See* Preliminary "Penalty Phase" Jury Instructions No. 2; Final "Penalty Phase" Jury Instructions Nos. 2 & 3.

In "**Step One**" of the "Penalty Phase" Verdict Form, the jurors were presented with a query concerning the "Non-statutory Aggravating Factors" similar to the queries concerning other "aggravating factors" in the "Eligibility Phase" Verdict Form: "For each Count, which one or more of the 'Non-statutory Aggravating Factors,' if any, do you unanimously find the prosecution has proved beyond a reasonable doubt?" The jury was instructed in this step, "Please put a **check mark** in the column for any count for which you find a particular aggravating factor has been proved." (Emphasis in the original.) In "**Step Two**," the jurors were presented with the following query: "Which 'Mitigating Factors,' if any, do any of you find the defendant has proved by the greater weight of the evidence for a particular count?" However, the further instruction concerning how to indicate the verdict on each count was slightly different: "Please indicate the **number of jurors** finding any 'Mitigating Factor' in the column for any count for which those jurors

find that the 'Mitigating Factor' applies." (Emphasis in the original.) The court finds that the use of "applies" for "mitigating factors," versus "proved" for "aggravating factors," was not the subject of any timely objection by the defense.

The court can find no objection on the record, and recalls none "off the record," to the nomenclature used to identify and distinguish among the "aggravating factors" in either the "eligibility phase" or the "penalty phase," nor any objection to the explanation to the jury for the nomenclature ultimately used by the court. Johnson also did not make any request to modify the language of the "Eligibility Phase" Jury Instructions to indicate that the prosecution "contend[ed]" that the "Gateway Aggravating Factor" and "Statutory Aggravating Factors" existed.

### b.    *Arguments of the parties*

In support of her contention that the court cast the "mitigating factors" in a "weaker" light than the "aggravating factors," Johnson contends that there were two specific errors in the pertinent instructions and verdict forms: (1) the instructions told the jurors that the mitigators, including statutory mitigators, were things that the defense was merely "contending" constituted mitigating factors, while the prosecution's "statutory" and "gateway" aggravating factors were given the imprimatur of law by having such labels affixed to them by the court; and (2) the verdict forms invited the jury to evaluate whether the mitigators "applied," but did not have similar language for the aggravators. As a consequence of these errors, Johnson contends that the instructions constituted an impermissible negative judicial comment on the mitigating factors and an impermissible positive comment on the aggravating factors, and thereby denied her due process of law.

In response, the government contends that Johnson did not make any objection to what she now contends were prejudicial labels for the "gateway" and "statutory" aggravating factors. The government contends, further, that such labels were accurate and

helpful to the jury, in part, because the labels and other instructions made clear that the prosecution was required to meet certain requirements of the governing statutes before the jury could even consider imposing the death penalty. The government also points out that Johnson has not shown how these labels actually prejudiced her in any way. As to whether or not the court erred by failing to instruct that the government "contended" that certain factors existed, the government points out that the court agreed to Johnson's request that such language be used in the "Penalty Phase" Jury Instructions for *both* "non-statutory aggravating factors" and "mitigating factors," and that no such request was made in the "eligibility phase." As to use of the word "applies" in the Verdict Form instruction for indicating the jurors' verdicts on "mitigating factors," the government contends that the difference between use of this word for "mitigating factors" and use of "proved" for "aggravating factors" was an appropriate way for the court to address the fact that "mitigating factors" did not have to be found unanimously. The government also notes that Johnson made no timely objection to this word choice and that she fails to explain how it was prejudicial. In short, the government contends that there was no abuse of discretion in the court's treatment of the "aggravating" and "mitigating" factors in either the instructions or verdict forms, because the jury instructions, in their entirety, correctly stated the law, and even if there was some error, Johnson has shown no prejudice from it.

> ### c.    *Analysis*

The court set forth above, beginning on page 179, the standards for determining whether relief can be granted for the erroneous formulation of jury instructions. To summarize, where timely objection is made, review is for "abuse of discretion," and relief will be granted only if the instruction was erroneous and prejudicial to one of the parties. *See Walker*, 428 F.3d at 1171. Where no timely objection is made, review is for "plain error," which requires a finding that the instruction was plainly erroneous, affected the

defendant's substantial rights, and affected the fairness and integrity of the judicial proceedings. *Olguin*, 428 F.3d at 728 & n.3. Comparable "abuse of discretion" and "plain error" review applies to alleged errors in verdict forms. *Martinson*, 419 F.3d at 753. The court acknowledges that, with 20/20 hindsight, it might wish it had used slightly different or more consistent language in some respects in the instructions and verdict forms. Nevertheless, the court cannot find either an abuse of discretion or plain error in any of the respects asserted by Johnson, and certainly no prejudice or substantial effect upon her rights from any of the alleged errors.

First, the court finds that the designations of the various aggravating factors as "Gateway," "Statutory," and "Non-statutory" were legally accurate and likely were helpful to the jury in distinguishing among the various aggravating factors and allowing the jurors (like the court and the parties) to identify them quickly and clearly in their discussions. The court cannot find that any juror would reasonably have found that these designations carried an "imprimatur of law" of any less consequence than the legal importance given to the "mitigating factors" in the instructions, particularly where the instructions and verdict forms, as a whole, clearly indicated the respective burdens of proof and the role that all of the aggravating and mitigating factors played in the ultimate determination of the appropriate penalty for each count in this case. *See, e.g., Olguin*, 428 F.3d at 728 (there is no plain error if the instructions, as a whole, fairly and adequately stated the relevant law); *accord Thomas*, 422 F.3d at 668 (there is no abuse of discretion if instructions, taken as a whole, fairly and adequately submitted the issues to the jury). Similarly, where other instructions plainly and correctly explained the roles the "aggravating" and "mitigating" factors played in the analysis, the court cannot find any prejudice to Johnson, or any substantial effect upon her rights, from the labeling issue that she now raises. *Olguin*, 428 F.3d at 728 & n.3 (relief for plain error in instructions

requires prejudice to substantial rights and fairness, as well as error); *Walker*, 428 F.3d at 1171 (prejudice is required for relief from an abuse of discretion in instructions).

Second, the court is equally unpersuaded that instructions in the "penalty phase" stating that Johnson "contend[ed]" that certain "mitigating factors" were present, but omission of that word in reference to the "gateway" and "statutory" aggravating factors that the government was required to prove in the "eligibility phase" was prejudicial error. In the "eligibility phase," there was no balancing of the "gateway" and "statutory" aggravating factors, on the one hand, and the "mitigating factors," on the other, and the instructions, as a whole, made very clear that the government bore the burden of proof on those aggravating factors. Thus, it seems highly unlikely that any juror even noticed that a different word was subsequently used as to the assertion of specific "mitigating factors" by Johnson in the "penalty phase." Where the "non-statutory aggravating factors" and "mitigating factors" were the subject of the same set of instructions, in the "penalty phase," the court quite willingly adopted Johnson's suggestion that both should be identified as "contentions" of the parties. Once the factors, "aggravating" or "mitigating," had actually been found, at the "weighing" step, there was no longer any need to refer to them as "contentions" of the parties. Thus, the court finds no error, plain or otherwise, and if there was error, Johnson has utterly failed to show how the error was prejudicial or affected her substantial rights, where the instructions, as a whole, correctly stated the law applicable to finding and weighing the various factors. *Olguin*, 428 F.3d at 728 & n.3 (relief for plain error in instructions requires prejudice to substantial rights and fairness, as well as error); *Walker*, 428 F.3d at 1171 (prejudice is required for relief from an abuse of discretion in instructions).

Finally, the court rejects Johnson's contention that requesting that jurors indicate in the "Eligibility" and "Penalty Phase" Verdict Forms which "aggravating factors" had

been "proved," but which "mitigating factors" the jury found "applie[d]," was erroneous or prejudicial. As the government suggests, the difference in language was a product of the difference between the unanimous findings required for "aggravating factors" and the non-unanimous findings required for "mitigating factors." Although the court now believes that it probably would have been possible, and perhaps even more appropriate, to formulate the direction for indicating verdicts on "mitigating factors" in terms of how many jurors, if any, found that a particular "mitigating factor" had been "proved" for each count, that formulation did not occur to either the court or the parties at the time. This oversight strongly suggests that no party perceived any prejudice from the court's formulation, making it highly unlikely that the difference in the words used had any substantial effect on the jurors' determinations. Again, Johnson has failed to show that she was prejudiced by the difference, where the jurors were otherwise correctly instructed on the manner in which they were to make the necessary findings and to weigh the various factors. *Olguin*, 428 F.3d at 728 & n.3 (relief for plain error in instructions requires prejudice to substantial rights and fairness, as well as error); *Walker*, 428 F.3d at 1171 (prejudice is required for relief from an abuse of discretion in instructions).

Johnson is not entitled to judgment of acquittal or new trial, even in the "eligibility" or "penalty" phases of her trial, on this ground.

### 14. *Ground No. 31: Failure to instruct in the "penalty phase" that the jury had not found certain aggravating factors in the "eligibility phase"*

As her fourteenth allegation of error in the "penalty phase," and her thirty-first ground for judgment of acquittal or new trial, in the "penalty phase," if not all phases, Johnson asserts that the court erred in denying her request to instruct the jury in the Final "Penalty Phase" Jury Instructions that the jury had not found that she had engaged in "substantial planning and premeditation" with respect to the killings of Nicholson and the

Duncans and that such a finding was not subject to being revisited by the jurors in their final "penalty phase" deliberations. Johnson is correct that, in the course of conferences on the "Penalty Phase" Jury Instructions, she requested that the court include a statement that the jury had not found "substantial planning and premeditation" as to the killings of Nicholson and the Duncans, and that the jury could not revisit that finding in the "penalty phase," right after the court identified for the jury the "aggravating factors" that they had found in the "eligibility phase." *See* Final "Penalty Phase" Jury Instruction No. 4 - Step Three: Weighing The Factors (reiterating "[f]or purposes of weighing all of the pertinent factors . . . the 'Gateway Aggravating Factor' and the 'Statutory Aggravating Factors' that [the jury] unanimously found beyond a reasonable doubt had been proved in this case").

The only argument offered by Johnson in support of this contention is that, in light of the evidence admitted at the third phase that was not admissible at the earlier phases, the failure to instruct on the rejection of the "substantial planning and premeditation" findings as to the killings of Nicholson and the Duncans deprived her of due process. The government notes that Johnson insisted on "bifurcating" the sentencing portion of the trial into "eligibility" and "penalty" phases, so that it was appropriate for the court to reiterate the "eligibility phase" findings, when all of the pertinent factors had to be weighed in the last step of the "penalty phase." The government also points out that nothing in the "Penalty Phase" Jury Instructions or Verdict Form provided the jurors with any opportunity to revisit their findings with regard to the "eligibility phase" aggravating factors. Finally, the government points out that the "Penalty Phase" Jury Instructions repeatedly told the jurors that they could only weigh those "eligibility phase" aggravating factors that they had previously found to exist. Therefore, the government contends that rejection of an instruction about findings that the jury had *not* made in the "eligibility phase" was not an abuse of discretion.

271

The court concludes that this allegation of error is without merit. The "eligibility phase" had been separated from the "penalty phase," not only by "trifurcation" of Johnson's trial, but also by the lengthy presentation of "penalty phase" evidence and by a delay before "penalty phase" closing arguments that had been necessitated by logistical problems. Consequently, it was more than appropriate, it was vital, for the court to remind the jury of their precise findings in the "eligibility phase." Also, as the government points out, the "Penalty Phase" Jury Instructions, as a whole, clearly and correctly indicated that only aggravating factors previously found in the "eligibility phase" could be considered with the aggravating and mitigating factors found in the "penalty phase" in the final step of the determination of the appropriate penalty. To make reference to findings *not* made in the "eligibility phase" might very well have invited the sort of reconsideration of those findings, in light of "penalty phase" evidence, that Johnson was so eager to avoid by seeking "trifurcation" of the proceedings. In short, the portion of the "Penalty Phase" Jury Instructions reiterating only findings made in the "eligibility phase," not findings *not* made, was appropriate to avoid confusion or misleading the jury. Thus, there was no error. *See Walker*, 428 F.3d at 1171 (where objection has been made to instructions, and review is consequently for "abuse of discretion," the defendant must first show that the instructions were erroneous). Even supposing that the court's rejection of Johnson's request to reiterate findings not made was somehow erroneous, Johnson has not shown that she was prejudiced in any way, where the instructions as a whole correctly stated what factors could be balanced, and Johnson was not precluded from reminding the jurors of what findings they had not made. *Id.* (the second step in "abuse of discretion" review of jury instructions is to determine whether the defendant was prejudiced by the error).

Therefore, Johnson is not entitled to judgment of acquittal or new trial, even in the "eligibility" or "penalty" phases of her trial, on this ground.

**15.** ***Ground No. 33: Plain error in the "penalty phase" verdict form regarding findings for life or death***

As her fifteenth allegation of error in the "penalty phase," and her thirty-third ground for judgment of acquittal or new trial, in the "penalty phase," if not all phases, Johnson asserts that the verdict form was plainly erroneous and in conflict with the narrative instructions with regard to the choice of penalties, because it required an unanimous finding for a "life" verdict. Johnson asserts, in essence, that the court should have provided one verdict form for an unanimous death verdict and a second verdict form providing for a life sentence if the jurors could not unanimously agree upon a death sentence, and the failure to do so violated her due process and statutory rights.

**a.** **Background**

The jurors were repeatedly instructed in the "Penalty Phase" Jury Instructions, and indeed, elsewhere, such as during jury selection, that they could only impose the death penalty on any count if their verdict for such a penalty was unanimous, and they were also instructed that, if any one juror found that death was not justified on any count, then the death penalty could not be imposed, and the court would, instead, impose a sentence of life imprisonment without possibility of parole.[29] *See* Preliminary "Penalty Phase" Jury Instruction No. 2 ("***Step Three***"); Final "Penalty Phase" Jury Instruction No. 1 ("Introduction"); Final "Penalty Phase" Jury Instruction No. 4 ("Weighing" and verdict). In light of the possibility of a non-unanimous verdict for a life sentence, the "Penalty Phase" Verdict Form did not begin with the court's usual formulation that the findings

---

[29]Johnson expressly requested the formulation of the alternative to the death penalty as "life imprisonment without possibility of parole."

were the jury's unanimous findings.  Instead, it began, "As to defendant Angela Johnson, on the 'penalty phase' issues submitted for our determination, we, the Jury, find as follows."  "Penalty Phase" Verdict Form, p. 1.  The Verdict Form then specified that findings on "Non-statutory Aggravating Factors" in "**Step One**" had to be unanimous, but that findings on "Mitigating Factors" in "**Step Two**" were those made by "any one of [the jurors]."  *Id.* at 2-3.  Finally, in "**Step Three**," the jurors were instructed to indicate their verdict on the appropriate penalty as follows:

> After weighing the "Aggravating Factors" found in the "eligibility phase," together with any "Non-statutory Aggravating Factors" found in **Step One** of this "penalty phase," and any "Mitigating Factors" found in **Step Two**, as explained in Final "Penalty Phase" Instruction No. 4, what sentence do you impose for each Count? (Please put a **check mark** in the column for any count for which you find a particular sentence must be imposed.)

"Penalty Phase" Verdict Form, p. 9 ("**Step Three**") (emphasis in the original).  The choices for each count were identified as "[a] sentence of death," or "[a] sentence of life imprisonment without possibility of parole."  *Id.*  Thus, the Verdict Form did *not* expressly require an unanimous verdict for a life sentence.  Indeed, because the instruction for indicating the verdict at "**Step Three**" expressly cross-referenced Final "Penalty Phase" Instruction No. 4, which expressly reiterated that, if "any one of [the jurors] finds that a sentence of death is not justified on a particular Count, then the death sentence *cannot* be imposed on that Count, and I will impose a sentence of life imprisonment without possibility of parole for that Count," the "non-unanimous" requirement for a verdict for a life sentence was clearly indicated.

Johnson is correct that each juror was required to sign the Verdict Form, first using his or her juror number, then his or her name.  However, this signature requirement did

not indicate that each and every finding in the Verdict Form was somehow unanimous. Rather, as indicated in Final "Penalty Phase" Jury Instruction No. 7, and in the "certification" in the Verdict Form, the signature indicated *each juror's* verdict on the issues presented. Final "Penalty Phase" Jury Instruction No. 7 ("justice without discrimination" instruction explaining that each juror would be required to sign the verdict form to indicate that the verdict form reflected each juror's verdict was not the product of discriminatory animus); "Penalty Phase" Verdict Form, p. 9 ("certification").

### b. Arguments of the parties

Although Johnson expressly conceded at oral arguments that she had not made any timely objection to the alleged error in the "Penalty Phase" Verdict Form that she now asserts, Johnson nevertheless argues, orally and in her brief, that the Verdict Form was plainly erroneous and in conflict with the narrative instructions. More specifically, she asserts that the instructions correctly told the jury that if they could not unanimously agree upon the death penalty, the court would impose a life sentence, but the verdict form required the jury to return an unanimous verdict itself imposing a life sentence without possibility of parole. Thus, she contends, the verdict form only allowed a "life" verdict if the jury unanimously agreed upon a life sentence. She asserts that this verdict form was in error in that it should have contained only an option for an unanimous death verdict and a second verdict form stating the jury could not unanimously agree upon a death sentence. Johnson asserts that this verdict form error denied her due process and statutory rights. Johnson contends that the legal standard for determining whether or not there was an error in the verdict form is whether there is a reasonable likelihood that the jury has applied the challenged instructions in a way that violates the Constitution, citing *Jones v. United States*, 527 U.S. 373, 390 (1999). Because she contends that there was such likelihood in her case that the jury felt confused by the inconsistency between the instructions and the

verdict form, and felt compelled by the "Penalty Phase" Verdict Form to render a life sentence only if they unanimously agreed to it, there was plainly error. She contends that the court should, instead, have used *one* verdict form that contained only an option for an unanimous death verdict, and a *second* verdict form stating that the jury could not unanimously agree upon a death sentence, whereupon the court would impose a life sentence. Johnson also likens the error here to the error in *Mills v. Maryland*, 486 U.S. 367 (1988), where the Supreme Court found that the verdict form could have effectively precluded the jurors from considering a mitigating factor unless the jurors unanimously found that it existed. Johnson asserts that the verdict form in her case also failed to give individual jurors who found that life was the appropriate sentence a "vehicle for expressing [their] reasoned moral response," in violation of *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), because, in her view, there was simply no place for "life" jurors to vote for "life," unless they could also convince the "death" jurors to vote for life.

The government, on the other hand, asserted in both its brief and its oral arguments that there was simply no inconsistency or error. The government notes that Johnson has conceded that the court properly instructed the jury that, unless the verdict was unanimous for the death penalty, the verdict would be life in prison. Indeed, the government points out that the jury was "inculcated" with this principle from the beginning, during *voir dire*, and repeatedly in the "Penalty Phase" Jury Instructions. The government then asserts that there was simply nothing in the "Penalty Phase" Verdict Form that required an unanimous verdict to impose a life sentence. Instead, the government points out that the Verdict Form asked the jurors to record "what sentence" they imposed for each count. Although each juror signed the Verdict Form, the government contends that there was nothing requiring an unanimous verdict to impose a life sentence in that requirement or in any other portion of the Verdict Form. Finally, the government points out that the court polled the jury and

each juror indicated that he or she had voted in favor of the death penalty on the counts on which such a verdict was rendered.

### c. *Analysis*

Although it is possible, with hindsight, that the "Penalty Phase" Jury Instructions and Verdict Form in this case could have indicated still more clearly that an unanimous verdict was not required to impose a life sentence on any count, the court is quite convinced that there was no error, plain or otherwise, in the Instructions or Verdict Form on this point. *See Martinson*, 419 F.3d at 753 (an error in a verdict form is reviewed for either abuse of discretion or plain error, depending upon whether timely objection was made, but in either case, the defendant must show both error and prejudice). As Johnson asserts, the question for purposes of determining error in circumstances of ambiguity in or between instructions and verdict forms is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Jones v. United States*, 527 U.S. 373, 390 (1999) (internal quotation marks and citations omitted). However, there is simply no such "reasonable likelihood" of improper application here.

First, as the government points out, the jury was informed repeatedly, during jury selection and in the "Penalty Phase" Jury Instructions themselves, that a non-unanimous verdict—indeed, a single holdout—would require imposition of a life sentence. Second, absolutely nothing in the Verdict Form was to the contrary, and indeed, the Verdict Form was crafted to indicate precisely when unanimous findings were required. Also, the pertinent query concerning the penalty expressly cross-referenced the Final "Penalty Phase" Jury Instruction that explained the effects of an unanimous or non-unanimous verdict. Thus, there simply is no "reasonable likelihood" that the jurors would have applied the Instructions or Verdict Form to require an unanimous verdict for a life

sentence. *See Jones*, 527 U.S. at 390 (establishing this standard for error). Moreover, nothing about requiring the jurors to sign the Verdict Form required unanimity on every finding; quite the contrary, the act of individually signing the Verdict Form inculcated the understanding that each juror was responsible for his or her individual findings and verdict. Thus, this case is nothing like *Mills v. Maryland*, 486 U.S. 367 (1988), and each juror was plainly afforded a "vehicle for expressing [the juror's] reasoned moral response," *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), including the ability to block a death sentence with an individual vote for a life sentence.

Finally, to the extent that Johnson asserts that the jury should simply have been required to reject the death sentence, and leave to the court the question of the sentence less than death to be imposed in this case, if jury's verdict for death was non-unanimous, such a course might have been appropriate under the death-penalty provisions of 21 U.S.C. § 848. Pursuant to § 848(k), upon a determination that the balance of all factors "justif[ies] a sentence of death," the jury, "by unanimous vote . . . shall recommend that a sentence of death shall be imposed rather than a sentence of life imprisonment without possibility of release or some other lesser sentence," and pursuant to § 848(*l*), "[u]pon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death," while "[o]therwise the court shall impose a sentence, other than death, authorized by law." 21 U.S.C. § 848(k) & (*l*). Thus, the statute does not *require* the jury to recommend a sentence other than death, based upon a non-unanimous verdict for death. However, Johnson waived this argument by specifically requesting that the alternatives submitted to the jury be either a "death sentence," upon an unanimous verdict, or "life imprisonment without possibility of parole," if any one or more jurors so found. Where the issue has been waived, as it has been here, it will not be reviewed, even for plain error. *United States v. Tulk*, 171 F.3d 596, 600 (8th Cir. 1999).

In short, Johnson is not entitled to judgment of acquittal or new trial, even in the "penalty phase," based upon this alleged error.

### 16.    Ground No. 36:  Prejudicial misconduct by a juror

Johnson's sixteenth allegation of error during the "penalty phase," and her thirty-sixth ground for judgment of acquittal or new trial, in the "penalty phase," if not all phases, is that one juror engaged in prejudicial misconduct when he sought and received information during the week preceding "penalty phase" arguments concerning prison conditions for an inmate serving a sentence of life without parole and one on death row. Although Johnson raised this issue in her motion, and eventually provided some briefing on the merits of it when she filed her supporting brief, as explained above, the court established separate briefing schedules to address, first, the merits of Johnson's request for an evidentiary hearing and investigation of the issue and then, when the court determined that no such investigation was required, further briefing to address the merits of the allegation of error.  Also as noted above, notwithstanding the order to file a supplemental brief on the merits of her alleged juror misconduct issue, Johnson did not file any such supplemental brief, but the government did. When called upon to explain at the oral arguments why she had filed no supplemental brief on this issue, Johnson stated that she believed that the issue was already fully briefed.

In light of Johnson's position that the issue has already been fully briefed, the court finds it unnecessary to explain in detail all of the reasons that the court concluded that Johnson is not entitled to an investigation or any other relief on the juror misconduct that she alleges.  Suffice it to reiterate that Johnson has not satisfied the standards stated in *United States v. Gianakos*, 404 F.3d 1065 (8th Cir. 2005), as supplemented on rehearing in *United States v. Gianakos*, 415 F.3d 912 (8th Cir. 2005), *cert. denied*, ___ U.S. ___, 2005 WL 3144340, 74 U.S.L.W. 3323 (Nov. 28, 2005) (NO. 05-7081), for an evidentiary

hearing or other investigation of the juror misconduct that she alleges, because she has not shown that there is any reason to doubt that the jury based its ultimate decision on anything other than the evidence formally presented at trial. *See Gianakos*, 415 F.3d at 922. Nor is the court convinced that Johnson has shown "a reasonable possibility of prejudice to the verdict." *See United States v. Tucker*, 137 F.3d 1016, 1030 (8th Cir. 1998). The extrajudicial information that the juror in question purportedly told other jurors, which consisted of information about the conditions of confinement for prisoners on death row versus the conditions for prisoners serving life sentences, was not demonstrably different from evidence presented *in Johnson's trial by Johnson* about the conditions of confinement for such prisoners, and Johnson has not made any showing that any errors in the juror's statements to other jurors about the effect of the jury's verdict and the nature of the appellate process were not adequately cured by correct instructions from the court. Johnson said nothing at oral arguments to convince the court that these conclusions were in error. Because Johnson can show no prejudicial effect upon either the juror in question or other jurors from the alleged misconduct, the court finds that there will be no "miscarriage of justice" if the verdicts in Johnson's case are allowed to stand. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement for a new trial under Rule 33(a) to require a showing that a "miscarriage of justice" will occur absent relief).

Therefore, no relief is appropriate on this portion of Johnson's motion for judgment of acquittal or new trial.

### 17. *Ground No. 32: The verdicts on numerous mitigators demonstrate juror confusion and a miscarriage of justice*

As her seventeenth allegation of error in the "penalty phase," and her thirty-second ground for judgment of acquittal or new trial, in the "penalty phase," if not all phases of

her trial, Johnson asserts that the verdicts on numerous "mitigating factors" are contrary to the weight of the evidence and show that the jury was either confused by the instructions, declined to follow the instructions, or simply disregarded the evidence and rendered verdicts that constitute a miscarriage of justice, all in violation of due process. The court set forth above, beginning on page 42, and including notes 11 and 12, the specific findings of the jury on each of Johnson's "mitigating factors." The court will not reiterate those findings here. Instead, the court will turn to Johnson's arguments that those findings indicate confusion or are against the weight of the evidence and the government's response.

### a.    *Arguments of the parties*

Johnson contends that she presented more than sufficient evidence for the jurors to have found numerous of her "mitigating factors" by the greater weight of the evidence, but that several of the jurors nonetheless did not mark those "mitigating factors" as proved in the "Penalty Phase" Verdict Form. She contends that a representative sample of the jury's findings on "mitigating factors"—which she contends is not intended to waive this error as to any other "mitigating factors"—demonstrates that the jurors were either confused by the instructions, failed to follow the instructions, or simply disregarded the evidence presented.

For example, she notes that "Mitigating Factor 1," which stated that, "even though Angela Johnson is guilty as an aider and abettor, her participation was relatively minor as compared to Dustin Honken's role in these murders," was not found by a single juror. Johnson asserts that the failure of any juror to find this "mitigating factor" is "unbelievabl[e]," where the evidence showed quite clearly that Johnson was not the trigger person, but only an "aider and abettor." Similarly, Johnson notes that "Mitigating Factor 2" stated, "Angela Johnson does not have a prior criminal record," but only six

jurors found that this mitigating factor had been proved by the greater weight of the evidence, notwithstanding the uncontroverted evidence that Johnson had no prior criminal record. Also, Johnson points out that "Mitigating Factor 4" stated that "another person, Dustin Honken, who is equally or more culpable in the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus, will not be punishable by death for those murders," but only three jurors found this "mitigating factor" had been proved by the greater weight of the evidence, again notwithstanding uncontroverted evidence that Honken will not face the death penalty for the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus.

Johnson points to "Mitigating Factor 19" as most clearly showing confusion on the part of the jurors. That "mitigating factor" stated, "although she is guilty of these murders, Angela Johnson was pregnant by Dustin Honken with her daughter, Marvea, at the time of the murders and, as a result, was in a disadvantaged position to resist Mr. Honken, leave him, or turn him in to authorities, which she offers as an explanation of her conduct, not as an excuse." Johnson points out that, as to four of the victims, no one on the jury found this mitigating factor had been proved, but as to the fifth victim, DeGeus, six jurors found this mitigating factor as to one count, but no jurors found it as to the other. Johnson asserts that this last example shows just how confused the jury was. Such confusion, and the fact that these and other findings were so clearly against the weight of the evidence, Johnson contends, demonstrates that there has been a miscarriage of justice.

The government, however, asserts, first, that Johnson has waived her right to complain as to any of the "mitigating factors" she has not expressly identified in her brief, notwithstanding her attempt to reserve her right to assert the findings on other "mitigating factors" as error. The government, next, asserts that nowhere has Johnson identified any portion of the court's instructions concerning "mitigating factors" that was erroneous.

As to the "mitigating factors" that Johnson has specifically identified as subject to this allegation of error, the government also asserts counterarguments. First, as to the "minor role" mitigating factor, the government contends that it argued, and a jury could reasonably have found on the evidence presented, that the fact that Honken pulled the trigger did not necessarily mean that Johnson's role in the killings was "minor." Rather, the government contends that the evidence was such that the jury could easily have concluded that Johnson was the driving force behind all of the killings. Indeed, the government contends that, without Johnson's participation and assistance, it is possible that none of the victims would have been killed.

Similarly, as to the "no criminal record" mitigating factor, the government points out that it argued, and a jury could reasonably have found, that Johnson technically had no prior criminal *record*, but that she had nevertheless engaged in substantial prior criminal *activity*. The government points out that this "mitigating factor" is defined by 21 U.S.C. § 848(m)(9) to be that "[t]he defendant did not have a significant prior criminal record," but that the comparable "no prior criminal record" mitigating factor under the Federal Death Penalty Act, 18 U.S.C. § 3592(a)(5), is further defined to mean that "[t]he defendant did not have a significant prior history of other criminal conduct," and that the Supreme Court construed this "mitigating factor" to "refer[ ] not to arrests or convictions, but more broadly to 'criminal activity,'" citing *Delo v. Lashley*, 507 U.S. 272, 278 (1993). The government contends that there was substantial evidence that Johnson did have a significant prior history of "criminal activity."

Just as the evidence did not necessarily show that Johnson's role in the killings was "minor," the government contends that the evidence did not necessarily show that Honken was "equally or more culpable in the killings," such that the jurors' finding on "Mitigating Factor 4" is not against the weight of the evidence. While it may be uncontroverted that

Honken was not sentenced to death for the killings of Nicholson, Lori Duncan, and DeGeus, what the government contends was strongly controverted on the evidence presented in Johnson's case was whether Honken's role in the killings was actually equal to or greater than Johnson's. Thus, the government contends that a reasonable juror could have concluded that this "mitigating factor" was not proved by the greater weight of the evidence.

Finally, as to the effect on Johnson of her pregnancy with Honken's child, as set out in "Mitigating Factor 19," the government contends that any confusion the jury might have had about this factor is Johnson's fault in formulating the "run-on" language in which the "mitigating factor" was submitted. The government notes that, as this "mitigating factor" was formulated, a juror could have found that Johnson was pregnant, and even that she was in a disadvantaged position to resist Honken, but still have rejected Johnson's contention that she was also in a disadvantaged position to turn him in to authorities. Moreover, the government points out that the court was reluctant to submit this "mitigating factor" to the jury at all, because of what the court believed at the time was a complete lack of evidence to support it. The government asserts that, apart from evidence that Johnson was pregnant with Honken's child, there was no evidence that a consequence of her pregnancy was that she was under Honken's substantial influence in any regard. Again, the government points out that Johnson chose to prevent her mental health experts from inquiring into her mental state or conduct at the time of the killings, so that no pertinent evidence was presented. The government also asserts that the difference in the findings on this "mitigating factor" as to the killings of Nicholson and the Duncans, on the one hand, and the killing of DeGeus, on the other, is that reasonable jurors could have found that Johnson's pregnancy had no impact on her ability to resist Honken for the earlier killings, when Johnson was only a few months pregnant, but had a more substantial

impact on her ability to resist Honken by the time that DeGeus was killed, when Johnson was many months pregnant, because Christi Gaubatz testified that, by that time, Johnson knew that she was pregnant. Finally, the government points out that it is not clear whether the jurors entered a 0 for the number of jurors finding this factor for one count charging the killing of DeGeus and a 6 for the other such count, or a sloppy 0 that appeared to be a 6. However, even where verdicts are inconsistent, the government asserts that there is no cause for the court to interfere, so long as the verdict is supported by sufficient evidence.

> **b.** *Analysis*

Johnson asserts that the jurors' findings on various "mitigating factors" are against the weight of the evidence, and thus, that she is entitled to a new trial, in the "penalty phase," if not in all phases, pursuant to Rule 33(a). Again, the court may grant a new trial even where there is substantial evidence to sustain the verdict, if the court nevertheless finds that the verdict is against the weight of the evidence. *See Dodd*, 391 F.3d at 934. However, the court does not find that the jury's findings on the challenged "mitigating factors" were either against the weight of the evidence or that a "miscarriage of justice" will occur if the jury's findings are allowed to stand. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"); *see also Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement for a new trial under Rule 33(a) to mean that a "miscarriage of justice" would otherwise occur).

First, as the government points out, Johnson has not pointed to any "penalty phase" instructions that engendered the confusion that she asserts is evident from the jury's findings on various "mitigating factors." Indeed, the court generally accepted Johnson's formulation of her "mitigating factors," so that she is responsible for any ambiguity as to their meaning. Second, the court cannot find that the jury's findings on the "mitigating

factors" that Johnson specifically identifies, or on any other "mitigating factors," were clearly contrary either to the court's instructions, such that the jury must have disregarded those instructions, or contrary to the pertinent evidence, such that the jury must have disregarded that evidence. This second point requires rather more explanation, but in essence, the court finds that Johnson is simply trying to prove too much from the evidence presented and the "mitigating factors" as formulated.

For example, Johnson is correct that, for purposes of "Mitigating Factor 1," she was only charged as, and the evidence only showed that she was, an "aider and abettor." However, that does not necessarily mean that the evidence showed beyond dispute that her role in the offense was only "minor." The government put on convincing evidence that Johnson was the "Lady MacBeth" for this series of murders, every bit as much the moving force in the killings as the person who actually pulled the trigger. It simply was not against the weight of the evidence for the jury to find that Johnson's role could not properly be considered "minor," even relative to Honken's. Similarly, as to"Mitigating Factor 4," while Johnson is correct that it is uncontroverted that Honken will not face the death penalty for the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus, that does not necessarily mean that the finding of several of the jurors that Honken was *not* "equally or more culpable in the murders" of the adult victims was necessarily against the weight of the evidence. Again, there was more than sufficient evidence to support the findings of the majority of the jurors that Johnson was at least as culpable as Honken or more culpable than Honken for the killings of the adult victims, and the court will not, on the present record, disturb the findings of those jurors. Also, as to "Mitigating Factor 19," jurors could reasonably have found, consistent with the evidence, that Johnson was largely unaffected in her relationship with Honken by her pregnancy at the time of the killings of Nicholson and the Duncans, or was not affected in the ways that she contends,

when she may not even have known that she was pregnant, but that she was not only affected in her relationship with Honken by her pregnancy at the time of the murder of DeGeus, but was affected in the ways in which she claims that she was. Indeed, in the court's view, the biggest problem for Johnson with this "mitigating factor" was a complete *lack* of evidence to support it.

The court concludes that the jurors' findings on "Mitigating Factor 19" require some further consideration, however, because of the apparent inconsistencies in the findings with regard to the two counts charging the killing of DeGeus. While Johnson makes much of the fact that six jurors found this factor as to one count, but none found it as to another count, the explanation may be much simpler than inconsistent findings. As the government contends, the six on the verdict form in the pertinent box for one count charging the killing of DeGeus might just as easily be read as a sloppy zero, so that the apparent inconsistency may be no more than a problem with bad handwriting. Putting such speculation to the side, however, the government is also correct that, even if the verdicts on this "mitigating factor" on the two counts charging the killing of DeGeus *are* inconsistent, "it is well established that inconsistent verdicts on the same indictment as to the same defendant are unobjectionable." *United States v. Fuller*, 374 F.3d 617, 623 (citing *United States v. Powell*, 469 U.S. 57, 62-63 (1984)), *cert. denied*, ___ U.S. ___, 125 S. Ct. 926 (2005). "So long as the guilty verdict is supported by sufficient evidence, courts have no cause to interfere." *Id.*; *see also United States v. Morton*, 412 F.3d 901, 904 (8th Cir. 2005) (inconsistent verdicts between co-defendants on the same indictment are as unobjectionable as inconsistent verdicts on multiple counts in a single indictment against a single defendant, because they may be the result of jury lenience and they are checked by the court's ability to protect defendants from "jury irrationality" by review of the sufficiency of the evidence); *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir.)

("The only relevant question when reconciling inconsistent verdicts . . . is whether there was enough evidence presented to support the conviction. . . . Inconsistent verdicts are not, on their own, sufficient grounds for reversal or a new trial."), *cert. denied*, 524 U.S. 940 (1998). Here, because there was sufficient evidence to support findings that Johnson was not substantially affected in her relationship with Honken by her pregnancy in her ability to resist Honken or to turn Honken in, at the time of the killing of DeGeus, and virtually no evidence supporting the finding that Johnson sought, which was that she was so affected, the court cannot find that a new trial is required.

The jury's finding on "Mitigating Factor 2," concerning Johnson's lack of a prior "criminal record," raises somewhat different issues. It was, as Johnson asserts, uncontroverted that Johnson did not have a prior criminal *record*, meaning no record of prior arrests or convictions, but there was also copious evidence that Johnson had engaged in prior criminal *activity*. The jury obviously accepted the government's argument concerning the meaning of this "mitigating factor" and rejected Johnson's, perhaps because they viewed consideration of only arrest and conviction records as an unrealistic or arbitrary measure of Johnson's prior criminal conduct. The court cannot find that the government's argument that "no criminal record" under 21 U.S.C. § 848(m)(9) should be interpreted to mean what it had been expressly stated to mean in 18 U.S.C. § 3592(a)(5), that the defendant had no "significant prior history of other criminal conduct," was erroneous as a matter of law. Even if that interpretation was legally erroneous, however, it was only an interpretation of one of twenty-two "mitigating factors," including "residual doubt" and "Johnson's suicide attempt," considered by the jury, and the court simply is not convinced that one such erroneous argument potentially resulting in erroneous findings by some of the jurors on only one of twenty-two "mitigating factors" constitutes a "miscarriage of justice" so dire as to require a new trial.

Even if the court might have found differently on each of these "mitigating factors," which is not necessarily the case, the court cannot find that the jurors' findings necessarily demonstrate an error in the "mitigating factor" instructions—where the court generally accepted Johnson's formulation of her "mitigating factors"—or that the jurors disregarded the pertinent instructions or evidence. Under these circumstances, the court cannot find a "miscarriage of justice" warranting a new trial on the "penalty phase."

Therefore, Johnson's motion for judgment of acquittal or new trial, in the "penalty phase" or any other phase of her trial, on this ground will be denied.

### G. Fundamental Eighth Amendment Violation

As her thirty-fifth, "catchall," argument for judgment of acquittal or new trial, Johnson contends that imposition of the death penalty under the circumstances shown in this record would violate the Eighth Amendment. Johnson premises this ground for judgment of acquittal or new trial primarily on *Enmund v. Florida*, 458 U.S. 782 (1982), *Tison v. Arizona*, 481 U.S. 137 (1987), and *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991).

### 1. Arguments of the parties

Johnson contends that, in *Enmund*, the Supreme Court set forth the standards for imposition of the death penalty upon one who only "aids and abets" a felony subject to the death penalty. Specifically, Johnson contends that the Court held that the Eighth Amendment forbids imposition of the death penalty upon an "aider and abettor" absent proof that the defendant killed, attempted to kill, or intended or contemplated that life would be taken, citing *Enmund*, 458 U.S. at 801. Moreover, she notes that the Court opined that the determination of a defendant's culpability should be limited to his or her own participation in the felony and that the punishment should be tailored to the

defendant's personal responsibility and moral guilt, so that the determination of the penalty to be imposed reflected "individualized consideration." Johnson contends that the Supreme Court subsequently adjusted that holding in *Tison*. She asserts that, in *Tison*, the Court found that the "intent" requirement, and hence, the Eighth Amendment, is satisfied when the defendant is a major participant in the felony that results in murder and when the record supports a finding of the culpable mental state of reckless indifference to human life, citing *Tison*, 481 U.S. at 151. While *Enmund* addresses either end of the spectrum of participation—from a "minor actor," who was not on the scene, and who neither intended to kill nor otherwise had a culpable mental state, to the person who actually killed, attempted to kill, or intended to kill—Johnson contends that *Tison* addresses those cases involving an intermediate role in the murder.

Here, Johnson contends that the facts do not support imposition of the death penalty, under either the *Enmund* or *Tison* standards, upon a defendant who merely "aided and abetted" the killings. She contends that this is so, because the evidence failed to show clearly that she had the constitutionally required level of participation in the killings or even that she was present during the actual sequence when the murders took place. While the evidence may have shown that Johnson participated in a kidnaping plot with regard to Nicholson and the Duncans, it did not show her substantial participation in or presence at the actual killings.

Second, Johnson contends that imposition of the death penalty upon her on the facts of this case would be disproportionate. She contends that the Supreme Court recognized "proportionality review" as an aspect of constitutional protection in *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991). The jury imposed the death penalty on Johnson for the murders of Lori Duncan and Terry DeGeus notwithstanding that Johnson's participation in and presence at the time of those murders was extremely unclear, and notwithstanding that the

"principal" in those killings, Dustin Honken, received only a life sentence for the same killings. Johnson asserts that it would be unreasonable and disproportionate to impose the death penalty upon her in these circumstances, because punishing an "aider and abettor" more severely than the "principal" for the same offense is illogical and contradictory to the proportionality required by the Supreme Court in death penalty cases. At oral arguments, Johnson added that, not only does sentencing her to death violate the proportionality rule, where her role in the offenses is at best ambiguous, but it would also be arbitrary.

The government asserts that imposing the death penalty upon Johnson, at least for the killings on which the jury found that such a penalty was appropriate, would not violate the Eighth Amendment. The government reiterates that, far from showing that Johnson was a "minor" participant, the evidence shows that she was a "major player," if not the "prime mover," in the killings, and that she was present at all of the murders. The government also asserts that the jury could have rejected the death penalty for Honken for reasons that had nothing to do with his role in the offense, but on the basis of mitigating factors that the jury found were present in his case, but the jury in Johnson's case found were not, or on the basis that his jury weighed certain factors differently than Johnson's jury did, in light of the evidence presented. Thus, the government contends that the death penalties imposed on Johnson by the jury were not in violation of "participation," "intent," or "proportionality" rules, and were not "arbitrary." Ultimately, however, the government contends that this is merely an academic argument, because the juries imposed the death penalty on both Honken and Johnson for killing the child victims, Amber and Kandi Duncan.

## 2. Analysis

In *Enmund v. Florida*, 458 U.S. 782 (1982), the Supreme Court held that the Eighth Amendment does *not* permit imposition of the death penalty on one who aids and abets a felony in the course of which a murder is committed by others, but who does not himself or herself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. *Enmund*, 458 U.S. at 797. Moreover, the Court held, "For purposes of imposing the death penalty, [a defendant's] criminal culpability must be limited to [the defendant's] participation in the [offense], and [the defendant's] punishment must be tailored to [the defendant's] personal responsibility and moral guilt." *Id.* at 801.[30] Subsequently, in *Tison v. Arizona*, 481 U.S. 137 (1987), the Court held "that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." *Tison*, 481 U.S. at 157-58. More specifically, the Court held "that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Id.* at 158.

---

[30]The Eighth Circuit Court of Appeals has noted, at least in passing, that an "aiding and abetting" case, involving "aiding and abetting" *the killings*, not just the underlying felony, is distinguishable from the "felony murder" case at issue in *Enmund*, such that the constitutional "participation" requirements of *Enmund* may not be applicable to an "aiding and abetting" case. *See United States v. Paul*, 217 F.3d 989, 998 n.4 (8th Cir. 2000). However, this court will assume, for the sake of argument, that the *Enmund* "participation" requirements apply to Johnson's case, even though she was charged with "aiding and abetting" the actual killings, not the underlying felony in a "felony murder" case.

Johnson's assertion that imposition of the death penalty in her case would violate the *Enmund* and *Tison* standards simply is not persuasive. Contrary to Johnson's contentions, imposition of the death penalty on her, even for the killings for which Honken did not receive the death penalty, would not violate these standards. As this court noted above, the jury found, and the evidence presented more than adequately supported their finding, that Johnson intended that the killings of all five victims would take place or that lethal force would be employed against each of them. *Id.* at 797. Moreover, because the evidence showed that Johnson was a major player in each of the killings, who at the very least was recklessly indifferent to whether each of the victims would be killed, and without whom none of the killings would likely have occurred, her culpability, measured in terms of her participation in the offenses, personal responsibility, and moral guilt, is such that imposition of the death penalty for each of the killings does not violate *Enmund*, *Tison*, or the Eighth Amendment. *Id.* at 801; *Tison*, 481 U.S. at 158.

Furthermore, Johnson misapprehends the nature of "proportionality review" under *Harmelin v. Michigan*, 501 U.S. 957 (1991). In *Harmelin*, five justices concurred in the judgment that "proportionality review" is not required by the Eighth Amendment, but is, instead, "one of several respects in which [the Supreme Court] ha[s] held that 'death is different,' and ha[s] imposed protections that the Constitution nowhere else provides." *Harmelin*, 501 U.S. at 994 (Scalia, J., with whom Rehnquist, C.J., joined, and three justices concurred in the judgment); *see also id.* at 965 ("[T]he Eighth Amendment contains no proportionality guarantee.") (Scalia, J., with whom Rehnquist, C.J., joined, and three justices concurred in the judgment). Thus, "proportionality review" is not, itself, a constitutional requirement as Johnson characterizes it, except in extreme cases, such as the imposition of life imprisonment for overtime parking. *See id.* at 962. Moreover, the "proportionality" that the Court found should be reviewed was not between

co-defendants, as Johnson seems to suggest, but between the offense and the punishment. *See id.*; *United States v. Chauncey*, 420 F.3d 864, 876 (8th Cir. 2005) ("[A] defendant's sentence is not disproportionate merely because it exceeds his co-defendant's sentence"; instead, the question is whether the sentence is disproportionate to the defendant's crime). Indeed, differences in penalties imposed upon co-defendants may have nothing to do with their conduct in the offense, but with other matters, such as one defendant's cooperation with authorities. *Chauncey*, 420 F.3d at 876. Here, as the government suggests, the differences in the penalties imposed upon Honken and Johnson for the same killings may be attributable to different findings by the jurors on similar mitigating factors or findings on different mitigating factors, which did not relate to conduct in the offenses. Thus, while there may be some initial concern that an "aider and abettor" was subjected to a death sentence on counts on which the "principal" was not, that does not alone establish "disproportionality." Moreover, as the court previously ruled, when Johnson asserted pretrial and post-trial, that imposition of the death penalty would be "disproportionate," where Honken was the "principal" in the killings, the death-penalty provisions of the CCE statute place before the jury, as a mitigating factor, the issue of whether a co-defendant, "equally culpable in the crime, will not be punished by death." *See* 21 U.S.C. § 848(m)(8). On the evidence presented, the jury could properly have rejected this mitigating factor in Johnson's case.

Nevertheless, to the extent that Johnson now asserts that imposition of the death penalty for merely "aiding and abetting" another in a killing is so "disproportionate" that it offends the Eighth Amendment or non-constitutional "proportionality review," this court finds that the issue is not the categorization of the defendant's crime as "aiding and abetting," but the conduct of the defendant in "aiding and abetting" the crime. *See United States v. Baker*, 415 F.3d 880, 882 (8th Cir. 2005) ("The relevant facts for the purpose

of an Eighth Amendment [proportionality] inquiry, however, are the facts surrounding the offense, not the relative strength or weakness of the government's successful proof of those facts.") (citing *Ewing v. California*, 538 U.S. 11, 29-30 (2003)). Again, on the record presented in this case, the jury was free to find that Johnson's participation in the crimes made her a major player in those offenses. On the present record, the court cannot find that imposition of the death penalty, even for killings for which Honken received a life sentence, is "disproportionate" to Johnson's offense.

One final point. As I indicated exactly one month ago at oral arguments on these motions, I remain gravely concerned about the imposition of the death penalty on Angela Johnson. If I had been the trier of fact and the decision maker in the "penalty phase," I would not have imposed the death sentence on this record. The defense presented strong and, in my view, persuasive "penalty phase" evidence from a myriad of sources, including evidence from numerous expert witnesses and compelling testimony from Angela Johnson's daughters. I am also troubled (more on a personal and philosophical level than on a legal one) by the lack of certainty in the record concerning the precise involvement of Angela Johnson in these crimes. For me, this haunting uncertainty alone is sufficiently mitigating to foreclose my vote for the death penalty. This lack of certainty in the record evidence is in no way a criticism of the government prosecutors or their case. There was simply no way to prove Angela Johnson's precise involvement in these crimes in the absence of testimony from a person who was there and who was willing and able to provide such testimony. However, the only persons who know for sure what happened are the murder victims, who cannot speak, and Dustin Honken and Angela Johnson, who have chosen not to do so, at least not in court.

At bottom, my weighing of the aggravating and mitigating factors, based on all of the evidence, would have led me to spare Angela Johnson's life. However, in passing the

legislation that made the death penalty an option for the crimes with which Dustin Honken and Angela Johnson were charged, Congress, quite wisely, I believe, reposed in a jury of twelve, rather than a single judge, the monumental decision of the appropriate penalty for one convicted of such an offense. I have not hesitated in the past to set aside a jury verdict in a criminal case where I believed that the verdict was against the weight of the evidence or where there were legal errors justifying a new trial. That is not the case here. While I am well aware of my authority, on a motion for new trial, to reweigh the evidence and to set aside the jury's verdict, *see Dodd*, 391 F.3d at 934, I simply do not find that it is appropriate to do so here, because despite my different view of the "penalty phase" evidence, I do not find that there has been a "miscarriage of justice" if the jury's findings are allowed to stand on the evidence presented. *See* FED. R. CRIM. P. 33(a) (providing for a new trial "if the interest of justice so requires"); *see also Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement for a new trial under Rule 33(a) to mean that a "miscarriage of justice" would otherwise occur). My disagreement with the imposition of the death penalty on the facts of this case is simply not a proper consideration for reversing the jury's contrary but considered judgement unanimously imposing death, at least where I must conclude that the jury's decision is amply supported by the "penalty phase" evidence.

Therefore, Johnson's motion for judgment of acquittal or new trial, in the "penalty phase" or any other phase of her trial, on this ground will be denied.

## V. CONCLUSION

Upon the foregoing,

1.      Johnson's August 19, 2005, Motion In Arrest Of Judgment (docket no. 636) is **denied in its entirety**.

2.     Johnson's August 19, 2005, Motion For Judgment Of Acquittal Or For New Trial (docket no. 634) is **denied in its entirety**.

THEREFORE, this matter will proceed to sentencing on December 20, 2005, as previously scheduled.

**IT IS SO ORDERED.**

**DATED** this 16th day of December, 2005.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA